**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>          Plaintiffs,<br><br>                    v.<br><br>VIZGEN, INC.,<br><br><br>          Defendant | C.A. NO. 22-595-MFK<br><br>████████████████ |

VIZGEN, INC.,

          Counterclaim-Plaintiff,

                    v.

10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

          Counterclaim-Defendants

**OPENING BRIEF IN SUPPORT OF PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S MOTION TO DISMISS VIZGEN, INC.'S COUNTERCLAIMS NOS. I-III**

OF COUNSEL:

Michael J. Tuteur (*pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
Geoffrey M. Raux (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 502-3284
mtuteur@foley.com
rrodrigues@foley.com
graux@foley.com

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Counterclaim-Defendant*
*President and Fellows of Harvard College*

## TABLE OF CONTENTS

I.   NATURE AND STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT ................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 2

    A.   Harvard University.................................................................................. 2

    B.   The License Agreement with Vizgen .................................................... 3

    C.   The License Agreement with 10x .......................................................... 3

    D.   Vizgen and 10x Become Competitors and Litigation Arises................................. 4

III. LEGAL STANDARD......................................................................................... 5

IV.  ARGUMENT ..................................................................................................... 6

    A.   Vizgen's Breach of Warranty Claim Is Premised on ............................................. 6
        an Implausible Reading of the License Agreement .................................................. 6

    B.   Vizgen's Implied Covenant Claim Seeks To Impose Duties on Harvard That Do Not Exist in the License Agreement, and Assumes a Purpose and Intent to the License Agreement that are Precluded by Its Own Terms ............... 12

    C.   Vizgen Has Not Identified Any False Representations on Which It Reasonably Relied To Sustain a Claim for Negligent Misrepresentation ............ 16

V.   RELIEF REQUESTED....................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.*,
489 N.E.2d 172 (Mass. 1986) ................................................................................ 8

*Anthony's Pier Four, Inc. v. HBC Assocs.*,
583 N.E.2d 806 (Mass. 1991) ............................................................................... 12

*Beauchesne v. New England Neurological Associates, P.C.*,
159 N.E.3d 728 (Mass. App. Ct. 2020) ................................................................ 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 5, 6

*Brillante v. R.W. Granger & Sons, Inc.*,
772 N.E.2d 74 (Mass. App. Ct. 2002) ................................................................... 9

*Cavi v. Evolving Sys. NC*, No. 15-1211,
2018 U.S. Dist. LEXIS 86971 (D. Del. May 23, 2018) ....................................... 17

*Christensen v. Kingston School Comm.*,
360 F. Supp. 2d 212 (D. Mass. 2005) .................................................................. 13

*Clark v. Janssen Pharms., Inc.*,
606 Fed. Appx. 592 (1st Cir. 2015) ....................................................................... 6

*Clark v. State St. Tr. Co.*,
169 N.E. 897 (Mass. 1930) ............................................................................... 9, 10

*Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*,
918 N.E.2d 36 (Mass. 2009) ................................................................... 17, 18, 19

*Curtis v. Herb Chambers I-95, Inc.*,
940 N.E.2d 413 (Mass. 2011) ......................................................................... 15, 16

*Davis v. Abington Mem'l Hosp.*,
765 F.3d 236 (3d Cir. 2014)................................................................................... 6

*Davis v. Wells Fargo*,
824 F.3d 333 (3d Cir. 2016)................................................................................... 2

*Downer & Co., LLC v. STI Holding, Inc.*,
927 N.E.2d 471 (Mass. App. Ct. 2010) ................................................................. 9

pad

*Edlow v. RBW, LLC,*
  688 F.3d 26 (1st Cir. 2012) ................................................................. 13

*Frederico v. Home Depot,*
  507 F.3d 188 (3d Cir. 2007)................................................................. 18

*Henning v. Wachovia Mortg., FSB,*
  969 F. Supp. 2d 135 (D. Mass. 2013) ................................................... 11

*Host Int'l, Inc. v. MarketPlace, PHL, LLC,*
  32 F.4th 242 (3d Cir. 2022) .................................................................. 6

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997)................................................................. 6

*In re TelexFree Sec. Litig.*, 4:14-md-02566,
  2022 U.S. Dist. LEXIS 156964 (D. Mass. Aug. 31, 2022) .................... 17

*Indep. Wireless Tel. Co. v. Radio Corp. of Am.,*
  269 U.S. 459 (1926)............................................................................... 4

*Johnson v. City of Shelby, Miss.,*
  574 U.S. 10 (2014)............................................................................. 6, 8

*Keystone Assocs. LLC v. Barclays Bank PLC*, No. 19-796,
  2020 U.S. Dist. LEXIS 3475 (D. Del. Jan. 9, 2020)............................. 17

*King v. Pratt & Whitney Can. Corp.*, No. 20-359,
  2021 U.S. Dist. LEXIS 30728 (D. Del. Feb. 19, 2021) ......................... 17

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,*
  781 N.E.2d 78795 (Mass. 2003) .......................................................... 20

*Lembo v. Waters,*
  294 N.E.2d 566 (Mass. App. Ct. 1973) .................................................. 9

*LePage v. E-One, Inc.,*
  4 F. Supp. 3d 298 (D. Mass. 2014) ........................................................ 7

*Linear Retail Danvers #1, LLC v. Casatova, LLC*, No. 2007-3147,
  2008 Mass. Super. LEXIS 171 (Mass. Super. Ct., June 11, 2008)........... 19

*Liss v. Studeny,*
  879 N.E.2d 676 (Mass. 2008) .............................................................. 13

*Lum v. Bank of Am.,*
  361 F.3d 217 (3d Cir. 2004)................................................................. 18

iv

*Mahaney v. John Hancock Mut. Life Ins. Co.*,
  380 N.E.2d 140 (Mass. App. Ct. 1978) ................................................................. 20

*Marram v. Kobrick Offshore Fund, Ltd.*, No. 01-2815,
  2009 Mass. Super. LEXIS 85 (Mass. Super. Ct., Jan. 30, 2009) ............................ 20

*Maus v. Fritz*,
  49 N.E.3d 697 (Mass. App. Ct. 2016) ................................................................... 17

*McCurdy v. Wright Med. Tech., Inc.*, No. 19-1898,
  2020 U.S. Dist. LEXIS 31804 (D. Del. Feb. 25, 2020) ......................................... 17

*McEneaney v. Chestnut Hill Realty Corp.*,
  650 N.E.2d 93 (Mass. App. Ct. 1995) ..................................................................... 8

*Med. Ctr. Corp. v. Sec'y of the Exec. Office of HHS*,
  974 N.E.2d 1114 (Mass. 2012) .............................................................................. 15

*N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
  567 F.3d 8 (1st Cir. 2009) ............................................................................... 17, 19

*Nikolouzakis v. Exinda Corp.*, No. 11-1261,
  2012 U.S. Dist. LEXIS 109976 (D. Del. Aug. 7, 2012) ........................................... 2

*Path to Riches, LLC v. CardioLync, Inc.*,
  290 F. Supp. 3d 280 (D. Del. 2018) ......................................................................... 7

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
  117 F. Supp. 3d 613 (D. Del. 2015) ......................................................................... 6

*Propat Intern. Corp. v. Rpost, Inc.*,
  473 F.3d 1187 (Fed. Cir. 2007) ............................................................................... 4

*Rio Grande Jewelers Supply, Inc. v. Data Gen. Corp.*,
  689 P.2d 1269 (N.M. 1984) ................................................................................... 20

*Rossman v. Fleet Bank Nat'l Ass'n*,
  280 F.3d 384 (3d Cir. 2002) .................................................................................. 15

*Sands v. Ridefilm Corp.*,
  212 F.3d 657 (1st Cir. 2000) ................................................................................. 20

*Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*,
  94 F.3d 721 (1st Cir.1996) .................................................................................... 13

*Sound Techniques, Inc. v. Hoffman*,
  737 N.E.2d 920 (Mass. App. Ct. 2000) ............................................................ 19, 20

*Sparks v. Fid. Nat'l Title Ins. Co.*,
  294 F.3d 259 (1st Cir. 2002) ........................................................................... 9

*Starr v. Fordham*,
  648 N.E.2d 1261 (Mass. 1995) ....................................................................... 9

*Suntex Indus. Corp. v. Cit Grp./BBC, Inc.*, No. 99-81,
  2001 U.S. Dist. LEXIS 17656 (D. Del. Sep. 28, 2001) ................................. 7

*T.W. Nickerson, Inc. v. Fleet Nat'l Bank*,
  924 N.E.2d 696 (Mass. 2010) ....................................................................... 12

*Town of Plymouth v. Veolia Water N. Am. - Ne.*, No. 1683CV00113,
  2017 Mass. Super. LEXIS 3270 (Mass. Super. Ct., Jan. 30, 2017) ............... 8

*Travelers Indem. Co. v. Cephalon, Inc.*,
  620 F. App'x 82 (3d Cir. 2015) ..................................................................... 17

*Uno Rests., Inc. v. Bost. Kenmore Realty Corp.*,
  805 N.E.2d 957 (Mass. 2004) ....................................................................... 13

*Vorchheimer v. Philadelphian Owners Ass'n*,
  903 F.3d 100 (3d Cir. 2018) .......................................................................... 16

*Vt. Mut. Ins. Co. v. Sondrini Enters*, 3:16-cv-30172,
  2019 U.S. Dist. LEXIS 82546 (D. Mass. May 15, 2019) ............................... 7

*Young v. Wells Fargo Bank, N.A.*,
  717 F.3d 224 (1st Cir. 2013) ..................................................................... 6, 11

## I.     NATURE AND STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT

This lawsuit is a dispute between two innovative biotechnology companies suing each other for patent infringement.  President and Fellows of Harvard College ("Harvard") is in the unusual position of being on both sides of the case.  It is the owner of certain patents asserted by 10x Genomics, Inc. ("10x"), and it is also the owner of the patent asserted by Vizgen, Inc. ("Vizgen").  Both 10x and Vizgen are Harvard's exclusive licensees.  To establish standing, each party joined Harvard as co-plaintiff in their respective infringement claims.

Harvard ordinarily takes a passive role in such litigation, deferring to its exclusive licensee. This, however, is not the typical case.  Not only does this case involve a dispute between two of Harvard's exclusive licensees, but now, Vizgen has sought to expand the litigation by suing Harvard on claims arising out of the Parties' September 26, 2019 license agreement (the "License Agreement").  The Counterclaims—for breach of warranty, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation—all boil down to the same thing: a purported promise by Harvard that Vizgen would have "freedom to operate"—*i.e.*, the ability to use its licensed patents to develop and commercialize products without liability for infringement as to other patents, including other patents owned by Harvard, that were ***not included*** in the license.

The problem with these Counterclaims, however, is that the License Agreement includes broad, unambiguous, and express disclaimers making clear that Harvard has ***not*** guaranteed anything close to freedom to operate.  The License Agreement says expressly in Section 8.3.1 that Harvard ███████████████████████████████████████████████████████ ███████████████████████████████." The License Agreement says expressly in Section 8.3.2 that ████████████████████████████████████████████████ ███████████████████████████████████████████████████████

████████████████████████████████████████████ And
the License Agreement says expressly in Section 8.3.3 that ███████████████
██████████████

In 270 separate paragraphs asserted in its Counterclaims, Vizgen never once mentions these express disclaimers.  Instead, Vizgen limits its focuses to two other provisions of the License Agreement—Section 8.2(d) and (e)—reading them in isolation and out of context in order to prop up the foundational premise that somehow Harvard warranted freedom to operate.  As a matter of law, it did not.  There is simply no way that the License Agreement can be fairly construed as promising freedom to operate.  Since all three of the Counterclaims against Harvard rest on the premise that Harvard guaranteed freedom to operate, and for other reasons more fully set forth herein, Counterclaims I-III fail and must be dismissed.

## II.   FACTUAL BACKGROUND

### A.   Harvard University[1]

Harvard is a nonprofit research university at the forefront of scientific discovery.  Harvard employs more than 4,800 faculty, researchers, and other academics who regularly make scientific discoveries and develop new technologies.[2]  To incentivize commercial adoption of new technology for the benefit of the public, Harvard secures patent protection on inventions developed at Harvard and often exclusively licenses such patents to companies with the potential to

---

[1] This Court may take judicial notice of "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (cleaned up).  In doing so the Court need not convert this motion into a motion under Rule 56.  *Id.; Nikolouzakis v. Exinda Corp.*, No. 11-1261, 2012 U.S. Dist. LEXIS 109976, at *8 (D. Del. Aug. 7, 2012).

[2] https://oir.harvard.edu/fact-book/faculty-and-staff

2

commercialize new technology.[3]  Each year, Harvard is granted about 180 patents and enters into about 46 patent license agreements. (Harvard has entered into 232 licenses in the past 5 years.[4])

### B.      The License Agreement with Vizgen

On September 19, 2019, Harvard and Vizgen entered into the License Agreement, which licensed a specific set of patents to Vizgen.[5]  (D.I. 29 ¶¶ 48, 58).  A copy of the License Agreement is attached hereto as **Exhibit A**.  The License Agreement grants Vizgen a license to specific Harvard patents "developed in research conducted by Harvard researcher Dr. Xiaowei Zhuang and other researchers working in Dr. Zhuang's Harvard laboratory."[6]  (Ex. A at 1; D.I. 29 ¶¶ 48, 58).



Section 2.1.1 of the License Agreement ████████████████████████ ████████████████  while  Section  2.1.2 ████████████████████████ ████████████████  (*See* Ex. A at 9-10).  The License Agreement defines ████████████ ████████████████████████████████████████████ ████████.[7]  (*Id.* at 3, 6).  ████████████████████████████ ████████████████████████████████████████████ ████████████████  (*See id.* at 3, 6, Schedule III).  No other patents are licensed.

### C.      The License Agreement with 10x

Prior to entering the License Agreement with Vizgen, Harvard entered a contract with

---

[3] *See* Harvard's IP Policy at https://otd.harvard.edu/faculty-inventors/resources/policies-and-procedures/statement-of-policy-in-regard-to-intellectual-property/.

[4] https://otd.harvard.edu/impact/productivity-highlights/.

[5] The License Agreement also included ████████████████████████████ ████████████████  is not the basis of any of Vizgen's Counterclaims.

[6] Dr. Zhuang is not an inventor on the 10x-licensed patents asserted in this matter.  Those patents arose from a different lab and have completely different inventors.  (D.I. 29 ¶¶ 50, 69).

[7] The License Agreement also includes ████████████████████ ████████████████████████████████████████████ ████████.  (*See* Ex. A at 7).

ReadCoor, Inc. ("ReadCoor"), through which it licensed to ReadCoor exclusive and non-exclusive patent rights derived from a different and distinct group of patents, originating in Prof. George Church's laboratory at Harvard.  (D.I. 29 ¶¶ 50, 69).  There is no overlap in the patents or patent filings licensed to ReadCoor with those listed in Schedule III of the Vizgen License Agreement.

In October of 2020, 10x acquired ReadCoor, including its Harvard license.  (*Id.* ¶ 72).

### D.      Vizgen and 10x Become Competitors and Litigation Arises

According to Vizgen, 10x acquired ReadCoor with the intention of competing with Vizgen in the area of spatial transcriptomics.  (*Id.* ¶ 69).  10x purportedly intended to use ReadCoor's technology, named FISSEQ, in its efforts to compete.  (*Id.*)  Vizgen uses what it describes as a "fundamentally different approach" for spatial transcriptomics, known as MERFISH.  (*Id.* ¶ 71).  Vizgen claims that 10x ultimately abandoned FISSEQ and began to pursue plans to launch its new Xenium product.  (*Id.* ¶ 73).  10x then allegedly "worked to reverse engineer and target MERFISH through a flurry of patent prosecution efforts, attempting to manufacture patent claims targeting Vizgen and MERFISH…"  (*Id.* ¶ 74; *see also id.* ¶ 75).

On May 3, 2022, 10x brought suit against Vizgen for patent infringement, asserting patents exclusively licensed from Harvard.  (D.I. 1).  Harvard agreed to join as a co-plaintiff, for purposes of standing.[8]   On August 30, 2022, Vizgen Answered and Counterclaimed, alleging patent infringement by 10x on a Harvard patent licensed to Vizgen under the License Agreement.  (D.I. 29 ¶¶ 3, 252-69).  Harvard agreed to join Vizgen as a co-plaintiff, again for purposes of standing.

---

[8] *See Propat Intern. Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007) ("[A]n exclusive licensee ordinarily may not sue in its own name alone, but must join the patent owner in an action brought against an accused infringer.") (citing *Indep. Wireless Tel. Co. v. Radio Corp. of Am.*, 269 U.S. 459, 464 (1926)).

4

In addition to asserting counterclaims against 10x, Vizgen also asserted three counterclaims directly against Harvard: for breach of warranty, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation. (*Id.* ¶¶ 1, 82-115). The stated purpose of these Counterclaims is to hold Harvard responsible for the lawsuit Vizgen is now facing. Vizgen seeks damages from Harvard and an order requiring Harvard to indemnify it for all losses in this lawsuit, and to pay its legal fees. (*Id.* at 71.) The central premise on which all of Vizgen's counterclaims against Harvard are based is that Harvard guaranteed it "freedom to operate." (*Id.* ¶ 51) ("Vizgen now seeks what it bargained for: the freedom to operate.").[9] By "freedom to operate," Vizgen means that Harvard assured Vizgen that it could freely commercialize the patents it licensed from Harvard without ever potentially infringing patents ***not*** included in the license— including ***other*** patents owned by Harvard that it licensed to other parties.

Because the foundational premise to each of Vizgen's Counterclaims against Harvard is based on conclusory statements and a misreading of the License Agreement that conflicts with the Agreement's express terms, Harvard now moves to dismiss with prejudice.

## III.   **LEGAL STANDARD**

Under Rule 12(b)(6), a motion may be granted if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of

---

[9] *See also* D.I. 29 ¶ 117 (alleging that the License Agreement "includes express and implied terms, including ...that Vizgen had the freedom to operate."); *see also id.* ¶ 50 (alleging that Harvard has "actively worked" to "eliminate the freedom to operate that Harvard and Vizgen had bargained for").

the elements of a cause of action.'"  *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  The plaintiff must plead facts sufficient to show that a claim has substantive plausibility.  *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014).

The court is "not compelled to accept unsupported conclusions and unwarranted inferences." *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 248 (3d Cir. 2022) (cleaned up).  Where claims arise out of or rely on a contract, the court should consider the contract itself. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).  "The court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiff's allegations in a complaint" or otherwise precludes plaintiff's claims.  *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015); *see also Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 232 (1st Cir. 2013) (examining contract's terms to determine plaintiff failed to state breach of contract claim); *Clark v. Janssen Pharms., Inc.*, 606 Fed. Appx. 592, 594 (1st Cir. 2015) (affirming district court's dismissal of a claim undermined by the plain terms of the contract).

Vizgen's Counterclaims I-III cannot meet these standards and must be dismissed.

## IV.   ARGUMENT

### A.   Vizgen's Breach of Warranty Claim Is Premised on an Implausible Reading of the License Agreement

Vizgen's Counterclaims against Harvard assert breach of warranty, breach of the implied covenant of good faith and fair dealing, and negligent misrepresentation.  Although the counterclaim for breach of warranty is set forth in Count II, it is the heart of Vizgen's case against Harvard, and it is integral to Vizgen's two other counterclaims.  Under Massachusetts law, a breach of express warranty claim has four elements: (1) the defendant made a definite promise or statement of fact with respect to the quality of service or good; (2) the definite promise or statement of fact induced the plaintiff to enter the contract; (3) the defendant breached the promise; and (4)

the breach was a proximate cause of the plaintiff's injury.  *See Vt. Mut. Ins. Co. v. Sondrini Enters.*, No. 3:16-cv-30172, 2019 U.S. Dist. LEXIS 82546, at *7 (D. Mass. May 15, 2019); *LePage v. E-One, Inc.*, 4 F. Supp. 3d 298, 313 (D. Mass. 2014).[10]

In this case, Vizgen asserts a breach of warranty claim based on statements by Harvard in Sections 8.2(d) and (e) of the License Agreement.    Section 8.2 sets forth ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

Vizgen's argument is that Sections 8.2(d) and (e) are not simple representations that the subject matter of the License Agreement—the Patent Rights—are unencumbered and legally able to be licensed by Harvard.  Rather, Vizgen argues that these sections operate as an express warranty that—regardless of how or in what manner Vizgen decides to commercialize products—Vizgen

---

[10] The License Agreement is governed by Massachusetts law, (Ex. A at 34, § 11.6), hence, Massachusetts law applies to Vizgen's breach of warranty and breach of the implied covenant counterclaims.  *See Suntex Indus. Corp. v. Cit Grp./BBC, Inc.*, No. 99-81, 2001 U.S. Dist. LEXIS 17656, at *10-11 (D. Del. Sep. 28, 2001).  Massachusetts law also applies to Vizgen's negligent misrepresentation counterclaim because both Harvard and Vizgen reside in Massachusetts, and the purported misrepresentations and injuries occurred in Massachusetts.  *See Path to Riches, LLC v. CardioLync, Inc.*, 290 F. Supp. 3d 280, 295 (D. Del. 2018).

will always have freedom to operate.  The alleged purpose of the Counterclaims is stated expressly: "Vizgen now seeks what it bargained for: the freedom to operate." (D.I. 29 ¶ 51).

To make its argument, Vizgen reads Sections 8.2(d) and (e) in isolation and out of context, relying heavily on the language of Section 8.2(d) that says the License Agreement ███████ ████████████████████████████████████████████████████████ Vizgen claims that ███████████ means freedom to operate.  (*Id.* ¶¶ 50-51, 59).  Vizgen's argument is that because it is now being sued for infringement for violating patent rights exclusively licensed to 10x, it was not given freedom to operate by Harvard; hence, Harvard breached its express warranties.  (*Id.* at 50-51, 103).  There are at least three fatal flaws with this argument.

**<u>First</u>**, and as a threshold matter, the representation in Section 8.2(d) does not constitute an express warranty under Massachusetts law.  "To constitute an express warranty, there must be some expression…amounting to an unequivocal affirmation…*It is not enough to prove mere expressions of opinion*."  *Town of Plymouth v. Veolia Water N. Am. - Ne.*, No. 1683CV00113, 2017 Mass. Super. LEXIS 3270, at *9 (Mass. Super. Ct., Jan. 30, 2017) (quoting Black's Law Dictionary) (emphasis added).  "An express warranty is found where the defendant promised a specific result."  *Id.* (quoting *Anthony's Pier Four, Inc. v. Crandall Dry Dock Eng'rs, Inc.*, 489 N.E.2d 172, 175 (Mass. 1986)).  By contrast, "[a] representation is one of opinion if it expresses only (a) the belief of the maker, *without certainty*, as to the existence of a fact; or (b) his judgment as to quality, value, authenticity, or other matters of judgment."  *McEneaney v. Chestnut Hill Realty Corp.*, 650 N.E.2d 93, 96 (Mass. App. Ct. 1995) (citations and quotations omitted).

The representation in Section 8.2(d) is qualified, made only ███████████████████ ████████████████████████████████████████████████████████████ ███████████    Accordingly, the representation in Section 8.2(d) is not an "unequivocal

affirmation," or a promise of a "specific result," but merely an expression of an opinion or judgment that cannot serve as the basis for a claim of breach of warranty under Massachusetts law. *See Town of Plymouth*, 2017 Mass. Super. LEXIS 3270 at *9; *see also Sparks v. Fid. Nat'l Title Ins. Co.*, 294 F.3d 259, 272 (1st Cir. 2002).  Since Vizgen's breach of warranty claim is premised on Section 8.2(d), which is not a warranty, dismissal is required.[11]

**Second**, even if both Sections 8.2(d) and (e) did constitute express warranties, there would still be no valid cause of action for breach of warranty insofar as Vizgen's claim is premised on an implausible and legally impermissible reading of the Parties' contract.  It is well established under Massachusetts law that a contract must be construed as a whole, in a reasonable and practical manner.  *Downer & Co., LLC v. STI Holding, Inc.*, 927 N.E.2d 471, 477 (Mass. App. Ct. 2010). The individual provisions of a contract must be read in the context of the entire writing rather than in isolation.  *Starr v. Fordham*, 648 N.E.2d 1261, 1269 (Mass. 1995).  Clauses within a contract must be read together and in a consistent manner where possible.  *Downer*, 927 N.E.2d at 477. When general and more broadly inclusive language in a contract is inconsistent with more specific language, the more specific language controls.  *Lembo v. Waters*, 294 N.E.2d 566, 569 (Mass. App. Ct. 1973).  Finally, when construing a contract, courts must avoid interpreting the instrument in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.  *Brillante v. R.W. Granger & Sons, Inc.*, 772 N.E.2d 74, 79 & n.13 (Mass. App. Ct. 2002); *see also Clark v. State St. Tr. Co.*, 169 N.E. 897, 903 (Mass. 1930).

---

[11] Vizgen's supposed reliance on Section 8.2(e)—which states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—is superfluous. There is no allegation in the Counterclaims that Harvard granted anyone a license to Vizgen's Exclusive Patent Rights.  Indeed, Vizgen could not make such an assertion consistent with Rule 11.  The Exclusive Patent Rights licensed to Vizgen are defined and detailed in the License Agreement. They are wholly distinct from any Patents licensed to ReadCoor/10x, and they have not been licensed to anyone but Vizgen.

Vizgen's Counterclaims break every one of these interpretative principles.  Vizgen reads Sections 8.2(d) and (e) in isolation, out of the context of the rest of Section 8.2 and the remainder of the License Agreement.  Vizgen argues that the general phrase ███████████████████ ██████████████████████ assured it freedom to operate without worry that ***any*** form ██ ████████████████████████████ arising out of Vizgen's infringement of Harvard patents exclusively licensed to others.  Indeed, the only alleged breach in Count II is that Vizgen is being sued for infringement in this action. (D.I. 29 ¶¶ 102-103.)

What Vizgen ignores (and omits from its pleading) are the express disclaimers in Sections 8.3.1, 8.3.2, and 8.3.3 that speak specifically to the issue.  The entirety of Section 8.3 is ██████████ █████████████████████████ and sets forth express disclaimers regarding the very freedom to operate Vizgen claims it received. (Ex. A at 26.)  Specifically, Harvard disclaims that the licensed Patent Rights ████████████████████████████████████████ to Vizgen.  (Ex. A. at 26, § 8.3.1.)  Harvard disclaims that the Patent Rights have any ██████████ ███████████████ (*Id.* at § 8.3.2).  Harvard disclaims that the Patent Rights can be practiced by ████████████████████████████████████████████████████████ ██████████████████████████████ (*Id.* at § 8.3.2).  Finally, Harvard disclaims all warranties of ████████████████ (*Id.* at § 8.3.3).

Vizgen now comes to this Court and asserts counterclaims against Harvard that rest on a construction of the License Agreement that is the ***very opposite of the clear and unambiguous meaning of these Sections***.  What is more, Vizgen passes over the fact that the License Agreement conveys a grant of ***Non-Exclusive*** Patent Rights, separate and apart from the grant of Exclusive Patent Rights.  (*See* Ex. A at 6, § 1.36; *id.* at Schedule III.)  This grant of Non-Exclusive Patent Rights—to a select set of patent filings listed on Schedule III—makes no sense under Vizgen's

10

interpretation of the License Agreement, since, under Vizgen's strained reading of Sections 8.2(d) and (e), Vizgen was purportedly given freedom to operate and, therefore, a non-exclusive license to the entirety of Harvard's patent portfolio (and, potentially, a prospective guarantee of non-infringement with respect to *anyone else's* patents). If that were true, there would have been no need to separately grant a Non-Exclusive license to a further specific subset of Harvard's portfolio.

When the License Agreement is read as a whole and in context, the foundational premise to each of Vizgen's Counterclaims against Harvard crumbles. Vizgen's contention that Harvard warranted freedom to operate, guaranteeing that Vizgen would be able to develop Licensed Products in any manner without infringing any patent or proprietary rights that it did not have, is an absurd and implausible reading of the License Agreement.[12] Accordingly, dismissal is required. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 232-33 (1st Cir. 2013); *Henning v. Wachovia Mortg., FSB*, 969 F. Supp. 2d 135, 147-48 (D. Mass. 2013).

**Third**, dismissal is required because—other than a purported failure to provide freedom to operate—there is no other alleged breach of Sections 8.2(d) or (e). As just discussed, in the face of Sections 8.3.1, 8.3.2, and 8.3.3, there is no plausible construction of Sections 8.2(d) and (e) that Harvard warranted freedom to operate. *Supra* pp. 9-10. In fact, a plain reading of the provisions on which Vizgen relies—even without the context of Sections 8.3.1, 8.3.2, and 8.3.3—reveals that they are saying something else. Section 8.2 is all about ██████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[12] It would also lead to a commercially unreasonable result whereby Harvard would own the risk for Vizgen's commercialization efforts downstream of the agreement. Contrary to Vizgen's unfounded and conclusory assertions, Harvard has limited insight into, and no control over, the commercialization efforts of its licensees. As a result, Harvard could never prospectively guarantee freedom to operate to Vizgen or any of its other licensees without opening itself to claims of breach where freedom to operate did not prove out in practice. Indeed, that is precisely why the disclaimers in Sections 8.3.1, 8.3.2, and 8.3.3 are emphasized in the contract and stated so robustly.

 Thus, when Sections 8.2(d) and (e) state that the License Agreement is not ████

The Counterclaims do not, and cannot, allege otherwise.  Vizgen never says that Harvard failed to grant it a license to the Patent Rights, nor that its licensed Patent Rights were previously licensed to any Third Parties.  Vizgen's argument is grounded exclusively in the fact that it chose to use the licensed Patent Rights to commercialize its products in a manner that infringed the 10x-licensed patents.  To the extent that might constitute a "conflict" between Vizgen's efforts and the 10x-licensed patent rights, it has nothing to do with the express language of Sections 8.2(d) and (e).  Vizgen has not pleaded, and cannot plead, that its license to the specific Patent Rights has been affected in any way.  It continues to hold and benefit from the license, and it has gone so far as to assert one of its exclusively licensed patents against 10x in this case.

For all of these reasons, Vizgen cannot state a valid claim for breach of warranty. Accordingly, dismissal of Count II is required.

**B.**    **Vizgen's Implied Covenant Claim Seeks To Impose Duties on Harvard That Do Not Exist in the License Agreement, and Assumes a Purpose and Intent to the License Agreement that are Precluded by Its Own Terms**

Vizgen's claim for breach of the implied covenant fares no better than its claim for breach of warranty.  Under Massachusetts law, "[e]very contract implies good faith and fair dealing between the parties to it."  *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 924 N.E.2d 696, 703-04 (Mass. 2010) (quoting *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806 (Mass. 1991)). However, in order to prevail on this claim, the claimant must show that the defendant "acted with

. . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing." *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir.1996). The bad faith conduct must either deprive a party of the fruits of labor already substantially earned or must consist of an unfair leveraging of the contract terms to secure an undue economic advantage. *See Christensen v. Kingston School Comm.*, 360 F. Supp. 2d 212, 226 (D. Mass. 2005).

The implied covenant does not create rights and duties that the parties did not negotiate nor put in the agreement. *See Liss v. Studeny*, 879 N.E.2d 676, 680–681 (Mass. 2008); *Uno Rests., Inc. v. Bost. Kenmore Realty Corp.*, 805 N.E.2d 957, 966 (Mass. 2004) (stating that the implied covenant does not supply terms that the parties were free to negotiate, but did not); *Beauchesne v. New England Neurological Associates, P.C.*, 159 N.E.3d 728, 735–736 (Mass. App. Ct. 2020). Rather, "the good faith doctrine is grounded in and springs from an express contractual provision." 1 Corbin on Massachusetts Contracts § 26.02 (2021). As a result, the scope of a party's implied covenant is only as broad as the party's contractual obligations. *See Edlow v. RBW, LLC*, 688 F.3d 26, 35 (1st Cir. 2012) (applying Massachusetts law).

In this case, Vizgen argues that Harvard breached the covenant implied in the License Agreement "by failing to remain faithful to the intended and agreed expectations of Harvard and Vizgen in their respective performance, undertaking actions at the behest of 10x that would have the effect of destroying or injuring the rights of Vizgen to receive the fruits of the contract, and by unfairly attempting to secure an undue economic advantage at Vizgen's expense." (D.I. 29 ¶ 85). Stripped of sound and fury, Vizgen's claim for breach of the implied covenant is simply a repeat of its breach of warranty claim.

Vizgen's argument once again hinges on the premise that Harvard guaranteed it freedom to operate. Vizgen cites and quotes the language of Sections 8.2(d) and (e), again contending that

13

it means Harvard warranted freedom to operate.  On the basis of that reading, Vizgen alleges that

Harvard breached the implied covenant because it did not advise Vizgen that its commercialization

efforts were potentially infringing the patent rights licensed to 10x.  (*Id.* ¶ 90).  Vizgen further

alleges that Harvard worked with and approved 10x's prosecution of those patent rights in a way

that made it more likely that Vizgen's commercialization efforts would infringe.  (*Id.* ¶¶ 91-95).

Vizgen claims that, under the implied covenant, Harvard was required to notify Vizgen that its

commercialization efforts could infringe rights granted to 10x, and Harvard was required to

prevent 10x from prosecuting its licensed patent rights in a manner that could limit Vizgen's

freedom to operate.  (*Id.* ¶¶ 90-96).  In short, Vizgen's view is that Harvard was obligated to

preserve, promote, and protect Vizgen's freedom to operate, and to ensure that Vizgen's

development efforts resulted in commercial success.  (*See generally id.* ¶¶ 82-97).

　　　　These are the so-called "fruits of the contract" Vizgen expected to receive from its License

Agreement with Harvard.  (*Id.* ¶ 85).  By virtue of this lawsuit being filed against it, Vizgen claims

that these fruits are now "threaten[ed]" and have been harmed.  (*Id.* ¶ 96).

　　　　The central problem with Vizgen's argument is the same problem precluding the breach of

warranty claim: it is premised on an implausible reading of the License Agreement.  As discussed

above, the contention that Harvard guaranteed Vizgen freedom to operate through Sections 8.2(d)

and (e) of the License Agreement is an implausible and legally impermissible construction of the

Parties' contract.  *Supra* pp. 9-10.  If there is no contractual promise that Vizgen will have freedom

to operate, that the Patent Rights will be commercially worthwhile, or that any Licensed Product

Vizgen develops will not infringe other intellectual property rights—and there cannot be, since

Sections 8.3.1, 8.3.2, and 8.3.3 expressly disclaim each of these—then Vizgen's implied covenant

claim cannot survive.  As a matter of law, the implied covenant cannot give Vizgen rights or

impose duties on Harvard that are not included in the License Agreement itself.  *See Bost. Med. Ctr. Corp. v. Sec'y of the Exec. Office of HHS*, 974 N.E.2d 1114, 1126 (Mass. 2012); *Curtis v. Herb Chambers I-95, Inc.*, 940 N.E.2d 413, 419 (Mass. 2011).

Because Harvard did not grant Vizgen freedom to operate, it had no obligation to ensure that Vizgen's development plans were commercially successful and did not violate the legal rights of any other party.  The License Agreement says nothing, moreover, about what Harvard can and cannot do with respect to the prosecution of other patents it owns that were not licensed to Vizgen. Vizgen's allegations that Harvard engaged in a nefarious plan to prosecute patents licensed to 10x in a way that was unfavorable to Vizgen—even if true—would not violate the implied covenant. Indeed, Vizgen would have this Court believe that the License Agreement not only guaranteed it freedom to operate, but it even prohibited Harvard from exercising its legal rights and obligations with respect to other intellectual property in any manner that might impinge on that freedom.

Similarly, Vizgen suggests that Harvard had continuing duties to monitor Vizgen's commercialization efforts and the overall genomics landscape, and to inform Vizgen any time it suspected Vizgen might be infringing.  Vizgen contends that Harvard should have notified it that its commercialization efforts might infringe patent rights licensed to 10x after receiving "detailed reports on those commercialization efforts" and "accept[ing] royalties on an ongoing basis."  (D.I. 29 ¶ 88).  The only "detailed reports" identified in the Counterclaims, however, are the



A review of these materials shows that they provide ▮▮▮▮▮▮▮

---

[13] For purposes of a motion under Rule 12, this Court can and should review those documents itself, and not simply accept Vizgen's characterization of them.  *See Rossman v. Fleet Bank Nat'l Ass'n*, 280 F.3d 384, 388 n.4 (3d Cir. 2002) (stating that the court may consider documents

███████████████████████████████████████████

██████████████████████████   Thus, even if Harvard had a continuing obligation to monitor

Vizgen's commercialization and inform Vizgen if it were infringing another's intellectual property

rights, there is no reasonable basis to conclude that Harvard had knowledge of that infringement

throughout the period of Vizgen's commercialization.  Be that as it may, Harvard had no such

contractual obligation, so there can be no breach of the implied covenant of good faith and fair

dealing for any failure in this regard.  *See Curtis*, 940 N.E.2d at 419.

In the end, Vizgen's implied covenant claim finds no basis in the actual terms of the

License Agreement, and dismissal of Count I is required.

### C.   Vizgen Has Not Identified Any False Representations on Which It Reasonably Relied To Sustain a Claim for Negligent Misrepresentation

Vizgen's final counterclaim against Harvard, for negligent misrepresentation, contains

nothing new or different from its contract-based counterclaims.  Vizgen's story is the same:

Harvard guaranteed it freedom to operate but did not actually give it freedom to operate or tell

Vizgen "during the parties' ongoing business dealings" that it did not have freedom to operate.

Thus, Harvard negligently made misrepresentations to Vizgen.  Vizgen purportedly relied on

Harvard's so-called misrepresentations to enter into the License Agreement (including three

different amendments to the same), pay Harvard royalties, and invest in its own business plans for

commercialization of the Patent Rights.  *See generally* (105-115).

A negligent misrepresentation claim has five elements: (1) the defendant, in the course of

its business, profession, employment, or in any other transaction in which it has a pecuniary

---

attached to the complaint and undisputedly authentic documents attached to the motion to
dismiss if the claims are based on those documents); *see also Vorchheimer v. Philadelphian
Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) (stating that if the complaint's exhibits
"contradict [the plaintiff's] allegations in the complaint, the exhibits control").

interest; (2) supplied false information for the guidance of others in their business transactions; (3) without exercising reasonable care or competence in obtaining or communicating the information; (4) the plaintiff reasonably relied on the information; and (5) the plaintiff suffered pecuniary loss caused by their reliance on the information.  *See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 918 N.E.2d 36, 47–48 (Mass. 2009); *Maus v. Fritz*, 49 N.E.3d 697 (Mass. App. Ct. 2016).

As a threshold matter, Vizgen's claim for negligent misrepresentation fails because it does not allege with specificity *any* representation made by Harvard that was false or misleading.  When a claim for negligent misrepresentation sounds in fraud, the plaintiff must satisfy Rule 9(b).  *See, e.g.*, *King v. Pratt & Whitney Can. Corp.*, No. 20-359, 2021 U.S. Dist. LEXIS 30728, at *11 (D. Del. Feb. 19, 2021); *Keystone Assocs. LLC v. Barclays Bank PLC*, No. 19-796, 2020 U.S. Dist. LEXIS 3475, at *2 & n.2 (D. Del. Jan. 9, 2020); *see also Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 85-86 & n.3 (3d Cir. 2015) (affirming application of Rule 9(b) to a negligent misrepresentation claim that "sounds in fraud").[14]  A negligent misrepresentation claim sounds in fraud when the defendant allegedly made the accused statements with some awareness of the purported falsity.  *Cavi v. Evolving Sys. NC*, No. 15-1211, 2018 U.S. Dist. LEXIS 86971, at *6 (D. Del. May 23, 2018); *McCurdy v. Wright Med. Tech., Inc.*, No. 19-1898, 2020 U.S. Dist. LEXIS 31804, at *12 (D. Del. Feb. 25, 2020).

---

[14]  Whereas Massachusetts law applies to the negligent misrepresentation claim, *see supra* n.10, the procedural law of the forum federal court applies.  This Court has held that Rule 9(b) applies to negligent misrepresentation claims sounding in fraud.  *See King v. Pratt & Whitney Can. Corp.*, No. 20-359, 2021 U.S. Dist. LEXIS 30728, at *9 (D. Del. Feb. 19, 2021).  But even if federal pleading standards from the District of Massachusetts were applied, the standard would be the same. *See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 15 (1st Cir. 2009); *In re TelexFree Sec. Litig.*, No. 4:14-md-02566, 2022 U.S. Dist. LEXIS 156964, at *74 (D. Mass. Aug. 31, 2022).

Here, the Counterclaims repeatedly allege that Harvard made misrepresentations with an awareness that Vizgen did not have freedom to operate and that its efforts might be infringing patents licensed to 10x.  (D.I. 29 ¶¶ 59, 65-66, 106-108, 113).  Accordingly, the negligent misrepresentation claim sounds in fraud, and Rule 9(b) applies.

"In order to satisfy Rule 9(b), [a plaintiff] must plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004).  To that end, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation," *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007), and "must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Lum v. Bank of America*, 361 F.3d 217, 224 (3d 2004).

Vizgen's counterclaim fails to state with particularity the circumstances of the alleged negligent misrepresentations.   The counterclaim refers to numerous instances of negligent misrepresentations, *see, e.g.*, D.I. ¶¶ 59, 65-66, 106-108, but with the exception of the alleged written misrepresentations stated in Sections 8.2(d) and (e) of the License Agreement, all other alleged misrepresentations are devoid of dates, times, places, and specific participants.

The purported misrepresentations in Sections 8.2(d) and (e), moreover, are not a proper basis upon which a negligent misrepresentation claim can be stated as they are representations made in a formal contract.  If there were a breach, it would give rise to a contract claim.  Indeed, that is the very contract claim Vizgen asserts for breach of warranty in Count II.  Vizgen cannot simply repackage that same claim as a tort and sue Harvard for negligent misrepresentation as well. *See Cumis*, 918 N.E.2d at 49.

18

But even if Vizgen could use the representations in Sections 8.2(d) and (e) for its tort claim, and even if Vizgen has or could satisfy the pleading standard under Rule 9, the counterclaim for negligent misrepresentation would still fail because Vizgen cannot demonstrate reasonable reliance. Vizgen's contention is that Harvard "informed [it] both orally and in writing that the License Agreement was not in conflict with any other intellectual property agreement between Harvard and any third party." (D.I. ¶ 108). Vizgen claims that Harvard "assured [it] that it had no other third-party licenses that conflicted with the Licensing Agreement, including the operational goals that the Vizgen-Harvard license exists to further, and the operational plans Harvard required from Vizgen, and reviewed, approved, and monitored for years." (*Id.*). Vizgen again takes the position that it elicited a guarantee from Harvard that it could implement whatever "operational plans" it might later conceive, free of any concern that it might infringe patents that it had no license to, including patent rights owned by Harvard and licensed to a different party. *Supra* pp. 10-11.

Given the express disclaimers in Sections 8.3.1, 8.3.2, and 8.3.3, any reliance Vizgen placed on purported representations assuring it that it could operate freely, *i.e.*, use the licensed patents without concern that it might infringe the patents of others, is simply not reasonable. As previously discussed, there is no plausible interpretation of the License Agreement that could support a conclusion that Harvard was guaranteeing freedom to operate.

What is more, the License Agreement contains two separate integration clauses, at Sections 11.4 and 11.17, making clear that it was a full and complete expression of the Parties' arrangement. Where a contract has a valid integration clause, claims of negligent misrepresentation that relate to the terms of the contract are barred. *See Sound Techniques, Inc. v. Hoffman*, 737 N.E.2d 920, 926 (Mass. App. Ct. 2000); *Linear Retail Danvers #1, LLC v. Casatova, LLC*, No. 2007-3147,

2008 Mass. Super. LEXIS 171, at *3-4 (Mass. Super. Ct., June 11, 2008).  This is because "'to allow the contract to be rewritten under the guise of an alleged action in tort' would be 'contrary to the favored policy of freedom of contract.'"  *Sound Techniques Inc.*, 737 N.E.2d at 927 (quoting *Rio Grande Jewelers Supply, Inc. v. Data Gen. Corp.*, 689 P.2d 1269, 1270-71 (N.M. 1984)).

Given the two integration clauses in the License Agreement, coupled with the unambiguous disclaimers of freedom to operate in Sections 8.3.1, 8.3.2, and 8.3.3, it is legally impossible for Vizgen to show that it reasonably relied on any purported (and thus far unidentified) extra-contractual statements of Harvard guaranteeing freedom to operate.  Accordingly, dismissal of the negligent misrepresentation counterclaim is required.  *See Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 795 (Mass. 2003) (ruling that it was unreasonable to rely on oral statements that conflicted with written quotation, where "all that was required of [the plaintiffs' representatives] was that they read the document to ascertain the obvious").[15]

## V.    RELIEF REQUESTED

For the foregoing reasons, Harvard respectfully requests that this Court grant its motion and dismiss Counts I – III of Vizgen's Counterclaims with prejudice.

Dated:  October 27, 2022

---

[15] *See also Sound Techniques, Inc. v. Hoffman*, 737 N.E.2d at 926 (stating that "no reasonable basis [existed] for ignoring the plain language of the merger clause, in which [the plaintiff] agreed that it was entering into the contract free from influence by or in reliance upon any representations other than those set out in the contract"); *Mahaney v. John Hancock Mut. Life Ins. Co.*, 380 N.E.2d 140 (Mass. App. Ct. 1978) (holding as matter of law that it was unreasonable to rely on oral statements that were "preposterous or palpably false."); *Marram v. Kobrick Offshore Fund, Ltd.*, No. 01-2815, 2009 Mass. Super. LEXIS 85, at *2 (Mass. Super. Ct., Jan. 30, 2009) ("[T]he presence of an integration clause, as a matter of law, means that any reliance on the prior oral representations is unreasonable."); *see also Sands v. Ridefilm Corp.*, 212 F.3d 657, 665 (1st Cir. 2000) (stating that "it was unreasonable for the plaintiff to rely on the alleged oral representations because of the express written word").

Respectfully submitted,

  */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com

Geoffrey M. Raux (*pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
Michael J. Tuteur (*pro hac vice*)
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199
(617) 502-3284
graux@foley.com
rrodrigues@foley.com
mtuteur@foley.com

*Attorneys for Counterclaim-Defendant*
*President and Fellows of Harvard College*

## CERTIFICATE OF SERVICE

The undersigned hereby certified that on October 27, 2022, a copy of the foregoing

documents was served on the persons listed below in the manner indicated:

**BY EMAIL**

James L. Higgins
Pilar G. Kraman
YOUNG CONAWAY STARGATT
&TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
jhiggins@ycst.com
pkraman@ycst.com

*Attorneys for Defendant Vizgen, Inc.*

David Bilsker (*pro hac vice*)
Sam Stake (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
davidbilsker@quinnemanuel.com
samstake@quinnemanuel.com

Kevin Johnson (*pro hac vice*)
Victoria Maroulis (*pro hac vice*)
Andrew Branhall (*pro hace vice*)
Quinn Emanuel Urquhart& Sullivan, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA 94065
kevinjohnson@quinnemanuel.com
victoriamaroulis@quinnemanuel.com
andrewbranhall@quinnemaniel.com

Angus Chen, Ph. D (*pro hac vice*)
Quinn Emanuel Urquhart& Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
anguschen@quinnemanuel.com

*Attorneys for Defendant Vizgen, Inc.*

Dated: October 27, 2022

    */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chich@morrisjames.com

Geoffrey M. Raux (*pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
Michael J. Tuteur (*pro hac vice*)
Foley & Lardner LLP
111 Huntington Avenue
Boston, MA 02199
(617) 502-3284
graux@foley.com
rrodrigues@foley.com
mtuteur@foley.com

*Attorneys for Counterclaim-Defendant*
*President and Fellows of Harvard College*

# EXHIBIT A

# FILED UNDER SEAL

# LICENSE AGREEMENT

This License Agreement (this "**Agreement**") is entered into as of this September 26 2019 (the "**Effective Date**"), by and between Vizgen, Inc., a corporation existing under the laws of Delaware, having a place of business at 10 Endicott Rd, Arlington, MA 02476 ("**Licensee**") and **President and Fellows of Harvard College**, an educational and charitable corporation existing under the laws and the constitution of the Commonwealth of Massachusetts, having a place of business at Richard A. and Susan F. Smith Campus Center, Suite 727, 1350 Massachusetts Avenue, Cambridge, Massachusetts 02138 ("**Harvard**"). This Agreement refers to Licensee and Harvard individually as a "**Party**" and collectively as the "**Parties**".

**WHEREAS**, the technology claimed in the Patent Rights and Copyrights was developed in research conducted by Harvard researcher Dr. Xiaowei Zhuang and other researchers working in Dr. Zhuang's Harvard laboratory;

**WHEREAS,** Dr. Zhuang is an employee of the Howard Hughes Medical Institute ("**HHMI**") and HHMI has assigned to Harvard all of its rights, title, and interests in those Patent Rights and Copyrights (each as defined below) on which Dr. Zhuang is an inventor, subject to certain rights retained by HHMI as specifically described below;

**WHEREAS,** the research was sponsored in part by the Federal Government of the United States of America and as a consequence this license is subject to overriding obligations to the Federal Government under 35 U.S.C. §§ 200-212 and applicable regulations;

**WHEREAS,** Licensee wishes to obtain a license under the Patent Rights and Copyrights;

**WHEREAS,** Harvard desires to have products based on the inventions described in the Patent Rights and Copyrights developed and commercialized to benefit the public;

**WHEREAS,** such products and/or services may be applicable to the improvement of the health of individuals throughout the world; and

**WHEREAS,** Licensee has represented to Harvard, in order to induce Harvard to enter into this Agreement, that Licensee shall commit itself to commercially reasonable efforts to develop, obtain regulatory approval for and commercialize such products, and thereafter make them available, each as defined below;

**NOW, THEREFORE,** the Parties hereto, intending to be legally bound, hereby agree as follows:

1. **Definitions**.

As used in this Agreement, the terms with initial letters capitalized, whether used in the singular or plural form, shall have the meanings set forth in this **Article 1** or, if not listed below, the meaning designated in places throughout this Agreement.

1.1 **"Additional Securities"** means shares of capital stock, convertible securities, warrants, options or other rights to subscribe for, purchase or acquire from Licensee, any capital stock of Licensee.

1.2 **"Affiliate"** means, with respect to any person, organization or entity, another person, organization or entity, directly or indirectly, through one or more intermediaries, Controlling, under common Control with, or Controlled by such person, organization or entity.

1.3 **"Amendment Negotiation Period"** has the meaning ascribed to such term in **Section 2.5.3**.

1.4 **"Annual License Maintenance Fee"** has the meaning ascribed to such term in **Section 4.3**.

1.5 **"Anti-Dilution Shares"** has the meaning ascribed to such term in **Section 4.2.3**.

1.6 **"Assignee"** means (a) any entity to which Harvard's participation rights under **Section 4.9** have been assigned either by Harvard or another entity, or (b) any entity that is Controlled by Harvard.

1.7 **"Calendar Quarter"** means each of the periods of three (3) consecutive calendar months ending on March 31, June 30, September 30 and December 31 during the Term.

1.8 **"Calendar Year"** means the period commencing on January 1 and ending December 31 of each year during the Term.

1.9 **"Cap Table"** has the meaning ascribed to such term in **Section 4.2.1**.

1.10 **"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the activities, management or policies of such person, organization or entity, whether through the ownership of voting securities, by contract or otherwise. Without limiting the foregoing, "Control" will be presumed to exist when a person, organization or entity (a) owns or directly controls fifty percent (50%) or more of the outstanding voting stock or other ownership interest of the other organization or entity or (b) possesses, directly or indirectly, the power to elect or appoint fifty percent (50%) or more of the members of the governing body of the other organization or entity. The Parties acknowledge that in the case of certain entities organized under the laws of certain countries outside of the United States, the maximum percentage ownership permitted by law for a foreign investor may be less than fifty percent (50%), and that in such cases such lower percentage will be substituted in the preceding sentence. The term **"Controlling"**, **"Controlled by"** and **"under common Control with"** have correlative meanings.

1.11 **"Copyrights"** means all right, title and interest in and to the Original Software under applicable copyright laws.

1.12 **"Covered Software"** means any of the following, in whole or in part: (a) the Original Software and (b) any Derivative Work made by or on behalf of Licensee or its Affiliates.

1.13 **"Derivative Work"** means (a) any modification or derivative work of the Original Software as determined under U.S. copyright laws and (b) any modification or derivative work of the foregoing.

1.14 **"Developing Country"** means any country identified as Low-income or Lower-middle-income in the World Bank *"Country and Lending Groups"* classification, as such list may be updated from time to time.

1.15 **"Development Milestones"** means the development and commercialization milestones set forth in **Schedule I** hereto.

1.16 **"Development Plan"** means the plan for the development and commercialization of Licensed Products attached hereto as **Schedule II**, as such plan may be adjusted from time to time pursuant to **Section 3.2**.

1.17 **"Distributor"** means a Third Party whom Licensee, its Sublicensee or any of its or their respective Affiliates engages to offer for sale, sell and/or import Licensed Products and/or Covered Software purchased from Licensee, such Affiliate or such Sublicensee, as applicable, for resale by such Third Party under the label of Licensee, such Affiliate or such Sublicensee, as applicable; provided that the term "Distributor" shall not include any person or entity who pays Licensee, its Sublicensee or any of its or their respective Affiliates any consideration (in any form) with respect to such engagement other than the consideration paid for the purchase of such Licensed Products and/or Covered Software.

1.18 **"Documentation"** shall mean training materials, system specifications and technical manuals, and all other user instructions regarding the capabilities, operation and use of the Covered Software, including, but not limited to, online help screens contained in the Covered Software provided to Licensee in connection with this Agreement.

1.19 **"Exclusive Patent Rights"** means the Patent Rights designated as Exclusive Patent Rights on **Schedule III** hereto.

1.20 **"Effective Date"** has the meaning set forth in the introductory paragraph to this Agreement.

1.21 **"FDA"** means the United States Food and Drug Administration.

1.22 **"Field"** means any and all fields of use.

1.23 **"on a Fully Diluted Basis"** means, as of a specified date, the sum of (i) the number of shares of common stock of Licensee then-outstanding (assuming conversion of all outstanding stock other than common stock into common stock), (ii) the number

of shares of common stock of Licensee issuable upon exercise or conversion of then-outstanding convertible securities, options, rights or warrants of Licensee (which shall be determined without regard to whether such securities are then vested, exercisable or convertible), plus (iii) the number of shares of common stock of Licensee that would be outstanding or acquirable, directly or indirectly, upon the issuance (and exercise, conversion or exchange, if applicable) of all securities reserved or otherwise intended for future issuance under any stock purchase, stock option or other compensatory benefit plan or arrangement of Licensee.

1.24 **"Harvard"** has the meaning ascribed to such term in the introductory paragraph of this Agreement.

1.25 **"Harvard Technology Transfer Information"** means the Documentation, as well as other information, formulas, specifications, directions, instructions, procedures, raw materials, formulation or production technology, processes, methods, materials techniques, technical manuals, designs, drawings, plans, protocols, know-how, data and other information and materials in existence as of the Effective Date and provided to Licensee pursuant to this Agreement, and any derivatives and modifications thereof made by or on behalf of Licensee, Sublicensees or any of their respective Affiliates. The Parties agree to use commercially reasonable efforts, after the execution of this Agreement, to agree to an Exhibit that lists all of the Harvard Technology Transfer Information applicable under this Agreement, which such Exhibit shall be attached hereto and incorporated herein by this reference. Such Exhibit may be amended from time to time by mutual agreement of the parties to include additional Harvard Technology Transfer Information or to include any Harvard Technology Transfer Information that was unintentionally excluded from the Exhibit.

1.26 **"Improvement"** means any patentable invention disclosed to OTD which (a) is conceived and reduced to practice within three (3) years after the Effective Date by Dr. Zhuang and those faculty members, postdoctoral fellows, students, technicians, and/or other individuals working on behalf of Harvard under Dr. Zhuang's supervision and direction solely in the course of research performed in Dr. Zhuang's laboratory at Harvard, and (b) is dominated by a Valid Claim within the Exclusive Patent Rights, and (c) is available for licensing after satisfaction of any obligations to Third Parties, including without limitation, sponsors of the research leading to such invention; provided that Improvements shall not include any development of components, materials, or processes that are useful in practicing the inventions of the Patent Rights but that do not themselves infringe any Valid Claim.

1.27 **"Improvement Patent Rights"** means any patent or patent application owned and controlled by Harvard, to the extent claiming an Improvement.

1.28 **"Infringed Patent"** means an issued and unexpired patent (a) that has not been abandoned, held invalid, revoked, held or rendered unenforceable or lost through interference and (b) the claims of which would be infringed by Licensee's making,

having made, using, selling, offering for sale, having sold, exporting or importing of a Licensed Product; provided, however, such claims have not been pending longer than seven years from the date of issuance of the first substantive patent office action considering patentability of such claim by the relevant patent office in the country or territory in which such claim is pending.

1.29    "**Infringement**" has the meaning ascribed to such term in **Section 7.1**.

1.30    "**Invoicing Entity**" shall have the meaning ascribed to such term in the definition of "Net Sales" below.

1.31    "**Licensed Product**" means any Type I Licensed Product and/or any Type II Licensed Product.

1.32    "**Licensed Service**" means, on a country-by-country basis, any service, the development, performance, sale or delivery of which (i) utilizes a Licensed Product and/or the Harvard Technology Transfer Information and/or the Covered Software, or (ii) would, without the license granted hereunder, infringe upon, directly, indirectly or by inducement of infringement, or indirectly by contributory infringement, at least one Valid Claim in a jurisdiction where such a Valid Claim exists.

1.33    "**Licensee**" has the meaning ascribed to such term in the introductory paragraph to this Agreement.

1.34    "**Marketing Authorization**" means, with respect to a Licensed Product or Licensed Service in a country or any other regulatory jurisdiction, any and all approvals or clearances from the applicable Regulatory Authority necessary to allow the commercial distribution, marketing, promotion, use, offering for sale, and sale of the Licensed Product or Licensed Service in accordance with applicable laws.

1.35    "**Net Sales**" means the gross amount billed or invoiced by or on behalf of Licensee, its Affiliates, or any Sublicensee (in each case, an "**Invoicing Entity**") on sales, leases or other transfers of Licensed Products or Covered Software, less the following to the extent applicable with respect to such sales, leases or other transfers of Licensed Products and/or Covered Software and not previously deducted from the gross invoice price: (a) any advertised or customary trade, quantity or cash discounts or rebates to the extent actually allowed and taken; (b) amounts actually repaid or credited by reason of rejection or return of any previously sold, leased or otherwise transferred Licensed Products and/or Covered Software; (c) any charges for insurance, freight and other transportation costs directly related to the delivery of Licensed Products and/or Covered Software; and (d) any taxes, tariffs, custom duties or other similar governmental charges levied on the sale of a Licensed Product and/or Covered Software (but excluding what are commonly known as value-added taxes, franchise taxes, gross receipts taxes,

income taxes or similar government charges) that are paid by or on behalf of the seller thereof; provided that:

**1.35.1** in any transfers of Licensed Products and/or Covered Software between an Invoicing Entity and an Affiliate of such Invoicing Entity not for the purpose of resale by such Affiliate, Net Sales will be equal to the fair market value of the Licensed Products and/or Covered Software so transferred, assuming an arm's length transaction made in the ordinary course of business, unless and except such Affiliate is using such Licensed Product and/or Covered Software for internal research or training purposes only and not to perform Licensed Services;

**1.35.2** in the event that an Invoicing Entity receives non-cash consideration for any Licensed Products and/or Covered Software or in the case of transactions not at arm's length with a non-Affiliate of an Invoicing Entity, Net Sales will be calculated based on the fair market value of such consideration or transaction, assuming an arm's length transaction made in the ordinary course of business; and

**1.35.3** sales of Licensed Products and/or Covered Software by an Invoicing Entity to its Affiliate, Sublicensee or Distributor for resale by such Affiliate, Sublicensee, or Distributor will not be deemed Net Sales. Instead, Net Sales will be determined based on the gross amount billed or invoiced by such Affiliate, Sublicensee or Distributor upon resale of such Licensed Products to a Third Party purchaser.

Notwithstanding the foregoing provisions of this definition of "Net Sales", the following shall not be included in Net Sales: Licensed Products and/or Covered Software used as samples to promote additional Net Sales in amounts consistent with normal business practices of Licensee, its Affiliates or Sublicensees, provided that Licensee, its Affiliates, or Sublicensees receive no consideration for such samples.

**1.36** **"Non-Exclusive Patent Rights"** means the Patent Rights designated as Non-Exclusive Patent Rights on **Schedule III** hereto.

**1.37** **"Non-Royalty Sublicense Income"** means any payments or other consideration that Licensee or any of its Affiliates receives from a Sublicensee in connection with a Sublicense, and, as to any Affiliate practicing the Patent Rights on behalf of Licensee under **Section 2.2**, any payments or other consideration received by such Affiliate, other than royalties based on Net Sales or Service Income. If Licensee or its Affiliate receives non-cash consideration from a Sublicensee in connection with a Sublicense or in the case of transactions not at arm's length, Non-Royalty Sublicense Income will be calculated based on the fair market value of such consideration or transaction, at the time of the transaction, assuming an arm's length transaction made in the ordinary course of business.

1.38 **"Original Software"** means the software set forth on **Schedule IV** developed by or under the supervision of Dr. Zhuang, including source code and object code, in the form provided by Harvard to Licensee within thirty (30) days after the Effective Date, but expressly excluding any Third Party software.

1.39 **"OTD"** means the Office of Technology Development at Harvard University.

1.40 **"Patent Rights"** means, in each case: (a) the patents and patent applications listed in **Schedule III:** (including the PCT and/or U.S. utility application claiming priority to such application(s) that are filed on or before the one year conversion date of such application(s)); (b) any patent or patent application that claims priority to and is a divisional, continuation, reissue, renewal, reexamination, substitution or extension of any patent application identified in (a); (c) any patents issuing on any patent application identified in (a) or (b), including any reissues, renewals, reexaminations, substitutions or extensions thereof; (d) any claim of a continuation-in-part application or patent (including any reissues, renewals, reexaminations, substitutions or extensions thereof) that is entitled to the priority date of, and is directed specifically to subject matter specifically described in, at least one of the patents or patent applications identified in (a), (b) or (c); (e) any foreign counterpart (including PCTs) of any patent or patent application identified in (a), (b) or (c) or of the claims identified in (d); and (f) any supplementary protection certificates, pediatric exclusivity periods, any other patent term extensions and exclusivity periods and the like of any patents and patent applications identified in (a) through (e).

1.41 **"Qualified Financing"** shall mean preferred equity financing funded by institutional investors in an aggregate amount of at least Ten Million Dollars (USD $10,000,000) in immediately available funds, in one or a series of related or unrelated transactions, in each case, in exchange for shares of preferred stock of Licensee.

1.42 **"Regulatory Authority"** means any federal, state, national, supranational, local or other government regulatory authority or entity, whether domestic or foreign, including any subdivision, department, agency, instrumentality, authority, commission, board or bureau thereof, or any court, tribunal or arbitrator, in each case having the legal authority to grant Marketing Authorization for Licensed Products, Licensed Services and/or Covered Software.

1.43 **"Royalty Term"** means, on a country-by-country and Licensed Product-by-Licensed Product (and Licensed Service-by-Licensed Service) basis, the period commencing on the Effective Date and ending on the later of (a) the expiration of the last Valid Claim within the Patent Rights covering the Licensed Product or Licensed Service, as applicable, in such country, or (b) the tenth (10th) anniversary of the date of the First Commercial Sale of the Licensed Product or Licensed Service.

1.44    "**Service Income**" means the gross amount billed or invoiced by or on behalf of an Invoicing Entity for the performance of a Licensed Service less the following (a) any advertised or customary trade, quantity, or cash discounts or rebates actually received by the purchaser(s) of the Licensed Service; (b) amounts actually repaid or credited by reason of rejection of any deliverable produced in the performance of the Licensed Services; (c) customer freight charges that are paid by or on behalf of the Invoicing Entity with respect to any deliverable produced in the performance of the Licensed Services; and (d) to the extent separately stated on purchase orders, invoices or other documents of sale, any sales, value added or similar taxes, custom duties or other similar governmental charges levied directly on the performance of Licensed Services, or the production, sale, transportation, delivery or use of a Licensed Product produced in the performance of Licensed Services, that are paid by or on behalf of the Invoicing Entity; provided that in the event that non-monetary consideration is received in connection with any Licensed Service or in the case of transactions not at arm's length, Service Income shall be calculated based on the fair market value of such consideration or transaction, assuming an arm's length transaction made in the ordinary course of business. For clarity, funds received from government grants shall not be considered "Service Income".

1.45    "**Subcontractor**" means a Third Party whom Licensee, its Sublicensee or any of its or their respective Affiliates engages to develop or manufacture Licensed Products or perform Licensed Services solely on behalf of Licensee, such Affiliate or such Sublicensee, as applicable; provided that the term "Subcontractor" shall not include any person or entity who pays Licensee, its Sublicensee or any of its or their respective Affiliates any consideration (in any form) with respect to such engagement.

1.46    "**Sublicense**" means: (i) a right granted, license given or agreement entered into by Licensee (or by a Sublicensee to or with a further Sublicensee subject to **Section 2.5)** with any Third Party, permitting the practice of the Patent Rights or use of the Covered Software under the license granted to Licensee by Harvard in accordance with the terms and conditions of this Agreement, and/or (ii) a right granted, license given or agreement entered into by Licensee or by a Sublicensee with any Third Party, permitting the use of the Harvard Technology Transfer Information solely to the extent necessary to permit the Sublicensee to practice the Patent Rights and Copyrights as set forth in Section 2.1, or (iii) any right granted, license given or agreement entered into by Licensee permitting the development, manufacture, use and/or sale of Licensed Products, Covered Software or Licensed Services, in each case, regardless of whether such grant of rights, license given or agreement entered into is referred to or described as a sublicense.

1.47    "**Sublicensee**" means any Third Party granted a Sublicense; provided, however, that a Subcontractor or Distributor shall not be considered a Sublicensee.

1.48    "**Term**" means the term of this Agreement as set forth in **Section 10.1**.

**1.49** **"Third Party"** means any person, organization, or entity other than Harvard, Licensee, or an Affiliate of Licensee.

**1.50** **"Type I Licensed Product"** means, on a country-by-country basis, any product, part of a product, apparatus or composition, the making, using, selling, offering for sale, importing or exporting of which would, without the license granted hereunder, (i) infringe upon, directly, indirectly or by inducement of infringement, or indirectly by contributory infringement, at least one Valid Claim in a jurisdiction where such a Valid Claim exists, or (ii) infringe the copyrights in any Covered Software.

**1.51** **"Type II Licensed Product"** means, on a country-by-country basis, any product that is not a Type I Licensed Product, but (i) results from, or is identified, selected for development, developed, optimized, characterized or made through the practice of the Patent Rights (or any derivative or analog thereof), or through the use of any Licensed Product or Covered Software, or (ii) had been a Type I Licensed Product prior to the expiration of the last-to-expire Valid Claim within the Patent Rights covering such Licensed Product.

**1.52** **"USPTO"** shall mean the United States Patent and Trademark Office.

**1.53** **"Valid Claim"** means: (a) a claim of an issued and unexpired patent within the Patent Rights that has not been (i) held permanently revoked, unenforceable, unpatentable or invalid by a decision of a court or governmental body of competent jurisdiction, unappealable or unappealed within the time allowed for appeal, (ii) rendered unenforceable through disclaimer or otherwise, (iii) abandoned or (iv) permanently lost through an interference or opposition proceeding without any right of appeal or review; or (b) a pending claim of a pending patent application within the Patent Rights that (i) has been asserted and continues to be prosecuted in good faith and (ii) has not been abandoned or finally rejected without the possibility of appeal or refiling.

**2.** **License**.

**2.1** **License Grant**. Harvard hereby grants to Licensee:

**2.1.1** an exclusive, world-wide royalty-bearing, non-transferrable (except as provided herein), sublicensable, right and license under Harvard's interest in and to the Exclusive Patent Rights, in each case: (i) to generate, have generated, develop, have developed, make, have made, use, have used, market, have marketed, offer for sale, have offered for sale, sell, have sold, import, have imported, export and have exported Licensed Products, for use within the Field, and (ii) to perform, have performed, deliver, have delivered, offer for sale, have offered for sale, sell, have sold, import, have imported, export and have exported Licensed Services, for use within the Field;

**2.1.2** a non-exclusive, world-wide, royalty-bearing, non-transferrable (except as provided herein), sublicensable, right and license under Harvard's interest in and to the Non-Exclusive Patent Rights: (i) to generate, have generated,

develop, have developed, make, have made, use, have used, market, have marketed, offer for sale, have offered for sale, sell, have sold, import, have imported, export and have exported Licensed Products, for use within the Field, and (ii) to perform, have performed deliver, have delivered, offer for sale, have offered for sale, sell, have sold, import, have imported, export and have exported Licensed Services, for use within the Field;

**2.1.3** an exclusive, world-wide, royalty-bearing, non-transferable (except as provided herein), sublicensable, right and license under Harvard's interest in the Copyrights to use and modify the Covered Software for or in connection with the manufacture and/or development of Licensed Products within the Field. For the purposes of this **Section 2.1.3**, the term "use" means to copy, install, access, execute, operate, distribute, archive and run the Covered Software for test, development, production, archival, emergency restart and disaster recovery purposes; and

**2.1.4** a non-exclusive, world-wide, royalty-bearing, non-transferrable (except as provided herein), sublicensable, right and license to use and modify the Documentation and other Harvard Technology Transfer Information solely to the extent necessary to practice the licenses granted in **Sections 2.1.1, 2.1.2 and 2.1.3**. Harvard will deliver Documentation and Harvard Technology Transfer Information in its possession as of the Effective Date to Licensee within thirty (30) days of the Effective Date.

## 2.2 Retained Rights.

**2.2.1** Harvard retains the right, for itself and for other not-for-profit research organizations, to practice the Patent Rights and Copyrights and to "use" the Original Software within the scope of the license granted above, solely for non-commercial research, educational and scholarly purposes; and, for clarity, for purposes of the foregoing, the term "non-commercial" shall include academic research sponsored or funded by a commercial entity, so long as any such transaction shall not be in conflict with the terms of this agreement. Harvard retains for itself the right to distribute the Original Software to other not-for-profit research organizations to enable such organizations to practice the Patent Rights and Copyrights and to use the Original Software as permitted under this Section 2.2.1. For the purposes of this **Section 2.1.1 and Section 2.2.2 below**, the term "use" means to copy, install, access, execute, operate, archive, run and create derivative works of;

**2.2.2** **HHMI**. HHMI has a fully paid-up, non-exclusive, irrevocable, worldwide license to exercise any intellectual property rights with respect to the Patent Rights and Copyrights and to "use" and distribute the Original Software for research purposes, with the right to sublicense to non-profit and governmental entities (the "**HHMI License**") for such research purposes. Any and all licenses and other rights granted under this Agreement are explicitly made subject to the HHMI License.

2.2.3 the United States federal government retains rights in the Patent Rights pursuant to 35 U.S.C. §§ 200-212 and 37 C.F.R. § 401 et seq., and any right granted in this Agreement greater than that permitted under 35 U.S.C. §§ 200-212 or 37 C.F.R. § 401 et seq. will be subject to modification as may be required to conform to the provisions of those statutes and regulations.

2.3 **Affiliates**. The licenses granted to Licensee under **Section 2.1** include the right to have some or all of Licensee's rights or obligations under this Agreement exercised or performed by one or more of Licensee's Affiliates, solely on Licensee's behalf, provided, however, that:

2.3.1 prior to any Affiliate exercising or performing any of Licensee's rights or obligations under this Agreement, such Affiliate shall agree in writing with Licensee to be bound by the terms and conditions of this Agreement as if it were Licensee hereunder, including specific written agreement (a) to indemnify, defend and hold the Indemnitees and the HHMI Indemnitees harmless, and carry insurance, under the same terms as **Article 9** of this Agreement, and (b) that the Indemnitees and HHMI Indemnitees are express third party beneficiaries of such writing; and

2.3.2 any act or omission taken or made by an Affiliate of Licensee under this Agreement will be deemed an act or omission by Licensee under this Agreement;

2.4 **Distributors and Subcontractors**. The licenses granted to Licensee under **Section 2.1** includes the right to engage Distributors and Subcontractors; provided, however, that:

2.4.1 no such Distributor or Subcontractor shall be entitled to grant, directly or indirectly, to any other person or entity, any right of whatever nature under, or with respect to, or permitting any use or exploitation of, any of the Patent Rights or Copyrights, including any right to develop, manufacture, market or sell Licensed Products; and

2.4.2 any act or omission taken or made by any such Distributor or Subcontractor of Licensee (other than a Subcontractor of a Third Party) will be deemed an act or omission by Licensee under this Agreement.

2.4.3 In addition, the license rights granted to Licensee under **Section 2.1** may be exercised by Licensee's Subcontractors and outsourcers performing services for or on behalf of Licensee. Licensee shall require such Subcontractors and outsourcers to agree in writing with Licensee to be bound by the terms and conditions of this Agreement as if it were Licensee hereunder.

2.5 **Sublicenses**.

2.5.1 **Sublicense Grant**. Licensee, its Affiliates practicing under this Agreement in accordance with Section 2.3, and any Sublicensee, is entitled to grant

Sublicenses to Third Parties and non-Controlled Affiliates of Licensee, subject to the terms of this **Section 2.5**.

2.5.2 **Scope of Sublicense.** Any such Sublicense shall be subject and subordinate to the terms and conditions of this Agreement and negotiated at arm's length. Licensee shall require all Sublicenses to be in writing and to: (a) include all provisions necessary to ensure Licensee's ability to perform its obligations under this Agreement; and (b) include a section substantially the same as **Article 9** of this Agreement, which also will state that the Indemnitees and HHMI Indemnitees are intended third party beneficiaries of such Sublicense for the purpose of enforcing such indemnification and insurance provisions; (c) include a provision prohibiting Sublicensee from assigning the Sublicense without the prior written consent of Harvard, except that Sublicensee may assign the Sublicense agreement to a successor in connection with the merger, consolidation or sale of all or substantially all of its assets or that portion of its business to which the Sublicense agreement relates; provided, however, that any permitted assignee agrees in writing to be bound by the terms of such Sublicense agreement; and (d) include a provision clarifying that, in the event of termination of the license set forth in Section 2.1 (in whole or in part (e.g., termination in a particular country)), any existing Sublicense agreement shall terminate to the extent of such terminated license; provided, however, that, for each Sublicensee, upon termination of the license, if the Sublicensee is not then in breach of the Sublicense agreement such that Licensee would not have the right to terminate such Sublicense agreement, such Sublicensee shall have the right to obtain a license from Harvard under the terms set forth in Section 10.3.1 hereto.

2.5.3 **Breach by Sublicensee.** Notwithstanding any Sublicense, Licensee shall remain liable to Harvard for all of Licensee's duties and obligations contained in this Agreement, including the payment of all royalties due. Licensee shall be responsible for any breach of a Sublicense agreement by a Sublicensee to the extent that any such breach results in a material breach of this Agreement. Licensee may elect to either (a) cure such breach in accordance with **Section 10.2.2.** of this Agreement or (b) enforce its rights by terminating such Sublicense agreement in accordance with the terms thereof, thereby curing any such breach deemed to have occurred hereunder.

2.5.4 **Sublicensee Records.** Licensee shall require its Sublicensees: (a) to keep records and submit reports to Licensee of the same type and at the same time as required of Licensee by **Section 5.3**; and (b) to submit to Harvard at the same time Licensee is required to submit reports under **Section 5.1**, a report of all uses and dispositions of products licensed under any Sublicense and the amount of payments made to Licensee in connection with each such use or disposition.

**2.5.5** **Notice of Sublicense**. Licensee shall furnish Harvard with a fully executed copy of each Sublicense agreement within ten (10) days after its execution. Harvard shall keep all such copies in its confidential files and shall use them solely for the purpose of monitoring Licensee's and Sublicensees' compliance with their obligations hereunder and enforcing Harvard's rights under this Agreement.

**2.6** **Notification of Harvard Improvements**.

Harvard shall provide Licensee with written notice of each Improvement to which OTD has received a notice of invention promptly after OTD has evaluated and made such Improvement available for licensing.

**2.7** **No Other Grant of Rights**. Except as expressly provided herein, nothing in this Agreement will be construed to confer any ownership interest, license or other rights upon Licensee by implication, estoppel or otherwise as to any technology, intellectual property rights, products or biological materials of Harvard, or any other entity, regardless of whether such technology, intellectual property rights, products or biological materials are dominant, subordinate or otherwise related to any Patent Rights or Copyrights.

**3.** **Development and Commercialization.**

**3.1** **Diligence.**

**3.1.1** **General**. Licensee shall use commercially reasonable efforts and shall cause its Sublicensees to use commercially reasonable efforts: (a) to develop Licensed Products and Licensed Services in accordance with the Development Plan; (b) to introduce Licensed Products and Licensed Services into the commercial market; (c) to market Licensed Products and Licensed Services following such introduction into the market; and (d) to make Licensed Products and Licensed Services available at locally-affordable prices, as determined by Licensee, in in Developing Countries. In addition, Licensee, by itself or through its Affiliates or Sublicensees, shall achieve each of the Development Milestones for a Licensed Product or a Licensed Service within the time periods specified in **Schedule I**.

**3.1.2** **Adjustments of Development Plan**. Licensee will be entitled, from time to time, to make such adjustments to the then-applicable Development Plan as Licensee believes, in its good faith judgment, are needed in order to improve Licensee's ability to meet the Development Milestones.

**3.1.3** **Reporting**. Within sixty (60) days after the end of each calendar year, Licensee shall furnish Harvard with a written report summarizing its, its Affiliates' and its Sublicensees' efforts during the prior year to develop and commercialize Licensed Products and Licensed Services, including: (a) research and development activities; (b) commercialization and/or other distribution efforts, including a breakdown by each type of Licensed Product

13

and Licensed Service; (c) marketing efforts; and (d) efforts to distribute Licensed Products in Developing Countries on a locally affordable basis, as determined by Licensee. Each report must contain a sufficient level of detail for Harvard to assess whether Licensee is in compliance with its obligations under Section 3.1 and a discussion of intended efforts for the then current year. Together with each report, Licensee shall provide Harvard with a copy of the then current Development Plan.

3.2 **Failure to Meet Development Milestone; Opportunity to Cure**. If Licensee believes that it will not achieve a Development Milestone, it may notify Harvard in writing in advance of the relevant deadline (a "**Delayed Milestone Notice**"). Licensee shall include with such Delayed Milestone Notice (a) a reasonable explanation of the reasons for such failure (which explanations may include, among other things, force majeure, regulatory changes, unavailability of raw materials for manufacture of Licensed Products, but lack of finances and lack of personnel will not constitute reasonable basis for such failure) ("**Explanation**") and (b) a reasonable, detailed, written plan for promptly achieving a reasonable extended and/or amended milestone ("**Plan**"). If Licensee provides Harvard with a Delayed Milestone Notice, but fails to provide Harvard with both an Explanation and Plan, then Licensee will have an additional sixty (60) days or until the original deadline of the relevant Development Milestone, whichever is later, to meet such Development Milestone. In such event, Licensee's failure to achieve the Development Milestone within the time set forth in the preceding sentence shall constitute a material breach of this Agreement and Harvard shall have the right to terminate this Agreement under Section 10.2.2. If Licensee provides Harvard with an Explanation and a Plan in or with its Delayed Milestone Notice, both of which are acceptable to Harvard in its reasonable discretion, then Schedule I will be amended automatically to incorporate the extended and/or amended milestone set forth in the Plan. If Licensee provides a Delayed Milestone Notice to Harvard and provides Harvard with an Explanation and a Plan, but the Plan is not acceptable to Harvard in its reasonable discretion, then Harvard will provide a written explanation to Licensee detailing why the Plan is not acceptable and provide Licensee with suggestions for an acceptable Plan ("**Harvard Explanation**"). Licensee will have one opportunity to provide Harvard with an acceptable Plan within ninety (90) days after receipt of such Harvard Explanation, during which time Harvard agrees to work with Licensee in its effort to develop an acceptable Plan. If, within such ninety (90) days, Licensee provides Harvard with an acceptable Plan, then Schedule I will be amended to incorporate the extended and/or amended Development Milestone set forth in the Plan. If, within such ninety (90) days, Licensee fails to provide an acceptable Plan, then Licensee will have thirty (30) days after the date of Harvard's final rejection of the last Plan submitted by Licensee or until the original deadline of the relevant Development Milestone, whichever is later, to meet such Development Milestone. In the event that a Plan is not accepted by Harvard pursuant to the foregoing process, or after acceptance of a Plan Licensee fails to achieve the agreed upon Development Milestone or revised Development Milestone, as applicable, then Harvard shall have the right to terminate this Agreement pursuant to Section 10.2.2. The sole remedy of Harvard

for any breach of Section 3.1 or this Section 3.2 shall be to terminate this Agreement in accordance with Section 10.2.2.

## 4. Consideration for Grant of License.

### 4.1 Issuance Fees.

**Initial Licensee Issuance Fee**. As partial consideration for the license to the Patent Rights initially granted hereunder, Licensee shall pay Harvard a non-refundable license fee of Fifty Thousand Dollars (USD $50,000), due and payable within thirty (30) days after the Effective Date.

### 4.2 Equity.

**4.2.1 Issuance**. As partial consideration for the license to the Patent Rights initially granted hereunder and pursuant to a mutually-agreeable stock purchase or subscription agreement, within thirty (30) days after the Effective Date, Licensee shall issue to Harvard a number of shares of Licensee's common stock representing five percent (5%) of Licensee's capital stock on a Fully Diluted Basis (as defined below) after giving effect to such issuance (the "**Shares**"). The Shares shall have the rights and obligations set forth in the then-effective Certificate of Incorporation and Bylaws of Licensee, which such documents shall be in the same form, without modification, amendment or supplement, as those provided to Harvard and as certified by Licensee prior to the Effective Date. Licensee agrees that it shall grant Harvard, as an owner of common stock of Licensee, the right to review and enter into any stockholders agreement (e.g., investors rights agreement, voting agreement, right of first refusal and co-sale agreement, etc.) to the same extent that any other owner of common stock of Licensee has such rights regarding any such agreement.

**4.2.2 Representations and Warranties**. Licensee represents and warrants to Harvard that, upon issuance of the Shares, and upon issuance of any Anti-Dilution Shares:

**4.2.2.1** the capitalization table, which Licensee shall provide upon issuance of the Shares or the Anti-Dilution Shares, as the case may be (the "**Cap Table**"), sets forth all of the capital stock of Licensee on a Fully-Diluted Basis as of the date of issuance of the Shares or the Anti-Dilution Shares;

**4.2.2.2** other than as set forth in the Cap Table, as of the date of issuance of the Shares or Anti-Dilution Shares, as applicable, there are no outstanding shares of capital stock, convertible securities, outstanding warrants, options or other rights to subscribe for, purchase or acquire from Licensee any capital stock of Licensee and there are no contracts or binding commitments providing for the issuance of, or the granting of rights to acquire, any capital

stock of Licensee or under which Licensee is, or may become, obligated to issue any of its securities; and

**4.2.2.3** the Shares or the Anti-Dilution Shares, as the case may be, when issued pursuant to the terms hereof, shall, upon such issuance, be duly authorized, validly issued, fully paid and nonassessable.

**4.2.3 Anti-Dilution**. If, at any time until immediately after the achievement of a Qualified Financing, Licensee issues Additional Securities that would cause Harvard's shareholdings in Licensee to drop below five percent (5%) on a Fully-Diluted Basis, concurrently with the issuance of such Additional Securities, Licensee shall issue to Harvard for no additional consideration such additional number of shares of common stock of Licensee (the "**Anti-Dilution Shares**") such that Harvard's shareholdings in Licensee shall equal five percent (5%) of the capital stock of Licensee on a Fully Diluted Basis, as calculated after giving effect to the Anti-Dilution issuance and the issuance of such Additional Securities through the Qualified Financing, but not any issuances in consideration for investment amounts in excess of the Qualified Financing. Such issuances shall continue only up to, and until such time as Licensee has achieved, the Qualified Financing. Thereafter, no additional shares shall be due to Harvard pursuant to this **Section 4.2.3**. For avoidance of doubt, in the event that Licensee issues Additional Securities in a Qualified Financing in exchange for a cash investment which exceeds a cumulative amount of Ten Million U.S. Dollars ($10,000,000) in the aggregate when combined with all prior issuances of preferred equity by Licensee, then the Anti-Dilution Shares issuable by Licensee in connection with such issuance will be calculated only with respect to the Additional Securities that would have been issued if the cumulative amount invested pursuant to the Qualified Financing (whether in one or more related or unrelated transactions) equaled exactly Ten Million U.S. Dollars ($10,000,000) in the aggregate (with the number of Anti-Dilution Shares being rounded up to the nearest whole share).

**4.3 Annual License Maintenance Fee**. Licensee shall pay Harvard an Annual License Maintenance fee as follows:

**4.3.1** Fifteen Thousand Dollars (USD $15,000) for Calendar Year 2020;

**4.3.2** Twenty Five Thousand Dollars (USD $25,000) for each of Calendar Year 2021 and 2022;

**4.3.3** Fifty Thousand Dollars (USD $50,000) for each of Calendar Year 2023 and 2024;

**4.3.4** Seventy Five Thousand Dollars ($75,000) for Calendar Year 2025; and

**4.3.5** One Hundred Thousand Dollars (USD $100,000) for each of Calendar Year 2026 and each subsequent Calendar Year during the Term.

Each such fee shall be due and payable on January 1st of the Calendar Year to which such fee applies. Each annual license maintenance fee shall be creditable against any royalty amounts payable under this Agreement with respect to Licensed Products sold and Licensed Services performed in the same Calendar Year that such annual license maintenance fee was due.

4.4    **Royalty on Net Sales and Service Income**. Licensee shall pay Harvard, on a country-by-country and Licensed Product-by-Licensed Product and Licensed Service-by-Licensed Service basis, running royalties on Net Sales and Service Income as follows: (a) Four percent (4%) of Net Sales of Type I Licensed Products and Service Income; (b) one and one half percent (1.5%) of Net Sales of each Type II Licensed Product, with respect to cumulative Net Sales up to Fifty Million U.S. Dollars ($50,000,000) in each calendar year; and (c) one and one quarter percent (1.25%) of Net Sales of each Type II Licensed Product with respect to cumulative Net Sales in excess of Fifty Million U.S. Dollars ($50,000,000) in each calendar year. Notwithstanding the foregoing, with respect to Net Sales attributable to Licensed Product(s) sold in any Developing Country(ies) at locally-affordable prices and Service Income generated through Licensed Services performed in any Developing Country(ies) at locally-affordable prices, solely for use in such Developing Country(ies) and not for further resale or use in any Developed Country(ies), the applicable royalty rate shall be reduced to zero percent (0%).

4.5    **Third Party Royalty Set-Off**. If Licensee obtains a license from a Third Party to an Infringed Patent after arm's length negotiations, it may offset fifty percent (50%) of any running royalty payments due thereunder with respect to sales of Licensed Products or performance of Licensed Services against the royalty payments that are due to Harvard with respect to Net Sales of such Licensed Products or Service Income derived from performance of such Licensed Services in such country; provided that in no event shall (a) the royalty payments to Harvard with respect to such Licensed Products or Licensed Services be reduced by more than fifty percent (50%) of the amount otherwise due and (b) the percentage offset that Licensee is entitled to make against royalty payments due to Harvard be greater than any percentage offset that Licensee is entitled to make against royalty payments due to such Third Party licensor on account of royalty payments made to Harvard with respect to such Licensed Product.

4.6    **Patent Challenge**. If Licensee, its Affiliate or a Sublicensee ("**Challenging Party**") commences an action in which it challenges the validity, enforceability or scope of any of the Patent Rights (a "**Challenge Proceeding**"), Harvard shall provide Licensee with a notice that the royalty rates specified in **Section 4.4** will be doubled with respect to Net Sales of Licensed Products that are sold and Service Income derived from Licensed Services performed during the pendency of such Challenge Proceeding; provided that the royalty rates will not be doubled for any such Challenge Proceeding by any Sublicensee if such Challenge Proceeding is dismissed within thirty (30) days of Harvard's notice under this Section 4.6. If the outcome of such Challenge Proceeding is a determination against the Challenging Party, (a) the royalty rate specified in **Section 4.4** with respect to Net Sales of

Licensed Products and Service Income derived from Licensed Services that are covered by the Patent Rights that are the subject of such Challenge Proceeding shall remain at such doubled rate and (b) Licensee shall reimburse Harvard for all expenses incurred by Harvard (including reasonable attorneys' fees) in connection with such Challenge Proceeding. If the outcome of such Challenge Proceeding is a determination in favor of the Challenging Party, Licensee will have no right to recoup any royalties paid before or during the pendency of such Challenge Proceeding.

4.7 **Non-Royalty Sublicense Income**. Licensee will pay Harvard (a) an amount equal to twenty percent (20%) of all Non-Royalty Sublicense Income accrued from the period beginning on the Effective Date, and ending on the date on which Licensee achieves the earlier of (i) the achievement of Seven Million Five Hundred Thousand Dollars (USD $ 7,500,000) in trailing twelve (12) month Net Sales, or (ii) FDA approval of a Licensed Product that is an in vitro diagnostic product, and (b) thereafter, an amount equal to ten percent (10%) of all Non-Royalty Sublicense Income.

4.8 **Milestone Payments**. Licensee shall pay Harvard the amount of One Hundred Thousand Dollars (USD $100,000) upon the achievement of cumulative Net Sales of Licensed Products and/or Service Income in the amount of Twenty Five Million Dollars (USD $25,000,000).

4.9 **Participation Rights**. If Licensee proposes to sell any equity securities or securities that are convertible into equity securities of Licensee, then Harvard and/or its Assignee (as defined below) will have the right to purchase up to ten percent (10%) of the securities issued in each offering on the same terms and conditions as are offered to the other purchasers in each such financing. Licensee shall provide thirty (30) days advanced written notice of each such financing, including reasonable detail regarding the terms and purchasers in the financing. The term "Assignee" means (a) Osage University Partners, (b) any entity to which Harvard's participation rights under this section have been assigned by Harvard with the prior written consent of Assignee (such consent not to be unreasonably withheld), or (c) any entity that is Controlled by Harvard for so long as such entity remains under Harvard's Control. This paragraph shall survive the termination of this Agreement.

4.10 **Information Rights**. Harvard and any Assignee shall be entitled to receive all financial statements, budgets and business plans of Licensee that Licensee provides to any other shareholder of Licensee, at the same time and in the same format and under the same confidentiality obligations as provided to such other shareholders. Licensee shall provide such information related to this Agreement as reasonably necessary for Harvard to comply with state law for accounting for the value of investments, upon reasonable request by Licensee.

4.11 **Complex Consideration**. The Parties acknowledge and agree (i) that the licenses granted by Harvard to Licensee in the Patent Rights, Copyrights and Harvard Technology Transfer Information hereunder will enable Licensee, its Affiliates or

18

Sublicensees to develop Licensed Products, and (ii) that in consideration of the rights to practice the Patent Rights and use the Copyrights and Harvard Technology Transfer Information granted hereunder, the royalties and other payments in this **Article 4** have been structured for Licensee's convenience in calculating and paying such amounts, and that certain royalty rates incorporate discounts reflecting that certain Licensed Products may be products that are not covered by Valid Claims within the Patent Rights, but may be based upon, derived from or developed through the practice or use of the Patent Rights, Covered Software or Harvard Technology Transfer Information, with the intent of compensating Harvard for the fair market value of such rights as determined and agreed upon by the Parties hereunder. Licensee agrees that, unless explicitly provided otherwise in this Agreement, it shall not be entitled to a reduction in the royalty rates, even if it does not at all times need or use a license to specific Patent Rights, until the end of any payment period contemplated under this **Article 4**.

5. **Reports; Payments; Records**.

   5.1 **Reports and Payments**.

   **5.1.1 Reports**. Within forty-five (45) days after the conclusion of each Calendar Quarter commencing with the first Calendar Quarter in which Net Sales or Service Income are generated or Non-Royalty Sublicense Income is received, Licensee shall deliver to Harvard a report containing the following information (in each instance, with a Licensed Product-by-Licensed Product, Licensed Service-by-Licensed Service and country-by-country breakdown) in the format set forth on Exhibit 5.1.1.:

   **5.1.1.1** the number of units of Licensed Products sold, leased or otherwise transferred by or on behalf of Invoicing Entities for the applicable Calendar Quarter;

   **5.1.1.2** the gross amount billed or invoiced for Licensed Products sold, leased or otherwise transferred by or on behalf of Invoicing Entities during the applicable Calendar Quarter;

   **5.1.1.3** a calculation of Net Sales for the applicable Calendar Quarter, including an itemized listing of allowable deductions;

   **5.1.1.4** (a) the number of Licensed Services performed by or on behalf of Invoicing Entities for the applicable Calendar Quarter, (b) the gross amount billed or invoiced for such Licensed Services, and (c) a calculation of Service Income for the applicable Calendar Quarter, including an itemized list of allowable deductions;

**5.1.1.5**    a detailed accounting of all Non-Royalty Sublicense Income received during the applicable Calendar Quarter;

**5.1.1.6**    the total amount payable to Harvard in U.S. Dollars on Net Sales, Service Income and Non-Royalty Sublicense Income for the applicable Calendar Quarter, together with the exchange rates used for conversion; and

**5.1.1.7**    a list of Harvard Case numbers for (i) all Patent Rights that have Valid Claims covering, or Copyrights that cover the Covered Software included in or used to develop, the Licensed Products or Licensed Services, and (ii) all Harvard Technology Transfer Information incorporated in, or used in the development, manufacture or sale of Licensed Products or the performance of Licensed Services;

**5.1.1.8**    a list identifying by name and description any products that were, in the previous report, treated as Licensed Products under the terms of this Agreement, but that have not been counted as royalty-bearing during the period that is the subject of such report on account of redesigns or other changes, which causes them to no longer practice the Patent Rights and/or Copyrights.

**5.1.2 Payment**.  Within forty-five (45) days after the end of each Calendar Quarter, Licensee shall pay Harvard all amounts due with respect to Net Sales, Service Income and Non-Royalty Sublicense Income for the applicable Calendar Quarter.

**5.2**    **Payment Currency**.  All payments due under this Agreement will be paid in U.S. Dollars.  Conversion of foreign currency to U.S. Dollars will be made at the conversion rate existing in the United States (as reported in the *Wall Street Journal*) on the last working day of the applicable Calendar Quarter.  Such payments will be without deduction of exchange, collection or other charges.

**5.3**    **Records**.  Licensee shall maintain, and shall cause its Affiliates and Sublicensees to maintain, complete and accurate records of Licensed Products that are made, used, sold, leased or transferred, and Licensed Services performed, under this Agreement, any amounts payable to Harvard in relation to such Licensed Products and Licensed Services, and all Non-Royalty Sublicense Income received by Licensee and its Affiliates, which records shall contain sufficient information to permit Harvard to confirm the accuracy of any reports or notifications delivered to Harvard under **Section 5.1**.  Licensee, its Affiliates and/or its Sublicensees, as applicable, shall retain such records relating to a given Calendar Quarter for at least five (5) years after the conclusion of that Calendar Quarter, during which time Harvard will have the right, at its expense, to cause an independent, certified public accountant (or, in the event of a non-financial audit, other appropriate auditor) to inspect such records during normal business hours for the purposes of verifying the

accuracy of any reports and payments delivered under this Agreement and Licensee's compliance with the terms hereof. Such accountant or other auditor, as applicable, shall not disclose to Harvard any information other than information relating to the accuracy of reports and payments delivered under this Agreement. The Parties shall reconcile any underpayment or overpayment within thirty (30) days after the accountant delivers the results of the audit. If any audit performed under this **Section 5.3** reveals an underpayment in excess of five percent (5%) in any Calendar Year, Licensee shall reimburse Harvard for all reasonable amounts incurred in connection with such audit. Subject to the foregoing sentence, Harvard shall bear all costs of any audit. Harvard may exercise its rights under this **Section 5.3** only once every year per audited entity and only with reasonable prior notice to the audited entity.

5.4 **Late Payments**. Any payments by Licensee that are not paid on or before the date such payments are due under this Agreement will bear interest at the lower of (a) one- and one-half percent (1.5%) per month and (b) the maximum rate allowed by law. Interest will accrue beginning on the first day following the due date for payment and will be compounded quarterly. Payment of such interest by Licensee shall not limit, in any way, Harvard's right to exercise any other remedies Harvard may have as a consequence of the lateness of any payment.

5.5 **Payment Method**. Each payment due to Harvard under this Agreement shall be paid by check or wire transfer of funds to Harvard's account in accordance with written instructions provided by Harvard. If made by wire transfer, such payments shall be marked so as to refer to this Agreement.

5.6 **Withholding and Similar Taxes**. Except as required by law, all amounts to be paid to Harvard pursuant to this Agreement shall be without deduction of exchange, collection, or other charges, and, specifically, without deduction of withholding or similar taxes or other government imposed fees or taxes, except as permitted in the definition of Net Sales. If Licensee is required to withhold any amounts payable hereunder to Harvard due to the applicable laws of any country, such amount will be deducted from the payment to be made by Licensee and remitted to the appropriate taxing authority for the benefit of Harvard. Licensee will withhold only such amounts as are required to be withheld by applicable law in the country from which payment is being made. Licensee shall submit to Harvard originals of the remittance voucher and the official receipt evidencing the payment of the corresponding taxes with the applicable royalty report. Licensee will cooperate with Harvard to provide such information and records as Harvard may require in connection with any application by Harvard to the tax authorities in any country, including attempt to obtain an exemption or a credit for any withholding tax paid in any country

5.7 **Corporate Transaction Reporting**. Licensee shall notify Harvard within thirty (30) days of the consummation of a Qualified Financing or any transaction which results in a change in Control of Licensee or any subsidiary practicing on behalf of Licensee pursuant to **Section 2.3**. Such notification shall include a summary of such

transaction and, subject to any obligations of confidentiality binding on Licensee, identify the parties involved.

5.8 **Solvency Certificate**. Upon written request by Harvard, made no more frequently than once per Calendar Year, an authorized officer of the Licensee shall deliver to Harvard, a certificate certifying that as of the date of delivery, the Licensee (i) has not dissolved or liquidated or taken any corporate action for such purpose; (ii) is not insolvent or generally unable to pay, and has not failed to pay its debts as they have become due; (iii) has not filed or had filed against it a petition for voluntary or involuntary bankruptcy or otherwise become subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (iv) has not made or sought to make a general assignment for the benefit of creditors; and (v) has not applied for or had a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

6. **Patent Filing, Prosecution and Maintenance**.

6.1 **Control**. Harvard will be responsible for the preparation, filing, prosecution, protection, defense and maintenance of all Patent Rights, using independent patent counsel reasonably acceptable to Licensee. Harvard will: (a) instruct such patent counsel to furnish the Licensee with copies of all correspondence relating to the Patent Rights from the United States Patent and Trademark Office (USPTO) and any other patent office, as well as copies of all proposed responses to such correspondence in time for Licensee to review and comment on such response; (b) give Licensee an opportunity to review the text of each patent application before filing; (c) consult with Licensee with respect thereto; (d) supply Licensee with a copy of the application as filed, together with notice of its filing date and serial number; (e) keep Licensee advised of the status of actual and prospective patent filings; and (f) provide advance copies of all material submissions related to the filing, prosecution, protection and maintenance of such patent filings. Harvard shall give Licensee the opportunity to provide comments on and make requests of Harvard concerning the preparation, filing, prosecution, protection, defense and maintenance of the Patent Rights, and shall seriously consider such comments and requests; however, final decision-making authority shall vest in Harvard. In particular, and without intending to limit any of Harvard's rights pursuant to this Agreement, Harvard expressly reserves the right to decline Licensee's request to file, prosecute, maintain or defend any of the Patent Rights in any Developing Country(ies) unless Licensee demonstrates to Harvard's reasonable satisfaction that the filing, prosecution, maintenance or defense of such Patent Rights in such Developing Country(ies) would materially increase the locally-affordable availability of Licensed Products or equivalents thereof (*e.g.,* generic products) in those and/or other Developing Country(ies). The provisions of **Section 7** notwithstanding, Licensee agrees that Harvard shall hold final decision-making authority, on a case-by-case basis, as to whether Licensee will be permitted to enforce such Patent Rights in such Developing Country(ies).

6.2 **Patent Expenses**. Subject to **Section 6.3** below, Licensee shall reimburse Harvard for all documented, out-of-pocket expenses incurred by Harvard pursuant to this **Article 6** within thirty (30) days after the date of each invoice from Harvard for such expenses. In addition, within thirty (30) days after the Effective Date, Licensee shall reimburse Harvard for all documented, out-of-pocket expenses incurred by Harvard prior to the Effective Date with respect to the preparation, filing, prosecution, protection and maintenance of Patent Rights.

6.3 **Abandonment**. If Licensee decides that it does not wish to pay for the preparation, filing, prosecution, protection, maintenance or defense of any Patent Rights in a particular country ("**Abandoned Patent Rights**"), Licensee shall provide Harvard with prompt written notice of such election. Upon receipt of such notice by Harvard, Licensee shall be released from its obligation to reimburse Harvard for the expenses incurred thereafter as to such Abandoned Patent Rights; provided, however, that expenses authorized prior to the receipt by Harvard of such notice shall be deemed incurred prior to the notice. In the event of Licensee's abandonment of its reimbursement obligations under **Section 6.2** as to any Patent Rights, any license granted by Harvard to Licensee hereunder with respect to such Abandoned Patent Rights will terminate, and Licensee will have no rights whatsoever to exploit such Abandoned Patent Rights. Harvard will then be free, without further notice or obligation to Licensee, to grant rights in and to such Abandoned Patent Rights to Third Parties.

6.4 **Small Entity Designation**. If Licensee, its Affiliates, any Sublicensee and/or any holder of an option to obtain a Sublicense does not qualify, or at any point during the Term ceases to qualify, as an entity entitled to pay lesser fees as provided by the USPTO (i.e., a "small entity") or the patent office of any other country, Licensee shall so notify Harvard immediately, in order to enable Harvard to comply with regulations regarding payment of fees with respect to Patent Rights.

6.5 **Marking**. To the extent commercially feasible and consistent with prevailing business practice, Licensee shall, and shall cause its Affiliates and Sublicensees to, mark all Licensed Products sold or otherwise disposed of in such a manner as to conform with the patent laws and practice of the country to which such products are shipped or in which such products are sold for purposes of ensuring maximum enforceability of Patent Rights in such country.

7. **Enforcement of Patent Rights**.

7.1 **Notice**. In the event either Party becomes aware of any possible or actual infringement of any Exclusive Patent Rights or the Copyrights with respect to Licensed Products or Licensed Services in the Field (an "**Infringement**"), that Party shall promptly notify the other Party and provide it with details regarding such Infringement.

7.2 **Suit by Licensee**. Licensee shall have the first right, but not the obligation, to take action in the prosecution, prevention, or termination of any Infringement. Before

Licensee commences an action with respect to any Infringement, Licensee shall consider in good faith the views of Harvard and potential effects on the public interest in making its decision whether to sue, especially with regard to the locally-affordable availability of Licensed Products or Licensed Services or equivalents thereof, *e.g.,* generic products, in Developing Countries. Should Licensee elect to bring suit against an infringer, Licensee shall keep Harvard reasonably informed of the progress of the action and shall give Harvard a reasonable opportunity in advance to consult with Licensee and offer its views about major decisions affecting the litigation. Licensee shall give careful consideration to those views, but shall have the right to control the action; provided, however, that if Licensee fails to defend in good faith the validity and/or enforceability of the Patent Rights in the action or, or if Licensee's license to a Valid Claim in the suit terminates, Harvard may elect to take control of the action pursuant to **Section 7.3**. Any and all expenses, including reasonable attorneys' fees, incurred by Harvard with respect to the prosecution, adjudication and/or settlement of such suit described in the preceding sentence, including any related appeals, shall be paid for entirely by Licensee and Licensee shall hold Harvard free, clear and harmless from and against any and all such expenses. The expenses of such suit or suits that Licensee elects to bring, including any expenses of Harvard incurred in conjunction with the prosecution of such suits or the settlement thereof, shall be paid for entirely by Licensee and Licensee shall hold Harvard free, clear and harmless from and against any and all costs of such litigation, including reasonable attorneys' fees. Licensee shall reimburse any and all such expenses incurred by Harvard within thirty (30) days after receiving an invoice (including a copy of detailed time and expense entries from attorneys) from Harvard for the same. Licensee shall not compromise or settle such litigation without the prior written consent of Harvard, which consent shall not be unreasonably withheld or delayed. In the event Licensee exercises its right to sue pursuant to this **Section 7.2**, it shall first reimburse itself out of any sums recovered in such suit or in settlement thereof for all costs and expenses of every kind and character, including reasonable attorneys' fees, necessarily incurred in the prosecution of any such suit. If, after such reimbursement, any funds shall remain from said recovery, then Harvard shall receive an amount equal to twenty percent (20%) of such funds and the remaining eighty percent (80%) of such funds shall be retained by Licensee.

7.3     **Suit by Harvard**. If Licensee does not take action in the prosecution, prevention, or termination of any Infringement pursuant to **Section 7.2** above, and has not commenced negotiations with the infringer for the discontinuance of said Infringement, within ninety (90) days after receipt of notice to Licensee by Harvard of the existence of an Infringement, Harvard may elect to do so. Should Harvard elect to bring suit against an infringer and Licensee is joined as party plaintiff in any such suit, Licensee shall have the right to approve the counsel selected by Harvard to represent Harvard and Licensee, such approval not to be unreasonably withheld. Any and all expenses, including reasonable attorneys' fees, incurred by Licensee with respect to the prosecution, adjudication and/or settlement of such suit, including any related appeals, shall be paid for entirely by Harvard and Harvard shall hold Licensee free, clear and harmless from and against any and all

such expenses. Harvard shall reimburse any and all such expenses incurred by Licensee within thirty (30) days after receiving an invoice (including a copy of detailed time and expense entries from attorneys) from Licensee for the same. Harvard shall not compromise or settle such litigation without the prior written consent of Licensee, which consent shall not be unreasonably withheld or delayed. In the event Harvard exercises its right to sue pursuant to this **Section 7.3**, it shall first reimburse itself out of any sums recovered in such suit or in settlement thereof for all costs and expenses of every kind and character, including reasonable attorneys' fees, necessarily incurred in the prosecution of any such suit. If, after such reimbursement, any funds shall remain from said recovery, then Licensee shall receive an amount equal to twenty percent (20%) of such funds and the remaining eighty percent (80%) of such funds shall be retained by Harvard.

7.4    **Own Counsel**. Each Party shall always have the right to be represented by counsel of its own selection and at its own expense in any suit instituted under this **Article 7** by the other Party for Infringement.

7.5    **Cooperation**. Each Party agrees to cooperate fully in any action under this **Article 7** that is controlled by the other Party, provided that the controlling Party reimburses the cooperating Party promptly for any costs and expenses incurred by the cooperating Party in connection with providing such assistance.

7.6    **Declaratory Judgment**. If a declaratory judgment action is brought naming Licensee and/or any of its Affiliates or Sublicensees as a defendant and alleging invalidity or unenforceability of any claims within the Patent Rights, Licensee shall promptly notify Harvard in writing and Harvard may elect, upon written notice to Licensee within thirty (30) days after Harvard receives notice of the commencement of such action, to take over the sole defense of the invalidity and/or unenforceability aspect of the action at its own expense, and shall reasonably consider all comments of Licensee concerning such action.

8.    **Warranties; Limitation of Liability**.

8.1    **Compliance with Law**. Licensee represents and warrants that it will comply, and will ensure that its Affiliates and Sublicensees comply, with all local, state, federal and international laws and regulations relating to the development, manufacture, use, sale and importation of Licensed Products and performance of Licensed Services. Without limiting the foregoing, Licensee represents and warrants, on behalf of itself and its Affiliates and Sublicensees, that it shall comply with all United States laws and regulations controlling the export of certain commodities and technical data, including without limitation all Export Administration Regulations of the United States Department of Commerce. Among other things, these laws and regulations prohibit or require a license for the export of certain types of commodities and technical data to specified countries. Licensee hereby gives written assurance that it will comply with, and will cause its Affiliates to comply with (and will contractually obligate its Sublicensees to comply with), all United States export control laws and regulations, that it bears sole responsibility

for any violation of such laws and regulations by itself or its Affiliates or Sublicensees, and that it will indemnify, defend, and hold Harvard and the HHMI Indemnitees harmless (in accordance with **Section 9.1**) for the consequences of any such violation.

8.2 **Harvard's Representations**. Harvard hereby represents, as of the Effective Date: (a) Harvard has received an assignment from each of the inventors listed in the Patent Rights as of the Effective Date of their interests in the Patent Rights, (b) Harvard has the legal power and authority to execute, deliver, and perform this Agreement, (c) the execution, delivery, and performance of this Agreement has been duly authorized by all necessary persons and committees, (d) this Agreement constitutes the legal, valid, and binding obligations of Harvard, and to the best of the knowledge of OTD, and, without any further investigation, is not in conflict with any existing intellectual property agreement with a Third Party under which Harvard is bound, and (e) Harvard has not previously granted exclusive rights to the Patent Rights in the Field to any Third Party.

8.3 **No Warranty**.

8.3.1 NOTHING CONTAINED HEREIN SHALL BE DEEMED TO BE A WARRANTY BY HARVARD THAT IT CAN OR WILL BE ABLE TO OBTAIN PATENTS ON PATENT APPLICATIONS INCLUDED IN THE PATENT RIGHTS, OR THAT ANY OF THE PATENT RIGHTS WILL AFFORD ADEQUATE OR COMMERCIALLY WORTHWHILE PROTECTION.

8.3.2 HARVARD MAKES NO WARRANTIES WHATSOEVER AS TO THE COMMERCIAL OR SCIENTIFIC VALUE OF THE PATENT RIGHTS. HARVARD MAKES NO REPRESENTATION THAT THE PRACTICE OF THE PATENT RIGHTS OR THE DEVELOPMENT, MANUFACTURE, USE, SALE OR IMPORTATION OF ANY LICENSED PRODUCT OR THE PERFORMANCE OF ANY LICENSED SERVICE OR ANY ELEMENT THEREOF, WILL NOT INFRINGE ANY PATENT OR PROPRIETARY RIGHTS OF ANY OTHER PERSON.

8.3.3 EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTY WITH RESPECT TO ANY TECHNOLOGY, PATENTS, GOODS, SERVICES, RIGHTS OR OTHER SUBJECT MATTER OF THIS AGREEMENT AND EACH PARTY HEREBY DISCLAIMS WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT WITH RESPECT TO ANY AND ALL OF THE FOREGOING.

8.4 **Limitation of Liability**.

**8.4.1** Except with respect to matters for which Licensee is obligated to indemnify Harvard under **Article 9**, neither Party will be liable to the other with respect to any subject matter of this Agreement under any contract, negligence, strict liability or other legal or equitable theory for (a) any indirect, incidental, consequential or punitive damages or lost profits or (b) cost of procurement of substitute goods, technology or services.

**8.4.2** Harvard's aggregate liability for all damages of any kind arising out of or relating to this Agreement or its subject matter under any contract, negligence, strict liability or other legal or equitable theory shall not exceed the amounts paid to Harvard under this Agreement.

9. **Indemnification and Insurance**.

9.1 **Indemnity**.

**9.1.1** Licensee shall indemnify, defend and hold harmless Harvard and its current and former directors, governing board members, trustees, officers, faculty, medical and professional staff, employees, students, and agents and their respective successors, heirs and assigns (collectively, the "**Indemnitees**") from and against any claim, liability, cost, expense, damage, deficiency, loss or obligation of any kind or nature (including reasonable attorneys' fees and other costs and expenses of litigation) asserted by a Third Party and based upon, or arising out of, (a) the exercise or practice of any rights or licenses granted to Licensee, its Affiliates and Sublicensees hereunder or (b) the development, manufacture, distribution, sale or use of Licensed Products or the performance of Licensed Services, including any cause of action relating to product liability concerning any product, process, or service made, used, sold or performed pursuant to any right or license granted under this Agreement (collectively, "**Claims**"), but excluding any Claims based upon, or arising out of, a material breach of this Agreement by Harvard or the gross negligence or willful misconduct of any Indemnitee. Licensee shall indemnify, defend and hold harmless HHMI, and its trustees, officers, employees, and agents (collectively, "**HHMI Indemnitees**") from and against any claim, liability, cost, expense, damage, deficiency, loss, or obligation, of any kind or nature (including, without limitation, reasonable attorneys' fees and other costs and expenses of defense) (collectively, "HHMI Claims"), based upon, arising out of, or otherwise relating to this Agreement or any Sublicense, including without limitation any cause of action relating to product liability. The previous sentence will not apply to any HHMI Claim that is determined with finality by a court of competent jurisdiction to result solely from the gross negligence or willful misconduct of an HHMI Indemnitee. Notwithstanding Section 8.4 or any other provision of this Agreement, Licensee's obligation to defend, indemnify and hold harmless the HHMI Indemnitees under this paragraph shall not be subject to any limitation or exclusion of liability or damages or otherwise limited in any way.

**9.1.2** Licensee shall, at its own expense, provide attorneys reasonably acceptable to Harvard and/or HHMI, as applicable, to defend against any actions brought or filed against any Indemnitee or any HHMI Indemnitee, as applicable, hereunder with respect to the subject of indemnity contained herein, whether or not such actions are rightfully brought.

**9.1.3** Any Indemnitee and/or HHMI Indemnitee, as applicable, seeking indemnification hereunder shall promptly notify Licensee of such Claim or HHMI Claim, as applicable. In the case of any HHMI Indemnitee, notice shall be given reasonably promptly following actual receipt of written notice thereof by an officer or attorney of HHMI. Notwithstanding the foregoing, the delay or failure of any HHMI Indemnitee to give reasonably prompt notice to Licensee of any such HHMI Claim shall not affect the rights of such HHMI Indemnitee unless, and then only to the extent that, such delay or failure is prejudicial to or otherwise adversely affects Licensee. The Indemnitees and/or HHMI Indemnitees, as applicable, shall provide Licensee, at Licensee's expense, with reasonable assistance and full information with respect to such Claim or HHMI Claim, as applicable and give Licensee sole control of the defense or settlement of any such Claim or HHMI Claim; provided, however, that (a) Licensee shall not settle any such Claim or impose any obligations on any Indemnitee without the prior written consent of such Indemnitee, which consent shall not be unreasonably withheld, (b) no Indemnitee shall settle any such Claim without the prior written consent of Licensee and HHMI, which consent shall not be unreasonably withheld, (c) Licensee shall not settle any such HHMI Claim without HHMI's written consent, where (a) such settlement would include any admission of liability on the part of any HHMI Indemnitee, (b) such settlement would impose any restriction on any HHMI Indemnitee's conduct of any of its activities, or (c) such settlement would not include an unconditional release of all HHMI Indemnitees from all liability for claims that are the subject matter of the settled HHMI Claim, and (d) any Indemnitee and any HHMI Indemnitee, as applicable, shall have the right to retain its own counsel, at the expense of Licensee, if representation of such Indemnitee or HHMI Indemnitee, as applicable, by the counsel retained by Licensee would be inappropriate because of actual or potential differences in the interests of such Indemnitee and/or HHMI Indemnitee, as applicable, and any other party represented by such counsel. Notwithstanding the foregoing, in no event shall Licensee be required to pay the expenses of more than one counsel for the Indemnitees and HHMI Indemnitees in addition to counsel retained by Licensee. Licensee agrees to keep Harvard and HHMI informed of the progress in the defense and disposition of such claim, suit or action and to consult with Harvard and HHMI with regard to any proposed settlement

**9.2 Insurance**.

    **9.2.1** Beginning at the time any Licensed Product is being commercially distributed or sold or any Licensed Service is being performed (other than for the purpose of obtaining regulatory approvals) by Licensee, or by an Affiliate, Sublicensee or agent of Licensee, Licensee shall, at its sole cost and expense, procure and maintain commercial general liability insurance in amounts not less than Five Million Dollars (USD $5,000,000) per incident and Five Million Dollars (USD $5,000,000) annual aggregate and naming the Indemnitees and HHMI Indemnitees as additional insureds. During clinical trials of any such Licensed Product, Licensee shall, at its sole cost and expense, procure and maintain commercial general liability insurance in such equal or lesser amount as Harvard shall require, naming the Indemnitees and HHMI Indemnitees as additional insureds. Such commercial general liability insurance shall provide: (a) product liability coverage and (b) broad form contractual liability coverage for Licensee's indemnification obligations under this Agreement.

    **9.2.2** If Licensee elects to self-insure all or part of the limits described above in **Section 9.2.1** (including deductibles or retentions that are in excess of Two Hundred Fifty Thousand Dollars (USD $250,000) annual aggregate) such self-insurance program must be acceptable to Harvard and CRICO/RMF (Harvard's insurer) in their sole discretion. The minimum amounts of insurance coverage required under this Section shall not be construed to create a limit of Licensee's liability with respect to its indemnification obligations under this Agreement.

    **9.2.3** Licensee shall provide Harvard with written evidence of such insurance upon request of Harvard. Licensee shall provide Harvard with written notice at least thirty (30) days prior to the cancellation, non-renewal or material change in such insurance. If Licensee does not obtain replacement insurance providing comparable coverage within such thirty (30) day period, Harvard shall have the right to terminate this Agreement effective at the end of such thirty (30) day period without notice or any additional waiting periods in accordance with Section 10.2.2.

    **9.2.4** Licensee shall maintain such commercial general liability insurance beyond the expiration or termination of this Agreement during: (a) the period that any Licensed Product or Licensed Service is being commercially distributed, sold or performed by Licensee, or an Affiliate, Sublicensee or agent of Licensee; and (b) a reasonable period after the period referred to in (a) above which in no event shall be less than five (5) years.

**10. Term and Termination**.

    **10.1 Term**. The term of this Agreement shall commence on the Effective Date and, unless earlier terminated as provided in this **Article 10**, shall continue in full force

and effect until the expiration of the last Royalty Term (the "**Term**"). Upon expiration of this Agreement, Licensee shall have a perpetual, non-exclusive, world-wide, non-exclusive, transferable and sublicensable right to use the Harvard Technology Transfer Information.

**10.2   Termination**.

**10.2.1 Termination Without Cause**.   Licensee may terminate this Agreement upon sixty (60) days prior written notice to Harvard.

**10.2.2 Termination for Default**.   In addition to each party's respective termination rights elsewhere in this Agreement, in the event that either Party commits a material breach of its obligations under this Agreement and fails to cure that breach within thirty (30) days after receiving written notice thereof, the other Party may terminate this Agreement immediately upon written notice to the Party in breach.   Notwithstanding the foregoing, the period and procedures for curing any material breach of Section 9.2.3 or Section 3.2 by Licensee shall be as set forth in each such respective Section and Harvard may terminate this Agreement immediately in the case of a material breach of either such Section subject to and following the cure period and procedures set forth therein; the additional thirty (30) day cure period of this Section 10.2.2. shall not apply to a termination for default of Licensee under Section 9.2.3 or Section 3.2.

**10.2.3 Bankruptcy**.   Harvard may terminate this Agreement upon notice to Licensee if Licensee becomes insolvent, is adjudged bankrupt, applies for judicial or extra-judicial settlement with its creditors, makes an assignment for the benefit of its creditors, voluntarily files for bankruptcy or has a receiver or trustee (or the like) in bankruptcy appointed by reason of its insolvency, or in the event an involuntary bankruptcy action is filed against Licensee and not dismissed within ninety (90) days, or if Licensee becomes the subject of liquidation or dissolution proceedings or otherwise discontinues business.

**10.3   Effect of Termination**.

**10.3.1 Termination of Rights**.   Upon termination of this Agreement by either Party pursuant to any of the provisions of **Section 10.2**: (a) the rights and licenses granted to Licensee under **Article 2** shall terminate, all rights in and to and under the Patent Rights, Copyrights, Original Software and Harvard Technology Transfer Information, will revert to Harvard and neither Licensee nor its Affiliates may make any further use or exploitation of the Patent Rights, Copyrights, Original Software or Harvard Technology Transfer Information; and (b) any existing agreements that contain a Sublicense to practice the Patent Rights or Copyrights or use the Original Software or Harvard Technology Transfer Information shall terminate to the extent of such Sublicense; provided, however, that, for each Sublicensee,

upon termination of the Sublicense agreement with such Sublicensee, if the Sublicensee is not then in breach of its Sublicense agreement with Licensee such that Licensee would have the right to terminate such Sublicense, such Sublicensee shall have the right to obtain a license from Harvard on substantially the same terms and conditions as set forth herein, which shall not impose any representations, warranties, obligations or liabilities on Harvard that are not included in this Agreement; and provided further, that (i) the scope of the license granted directly by Harvard to such Sublicensee with respect to the Patent Rights shall be co-extensive with the scope of the Sublicense granted by Licensee to such Sublicensee, (ii) if the Sublicense granted to such Sublicensee was non-exclusive such Sublicensee shall not have the right to participate in the prosecution or enforcement of the Patent Rights under the license granted to it directly by Harvard, (iii) if there is more than one Sublicensee, each Sublicensee that is granted a direct license shall be responsible for a pro rata share of the reimbursement due under **Section 6.2** of this Agreement (based on the number of direct licenses under the Patent Rights in effect on the date of reimbursement), (iv) the financial terms of such direct license by Harvard shall be no less favorable to Harvard than the financial terms that apply to Licensee under this Agreement, (v) Harvard shall not have any representations, warranties, obligations or liabilities that are greater than or inconsistent with the obligations of Harvard under this Agreement or the nature of Harvard as an academic and non-profit entity, or any fewer rights than Harvard has under this Agreement, and (vi) all obligations of Licensee under such Sublicense arising prior to execution of such direct license shall remain the responsibility of Licensee and Harvard shall be released from any and all liability relating to such obligations. If any Sublicensee desires to enter into such a direct license, it shall be wholly the responsibility of that Sublicensee to notify Harvard of such desire no later than thirty (30) days after the effective date of termination of this Agreement. Further, if Licensee, its Affiliates or any Sublicensee continues after the effective date of any termination of this Agreement to sell any Type II Licensed Product, or perform Licensed Services that ceased to be covered by a Valid Claim of a Patent Right prior to such termination, then (a) for the remaining duration of any Royalty Term applicable to any such Licensed Product or Licensed Service, Licensee shall pay the applicable milestone payments set forth in **Section 4.3**, any fees accrued under **Section 4.7** with respect to any Sublicense that survived (in whole or in part) the termination of this Agreement, and fifty percent (50%) of the royalty payments on such Licensed Service and one hundred percent (100%) of the royalty payments on any such Type II Licensed Product, as set forth in **Section 4.4**, and provide reports and audit rights to Harvard pursuant to **Article 5**, and (b) Licensee shall maintain insurance in accordance with the requirements of **Section 9.2** with respect to such sales of Licensed Products and Licensed Services.

10.3.2 **Accruing Obligations**. Termination or expiration of this Agreement shall not relieve the Parties of obligations accruing prior to such termination or expiration, including obligations to pay amounts accruing hereunder up to

the date of termination or expiration. After the date of termination or expiration (except in the case of termination by Harvard pursuant to **Section 10.2**), Licensee, its Affiliates and Sublicensees (a) may sell Licensed Products then in stock, (b) may complete the production of Licensed Products then in the process of production and sell the same and (c) may perform any Licensed Services scheduled as of the date of termination; provided that, in the case of (a), (b) and (c), Licensee shall pay the applicable royalties and payments to Harvard in accordance with **Article 4**, provide reports and audit rights to Harvard pursuant to **Article 5** and maintain insurance in accordance with the requirements of **Section 9.2**. The Parties agree that the obligations in **Section 4.1** (Issuance Fee), **Section 4.2** (Equity) and **Section 6.2** (Patent Expenses) will accrue immediately upon execution of this Agreement by both Parties, regardless of the events, invoice and payment timing details set forth therein.

10.3.3 **Regulatory Filings**. Licensee shall have the exclusive right to prepare and present all regulatory filings necessary or appropriate in any country and to obtain and maintain any Marketing Authorization and/or other regulatory approval required to market Licensed Products or Licensed Services in any such country. Licensee shall solely own all right, title and interest in and to all such Marketing Authorizations, regulatory approvals and filings.

10.4 **Survival**. The Parties' respective rights, obligations and duties under **Articles 5, 9, 10** and **11** and **Sections 4.1, 4.2, 4.9, 8.2** and **8.3**, as well as any rights, obligations and duties which by their nature extend beyond the expiration or termination of this Agreement, shall survive any expiration or termination of this Agreement. In addition, Licensee's obligations under **Section 4.7** with respect to Sublicenses granted prior to expiration or termination of the Agreement shall survive such expiration or termination.

11. **Miscellaneous**.

11.1 **Preference for United States Industry**. During the period of exclusivity of this license in the United States, Licensee shall comply with 37 C.F.R. § 401.14 (i) or any successor rule or regulation. Upon Licensee's request, and at Licensee's expense, Harvard shall apply to the applicable United States governmental agency for a waiver to such requirements; provided, however, that all costs related to the preparation and application of the waiver shall be paid by Licensee within thirty (30) days following receipt of Harvard's invoice for such costs. In the event that Harvard is unable to obtain such waiver, Licensee shall have the right to immediately terminate this Agreement upon written notice to Harvard.

11.2 **No Security Interest**. Licensee shall not enter into any agreement under which Licensee grants to or otherwise creates in any Third Party a security interest in this Agreement or any of the rights granted to Licensee herein; provided, however that this Agreement and the rights granted to Licensee herein may be included under an "all assets" lien against Licensee's assets, to the extent required by an institutional

lender to secure a term loan or revolving line of credit granted to Licensee. Any grant or creation of a security interest purported or attempted to be made in violation of the terms of this **Section 11.2** shall be null and void and of no legal effect.

11.3 **Use of Name**. Except as provided below, Licensee shall not, and shall ensure that its Affiliates and Sublicensees shall not, use or register the name "Harvard" or "HHMI" (alone or as part of another name) or any logos, seals, insignia or other words, names, symbols or devices that identify Harvard or HHMI or any Harvard school, unit, division or affiliate ("**Harvard Names**" or "**HHMI Names**" as applicable) for any purpose except with the prior written approval of, and in accordance with restrictions required by, Harvard or HHMI, as applicable. Without limiting the foregoing, Licensee shall, and shall ensure that its Affiliates and Sublicensees shall, cease all use of Harvard Names and HHMI Names on the termination or expiration of this Agreement except as otherwise approved by Harvard or HHMI, as applicable. This restriction shall not apply to any information required by law to be disclosed to any governmental entity.

11.4 **Entire Agreement**. This Agreement is the sole agreement with respect to the subject matter hereof and except as expressly set forth herein, supersedes all other agreements and understandings between the Parties with respect to the same.

11.5 **Notices**. Unless otherwise specifically provided, all notices required or permitted by this Agreement shall be in writing and may be delivered personally, or may be sent by email, expedited delivery or certified mail, return receipt requested, to the following addresses, unless the Parties are subsequently notified of any change of address in accordance with this **Section 11.5**:

| | |
|---|---|
| If to Licensee (other than invoices): | Vizgen, Inc.<br>225 Davis Rd.<br>Carlisle, MA 01741<br>Attn: Peidong Wang, CEO<br>Email: peidong@comcast.net |
| Copy to: | Faber Daeufer & Itrato PC<br>890 Winter St #315,<br>Waltham, MA 02451<br>Attn: Ken Itrato, Esq.<br>Email: ken.itrato@faberlawgroup.com |

| If to Licensee (invoices only): | Vizgen, Inc.<br>225 Davis Rd,<br>Carlisle, MA 01741<br>Attn.: Peidong Wang<br>Telephone: 781.771.1159<br>Email: peidong@comcast.net |
|---|---|
| If to Harvard: | Office of Technology Development<br>Harvard University<br>Richard A. and Susan F. Smith Campus Center, Suite 727<br>1350 Massachusetts Avenue<br>Cambridge, Massachusetts 02138<br>Email: otd@harvard.edu<br><br>Attn.: Chief Technology Development Officer |

Any notice shall be deemed to have been received as follows: (a) by personal delivery or expedited delivery, upon receipt; (b) by email, on the date sent; (c) by certified mail, as evidenced by the return receipt. If notice is sent by email, a confirming copy of the same shall be sent by mail to the same address.

**11.6** **Governing Law and Jurisdiction**. This Agreement will be governed by, and construed in accordance with, the substantive laws of the Commonwealth of Massachusetts, without giving effect to any choice or conflict of law provision, except that questions affecting the construction and effect of any patent shall be determined by the law of the country in which the patent shall have been granted. Any action, suit or other proceeding arising under or relating to this Agreement (a "**Suit**") shall be brought in a court of competent jurisdiction in the Commonwealth of Massachusetts, and the Parties hereby consent to the sole jurisdiction of the state and federal courts sitting in the Commonwealth of Massachusetts. Each Party agrees not to raise any objection at any time to the laying or maintaining of the venue of any Suit in any of the specified courts, irrevocably waives any claim that Suit has been brought in any inconvenient forum and further irrevocably waives the right to object, with respect to any Suit, that such court does not have any jurisdiction over such Party.

**11.7** **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns.

**11.8** **Headings**. Section and subsection headings are inserted for convenience of reference only and do not form a part of this Agreement.

**11.9** **Counterparts**. The Parties may execute this Agreement in two or more counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument. Transmission by facsimile or electronic mail of an executed counterpart of this Agreement shall be deemed to

constitute due and sufficient delivery of such counterpart. If by electronic mail, the executed Agreement must be delivered in a .pdf format.

**11.10 Amendment; Waiver**. This Agreement may be amended, modified, superseded or canceled, and any of the terms may be waived, only by a written instrument executed by each Party or, in the case of waiver, by the Party waiving compliance. The delay or failure of either Party at any time or times to require performance of any provisions hereof shall in no manner affect the rights at a later time to enforce the same. No waiver by either Party of any condition or of the breach of any term contained in this Agreement, whether by conduct, or otherwise, in any one or more instances, shall be deemed to be, or considered as, a further or continuing waiver of any such condition or of the breach of such term or any other term of this Agreement.

**11.11 No Agency or Partnership**. Nothing contained in this Agreement shall give either Party the right to bind the other, or be deemed to constitute either Party as agent for or partner of the other or any Third Party.

**11.12 Assignment and Successors**. This Agreement may not be assigned by either Party without the consent of the other, which consent shall not be unreasonably withheld, except that Licensee may, without such consent, assign this Agreement in its entirety and the rights, obligations and interests of Licensee to any Third Party purchaser of all or substantially all of its assets or all of its equity, or to any Third Party successor corporation resulting from any merger or consolidation of Licensee with or into such corporation; provided, in each case, that the assignee agrees in writing to be bound by the terms of this Agreement. Any assignment purported or attempted to be made in violation of the terms of this **Section 11.12** shall be null and void and of no legal effect.

**11.13 Force Majeure**. Except for monetary obligations hereunder, neither Party will be responsible for delays resulting from causes beyond the reasonable control of such Party, including fire, explosion, flood, war, strike, or riot, provided that the nonperforming Party uses commercially reasonable efforts to avoid or remove such causes of nonperformance and continues performance under this Agreement with reasonable dispatch whenever such causes are removed.

**11.14 Interpretation**. Each Party hereto acknowledges and agrees that: (a) it and/or its counsel reviewed and negotiated the terms and provisions of this Agreement and has contributed to its revision; (b) the rule of construction to the effect that any ambiguities are resolved against the drafting Party shall not be employed in the interpretation of this Agreement; (c) the terms and provisions of this Agreement shall be construed fairly as to both Parties hereto and not in favor of or against either Party, regardless of which Party was generally responsible for the preparation of this Agreement; and (d) the use of "include," "includes," or "including" herein shall not be limiting and "or" shall not be exclusive.

**11.15 Severability**. If any provision of this Agreement is or becomes invalid or is ruled invalid by any court of competent jurisdiction or is deemed unenforceable, it is the intention of the Parties that the remainder of this Agreement shall not be affected.

**11.16 HHMI Third Party Beneficiary**. HHMI is not a party to this Agreement and has no liability to Licensee or any licensee, sublicensee, or user of anything covered by this Agreement, but HHMI is an intended third-party beneficiary of this Agreement, which shall be enforceable by HHMI in its own name.

**11.17 No Other Promises and Agreements; Representation by Counsel**. Each Party hereto expressly warrants and represents and does hereby state and represent that no promise or agreement which is not herein expressed has been made to the other Party in executing this Agreement except those explicitly set forth herein, and that such Party is not relying upon any statement or representation of the other Party or its representatives. Each Party hereto is relying on its own judgment and has had the opportunity to be represented by legal counsel. Each Party hereto hereby warrants and represents that it understands and agrees to all terms and conditions set forth in Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

**President and Fellows of Harvard College**

By: _Isaac J. C___

Name: _Isaac T. Kohlberg_

Title: _Chief Technology Development Officer_

**Vizgen, Inc.**

By: _Wangpeidong_

Name: _Peidong Wang_

Title: _President & CEO_

**Schedule I**
**Development Milestones**

1. Raise at least $10M for commercialization of the technology.
2. Identify and lease a facility of at least 1k sq ft.
3. In house instrument setup within first 6 months of receiving components.
4. Website, tutorials, and documentation within first 12 months after the Effective Date.
5. Identify and hire a CEO within the first 18 months after the Effective Date.
6. Spend $5M on development in first 24 months after the Effective Date.
7. Place one instrument with an external lab in the first 24 months after the Effective Date.

# Schedule II
# Development Plan

Vizgen aims to be the premier supplier of tools and services for interrogating tissue samples to generate high-plex and spatially-resolved -omics data at the single-cell level. Vizgen will sell instruments, reagents, and software to customers performing research and translational studies via direct sales and through supplier, distribution, and/or technology partners.

Timeline:



# Schedule III
## Patent Rights

### Exclusive Patent Rights – 5327, 5328, 7069, 7578

| Case | Country | Serial Number | Filing Date | Type | Filing Status | Patent Number | Issue Date |
|------|---------|---------------|-------------|------|---------------|---------------|------------|
| 5327 | U.S. | 62/031,062 | 07/30/14 | PROV Priority | Converted | | |
| 5327 | U.S. | 62/142,653 | 04/03/15 | PROV | Converted | | |
| 5327 | PCT | PCT/US15/42556 | 07/29/15 | PCT | In Nat'l. Stage | | |
| 5327 | U.S. | 15/329,683 | 01/27/17 | Utility | Pend | | |
| 5327 | EPO | 15827358.1 | 07/29/15 | Natl | Pend | | |
| 5327 | China | 201580052678.7 | 07/29/15 | Natl | Pend | | |
| 5328 | U.S. | 62/050,636 | 09/15/14 | PROV Priority | Converted | | |
| 5328 | PCT | PCT/US15/42559 | 07/29/15 | PCT | In Nat'l. Stage | | |
| 5328 | U.S. | 15/329,651 | 01/27/17 | Utility | Issd | 10,240,146 | 03/26/19 |
| 5328 | EPO | 15828133.7 | 07/29/15 | Natl | Pend | | |
| 5328 | China | 201580051029.5 | 07/29/15 | Natl | Pend | | |
| 5328 | U.S. | 16/253,919 | 01/22/19 | CONT | Pend | | |
| 7069 | U.S. | 62/569,127 | 10/06/17 | PROV Priority | Converted | | |
| 7069 | PCT | PCT/US17/60558 | 11/08/17 | PCT | In Nat'l. Stage | | |
| 7069 | U.S. | 16/348,071 | 05/07/19 | Utility | Pend | | |
| 7069 | China | 201780082227.7 | 11/08/17 | Natl | Pend | | |
| 7069 | EPO | 17869515.1 | 11/08/17 | Natl | Pend | | |
| 7578 | U.S. | 62/779,333 | 12/13/18 | PROV Priority | Pend | | |

### Non-Exclusive Patent Rights - 6588

| Case | Country | Serial Number | Filing Date | Type | Filing Status | Patent Number | Issue Date |
|------|---------|---------------|-------------|------|---------------|---------------|------------|
| 6588 | U.S. | 62/419,033 | 11/08/16 | PROV Priority | Converted | | |
| 6588 | PCT | PCT/US17/60570 | 11/08/17 | PCT | In Nat'l. Stage | | |
| 6588 | U.S. | 16/347,874 | 05/07/19 | Utility | Pend | | |
| 6588 | EPO | 17869122.6 | 11/08/17 | Natl | Pend | | |
| 6588 | China | 201780082228.1 | 11/08/17 | Natl | Pend | | |

**Schedule IV**
**Software**

Harvard Case No 6184 – MERFISH SOFTWARE

Exhibit 5.1.1



**HARVARD**
Office of Technology Development     **Agreement Report of Royalty Income**

Harvard University Agreement #: _____

Licensee: _____

Sub-licensee (if applicable): _____

*Please complete a separate report for each product sold.*

Product Name: _____

Report Time
Period: _____ [mm/dd/yyyy]  to  _____ [mm/dd/yyyy]

Case # of IP used: _____

_____

*Use second & third columns only when there are sales in multiple countries.*

Country of Sale: _____ _____ _____

Quantity Sold: _____ _____ _____

Exchange Rate: _____ _____ _____

Gross Sales (USD): _____ _____ _____

Deductions*

*List each deduction separately, using the same definition as appears in the agreement noting the agreement paragraph as a reference

_____ _____ _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

Total
Deductions: _____ _____ _____

**Net Sales:** _____  _____  _____

**Royalty Percentage:** _____  _____  _____

**Royalties Due:** _____  _____  _____

**\*\*PLEASE ATTACH DETAILED SALES REPORTS\*\***



# HARVARD
## Office of Technology Development

**Agreement Report of
Non-Royalty Income**

**Harvard University Agreement #:** _____

**Licensee:** _____

**Sub-licensee (if applicable):** _____


**Report Time
Period:** _____  [mm/dd/yyyy
]      to      _____  [mm/dd/yyyy
]

**Case # of IP used:** _____

_____

_____

*Use second & third columns only when there are multiple income items to report*

**Income Item**
(e.g. Milestone Event,
Sublicense Fee
Payment)**:**   _____   _____   _____

**Gross Amount:**   _____   _____   _____

**Deductions\***

*\*List each deduction separately, using the same definition as appears in the agreement noting the agreement
paragraph as a reference*

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

**Total
Deductions:**   _____   _____   _____

**Net Amount:
Percentage
Due:**   _____   _____   _____

44

**Total Due
(USD):**     _____     _____     _____

# EXHIBIT B

# FILED UNDER SEAL



August 14, 2020

Vizgen Milestone Progress report

Vizgen, Inc. (the "Company")  is a biotechnology company commercializing MERFISH (Multiplexed Error-Robust Fluorescence In-Situ Hybridization) technology licensed from Professor Xiaowei Zhuang's lab of Harvard University. MERFISH is a cutting-edge high-resolution microscope platform for spatial-resolved transcriptomics imaging. Vizgen initial objectives include:

- Instrument placement in KOL labs
- Engage pharmaceutical companies for MERFISH measurement service partnerships
- Develop microscope instrument for commercial launch by mid-year 2021
- Launch marketing campaign by developing a Vizgen website
- Build up leadership and commercial team

All these goals are for Vizgen to democratize the MERFISH technology to biology community for early adoption as a tool for their basic research, clinical diagnostics and drug targeting and discovery.

The Company's first-year milestones include placing alpha-level instruments and supply reagents to a few Key Opinion Leader ("KOL") labs. So far as of mid-August, we have placed two systems into the KOL labs, with two more pending by the end of the year. See the table below:

| INSTITUTION | CONTACT | PROJECTS | VIZGEN LEAD | INITIAL INTRODUCTION | CURRENT STATUS |
|---|---|---|---|---|---|
| Broad | Sami Fahri | • Profile ion channel expression in iPSCN<br>• MERFISH on PBMC derived cell line (THP1) | George Emanuel | Jeff Moffitt. Facilitated by Xiaowei Zhuang | • Installed on 6/11.<br>• Training complete 6/29.<br>• Purchased protocol optimization kits to test new sample types.<br>• Preparing gene list for full reagent order. |
| Rockefeller | Charlie Rice | • Host response to viral infection in mouse brain.<br>• Tumor microenvironment in liver cancer.<br>• Molecular and genetic mechanisms for vocal learning in dolphins. | George Emanuel | Xiaowei Zhuang | **Agreement signed and PO issued.** Simple customizations tested. Installation/training anticipated next week |
| CZ Biohub | John Haliburton/Norma Neff | • COVID tissue atlas<br>• Multiple other projects hinted at but not yet discussed | George Emanuel | Sean Kendall/Xiaowei Zhuang | Introductory conversation 7/13. **Followup conversation scheduled for 7/30.** |
| Janelia Farm (Anticipated) | Ron Vale | | George Emanuel | | Introduction anticipated within 1-2 weeks |

While COVID-19 has delayed our placement schedule by about three months, we are confident that the Company can achieve its goals originally planned at the beginning of the year 2020.

The 2nd milestone is to engage pharma companies for service partnerships in which Vizgen will carry out high quality MERFISH measurements for pharmaceutical companies to study their isease models or

allow them to evaluate MERFISH technology itself as technical evaluation projects. The Company has several of these contracts in the pipeline with POs placed. See table below for details:

| Company | Project Lead | Initial Contact | Disease Area | Project Description | Sample types | Workload and Estimated Time | Status |
|---------|--------------|-----------------|--------------|--------------------|--------------|-----------------------------|--------|
| Pfizer | Jiang He | Jeff Moffitt | Liver fibrosis | Investigate the mechanism of action for drugs in a mouse liver fibrosis model. Need cell identification | Pilot: mouse fresh frozen tissue Follow-up: human samples | 30-40 samples, 4-8 months | Drafting SOW |
| Pfizer | Jiang He | Jeff Moffitt | Oncology | Evaluate MERFISH's capability for cell atlasing in a mouse pancreatic cancer model | Pilot: mouse fresh frozen tissue Follow-up: human samples | 30-40 samples, 4-8 months | Finalizing SOW |
| Genentech | Jiang He | Jiang He | Immuno-oncology | Investigate the mechanism of action of immune cells for immuno-oncology drug treatment in mouse breast cancer. Need cell identification. | Pilot: mouse fresh frozen tissue Follow-up: human FFPE samples | 10 samples <300 genes 2-3 months | PO issued, animal cohort in preparation by Genentech |
| Genentech | Jiang He | Jiang He | Oncology | Investigate the spatial expression profile 300-500 genes in response to drug treatment in mouse lung cancer for biomarker development | Pilot: mouse fresh frozen tissue Follow-up: human FFPE samples | 10-20 samples 300-500 genes 2-3 months | Finalizing SOW. Aim to issue PO and start in August as samples are ready |
| Genentech | Jiang He | Jiang He | Parkinson Disease | Rare cell type identification in mouse brain samples | Pilot: mouse fresh frozen tissue Follow-up: fixed human samples | ~50 samples | Drafting SOW |
| GSK | Jiang He | Jeff Moffitt | AI and drug discovery | CRISPR screen to identify gene regulatory elements in cultured cell line | Cultured cells | | Vizgen declined the request as the requested project is out of standard offerings |
| J&J | Jiang He | ARCH | | | | | Introductory call in July |

For the instrument development, Vizgen has made excellent progress on meeting our commercialization plan of launching a 1st generation system by the mid-2021. We have selected Gener8 as a system development partner. The detailed milestones are in the Gantt below:



Vizgen also has plans to launch the website (Vizgen.com) and engage the media for a few press releases; please see our website for details.

Finally, the Board of Directors has selected a new CEO who will join the Company in early September.

In conclusion, various progress has been made in the first year of Vizgen's founding and Series A funding on October 1, 2019. We are on our way for the future success.

*Peidong Wang*

Peidong Wang

Interim CEO, VP of Engineering and HW development.



CONFIDENTIAL

## Vizgen Development & Commercialization Summary

Calendar Year 2021

Harvard License Report

Feb 28th, 2022

---

**Development Summary and Timeline**

Vizgen received its first beta instrument prototype from its contract engineering firm in early 2021. Rapid development began immediately to integrate hardware and software component testing and to complete the platform design. In parallel, a reagent-based consumable imaging cartridge that is used in the instrument for each sample run was developed and tested.

Additional consumables and reagent kits were developed to support the upstream manual sample preparation. Development of these kits and the necessary protocols for various applications was performed through both internal R&D as well as through lab service projects with external investigators. By the end of August, we demonstrated successful results in over 25 tissue types, including both mouse and human tissue. We also showed our platform to be compatible with various sample types including cell culture, fresh frozen, and fixed frozen samples.

A significant amount of investment in 2021 was also spent on software development. The overarching goal was to develop a seamless experience for the customer to manage their experiments and easily analyze their data outputs. Software projects in 2021 fell into 5 major categories: (1) Gene Panel Design, a web-based portal that allows customers to input their selected genes which is then automatically sent to Vizgen for panel / probe design; (2) Instrument Control SW, coding to enable the instrument to function properly and follow specific commands; (3) Graphic User Interface, front end of the control software that allows the user to follow step by step instructions and receive feedback from the instrument; (4) Decoding and Processing, decoding of instrument images and processing them into usable data output files; and (5) Visualization, a desktop program that allows users to import their MERFISH results and immediately reconstruct the data into an image map where they can visualize the spatial architecture of cells and RNA.

Two beta instruments were prepared for external testing and were placed at the Broad Institute and UCSD in July. By the end of August, Vizgen announced the Limited Release of the commercial MERSCOPE platform. This Limited Release period represented a pilot phase to assess customer experience and stability of the commercial platform prior to broader product release. This August milestone represented the first commercial release of a high plex, single cell spatial genomics platform in the industry. A total of nine commercial MERSCOPE instruments were shipped to customers by the end of the year for the Limited Release.

During the pilot phase, R&D's priority was focused on ensuring that the MERSCOPE platform has been fully stabilized and optimized for running experiments in various types of settings and conditions. This includes scaling production for both instrument and reagents and improving manufacturing and quality testing processes.



CONFIDENTIAL

At the end of March 2021, Vizgen completed its series B fundraising round of $37 million, bringing the total investment in the company to $51 million.

At the beginning of 2021, Vizgen had a total of 17 full-time employees, the majority of which were in an R&D function. By the end of 2021, Vizgen had 61 full-time employees and represented a variety of additional functional areas including Finance, Operations, HR, and Commercial.



---

**Commercialization and Marketing**

During the course of 2021, Vizgen released 10 press releases (https://vizgen.com/news/ ) including the announcement in January 2021 that Nature Methods selected spatially resolved transcriptomics as the Method of the Year. Vizgen then unveiled for the first time the MERSCOPE product name, features, and launch timeline at AGBT's Annual Meeting (virtual due to pandemic).

In May of 2021, Vizgen released the largest free public access dataset for single cell spatial transcriptomics. This dataset included 8 mouse brain sections representing a total of over one million cells and over one billion spatially resolved transcripts.

Vizgen provided continuous push across all digital media channels throughout 2021 including Vizgen's website, LinkedIn, Twitter, and YouTube. Through its media activities, Vizgen has also been profiled by a number of trade publications including GenomeWeb, SynbioBeta, Decibio, Technology Networks, DDN, Microscopy Today, GEN, Drug Target Review, Biocompare, and others. Vizgen's MERSCOPE platform was also selected as one of the Scientist's Top 10 Innovations at the end of 2021.



**CONFIDENTIAL**



**LinkedIn**
Followers: 4382
Follower Growth: 50%
Total Page Views: 31K
Total Impressions: 314K



**Twitter**
Followers: 1447
Follower Growth: 107%
Total Page Views: 85K
Total Impressions: 630K



**YouTube**
10,500 total view
741 hours watch time
94 subscribers
50k Impressions



**Vizgen Website**
Users: 44K
Sessions: 70K
Pageviews: 147K

In October 2021, Vizgen hired Dale Levitzke as Senior VP of Global Sales and Support. Dale has previously had experience building sales organizations at a number of startups and had a very successful career at both Illumina and NanoString.

Development of the first-generation platform MERSCOPE and pilot commercial release were successfully completed during 2021. MERSCOPE exited the pilot phase by the end of 2021, and the full US launch for the MERSCOPE platform was announced on January 18th, 2022. The commercial launch of the platform included a catalog of reagents and consumables as shown below.

| Instrument Name | Unit Size |
|---|---|
| MERSCOPE Platform | 1 |

| Reagents and Consumables Name | Unit Size |
|---|---|
| MERSCOPE Slide Box | Package of 20 |
| MERSCOPE Non-Beaded Slide Box | Package of 20 |
| MERSCOPE 140 Gene Panel | 20 samples |
| MERSCOPE 300 Gene Panel | 20 samples |
| MERSCOPE 500 Gene Panel | 20 samples |
| Custom Gene Panel Design Fee | 1 Panel |
| MERSCOPE 140 Gene Imaging Kit | 1 Kit |
| MERSCOPE 300 Gene Imaging Kit | 1 Kit |
| MERSCOPE 500 Gene Imaging Kit | 1 Kit |
| MERSCOPE Cell Boundary Staining Kit | 20 Samples |
| MERSCOPE Sample Prep Kit | 20 Samples |
| MERSCOPE Sample Verification Kit (Human) | 5 Samples |
| MERSCOPE Sample Verification Kit (Mouse) | 5 Samples |

The first field team members for sales and applications were also hired at the end of 2021. We expect rapid growth of the commercial organization as we build momentum from the product launch and defend against competition. Competition in the field has significantly intensified with a number of new spatial RNA and multi omic competitive platforms planned for launch in 2022. Competitors include NanoString, 10X Genomics, Rebus,



CONFIDENTIAL

Resolve, Spatial Genomics, Akoya, and Veranome among others.

Expansion in international markets will occur in 2022 which requires additional product compliance and safety testing, logistical management to ship and import products, and local sales and support. Vizgen is currently planning a hybrid of dedicated Vizgen team members alongside a network of distributors. Global expansion in 2022 is expected to be limited at first to key markets where demand for high plex, single cell spatial genomics is the highest.



**Future Development**

During the first half of 2022, Vizgen will continue to work on optimization, process improvements, and quality metrics for the MERSCOPE platform including instrument, reagents, and software. This work will enable Vizgen to standardize manufacturing, scale production, and ensure that products of the highest quality are delivered. In addition, product ruggedness will be introduced to maintain performance quality for when the products are ready to be commercialized overseas.

Additional development plans for Vizgen and MERFISH in 2022 include new capabilities which will make the platform compatible with FFPE samples, protein detection, and higher RNA multiplexing. Vizgen will also be focusing on developing new software capabilities for improving customer user experience to design gene panels, analyze their data, and collaborate with other researchers.

61 Moulton Street, Cambridge, MA 02138 | info@vizgen.com | www.vizgen.com



**CONFIDENTIAL**

**Conclusion**

In conclusion, 2021 was a year of rapid development and tremendous company growth. The company's limited commercial release of MERSCOPE not only represented an incredibly successful milestone for Vizgen, but for the entire life sciences research industry. Through this product launch, Vizgen has demonstrated that detection of RNA with sub cellular resolution in tissue sections can, for the first time, be made routine. While this has generated tremendous interest for researchers, it has also provided a roadmap for competitors to follow. We expect spatial biology to become intensively competitive in 2022 with resourcing and execution becoming even more critical for gaining commercial success.

Terry Lo
President & CEO

61 Moulton Street, Cambridge, MA 02138 | info@vizgen.com | www.vizgen.com