**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
DELAWARE**

| | | |
|---|---|---|
| **10X GENOMICS, INC., and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 22-595-MFK** |
| **VIZGEN, INC.,** | ) ) ) | |
| **Defendant.** | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

This suit arises out of a dispute among two biotechnology companies, 10x Genomics, Inc. (10x) and Vizgen, Inc. (Vizgen), as well as the President and Fellows of Harvard College (Harvard), which owns certain patents that are licensed to 10x or Vizgen.  10x has sued Vizgen for patent infringement, and Vizgen has asserted counterclaims, including a claim for infringement of a separate patent.  As the owner of all the patents in suit, and establish standing, Harvard is on both sides of the "v."  But what began as an ordinary patent infringement dispute between 10x and Vizgen—with Harvard joined as a party for standing purposes only—has since evolved into a broader dispute over 10x and Harvard's conduct vis-à-vis Harvard's patent portfolio and its licensing agreement with Vizgen.

10x and Harvard have separately moved to dismiss certain counterclaims that Vizgen has asserted against them.  For the reasons set forth below, the Court dismisses Vizgen's second and third counterclaims against Harvard but otherwise

denies Harvard's motion, and the Court denies 10x's motion to dismiss in its entirety.

### Factual Background

10x and Vizgen are both biotechnology research companies specializing in *in situ*[1] single cell spatial transcriptomics.  Utilizing patents licensed from Harvard, a nonprofit research university, both companies have developed and commercialized highly complex genome sequencing technologies.  10x's allegedly infringing platform is called Xenium In Situ (Xenium), and Vizgen's allegedly infringing platform is called MERSCOPE.

In 2019, Dr. Xiaowei Zhuang, her colleagues at Harvard, and others founded Vizgen to commercialize their proprietary MERFISH technology.  On September 26, 2019, Harvard and Vizgen entered into an agreement that grants Vizgen an exclusive license to eighteen of Harvard's patents and a non-exclusive license to five additional Harvard-owned patents.  These patents are listed in Schedule III of the agreement.  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl., Ex. 1 at 40.  Vizgen alleges that Harvard informed it both orally and in writing that their agreement did not conflict with any intellectual-property agreement between Harvard and any other party.  Vizgen further alleges that its agreement with Harvard required it to commercialize its MERFISH technology and that Harvard was aware of Vizgen's plans to do so throughout the development of the MERSCOPE platform.  In March 2021, Vizgen announced the launch of its MERSCOPE platform.

In October 2020, 10x acquired two companies that also operate in the *in situ* spatial transcriptomics space, Boston-based ReadCoor and Stockholm-based CartaNA.

---

[1] *In situ* technology aims to measure and analyze molecules directly in tissue samples rather than removing them from the tissue.

At the time of the acquisition, ReadCoor held exclusive and non-exclusive patent rights to a group of Harvard-owned patents distinct from those licensed to Vizgen.  Since at least 2021, 10x has been internally developing Xenium utilizing the technology, expertise, and intellectual property it acquired from ReadCoor and CartaNA.  Vizgen alleges in one or more of its counterclaims that Xenium infringes on U.S. Patent No. 11,098,303 (the 303 Patent), one of the Harvard patents exclusively licensed to Vizgen. Though 10x's Xenium product had not been released at the time Vizgen filed its amended counterclaim in November 2022, it has since been brought to market.

10x, for its part, alleges that Vizgen's MERSCOPE platform infringes on several other patents that 10x exclusively licenses from Harvard, including those it acquired from ReadCoor: U.S. Patent Nos. 11,021,737, 11,293,051, 11,293,052, 11,293,054, and 11,299,767 (the Harvard/10x patents).

In sum, 10x and Vizgen each allege that the other's platform infringes on one or more patents that are owned and licensed to each company by Harvard.  Because of Harvard's involvement as the licensor at the center of this dispute, Vizgen also alleges that Harvard acted in bad faith, in concert with 10x, to unfairly eliminate Vizgen as a competitor.

**Procedural Background**

In May 2022, 10x and Harvard sued Vizgen alleging infringement of the Harvard/10x patents.  After the Court denied Vizgen's motion to dismiss certain claims in 10x and Harvard's first amended complaint, Vizgen filed its answer and defenses to the complaint and asserted sixteen counterclaims against 10x and/or Harvard.  On October 27, 2022, 10x and Harvard each moved to dismiss certain of Vizgen's

counterclaims, but the Court denied these motions as moot after Vizgen filed amended counterclaims on November 17, 2022.  Vizgen's amended counterclaims included:  (a) three claims against Harvard for breach of implied covenant, breach of warranty, and negligent misrepresentation (counts 1, 2 and 3); (b) one claim against 10x for tortious interference with contractual and advantageous business relations (count 4); (c) one claim against both 10x and Harvard for alleged violation of Massachusetts General Law Chapter 93A §§ 2 and 11 (count 5); (d) ten claims for declaratory judgment of noninfringement on the Harvard/10x patents (counts 6-15); and (e) one claim (on behalf of both Vizgen and Harvard) against 10x for alleged infringement of the 303 patent (count 16).

10x has moved to dismiss count 16—Vizgen's patent infringement claim—for failure to state a claim upon which relief can be granted and counts 4 and 5 based on preemption under the Patent Act and under the *Noerr-Pennington* doctrine.  Harvard has moved to dismiss counts 1, 2, and 3 for failure to state a claim upon which relief can be granted and count 5 as barred by Harvard's non-profit status, federal preemption, and the *Noerr-Pennington* doctrine.

### Discussion

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant."  *Davis v.*

4

*Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (quotation marks and citation omitted). The complaint must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When a claim sounds in fraud, however, the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b) apply.  "In order to satisfy Rule 9(b), [Vizgen] must plead with particularity the circumstances of the alleged fraud in order to place [10x and/or Harvard] on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004).

## A.    Counterclaim 16 (infringement of 303 patent)

Vizgen alleges in count 16 that the Xenium platform directly infringes on at least one claim of the 303 patent, which concerns, among other things, the "application of multiple nucleic acid probes to targets located within cells and tissue."  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl. ¶ 267.  Exhibit 3 to Vizgen's amended answer is a 45-page chart detailing how Vizgen alleges Xenium infringes on the 303 patent.  10x contends that the *qualitative* value of this chart is negligible because Vizgen has failed to specifically allege that Xenium infringes every element of the asserted 303 patent claims, which requires approximately eleven steps.

As Vizgen argues, however, the pleading standard 10x demands has been rejected by the Federal Circuit.  *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021) (a plaintiff is not required to plead infringement on an element-by-element basis).  Second, there is no basis to conclude that the allegations contained in

5

Vizgen's claim chart are implausible or lack qualitative value.  The level of detail provided by Vizgen goes far beyond what is required of it at the pleading stage in the litigation.  The Court declines 10x's invitation to construe the meaning of claim terms and perform an infringement analysis to resolve its motion to dismiss.  *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (it is not appropriate for a district court to conduct an in-depth infringement analysis of complex scientific claims without the benefit of claim construction, as the purpose of a motion to dismiss is not to test the merits).

10x also contends that Vizgen did not and could not provide plausible support for its infringement claim because 10x's Xenium product was not commercially released at the time Vizgen filed its amended answer.  Specifically, 10x challenges Vizgen's use of 10x's marketing materials as well as academic articles that 10x alleges are not affiliated with 10x or Xenium.  This contention lacks merit.  What Vizgen was able to offer to plead its infringement claim at this stage is sufficient.  *See C. R. Bard Inc. v. AngioDynamics, Inc.*, 979 F.3d 1372, 1379 (Fed. Cir. 2020) (finding that plaintiff "was entitled to rely on [defendant's] representations to its customers" and "[defendant's] statements regarding the capabilities of its own product" to establish infringement); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 761 F.3d 1329, 1342 (Fed. Cir. 2014) (holding that the district court erred in finding marketing materials that described how the accused product functioned irrelevant to the question of infringement).  Vizgen has also alleged facts that, if accepted as true, are sufficient to indicate that the information in the cited publications directly relates to Xenium and allows the Court to draw inferences regarding Xenium's capabilities.

6

The Court therefore finds that Vizgen has stated a claim for infringement of the 303 patent.

**B.    Counterclaims 1-3 (certain common law claims against Harvard)**

Counts 1, 2, and 3 involve conduct related to the Harvard-Vizgen license agreement.  Under the forum selection clause in section 11.6 of the parties' agreement, the agreement is governed by Massachusetts law.  The Court will therefore apply Massachusetts law (including as described by the First Circuit where applicable) to Vizgen's counterclaims for breach of contract, breach of warranty, and negligent misrepresentation.

**1.    Breach of the implied covenant of good faith and fair dealing**

In Massachusetts, every contract includes an implied covenant of good faith and fair dealing.  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473, 583 N.E.2d 806, 821 (1991).  "The covenant provides that neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."  *Id*. at 471, 583 N.E.2d at 820.  To prevail on this claim, Vizgen must show that the Harvard "acted with . . . dishonest purpose or conscious wrongdoing necessary for a finding of bad faith or unfair dealing."  *Schultz v. Rhode Island Hosp. Trust Nat'l Bank, N.A.*, 94 F.3d 721, 730 (1st Cir.1996).

Vizgen alleges that Harvard gave it a false sense of assurance that the platform it was developing to commercialize its MERFISH technology—which the parties' agreement at least arguably required Vizgen to do[2]—was not in conflict with any

---

[2] "Licensee shall commit itself to commercially reasonable efforts to develop, obtain regulatory approval for and commercialize such products, and thereafter make them available . . . "  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl., Ex. 1 at 2.  In its reply, Harvard contends that this clause of the parties' agreement did

intellectual property agreements between Harvard and other parties.  Vizgen alleges that Harvard acted in bad faith by approving Vizgen's commercialization plans and accepting royalties from Vizgen while having knowledge of the allegedly conflicting 10x/Harvard patent agreements.  Vizgen further alleges that Harvard worked in concert with 10x to reverse engineer its patent portfolio and orchestrate patent prosecution efforts[3] that would allow 10x to gain an undue economic advantage at Vizgen's expense.  This, Vizgen alleges, had the effect of destroying or injuring its rights to receive the fruits of its contract with Harvard.

Harvard contends that these allegations are "simply a repeat of Vizgen's breach of warranty claim."  Opening Br. in Supp. of Harvard's Mot. to Dismiss Vizgen's Am. Countercl. at 15.  10x argues that nowhere in the Harvard-Vizgen written agreement or verbal dealings did Harvard grant Vizgen the "freedom to operate" vis-à-vis Harvard's patent portfolio.  Because Harvard gave no such assurance, it contends, Vizgen cannot allege that Harvard acted in bad faith by failing to tell Vizgen that its commercialization efforts could infringe rights that Harvard had granted to 10x or by seeking to enforce those rights in this suit.

Harvard is correct that under Massachusetts law, the implied covenant of good faith and fair dealing may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship."  *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004).  The

---

not require Vizgen to develop and commercialize MERFISH in the specific manner that it did, but rather to use the license to develop products to benefit the public.  The manner in which Vizgen pursues development, Harvard contends, is not dictated by the agreement.

[3] Harvard's allegedly aggressive patent prosecution efforts are detailed in paragraphs 94 to 98 of Vizgen's amended answer.

covenant does, however, concern the manner of performance, and "it exists so the objectives of the contract may be realized." *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, 822 N.E.2d 667, 684 (2005).  In other words, the implied covenant is not tied so narrowly to the black and white terms of the agreement as Harvard would suggest.  The Court also disagrees with Harvard's contention that Vizgen has failed to describe Harvard's claimed extra-contractual conduct with sufficient specificity.  Vizgen has alleged facts that, when read in the light most favorable to Vizgen as required, allow a reasonable inference that Harvard acted in bad faith to frustrate the purpose of parties' agreement and deprive Vizgen of the fruits of the 303 patent.  The Court concludes that Vizgen has stated a claim for breach of the implied covenant of good faith and fair dealing.

### 2.  Breach of warranty

Under Massachusetts law, a warranty in a contract is a promise of a particular standard of performance, and it imposes on the warrantor an obligation to fulfill the promise made.  *See Coca–Cola Bottling Co. of Cape Cod v. Weston & Sampson Eng'rs, Inc.*, 45 Mass. App. Ct. 120, 128, 695 N.E.2d 688, 694 (1998).  Vizgen alleges a breach of warranty based on section 8.2(d) of its license agreement with Harvard.

The parties dispute the meaning of section 8.2(d), which is found within a section of the agreement titled "Harvard's Representations."  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl., Ex. 1 at 26.  Section 8.2(d) states: "Harvard hereby represents . . . ;  (d) this Agreement constitutes the legal, valid, and binding obligations of Harvard, and to the best of the knowledge of OTD, and, without any further investigation, [and] *is not in conflict with any existing intellectual property agreement*

*with Third Party under which Harvard is bound* . . . ."  *Id*. (emphasis added).[4]
Immediately following section 8.2 is section 8.3, entitled "No Warranty."  *Id*.  Section 8.3
states that, among other things, (1) nothing in the agreement constitutes a warranty that
the patent rights "will afford adequate or commercially worthwhile protection" to Vizgen;
(2) Harvard makes no warranties regarding "the commercial or scientific value" of the
patent rights;  and (3) Harvard makes no warranties that the patent rights or the
development, manufacture, use, or sales of any licensed product "will not infringe any
patent or proprietary rights of any other person."  *Id*. at §§ 8.3.1, 8.3.2, 8.3.3.  Section
8.3.3 also disclaims any warranties of noninfringement.

Vizgen reads 8.2(d) as expressly warranting that Vizgen can use its license to
commercialize MERFISH, in a manner consistent with the plans it submitted to Harvard
as required by the agreement, without infringing on Harvard's other patent rights.
Vizgen refers to this as a "freedom to operate."  Vizgen Resp. to Harvard's Mot. to
Dismiss Am. Countercl. at 5.  Vizgen further alleges that Harvard breached 8.2(d) by
joining 10x in its infringement suit against Vizgen even though it had required Vizgen to
commercialize MERFISH.  Harvard disagrees with this reading of 8.2(d).  It contends
that the agreement, when read as whole and using common sense, cannot plausibly be
read to grant Vizgen the freedom to operate vis-à-vis any patent rights not expressly
listed in Schedule III.  Put differently, Harvard rejects any reading of section 8.2(d) that
would allow Vizgen, through its commercialization of MERFISH, to enjoy the benefit of
*all* of Harvard's patents—some of which are also exclusively licensed to other parties—
without infringing on the rights of others under those patents or licenses of rights under

---

[4] "OTD" refers to Harvard's Office of Technology Development.

those patents.  Harvard further contends that Vizgen's proposed reading of section 8.2(d) is not only commercially unreasonable but also belied by other disclaimers and terms in the contract.

Vizgen is correct that, under Massachusetts law, ambiguities in a contract may involve questions of fact that should be determined at trial.  *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779, 761 N.E.2d 946, 951 (Mass. 2002).  "Contract language is ambiguous 'where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'"  *President & Fellows of Harvard Coll. v. PECO Energy Co.*, 57 Mass. App. Ct. 888, 896, 787 N.E.2d 595, 601 (2003) (quoting *Suffolk Constr. Co. v. Lanco Scaffolding Co.*, 47 Mass. App. Ct. 726, 729, 716 N.E.2d 130, 133 (1999)).  The Court concludes that Vizgen's reading of 8.2(d) is unreasonable and does not give rise to an ambiguity.

The unambiguous language of the parties' agreement, read in context and in a consistent manner, supports Harvard's reading of section 8.2(d).  *Starr v. Fordham*, 420 Mass. 178, 190, 648 N.E.2d 1261, 1269 (1995) (individual provisions should be read in the context of the entire contract rather than in isolation, and no part of the contract should be disregarded).  Read in this light, section 8.2(d) warrants only that Harvard is legally empowered to license the patent rights listed in Schedule III and that, to the best of its knowledge, the agreement is not in conflict with any other existing *agreements* between Harvard and other parties.  That is different from Vizgen's reading, which is that rights licensed to Vizgen through the agreement, or products that Vizgen might develop under the license, are not in conflict with the *patent rights* licensed to other third parties, or more specifically, do not infringe on other patent rights licensed by Harvard.

11

The parties discuss at length whether section 8.2(d) amounts to an opinion—which would not be actionable on a claim for breach of warranty—or an express representation.  Because section 8.2(d) is labeled as one of "Harvard's Representations" in a section titled "Warranties," Harvard's characterization of section 8.2(d) as a mere opinion is strained.  But this line of argumentation misses the point.  What renders Vizgen's reading of section 8.2(d) implausible is not that it might amount to an opinion but rather that the fact that section 8.2 does not by its terms concern potential conflicts with existing patent rights licensed to others.  By its terms, section 8.2(b) disclaims only conflicts between the Harvard-Vizgen agreement and "any existing *intellectual property agreement* with a Third Party."  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl., Ex. 1 at 26 (emphasis added).  This point is further underscored by Section 2.7, which states

> **No Other Grant of Rights**. Except as expressly provided herein, *nothing in this Agreement will be construed to confer any ownership interest, license or other rights upon Licensee by implication, estoppel or otherwise as to any technology, intellectual property rights, products or biological materials of Harvard, or any other entity*, regardless of whether such technology, intellectual property rights, products or biological materials are dominant, subordinate or otherwise related to any Patent Rights or Copyrights.

*Id*. at 13 (emphasis added).  The plain language of section 2.7 conflicts with Vizgen's contention that Harvard represented elsewhere in the contract that Vizgen could use its licensed patents to commercialize products without liability for infringement of other Harvard patents not included in the license.

In sum, it is not plausible to read a term stating that the license Harvard was granting Vizgen would not conflict with Harvard's contracts to constitute a warranty that products Vizgen might develop under the license would not conflict with other Harvard

patents.  It would also render meaningless the inclusion of a specific list of patents to which Vizgen was granted a non-exclusive license (Schedule III), as well as the disclaimers discussed earlier.  *See Lexington Ins. Co. v. All Regions Chem. Labs, Inc.*, 419 Mass. 712, 712, 647 N.E.2d 399, 400 (1995) ("contract[s] should be construed in such a way that no word or phrase is made meaningless by interpreting another word or phrase.").

For these reasons, the Court dismisses count 2.

### 3.     Negligent misrepresentation

Under Massachusetts law, a claim of negligent misrepresentation has five elements:  (1) the defendant, in the course of its business, profession, employment, or in any other transaction in which it has a pecuniary interest; (2) supplied false information for the guidance of others in their business transactions; (3) without exercising reasonable care or competence in obtaining or communicating the information; (4) the plaintiff reasonably relied on the information; and (5) the plaintiff suffered pecuniary loss caused by their reliance on the information.  *See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 471–72, 918 N.E.2d 36, 47–48 (2009).  Moreover, "[o]ne who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose *if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question*."  Restatement (Second) of Torts § 551(1) (1977) (emphasis added); *see Nei v. Burley*, 388 Mass. 307, 310, 446 N.E.2d 674, 676 (1983) (applying Restatement (Second) of Torts § 551 to a claim of

nondisclosure); *see also*, *Kannavos v. Annino*, 356 Mass. 42, 247 N.E.2d 708, 711 (1969) ("In Massachusetts, a claim for misrepresentation can encompass the failure to disclose a material fact."); *cf. Adams v. Hyannis Harborview*, *Inc.*, 838 F. Supp. 676, 694 (D. Mass. 1993) (nondisclosure alone does not give rise to a claim for negligent misrepresentation, but party that discloses partial information that is misleading has a duty to reveal material facts to avoid deceiving other party).

Vizgen alleges that Harvard gave incorrect and/or incomplete information, both orally and in writing, throughout the parties' ongoing business dealings regarding potential conflicts with Harvard's other patents.  Specifically, in paragraph 110 of Vizgen's amended counterclaim, it alleges that "Harvard approved the commercialization plans Vizgen submitted, licensed Vizgen to undertake those commercial activities, and accepted royalties on an ongoing basis after reviewing detailed reports on those commercialization efforts," without disclosing that Vizgen's development of MERFISH infringed on other Harvard-owned patents licensed to other parties.  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl. ¶ 110. Vizgen further alleges that:

> Harvard . . . informed Vizgen both *orally* and *in writing* . . . that the License Agreement was not in conflict with any other intellectual property agreement between Harvard and any third party. (Ex. 1, License Agreement § 8.2 (d)). Harvard assured Vizgen that it had no other third-party licenses that conflicted with the Licensing Agreement, including the operational goals that the Vizgen-Harvard license exists to further, and the operational plans Harvard required from Vizgen, and reviewed, approved, and monitored for years.

*Id*. ¶ 111 (emphasis added).

In other words, Vizgen alleges that Harvard made affirmative misrepresentations orally and in writing and also made a misleading omission by failing to advise Vizgen

that the technology it was developing may infringe on other patents in its portfolio. Vizgen alleges that it signed the agreement, as well as three amendments to it, in reliance on these misrepresentations and omissions.

The parties dispute whether the heightened pleading standard of Rule 9(b) should apply to Vizgen's negligent misrepresentation claim, as Harvard contends that Vizgen's allegations sound in fraud.  The Court need not decide this, however, because Vizgen's claim does not survive even if Rule 9(b) does not apply.

First, Vizgen's allegation regarding Harvard failing to disclose the possibility of infringement simply does not give rise to liability for negligent misrepresentation upon which relief can be granted.  Vizgen cites no authority to support its contention that Harvard, which was simply a contracting counterparty, had a duty enforceable in tort to affirmatively warn Vizgen in this regard.  *See First Marblehead Corp. v. House*, 473 F.3d 1, 10 (1st Cir. 2006) (a negligent misrepresentation claim based on failure to disclose first requires a showing that there was a duty to disclose).  "Absent some other independent duty to disclose the allegedly omitted information . . . which duty has not been identified by [Vizgen], the omissions do not give rise to liability under the [Vizgen's] claim[] for . . . negligent misrepresentation . . ."  *In re Access Cardiosystems, Inc.*, 404 B.R. 593, 669 (Bankr. D. Mass. 2009).

Regarding the allegedly negligent *written* misrepresentation contained in section 8.2(d) of the Harvard-Vizgen agreement, Vizgen's contentions are deficient for largely the same reasons discussed in the previous section of this opinion.  Because the representation that Vizgen attempts to read into section 8.2(d) is implausible at the outset, it cannot be considered a *mis*representation.  Where claims arise out of or rely

on a contract, as Vizgen's do, "[t]he court may grant a motion to dismiss when unambiguous language of a contract contradicts plaintiff's allegations in a complaint" or otherwise precludes plaintiff's claims. *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015). Vizgen contends that "[the] misrepresentations [described in paragraphs 110-112 of the complaint], many of which were made before or after the License Agreement was executed, are separate and distinct from any that can be found in that agreement and provide independent grounds for the negligent-misrepresentation claim." Vizgen Resp. to Harvard's Mot. to Dismiss Am. Countercl. at 13. But Vizgen simply has not identified any acts separate and distinguishable from its implausible interpretation of section 8.2(d) from which one could infer that Harvard made representations to Vizgen about the possibility, or lack thereof, of infringement. And that aside, "[p]laintiffs who are unable to prevail on their contract claims may not repackage the same claims under tort law." *Cumis Ins. Soc'y*, 455 Mass. at 474, 918 N.E.2d at 49.

Regarding the allegedly negligent *oral* misrepresentations, the parties' agreement contains two separate integration clauses at sections 11.4 and 11.17 that undercut Vizgen's contentions. Section 11.4 states that the written agreement supersedes any prior promises, agreements, or understandings between the parties. Section 11.17, even more pointedly, states that each party—that is, including Vizgen—warrants "that no promise or agreement which is not herein expressed has been made . . . except those explicitly set forth herein, and that [it] is not relying upon any statement or representation of the other Party or its representatives." Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl., Ex. 1 at 36. Under Massachusetts law, these

contractual terms bar Vizgen's claim with respect to Harvard's alleged oral misrepresentations outside the four corners of the contract.  *See Sound Techniques, Inc. v. Hoffman*, 50 Mass. App. Ct. 425, 432-33, 737 N.E.2d 920, 925-26 (2000) (merger or integration clause precludes liability based on an oral negligent misrepresentation); *see also*, *Starr Cap. Partners, LLC v. Toll Bros., Inc.*, 101 Mass. App. Ct. 1123, *7, 199 N.E.3d 882 (2022).[5]

For these reasons, the Court dismisses negligent misrepresentation claim for failure to state a claim.

## C.    Counterclaims 4 and 5 (tortious interference against 10x and unfair competition against both 10x and Harvard)

In count 4, Vizgen alleges that 10x tortiously interfered with Vizgen's agreement with Harvard by knowingly inducing it to breach their agreement and alter its patent portfolio so that it could target Vizgen's commercial activities with calculated patent prosecutions.  In count 5, Vizgen alleges that 10x and Harvard both "engaged in a pattern of conduct, with an improper motive, aimed at destroying and injuring Vizgen's right to receive the fruits of the License Agreement, in disregard of known contractual arrangements, and with the intent to secure commercial benefits for 10x and Harvard" in violation of Massachusetts General Laws c. 93A, §§ 2 and 11 (Chapter 93A).  Chapter

---

[5] Vizgen contends that Massachusetts courts have held that negligent misrepresentation claims should not be dismissed solely based on an integration clause, but this argument lacks merit.  First, the Court is not dismissing count 3 based solely on the integration clauses found in the parties' contract.  Second, the authority Vizgen cites concerns the reasonableness of a plaintiff's reliance on a defendant's misrepresentation in light of an integration clause and the view that discovery is needed to make that determination.  Here, however, we are not talking about reasonable reliance.  Rather, Vizgen stakes part of its claim on claimed oral statements by Harvard that Vizgen expressly disclaimed in the contract.  That is a distinct issue not controlled by the cases Vizgen cites.

93A makes unlawful any "[u]nfair . . . acts or practices in the conduct of any trade or commerce."  *Anthony's Pier Four*, 411 Mass. at 474, 583 N.E.2d at 821.

Vizgen alleges that 10x and Harvard's unfair and deceptive conduct included: (1) Harvard "soliciting confidential information regarding Vizgen's business plans and assuring Vizgen that the intellectual property Harvard licensed to Vizgen included all the necessary rights and approvals required for Vizgen's commercial plans"; (2) Harvard approving Vizgen's contractually required commercialization efforts and accepting royalty payments from Vizgen despite knowing that it was infringing on patent rights previously licensed to 10x; (3) 10x and Harvard "working together to file new patents and amend existing ones in an attempt to reverse engineer patent coverage for Vizgen's activities (as disclosed to Harvard), to manufacture infringement claims against Vizgen, and to thwart Vizgen's business"; (4) Harvard "intentionally str[inging] along Vizgen, encouraging it to build and invest in its business, all the while continuing to reap the royalty payments Vizgen paid Harvard pursuant to the License Agreement and working in concert with 10x to drift their patent prosecution focus towards Vizgen's activities"; (5) Harvard seeking damages related to commercialization efforts that Harvard itself required Vizgen to undertake as part of the parties' agreement; and (6) commencing this "sham" litigation to "slow the market uptake of Vizgen's MERSCOPE™/MERFISH technology and products and to damage Vizgen."  Def.'s Am. Answer, Defenses, and Countercl. to Pls.' First Am. Compl. ¶¶ 135-147.

Harvard contends that its non-profit status and *Noerr-Pennington* immunity shield it from liability for Chapter 93A violations.  Harvard further contends that Vizgen's Chapter 93A claim is preempted by federal law, is subject to the heightened pleading

requirement of Rule 9(b), and is merely a repackaged version of its breach of warranty claim.  10x also contends that it enjoys *Noerr-Pennington* immunity from Vizgen's tortious interference claim and its Chapter 93A claim and that both claims are preempted by federal law.  The Court will address any overlapping arguments together.

### 1.   Non-profit shield, Rule 9(b) pleading, and breach of contract as an unfair practice

Harvard contends that, as a non-profit university, it cannot be held liable for a Chapter 93A violation because the statute was designed to regulate unfair consumer-business behavior in the marketplace, not charitable work.  Because its patent activity is undertaken in furtherance of its core mission—"to advance new ideas and promote enduring knowledge"—and is incidental to its charitable purpose, Harvard contends it cannot be sued under 93A.  Harvard's Mot. to Dismiss Vizgen's Am. Countercl. Nos. I-III, and V at 3.

Vizgen contends, and the Court agrees, that Harvard's non-profit status does not by itself require dismissal of Vizgen's Chapter 93A claim.  *Linkage Corp. v. Trs. of Bos. Univ.*, 425 Mass. 1, 23-24, 679 N.E.2d 191, 207, 207-09 (Mass. 1997) ("An entity's status as a charitable corporation is not, in and of itself, dispositive of the issue whether c. 93A applies.") (internal quotation marks omitted).  Harvard's licensing of intellectual property in exchange for royalties, milestone payments, and equity certainly qualifies as "trade or commerce" subject to Chapter 93A, which defines "trade and commerce" as including "the sale, rent, lease or distribution of *any services and any property, tangible or intangible*, real, personal or mixed . . . ."  Mass. Gen. L. ch. 93A, § 1(b) (emphasis added).  Some non-profits engaged in business activity have been shielded from liability under Chapter 93A, but only when the organization "has not sought to profit from its

transaction with the plaintiff."  *See All Seasons Servs., Inc. v. Comm'r of Health & Hosps. of Boston*, 416 Mass. 269, 271, 620 N.E.2d 778, 780 (1993); *see also*, *Hubert v. Melrose–Wakefield Hosp. Ass'n*, 40 Mass. App. Ct. 172, 176, 661 N.E.2d 1347, 1350 (1996).  That is not the case here.  Harvard has not shown that Chapter 93A does not apply to its activity at issue in this case.

Harvard next contends that Vizgen failed to meet Rule 9(b)'s pleading standard, which Harvard contends applies because Vizgen's Chapter 93A claim sounds in fraud. Assuming Rule 9(b) applies—a question the Court need not decide—Vizgen has sufficiently pleaded its claim.

The purpose of Rule 9(b)'s heightened pleading standard is to give defendants notice of the claims against them and reduce the number of frivolous suits brought solely to extract settlements.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002) (internal quotation marks omitted).  Vizgen's allegations satisfy this standard, as they are not merely "boilerplate and conclusory," and it has "accompan[ied] [its] legal theory with factual allegations that make [its] theoretically viable claim plausible."  *In re Burlington Coat Factory*, 114 F.3d at 1418.  The Court therefore concludes that Vizgen's Chapter 93A counterclaim survives scrutiny under 93A, as Harvard—and 10x for that matter—have been sufficiently put on notice of the claims against them, and there is no basis to conclude that Vizgen's counterclaim is frivolous.

Finally, Harvard contends that Vizgen's Chapter 93A claim fails because breach of contract, standing alone, is not an unfair trade practice. *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 169 (2008). Harvard states the law correctly but misapplies it. As stated throughout this opinion, Vizgen's allegations extend beyond mere breaches of the parties' agreement. Vizgen's plausible allegations of a broader scheme to deceive Vizgen and achieve an unfair advantage are sufficient to allege more than a simple breach of contract.

### 2. *Noerr-Pennington* immunity

10x contends that Vizgen's tortious interference and Chapter 93A claims are barred by the so-called *Noerr-Pennington* doctrine. Harvard incorporates 10x's arguments by reference in support of dismissal of count 5.

Under the *Noerr-Pennington* doctrine, parties "who petition [the] government for redress are generally immune from antitrust liability." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (*PRE*). Originally developed in the antitrust context, the doctrine has since been applied in other areas to provide absolute immunity for those who exercise their First Amendment right to petition the government. *See Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000) ("To the extent that Supreme Court precedent can be read to extend Noerr—Pennington outside of the antitrust context, it does so solely on the basis of the right to petition."). Such immunity extends to parties who initiate proceedings before courts and administrative agencies. *PRE,* 508 U.S. at 57. It does not, however, apply where a restraint on trade "has resulted from private action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (private association that

imposed anticompetitive restraints through its standard-setting process was not entitled to *Noerr-Pennington* immunity).  Moreover, under the sham exception to the *Noerr-Pennington* doctrine, immunity does not apply to "sham" activity—activity that, though "ostensibly directed toward influencing governmental action . . . is a mere sham to cover an attempt to interfere directly with the business relationships of a competitor."  *PRE*, 508 U.S. at 56.

10x and Harvard contend that the *Noerr-Pennington* doctrine creates immunity for a patent owner that asserts its rights through a patent infringement action.  But they do not cite any binding authority[6] for that proposition.  Each application of *Noerr-Pennington* requires courts to "balance" the "right to petition" and "countervailing government interests" in regulation.  *Mirabella v. Villard*, 853 F.3d 641, 654 & n.9 (3d Cir. 2017).  The Supreme Court has cautioned against extending *Noerr-Pennington* immunity to petitions that happen to be addressed to the government (e.g., via a lawsuit in federal court) but are actually based in a personal grievance rather than the kind of political or social petitioning activity that *Noerr-Pennington* sought to protect.  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 394-95 (2011).

In this case, 10x and Harvard's theory of immunity is closely tied to the contention that Vizgen's 93A claim—and in 10x's case, Vizgen's tortious interference claim—is based solely on Harvard joining 10x's patent infringement suit.  But the scope

---

[6] 10x cites only one case for this proposition, *Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, No. 07-127-LPS, 2011 U.S. Dist. LEXIS 16485 (D. Del. Feb. 18, 2011).  But the court in *Magnetar* stated this holding summarily and cited only *Noerr* and *Pennington* to support it, and neither of those cases involved patent infringement suits.  The other cases cited by 10x and Harvard involve state law claims arising out of the same petitioning activity alleged to violate federal *antitrust* laws, so it followed that *Noerr-Pennington* would apply.  That is not the case here, as Vizgen has not alleged any antitrust violations.

of 10x and Harvard's conduct alleged in Vizgen's counterclaims goes well beyond the initiation of this suit; it involves additional alleged bad faith business practices predating the lawsuit.  Moreover, any allegation in the counterclaim about Harvard joining 10x's suit does not concern Harvard enforcing its rights as a patent owner, but rather its breach of a promise not to sue Vizgen, its licensee, under the parties' agreement.  As Vizgen argues, if one were to accept 10x and Harvard's theory of immunity, all tortious interference, unfair competition, or even breach of contract counterclaims involving patent prosecution or patent licensing would be barred by the *Noerr-Pennington* doctrine.  This is vastly overbroad and unsupported by precedent.

Because the Court declines to dismiss counts 4 and 5 of Vizgen's counterclaims based on *Noerr-Pennington* immunity, it need not discuss whether the sham litigation exception to *Noerr-Pennington* immunity applies.[7]

### 3.    Federal preemption

Finally, 10x and Harvard contend that Vizgen's Chapter 93A claim—and in Harvard's case, Vizgen's tortious interference claim—should also be dismissed because federal patent law preempts these claims.  But the Federal Circuit has held that the Patent Act does not preempt state law tort claims that do not clash with the objectives of federal patent laws or include elements not found in the patent law remedy.  *See Dow Chem. Co. v. Exxon Corp.,* 139 F.3d 1470, 1473 (Fed. Cir. 1998) ("We hold that

---

[7] Even if the Court were to address the parties' arguments regarding this exception, the factual record would be too undeveloped to assess the merits of Vizgen's allegations that 10x and Harvard's patent infringement suit is a sham.  *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 273 (3d Cir. 2017) ("to conclude [that 10x and Harvard] did not submit[] a sham petition not supported by science requires an evaluation of the scientific merit of [10x and Harvard's] petition.  Such an inquiry is unsuitable for resolution on a motion to dismiss.").

[intentional interference with actual and prospective contractual relations] . . . is not preempted by the federal patent law, even if it requires the state court to adjudicate a question of federal patent law, provided the state law cause of action includes additional elements not found in the federal patent law cause of action and is not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law."); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed. Cir. 1999) (patent law does not preempt tortious interference with prospective economic advantage or unfair competition claims);  *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1333 (Fed. Cir. 1998) (there is no field preemption of state unfair competition claims that rely on a substantial question of federal patent law);  *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 237 (1st Cir. 2005) ("state claims alleging misconduct *between parties after the patent has issued*" are not preempted whereas claims alleging "bad faith misconduct *by the applicant against the PTO*" are).

In arguing that Vizgen's claims are preempted by federal patent law, 10x and Harvard again attempt to hollow out Vizgen's claim, leaving only its allegations about 10x and Harvard enforcing their patent in the marketplace.  This ignores Vizgen's other allegations of bad faith separate and apart from bringing the present patent infringement suit.  Moreover, Vizgen's claims cannot plausibly be construed as presenting any obstacle to Congress' objectives in enacting patent law.  Nor have 10x or Harvard even attempted to show that, or how, the elements of Vizgen's Chapter 93A and/or tortious interference claims are the same as those of any federal patent law claims.  *See In re Asbestos Prod. Liab. Litig. (No. VI)*, 822 F.3d 125, 133 n.6 (3d Cir. 2016) ("[F]ederal

preemption is an affirmative defense on which the defendant bears the burden.").

As with the sham litigation exception, the parties dispute at length whether the bad faith exception to preemption applies to Vizgen's counterclaims.  But the Court need not address this point, as 10x and Harvard have not met their burden of proving that Vizgen's claims are preempted in the first instance.

### Conclusion

For these reasons, the Court denies Harvard's motion to dismiss Vizgen's amended counterclaims 1 and 5 [dkt. no. 86] but dismisses counterclaims 2 and 3. The Court denies 10x's motion to dismiss Vizgen's amended counterclaims 4, 5, and 16 [dkt. no. 83].  The Court directs 10x and Harvard to answer the remaining counterclaims that they have not already answered by no later than February 21, 2023.

A telephonic status hearing is set for April 5, 2023 at 8:30 a.m. Central Time (9:30 a.m. Eastern Time), using call-in number 888-684-8852, access code 746-1053.  A joint status report concerning the status of discovery and any settlement discussions is to be filed on March 29, 2023.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  January 31, 2023