**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,** ) ) ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 22-595-MFK** |
| ) | |
| **VIZGEN, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

10x Genomics, Inc. and the President and Fellows of Harvard College have sued Vizgen, Inc., a biotechnology company, for patent infringement. Vizgen has asserted several counterclaims, which 10x and Harvard separately moved to dismiss. On February 2, 2023, the Court dismissed Vizgen's breach of warranty and negligent misrepresentation counterclaims (counterclaims 2 and 3), but otherwise denied the motions. *See 10x Genomics, Inc. v. Vizgen, Inc.*, No. 22-595-MFK, 2023 WL 1470672 (D. Del. Feb. 2, 2023). In answering 10x and Harvard's second amended complaint, Vizgen asserted six new counterclaims (counterclaims 17-22). 10x and Harvard (collectively, 10x) have jointly moved to dismiss the additional counterclaims under Rule 12(b)(6) for failure to state a claim. For the reasons stated below, the Court denies the motion, except with respect to counterclaim 22, which the Court dismisses.

### Background

The Court assumes familiarity with this case's factual and procedural

background, which this Court discussed in its prior written opinion.  *See 10x Genomics*, 2023 WL 1470672.  The following background is relevant to 10x and Harvard's current motion to dismiss Vizgen's amended counterclaims 17-22.

10x and Vizgen are both biotechnology research companies specializing in single-cell spatial transcriptomics (SST).  Both companies developed SST products designed to conduct spatial analysis of single-cell gene expression information. Vizgen's product is called MERSCOPE, and 10x's product is called Xenium In Situ. Vizgen's MERSCOPE platform is based on its MERFISH technology, which was developed by Harvard professor Dr. Xiaowei Zhuang and her colleagues.  10x's Xenium stems from its acquisition of ReadCoor, Inc., and CartaNA, which each had nascent SST products.  ReadCoor was founded by Dr. George Church, another Harvard professor studying SST.

## A.    The NIH grant agreement

In May 2009, Dr. Church and Harvard jointly applied for grant funding from the National Institutes of Health (NIH) under the "Centers of Excellence in Genomics Science" program for their proposed research center, the Center for Transcriptional Consequences of Human Genetic Variation (CTCHGV).  Countercl. ¶ 22.  The application sought $20 million in funding from April 1, 2010, through March 31, 2015.  In the "Overview," the application explained that "[a]s a matter of principle, Professor Church strongly believes in open dissemination of knowledge and technology[] and is therefore committed to making CTCHGV innovations available to the larger research community:  both directly through tools and methods for immediate use by individual researchers, and by technology transfer to industry, whereby companies incorporate the

2

innovations into their products."  Dkt. no. 138-2 at 117.

The application stated in its "Data and Materials Dissemination Plan" (DMDP) that "[i]n line with long-standing Church Lab commitments, we continue to champion concepts that we helped establish for the genome sequencing community that encourage rapid data deposition and technology transfer, such as 'Open Source Biology,'" the "goal" of which "is to prevent exclusive licenses from potentially interfering with technology transfer."  *Id.* at 130.  The application went on to state that "[i]n this regard," CTCHGV would "try to move our technology either into the public domain or non-exclusive licensing mechanisms well before they would be normally publishable."  *Id.*

The "Commercialization" subsection of the DMDP stated that "[a]s described above, CTCHGV will pursue open and non-exclusive licensing agreements that encourage innovations to be made widely available to researchers and commercial entities."  *Id.* at 131.  The subsequent sentence explains that "Professor Church has been on the Harvard-wide Copyright and Patent Committee (CPC) for years, a recipient of numerous successful patents, and is in constant contact with the HMS Office of Technology Licensing (OTL)."  *Id.*  The application then lists Professor Church's "[c]urrent company Scientific Advisory roles" and "[p]ast [c]ompanies licensing Church lab patents or software."  *Id.*  In the following "Resource Sharing Plan" section, the application states that "[t]o broaden the availability to the research community of innovations developed by CTCHGV, the Church Lab will work with the Harvard Medical School Office of Technology Licensing to obtain open and non-exclusive licenses that will encourage commercialization of these innovations.  Please refer to the DMDP for

additional details." *Id.* at 133.

In September 2010, the NIH accepted Harvard's grant application and awarded $19 million dollars.  NIH's "Notice of Award" states that "[t]his award is pursuant to the authority of 42 USC 241 42 CFR 52 and is subject to the requirements of this statute and regulation and of other referenced, incorporated or attached terms and conditions." Dkt. no. 138-3 at 1.  The notice further states that "[a]cceptance of this award including the 'Terms and Conditions' is acknowledged by the grantee when funds are drawn down or otherwise obtained from the grant payment system." *Id.*  In Section IV titled "HG Special Terms and Conditions," the notice states that "[c]ompliance with the data and materials sharing and release plans, described on pages 117-118 and 130-133 of the grant application is a condition of this award.  Failure to comply with these plans may result in termination of the award." *Id.* at 4.

## B.    Harvard's licensing agreements

In 2016, after NIH had finished funding the project, ReadCoor and Harvard entered into an exclusive license agreement, which included the patents 10x now asserts in this suit.  Vizgen alleges that 10x's asserted patents originate from patents that were developed by Dr. Church and Harvard under their NIH grant funding and that a statement to that effect appears in each asserted patent.

In 2019, Vizgen entered into a licensing agreement with Harvard for several other patent rights.  Vizgen alleges that the agreement required it to commercialize its MERFISH technology.  During negotiations, Vizgen shared its intended business plans at Harvard's request, and Harvard did not inform Vizgen that its plans would require patent rights that Harvard had already exclusively licensed to ReadCoor.  Pursuant to

4

their agreement, Vizgen provided Harvard updates on its progress commercializing MERSCOPE and publicly announced commercial launch plans in March 2021.

**C.   10x and Harvard's "open early, closed late" scheme**

Vizgen alleges that after 10x acquired ReadCoor in 2020, Harvard and 10x worked together to draft patent claims purporting to cover Vizgen's MERFISH technology and claiming earlier priority dates.  Then, in 2022, 10x and Harvard initiated this suit against Vizgen for patent infringement.  "While Harvard had initially promised the open dissemination of the ReadCoor intellectual property to the NIH[] and led Vizgen to believe the same leading up to the September 2019 Vizgen negotiations," Vizgen alleges that "[t]he filing of th[is] lawsuit confirms Harvard's reversal of its previous 'open' policy towards Vizgen."  Countercl. ¶ 108.  Vizgen describes this as 10x and Harvard's "open early, closed late" scheme to gain a monopoly in the SST market. *Id.* ¶¶ 121, 133.

Vizgen alleges that after "luring Vizgen in" during the "open early" part of the scheme to "cause[] Vizgen and others to commit to Harvard's alleged technology," Harvard then "closed" by claiming "that virtually all SST technology was covered by other patents . . . off limits to Vizgen and any other potential competitors."  *Id.* ¶ 133. "Given the cutting-edge nature of the SST Market," only one other company, NanoString Technologies, Inc., has commercialized an SST product.  *Id.* ¶ 116. NanoString's product is subject to a related infringement suit brought by 10x and Harvard.  Vizgen alleges that the only remaining choices for "Vizgen and others" are to "pay extortionate fees to 10x" or "exit the SST market."  *Id.* ¶ 133.  Meanwhile, 10x "advertise[s] that it wants to create an 'end-to-end ecosystem' that will lock-in

researchers to using 10x products." *Id.* ¶ 138.  Vizgen alleges that these "lock-in effects

ha[ve] been described by 10x executives as a 'critical component of [10x]'s business

model.'"  *Id.*

### Discussion

To survive dismissal under Federal Rule of Civil Procedure 12(b)(6), a complaint

need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court is "required to accept as

true all allegations in the complaint and all reasonable inferences that can be drawn

from them after construing them in the light most favorable to the nonmovant."  *Davis v.*

*Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016) (internal quotation marks omitted).  The

complaint must provide sufficient factual allegations to allow the Court to "draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556

U.S. at 678.

### A.     Counterclaim 22 (breach of contract)

In counterclaim 22, Vizgen claims that 10x and Harvard are liable for breaching

the "Special Terms and Conditions" of the NIH grant, dkt. no. 138-3 at 4, because

Harvard refused to offer "open and non-exclusive licensing agreements" for the

innovations the grant funded, dkt. no. 138-2 at 131.  Vizgen seeks to enforce the NIH

grant as a third-party beneficiary.

"Regional circuit law is applied to contractual disputes, including disputes

involving license agreements."  *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d

1368, 1371 (Fed. Cir. 2008); *see also DePuy Spine, Inc. v. Medtronic Sofamor Danek,*

*Inc.*, 469 F.3d 1005, 1013 (Fed. Cir. 2006) ("Interpretation of contract terms is a matter not unique to our exclusive jurisdiction and is therefore reviewed under regional circuit law.").[1]  Neither party has argued that Federal Circuit law should apply to Vizgen's breach of contract claim.  Thus, the Court applies Third Circuit law.

As an initial matter, 10x contends that the NIH grant is not a contract.  Neither party has cited, nor has the Court found, any Third Circuit case addressing the circumstances under which government grants can constitute enforceable contracts.[2]  The Federal Circuit "treat[s] federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound."  *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021).  To determine whether the standard conditions for a contract are met, the Federal Circuit "appl[ies] the traditional four-part test for the existence of a government contract:  (1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States."  *Id.* at 1339.

10x does not expressly address any of these elements.  Rather, it contends that

---

[1] The Federal Circuit has made an exception to this general rule where "the relevant contract is one with the government, and the relevant question is the scope of the government's authorization and consent to suit, in lieu of a private defendant, for patent infringement" because this question bore "an essential relationship" to the Federal Circuit's "jurisdiction over patent cases" and "jurisdiction over appeals pertaining to government contract disputes."  *Sevenson Env't Servs., Inc. v. Shaw Env't, Inc.*, 477 F.3d 1361, 1365 n.3 (Fed. Cir. 2007).  The question addressed in *Sevenson* is not present in this case, as no party here asserts that "the United States [i]s the proper defendant."  *Id.* at 1364.

[2] In *Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54–55 (3d Cir. 1983) (per curiam), the Third Circuit referred to grants provided to private agencies by the federal government interchangeably as "grant agreements" and "government contracts" without discussion.

because the NIH grant "was made pursuant to 42 U.S.C. § 241," it is "governed by statute, not contract law."  Pls.' Opening Br. at 7–8 (quoting *Tavoloni v. Mount Sinai Med. Ctr.*, 26 F. Supp. 2d 678, 683 (S.D.N.Y. 1998), *aff'd*, 198 F.3d 235 (2d Cir. 1999)). *Tavoloni* is inapposite.  In that case, the terms of the NIH grant award were "not subject to negotiation between the parties," so the Second Circuit interpreted the grant "by examining the relevant statute and regulations and not the parties' understanding." *Tavoloni v. Mount Sinai Med. Ctr.*, 198 F.3d 235, 1999 WL 972656, *2 (2d Cir. 1999). Here, by contrast, Vizgen has alleged that the terms Harvard breached were provided not by any statute, but rather as part of Harvard and NIH's negotiation.  Vizgen alleges that Harvard offered to provide "open and non-exclusive licensing agreements," dkt. no. 138-2 at 131, an offer that NIH then accepted and made a "special term and condition" of the award, dkt. no. 138-3 at 4.

10x argues that 42 U.S.C. § 241 distinguishes between "grants-in-aid" and "contracts."  But this section simply authorizes the Secretary to both "make grants-in-aid" and "enter into contracts."  42 U.S.C. §§ 241(a)(3), (a)(7).  To the extent 10x is arguing that, even though the NIH was authorized to enter into a contract, the NIH did not actually intend its grant to Harvard to be enforceable as a contract, that is a factual issue that cannot be determined on a motion to dismiss.  *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 263 (3d Cir. 2010) ("[W]hen the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact.") (internal quotation marks omitted).  For the same reason, the Court disregards the parties' competing evidence regarding NIH's intent, namely, 10x's references to NIH's website that purportedly distinguishes between grants

and contracts and the agency's policy that does not describe a breach of contract claim as an available remedy, and Vizgen's reference to a NIH spokesperson's statement "that an award notice is 'an official, legally binding document.'"  Def.'s Resp. Br. at 8 (quoting Appx. C at 2).  The Court therefore need not resolve each side's contentions that the other relies on improper extrinsic evidence.

10x relies on *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011), for the proposition that "the 'absence of a private right to enforce' would be rendered 'meaningless' if courts allowed an end-run by purported third-party beneficiaries to the putative 'contract.'"  Pls.' Opening Br. at 8-9 (quoting *Astra*, 563 U.S. at 118).  But this analysis concerns Vizgen's ability to enforce the NIH grant as a third-party beneficiary, discussed below, not whether a contract existed in the first place.  Indeed, in *Astra*, the Supreme Court noted that "[t]he statutory and contractual obligations . . . are one and the same," not that no contractual obligations existed.  *Astra*, 563 U.S. at 118.  Moreover, *Astra* is distinguishable because it involved "form agreements" that "contain[ed] no negotiable terms."  *Id.*  In this case, as stated above, Vizgen alleges that Harvard breached a term that it offered in its grant application, not terms that are contained in any statute or regulation.

10x contends that even if a contract existed, Vizgen's interpretation of the claimed terms is implausible.  The Court disagrees.  In the "Commercialization" section of the grant application, it stated that the applicant "will pursue open and non-exclusive licensing agreements that encourage innovations to be made widely available to researchers and commercial entities."  Dkt. no. 138-2 at 131.  Although 10x argues that this sentence does not explicitly mention patents, the rest of the paragraph references

9

Professor Church's role on the Harvard Copyright and Patent Committee and then lists companies that license "Church lab patents or software." *Id.* at 131–32.  In context, Vizgen has plausibly alleged that Harvard promised to offer non-exclusive patent licenses, which NIH accepted by reference to those specific pages of Harvard's grant application.

10x also argues that "Harvard did issue many non-exclusive licenses in connection with the NIH-funded research."  Pls.' Reply Br. at 6.  This is an asserted fact contrary to Vizgen's allegations in the counterclaim that Harvard "refus[ed] to grant open and non-exclusive licensing agreements" and "fail[ed] to make innovations developed at CTCHGV . . . available to commercial entities and the larger research community."  Countercl. ¶ 406.  Vizgen also alleges that Harvard breached the NIH grant agreement by "grant[ing] exclusive licenses to the Asserted Patents and expressly refus[ing] to grant Vizgen a reasonable open and non-exclusive license to the same."  *Id.* ¶ 407.  On a motion to dismiss, the Court is required to accept Vizgen's allegations as true.  *Davis*, 824 F.3d at 341.

In short, Vizgen has sufficiently alleged the existence of a contract between NIH and Harvard requiring Harvard to offer open and non-exclusive licensing agreements for patents funded by the grant.

For Vizgen to be entitled to sue for breach, however, it must be a third-party beneficiary of the contract.  *See In re Frescati Shipping Co.*, 718 F.3d 184, 197 (3d Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 12, 2013) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement, to which he is not a party, he must at least show that it was intended for his

direct benefit." (quoting *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307 (1927))).  10x asserts, and Vizgen does not dispute in its briefing, that federal common law applies to "contracts to which the government is a party."  *Ginsberg v. Austin*, 968 F.2d 1198, 1200 (Fed. Cir. 1992); *see also Excel Willowbrook, L.L.C. v. JP Morgan Chase Bank, N.A.*, 758 F.3d 592, 598 (5th Cir. 2014) ("It is well-established that government contracts are governed by federal common law.").

The Third Circuit "look[s] to the Restatement of Contracts for the federal law on third-party beneficiaries."  *In re Frescati*, 718 F.3d at 198.  "[G]overnment contracts . . . 'often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.'"  *Interface Kanner, L.L.C. v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir. 2013) (quoting Restatement (Second) of Contracts § 313(2) cmt. a).  "The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity."  *Astra*, 563 U.S. at 118 (quoting 9 J. Murray, *Corbin on Contracts* § 45.6 (rev. ed. 2007)).

The Restatement provides that:

> [A] promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless
> (a) the terms of the promise provide for such liability; or
> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Restatement (Second) of Contracts § 313(2).  The Third Circuit has "held that plaintiffs could not be considered third-party beneficiaries of [ ] grant agreements" where the

plaintiffs did not point to a "provision of the grant agreements" that provided that the party contracting with the government will be liable to the purported beneficiary "should it fail to perform."  *Nguyen*, 719 F.2d at 55; *see also McCullough v. Redev. Auth. of City of Wilkes-Barre*, 522 F.2d 858, 868 n.27 (3d Cir. 1975) ("Plaintiffs are not a party to that contract and cannot claim third party beneficiary status under a government contract absent an interest that they be compensated thereunder."); *Allstate Transp. Co. v. Se. Pennsylvania Transp. Auth.*, No. CIV. A. 97-1482, 2000 WL 329015, at *16 (E.D. Pa. Mar. 27, 2000) ("The Court of Appeals for the Third Circuit has interpreted the Restatement to require that the contract at issue contain some specific language or provision reflecting the intent to make the party contracting with the government liable to third parties should it fail to perform.").

In this case, the NIH grant does not provide that Harvard is liable to any members of the public for breach of the "data and materials sharing and release plans." Dkt. no. 138-3 at 4.  Vizgen does not point to any provision of the NIH grant that plausibly "reflects the notion" that Harvard will be liable to Vizgen should Harvard fail to perform.  *Nguyen*, 719 F.2d at 55.  Rather, the grant award specifically provides that "[f]ailure to comply with these plans may result in termination of the award," placing enforcement rights squarely with the NIH.  Dkt. no. 138-3 at 4.

Vizgen contends that it has sufficiently alleged that it is a third-party beneficiary by alleging that it "falls within a class clearly intended to be benefited" by the data and materials sharing and release plans in the NIH grant agreement.  Def.'s Resp. Br. at 11 (alteration accepted) (quoting *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997)).  *Montana* does not dictate a contrary result for two reasons.  First, the Federal

Circuit after *Astra* has observed that "[p]rinciples of contract law and limitations on private rights of action both counsel against granting third-party enforcement rights when those rights would overlap with the enforcement rights of the government as the contracting party." *Columbus*, 990 F.3d at 1347.  Where, as here, the plaintiffs seek "to step into the government's shoes to enforce a contractual obligation," the Federal Circuit has "rejected the plaintiffs' third-party claims." *Id.* at 1348 n.9 (citing *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1057–59 (Fed. Cir. 2012)).

Second, as discussed above, Third Circuit law, rather than Federal Circuit law, is controlling for this non-patent issue.  Vizgen does not argue otherwise.  In *Nguyen*, the United States "contract[ed] with agencies such as the United States Catholic Conference (U.S.C.C.) to continue their aid to refugees." *Nguyen*, 719 F.2d at 54. Although the plaintiffs, as refugees, fell within a class clearly intended to be benefited by the resulting grant agreements, the district court reasoned that "[s]omething more than mere intent to benefit some third party must be shown for the third party to have actionable rights under the contract." *Liem Duc Nguyen v. U.S. Cath. Conf.*, 548 F. Supp. 1333, 1348 (W.D. Pa. 1982), *aff'd sub nom. Nguyen*, 719 F.2d 52; *see also Jama v. U.S. INS*, 334 F. Supp. 2d 662, 687 (D.N.J. 2004) ("Under *Nguyen*'s application of the Restatement approach, members of the public may not sue as third party beneficiaries of government contracts unless the contract contains specific language providing them with the right to do so.").

Vizgen also contends that "[i]n an analogous context, courts have routinely recognized third-party beneficiary claims based on promises to standard-setting organizations to license patents to unnamed companies for future products." Def.'s

Resp. Br. at 11 (citing *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 885 (9th Cir. 2012)).  But in that case, the defendant "did not dispute that it entered into . . . binding contractual commitments . . . and that Microsoft [wa]s a third-party beneficiary of these commitments."  *Microsoft*, 696 F.3d at 878.  Moreover, in granting partial summary judgment on this issue, the district court specifically observed that the plaintiff was a third-party beneficiary "as a member of both" of the standards-setting organizations that contracted with the defendant.  *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012).  Vizgen has not alleged a similar connection with the NIH in this case.

In sum, Vizgen has not plausibly alleged that it is a third-party beneficiary of the NIH grant agreement.  Thus, the Court dismisses Vizgen's breach of contract claim (counterclaim 22).  Because the Court dismisses the counterclaim on this ground, the Court need not address 10x's additional arguments that any obligations from the NIH grant terminated in 2016 and that 10x, as a nonparty to the NIH grant, cannot be held liable for breach.

## B.   Counterclaims 17 and 18 (federal antitrust claims)

Counterclaims 17 and 18 involve Vizgen's allegations that 10x and Harvard engaged in an "open early, closed late" anticompetitive scheme.  Both parties cite Third Circuit law, and neither contends that another circuit's law should apply, so the Court applies Third Circuit law to Vizgen's federal antitrust claims.  *See Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014) ("[P]arties may waive choice-of-law issues.").

### 1.    Conspiracy to monopolize

Vizgen claims that 10x and Harvard engaged in a conspiracy to monopolize the SST market in violation of 15 U.S.C. § 2.  "Section 2 imposes liability on 'every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States.'" *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) (alteration accepted) (quoting 15 U.S.C. § 2).  "A Section 2 conspiracy claim has four elements:  (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged."  *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010).  10x only contests the first element.[3]

First, 10x argues that a patent holder and its exclusive licensee are treated as a single economic entity that cannot conspire with itself as a matter of law under the *Copperweld* doctrine.  *See Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984).  But "*Copperweld* does not hold that a patent holder and licensee never can conspire to violate the antitrust laws.*"  In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1301 (D. Kan. 2018).  "The key [in determining whether the *Copperweld* doctrine applies] is whether the alleged 'contract, combination, or conspiracy' is concerted action—that is, whether it joins together

---

[3] In a footnote, 10x briefly asserts that "the failure to allege when Harvard and 10x entered into this supposed conspiracy, and the terms of the alleged conspiracy, is another basis for dismissal."  Pls.' Opening Br. at 16 n.18.  10x has forfeited this argument by not developing it.  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").

separate decisionmakers." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (alteration accepted) (quoting *Copperweld*, 467 U.S. at 769).  "The relevant inquiry, therefore, is whether there is a contract, combination, or conspiracy amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *Id.* (alteration accepted) (citations and internal quotation marks omitted).

Vizgen alleges that Harvard and 10x are "separate decision-makers that conspired to ensure 10x obtains a monopoly in the SST market and that Harvard receives a portion of its monopoly rents."  Def.'s Resp. Br. at 16.  It is plausible that 10x, as "a competitor in the market for products incorporating the patented technology," "ha[d] an interest in excluding competitors," whereas Harvard, as a licensor, had a different interest in "maximiz[ing] the licensing revenue from [its] patents."  *Townshend v. Rockwell Int'l Corp.*, No. C99-0400SBA, 2000 WL 433505, at *6 n.2 (N.D. Cal. Mar. 28, 2000).  "Because the question of capability to enter a conspiracy is a question of fact," this is sufficient to allege that Harvard and 10x are independent decision-makers that joined together.  *Id.* at *6*; see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4910673, at *9 (E.D. Pa. Oct. 30, 2017) (holding that "the *Copperweld* doctrine d[id] not apply" to "the patentee/licensee relationship in this case" where the complaint "describe[d] two separate entities that engaged in concerted action to jointly advance their independent economic interests").

Second, 10x argues that Vizgen has not alleged that Harvard and 10x "conspired for the purpose of obtaining an unlawful monopoly" because Vizgen has alleged only

lawful conduct.  Pls.' Opening Br. at 15 (emphasis omitted).  "Liability under § 2 requires . . . the willful acquisition or maintenance of [monopoly] power," which "must be accompanied by some anticompetitive conduct on the part of the possessor." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306–08 (3d Cir. 2007). "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits."  *Id.* at 308.  "[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."  *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc).  "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive."  *Broadcom*, 501 F.3d at 308.  "Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive."  *Id.*

Vizgen alleges that 10x and Harvard engaged in an "open early, closed late" scheme.  Countercl. ¶¶ 121, 133.  Vizgen alleges that Harvard initially promised that its technology would be "available for licensing on open and non-exclusive terms," but then "closed" by suing for infringement after "Vizgen and others [ ] commit[ted]" to Harvard's technology, forcing "Vizgen and others" to "pay extortionate fees to 10x (thereby enriching Harvard and 10x at the expense of competition) or exit the SST market."  *Id.* ¶¶ 121, 133–134.

Vizgen relies on *Broadcom* for the proposition that this "bait-and-switch conduct" is actionable.  Def.'s Resp. Br. at 18 (citing *Broadcom*, 501 F.3d at 314).  In *Broadcom*, the Third Circuit held that "(1) in a consensus-oriented private standard-setting

17

environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND [free, reasonable, and non-discriminatory] terms, (3) coupled with an SDO [standards-determining organization]'s reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct." *Broadcom*, 501 F.3d at 314; *see also Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007) (holding that anticompetitive conduct was alleged where "[t]he Manufacturers [ ] alleged that Rambus participated in a standards-setting organization, understood its intellectual property disclosure policy, withheld information about its patent applications, waited until the industry was irreversibly 'locked in' to the standard, and then began a litigation campaign to extract royalties").

The Third Circuit explained that its holding followed from the harm of "patent hold-up" that can be caused by "[d]eceptive FRAND commitments." *Broadcom*, 501 F.3d at 314.  "[P]atent hold-up" can occur when "[i]ndustry participants who have invested significant resources developing products and technologies that conform to the [SDO's] standard will find it prohibitively expensive to abandon their investment and switch to another standard." *Id.* at 310.  Because industry participants are "locked in" to the standard, the patent holder is in a "unique position of bargaining power" and "may be able to extract supracompetitive royalties from the industry participants." *Id.*  In these circumstances, the Third Circuit observed that "measures such as FRAND commitments," i.e., commitments to license technologies on "fair, reasonable, and non-discriminatory" terms, "become important safeguards against monopoly power." *Id.* at 304, 314.

Similar to *Broadcom*, Vizgen alleges that 10x's technology has "lock-in effects" and is advertised as an "end-to-end ecosystem" to "lock-in researchers."  Countercl. ¶ 138.  It contends that Harvard made its promise to offer open, non-exclusive licenses to NIH as part of the "open early" portion of its scheme.  *Id.* at ¶ 121.  According to Vizgen, it was only after "Vizgen and others [ ] commit[ted] to Harvard's alleged technology" through investments in commercialization, that "Harvard 'closed' its approach to intellectual property" by claiming "that virtually all SST technology was covered by other patents."  *Id.* ¶ 133.  As in *Broadcom*, Vizgen alleges that this scheme provided 10x and Harvard monopoly power to extract "extortionate fees."  *Id.*  Vizgen further alleges that research "will be more expensive as researchers are forced to pay monopoly rents to 10x."  *Id.* ¶ 139.  These allegations plausibly suggest that 10x competed with Vizgen "on some basis other than the merits" and are sufficient on a motion to dismiss to allege anticompetitive conduct.  *W. Penn Allegheny*, 627 F.3d at 110 ("Viewed as a whole, these allegations plausibly suggest that UPMC has engaged in anticompetitive conduct, *i.e.*, that UPMC has competed with West Penn on some basis other than the merits.") (internal quotation marks omitted); *see also LePage's*, 324 F.3d at 152 ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C.Cir.1998))).

10x contends that *Broadcom* is inapposite because Harvard did not make its promise to a standard-setting organization.  But 10x has not cited any case holding that an "open early, closed late" scheme requires a standard-setting organization to

establish anticompetitive patent hold-up.  *See Arista Networks, Inc. v. Cisco Sys. Inc.*,
No. 16-CV-00923-BLF, 2018 WL 11230167, at *14 (N.D. Cal. May 21, 2018) ("Cisco
does not point to any authority that concluded that an anticompetitive 'open early,
closed late' scheme necessarily requires intellectual property 'hold-up' or 'lock-in' of
standards set by an SSO.").  In *Arista*, the court held that there was "a genuine issue of
material fact whether Cisco's [technology] was marketed as an industry standard"
because there was evidence that "Cisco ha[d] previously represented that '[its
technology] is the current de-facto standard.'"  *Id.* (alterations accepted).  Similarly, in
this case, Vizgen has alleged that 10x's technology has "lock-in effects" and is
advertised as an "end-to-end ecosystem" to "lock-in researchers."  Countercl. ¶ 138.

10x also attempts to distinguish *Broadcom* by contending that "Vizgen does not
allege [that] the Asserted Patents are 'essential' to Vizgen competing."  Pls.' Reply Br. at
9.  But this is precisely what Vizgen alleges.  *See, e.g.*, ¶ 133 ("Vizgen and others face,
at best, a Hobson's choice:  pay extortionate fees to 10x (thereby enriching Harvard and
10x at the expense of competition) or exit the SST market.").

10x makes two remaining arguments regarding the "open early, closed late"
scheme.  First, 10x argues that the "open" part of the alleged conspiracy is flawed
because "Vizgen never had a right to the license" given that it cannot enforce the NIH
grant.  Pls.' Opening Br. at 17 (emphasis omitted).  But the Third Circuit's analysis in
*Broadcom* did not hinge on the legal right of competitors to a license, but rather the
deceptive conduct that had anticompetitive effects.  *See Broadcom*, 501 F.3d at 310–
14.  As explained above, Vizgen has alleged similar deceptive conduct in this case.[4]

---

[4] Contrary to 10x's assertion, the Court did not "already reject[]" Vizgen's allegations of

Second, 10x argues that the "closed" part of the alleged conspiracy fails because Vizgen has not plausibly alleged that 10x's litigation is objectively baseless.[5]  This argument assumes that 10x's litigation conduct cannot form part of the scheme unless it is a sham under the *Noerr-Pennington* doctrine.  But 10x does not cite any case for this proposition.  Vizgen contends that the *Noerr-Pennington* doctrine does not apply if "the current lawsuit is 'causally connected' to Plaintiffs' broader anticompetitive scheme." Def.'s Resp. Br. at 18–19 (quoting *Microsoft Mobile Inc. v. Interdigital, Inc.*, No. CV 15-723-RGA, 2016 WL 1464545, at *3 (D. Del. Apr. 13, 2016)).  In *Hynix*, the court held that patent litigation was "causally connected" because "a patent 'ambush' or 'hold-up' is ineffective without the threat of litigation."  *Hynix*, 527 F. Supp. 2d at 1098.

10x does not contest that the "causally connected" test applies but rather contends that Vizgen has not satisfied the test because it has not alleged that the "non-litigation 'aspects of the scheme independently produced anticompetitive harms.'"  Pls.' Reply Br. at 9 (alteration accepted) (emphasis omitted) (quoting *id.* at 1097).  10x characterizes Vizgen's counterclaim as alleging "that Harvard and 10x formed an exclusive license and refused a license to Vizgen."  *Id.*  But this oversimplifies the more complex scheme that Vizgen has alleged, which has independent anticompetitive harms, as described above.  *See* Countercl. ¶¶ 120-122, 130-141, 350-351.  Similar to *Hynix*, Vizgen alleges that 10x's patent litigation is causally connected to the alleged

an "open early, closed late" scheme when it dismissed Vizgen's breach of warranty claim.  Pls.' Opening Br. at 16 (citing *10x Genomics*, 2023 WL 1470672, at *5–6).
[5] Because the Court holds that Vizgen has sufficiently alleged anticompetitive conduct based on its alleged "open early, closed late" scheme, the Court need not address Vizgen's additional allegations that 10x and Harvard engaged in "anticompetitive sham litigation."  Def.'s Resp. Br. at 19.

anticompetitive scheme as "one enforcement mechanism of the scheme." *Id.* ¶ 134.

### 2. Attempted monopolization

Vizgen also asserts a claim under section 2 of the Sherman Act for attempted monopolization.  "A claim of attempted monopolization under § 2 of the Sherman Act must allege (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom*, 501 F.3d at 317 (internal quotation marks omitted).  10x contends that Vizgen has failed to allege the first and third elements.

For the first element, 10x contends that Vizgen has not alleged "anticompetitive conduct as a matter of law" for the same reasons it argued Vizgen failed to state a conspiracy claim.  Pls.' Opening Br. at 19.  For the reasons explained above, the Court overrules this contention.

Regarding the third element, 10x contends that Vizgen has not alleged a dangerous probability of achieving monopoly power.  "[W]hether the Complaint alleged sufficient facts as to the dangerous probability" element is "a particularly fact-intensive inquiry" that "[c]ourts typically should not resolve . . . at the pleading stage unless it is clear on the face of the complaint that the dangerous probability standard cannot be met as a matter of law." *Broadcom*, 501 F.3d at 318 (internal quotation marks omitted).  "In a determination of dangerous probability . . . factors such as significant market share coupled with anticompetitive practices, barriers to entry, the strength of competition, the probable development of the industry, and the elasticity of consumer demand may be considered." *Id.*

Rather than address any of these factors, 10x contends that Vizgen's allegations

that 10x and Harvard will have a monopoly if they succeed in their patent litigation cannot constitute a dangerous probability of achieving monopoly power as a matter of law because "any monopoly so achieved will be a legal one."  Pls.' Opening Br. at 19 (emphasis omitted).  This contention is circular.  The cases 10x relies on for this proposition do not address allegations akin to Vizgen's in this case of a broader anticompetitive scheme in which patent litigation plays an enforcement role.  *See Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 65 (D. Mass. 2020) (holding that "[r]egarding the showing of a dangerous probability of achieving monopoly power, the litigation itself cannot serve as the predicate anticompetitive harm under *Noerr-Pennington*"); *Chip-Mender, Inc. v. Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 WL 13058, at *4–5 (N.D. Cal. Jan. 3, 2006) (holding that the defendant had "not alleged facts showing a dangerous probability of success" where its allegations "depend[ed] on the assertion" that the plaintiff's "patents were fraudulently procured").  10x does not press this argument further in its reply brief outside of a footnote.  The Court therefore overrules 10x's contention that Vizgen cannot meet the dangerous probability element as a matter of law.

## C.   Counterclaims 19-21 (state law claims)

Lastly, counterclaims 19 and 20 allege violations of California's Cartwright Act and Unfair Competition Law.  10x's only contention for dismissal of these claims is that they "are merely a rehash of Vizgen's defective federal antitrust claims."  Pls.' Opening Br. at 20.  Because the Court declines to dismiss Vizgen's federal antitrust claims, it also denies 10x's motion to dismiss these counterclaims.

Counterclaim 21 alleges a second violation of Massachusetts General Laws

c. 93A, §§ 2 and 11 (Chapter 93A) by "making false statements to the NIH, intentionally violating commitments made to the NIH, and engaging in a scheme to establish control over the technology funded by the NIH grant."  Def.'s Resp. Br. at 3–4.  Chapter 93A makes unlawful any "unfair acts or practices in the conduct of any trade or commerce." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474, 583 N.E.2d 806, 821 (1991) (alterations accepted) (quoting Chapter 93A, § 2(a)).  10x does not address this counterclaim except in footnotes in its opening and reply briefs.  It has therefore forfeited the point.  *See John Wyeth*, 119 F.3d at 1076 n.6 ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.").

Even if the arguments contained in the footnotes were not forfeited, they merely reassert contentions the Court has already rejected in its earlier order on Vizgen's counterclaims.  *See 10x Genomics*, 2023 WL 1470672, at *9–10.  First, 10x repeats the argument that "the new 93A claim fails because Harvard was not engaged in commercial conduct in connection with applying for a research grant."  Pls.' Opening Br. at 13 n.12.  As the Court has already explained, "[s]ome non-profits engaged in business activity have been shielded from liability under Chapter 93A, but only when the organization 'has not sought to profit from its transaction.'"  *10x Genomics*, 2023 WL 1470672, at *9 (quoting *All Seasons Servs., Inc. v. Comm'r of Health & Hosps. of Boston*, 416 Mass. 269, 271, 620 N.E.2d 778, 780 (1993)).  10x has not established that Harvard did not seek to profit from its transactions with the NIH.  *See Linkage Corp. v. Trustees of Bos. Univ.*, 425 Mass. 1, 26, 679 N.E.2d 191, 209 (1997) (holding that Chapter 93A will apply where "an institution's business motivations, in combination with the nature of the transaction and the activities of the parties, establish a 'business

context'" and "emphasiz[ing] the fact-specific nature of the inquiry").

Second, 10x also repeats its assertion that this "counterclaim simply alleges that Harvard breached its purported 'contract' with the NIH," which, "standing alone, is not an unfair trade practice."  Pls.' Opening Br. at 13 n.12 (quoting *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 169, 896 N.E.2d 937, 963 (2008)).  As before, this contention "states the law correctly but misapplies it."  *10x Genomics*, 2023 WL 1470672, at *10. Vizgen's allegations, as summarized above and described throughout this opinion, extend beyond mere breach of the NIH grant agreement.

## Conclusion

For the reasons stated above, the Court denies 10x and Harvard's motion to dismiss Vizgen's counterclaims 17-21 but grants the motion [dkt. no. 155] with respect to counterclaim 22.  10x and Harvard are directed to answer counterclaims 17 through 21 within twenty-one days of this order.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 10, 2023