IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>        Plaintiffs,<br><br>    v.<br><br>VIZGEN, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 22-595 (MFK)

| | |
|---|---|
| VIZGEN, INC.,<br><br>        Counterclaim-Plaintiff,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Counterclaim-Plaintiff as to certain claims,<br><br>    v.<br><br>10X GENOMICS, INC.,<br>        Counterclaim-Defendant as to certain claims,<br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>        Counterclaim-Defendant as to certain claims. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**10X GENOMICS, INC'S NOTICE OF DEPOSITION OF VIZGEN, INC.**

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 30(b)(6),

Plaintiff 10x Genomics, Inc. ("10x"), by and through undersigned counsel, will take the

deposition of Vizgen, Inc. The deposition will take place at a date, time, and location to be

mutually agreed upon by the parties. The deposition will be taken before a notary public or other officer authorized by law to administer oaths and take testimony. The deposition shall continue from day to day (weekends and holidays excepted) until concluded and shall be recorded stenographically and by video recording.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Vizgen shall designate one or more witnesses to testify on their behalf as to all facts and other information known or reasonably available to Vizgen relating to the subject matters set forth in the schedule of Deposition Topics, and not just about information personally known to the witness or witnesses. If the designated witness or witnesses do not possess such knowledge, Vizgen shall prepare them so that they  may give knowledgeable and binding answers per the requirements of Rule 30(b)(6).

## **DEFINITIONS**

The following definitions apply to the Instructions and Deposition Topics set forth below.

A.　"**You**," "**Your**," "**Vizgen**" shall each mean and refer, individually and collectively, to Vizgen, Inc., and without limitation all corporate locations, and all predecessors and successors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and entities acting in joint-venture or partnership relationships with Vizgen, and others acting on behalf of Vizgen.

B.　"**10x**" shall mean 10x Genomics, Inc. and without limitation all its corporate locations, and all predecessor subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with 10x, and others acting on behalf of 10x.

C.　"**Harvard**" shall mean President and Fellows of Harvard College, and without limitation all its locations, and all parents, subsidiaries and affiliates, and all past or present

directors, officers, agents, representatives, employees, consultants, attorneys, entities acting in joint-venture or partnership relationships with Harvard, and others acting on behalf of Harvard.

D.     "**Action**" shall mean the above-captioned proceedings before the United States District Court of Delaware, 1:22-cv-00595-MFK.

E.     "**10x Asserted Patent(s)**" shall mean U.S. Patent Nos. 11,021,737 ("**737 Patent**"), 11,293,051 ("**051 Patent**"), 11,293,052 ("**052 Patent**"), 11,299,767 ("**767 Patent**"), 11,549,136 ("**136 Patent**"), and any other U.S. patents that are asserted by 10x in this Action, as well as European Patent No. **EP 4 108 782** the ("**EP 782 Patent**"), and any reexamination or reissue certificate(s) issuing from the foregoing, and any patent applications leading directly or indirectly to the foregoing (including without limitation all published and unpublished pending and abandoned applications).

F.     "**10x Related Patent(s)**" shall include, but are not limited to: (a) patents issuing directly or indirectly from any ancestor, continuation, continuation-in-part, divisional or reissue application of the 10x Asserted Patents or from any interference or reexamination proceedings regarding any such patents or the applications thereof, any reexamination and reissue certificate(s) issuing from any of the foregoing, and any patent applications leading directly or indirectly to the foregoing (including without limitation all published and unpublished pending and abandoned applications); and (b) foreign counterparts of the 10x Asserted Patents.

G.     "**Xenium Analyzer**" shall mean 10x's Xenium Analyzer instrument and components thereof.

H.     "**Xenium Platform**" shall mean 10x's Xenium Analyzer and all assays and other consumables and instruments or components used with or sold with Xenium Analyzer.

I.        "**MERSCOPE**" shall mean Vizgen's MERSCOPE instrument and components thereof.

J.        "**MERSCOPE Lab Services**" shall mean MERSCOPE Platform lab services provided through the Vizgen Lab Services.

K.        "*In Situ* **Analysis**" shall mean identification, quantification, and/or analysis of biological targets and their spatial context in cells or tissues.

L.        "**Spatial Analysis**" shall mean analysis related to spatial gene expression.

M.        "**Vizgen Accused Instrumentalities**" shall mean each version of the Vizgen products and workflows that 10x and Harvard have accused or subsequently accuse of infringing one or more claims from one or more of the 10x Asserted Patents, including without limitation MERSCOPE, MERSCOPE Lab Services, and any Vizgen products, services, workflows, and components named in the Second Amended Complaint and in any timely and properly served disclosure in this action.

N.        "**Vizgen Asserted Patent(s)**" shall mean U.S. Patent No. 11,098,303 ("**303 Patent**") and any other U.S. patents that are asserted by Vizgen in this Action, as well as any reexamination or reissue certificate(s) issuing from the foregoing, and any patent applications leading directly or indirectly to the foregoing (including without limitation all published and unpublished pending and abandoned applications).

O.        "**Vizgen Related Patent(s)**" shall include, but are not limited to: (a) patents issuing directly or indirectly from any ancestor, continuation, continuation-in-part, divisional or reissue application of the Vizgen Asserted Patents or from any interference or reexamination proceedings regarding any such patents or the applications thereof, any reexamination and reissue certificate(s) issuing from any of the foregoing, and any patent applications leading directly or indirectly to the

foregoing (including without limitation all published and unpublished pending and abandoned applications); and (b) foreign counterparts of the Vizgen Asserted Patents.

P.      "**Harvard-Vizgen License**" shall mean the September 26, 2019, License Agreement between Harvard and Vizgen (D.I. 29, Ex. 1) and any subsequent amendments.

Q.      "**NanoString**" shall each mean and refer, individually and collectively, to NanoString Technologies, Inc., and without limitation all corporate locations, and all predecessors and successors, subsidiaries, parents, and affiliates, and all past or present directors, officers, agents, representatives, employees, consultants, attorneys, and entities acting in joint-venture or partnership relationships with NanoString, and others acting on behalf of NanoString.

R.      "**CosMx SMI**" shall mean NanoString's CosMx Spatial Molecular Imager instrument and components thereof.

S.      "**CosMx Platform**" shall mean NanoString's CosMx SMI and all assays and other consumables and instruments or components used with or sold with CosMx SMI.

T.      "**Vizgen's Alleged SST Market**" shall mean the "Single-Cell Spatial Transcriptomics" market(s), and products that are offered for sale, sold, and/or compete therein, as Vizgen uses the term, including in connection with its Answer, Defenses, and Counterclaims to Plaintiffs' Second Amended Complaint (D.I. 138), including in its Seventeenth Counterclaim (Alleged Conspiracy to Monopolize (15 U.S.C. § 2)), Eighteenth Counterclaim (Alleged Attempted Monopolization (15 U.S.C. § 2)) Nineteenth Counterclaim (California Cartwright), Counterclaim Twenty (California Unfair Competition), and Counterclaim Twenty-One (Massachusetts Unfair Competition).

U.      "**NIH Grant No. P50HG005550 Proposal**" means all versions of any proposal or application concerning NIH Grant No. P50HG005550, including but not limited to the document

reflected as item no. 26 on Information Disclosure Statement dated Feb. 5, 2021, in the file history of U.S. Application No. 16/941,585, titled "Church; 'Proposal for a Center for the determination of the Causal Transcriptional Consequences of Human Genetic Variation (CTCHGV)'" (10XH-00000929-1513 at 10XH-00001334), and including but not limited to the complete version of any such proposal.

    V.  "**Document**" shall be understood to have the broadest possible meaning under the Federal Rules of Civil Procedure and shall include without limitation any written, recorded, graphic, or other matter, whether sent or received or made or used internally, however produced or reproduced and whatever the medium on which it was produced or reproduced (whether on paper, cards, charts, files, or printouts; tapes, discs, video tapes, audiotapes, tape recordings, cassettes, or other types of voice recording or transcription; computer tapes, databases, e-mails; pictures, photographs, slides, films, microfilms, motion pictures; or any other medium), and any other tangible item or thing of readable, recorded, or visual material of whatever nature including without limitation originals, drafts, electronic documents with included metadata, and all non-identical copies of each document (which, by reason of any variation, such as the presence or absence of hand-written notes or underlining, represents a distinct version). By way of example, the term "document(s)" as used herein shall include, without limitation: correspondence; blueprints; memoranda; notes; diaries; letters; telegraphs; telegrams; telexes; e-mails; minutes; agendas; contracts; reports; studies; checks; statements; receipts; returns; summaries; pamphlets; circulars; press releases; advertisements; books; communications (as defined below); handwritten or typewritten notes; notations or summaries of telephone conversations, meetings, or conferences; bulletins; computer printouts; databases; teletypes; telefax; invoices; worksheets; photographs; tape recordings; websites; blog entries; social media postings; code; Excel spreadsheets;

PowerPoint presentations; Word documents; transcripts from Slack or Microsoft Teams; company blogs, bulletin boards, or wikis; and all other tangible items of readable, recorded, or visual material of any kind.

W.     "**Thing**" shall be construed under the broadest possible construction under the Federal Rules of Civil Procedure.

X.     "**Communication**" shall mean any transmission of information in any context or situation by or between two or more persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically or digitally, or on tape, either orally or in writing, including but not limited to conversations; correspondence; electronic mails; telexes; facsimile transmissions; telecopies; recordings in any medium of oral, written, or typed communications; telephone or message logs; notes or memoranda relating to written or oral communications; transcripts from Slack or Microsoft Teams; company blogs, bulletin boards, or wikis; and any translation thereof.

Y.     "**Identify**" and "**Identity**" shall each mean:

a)  as applied to an individual, to state the individual's full name, present or last known address and telephone number, present or last known employer, present or last known business address and telephone number, present and prior employment positions and corresponding dates of such positions, a description of the individual's present employment title and responsibilities, and the individual's past and present relationship to You;

b)  as applied to a person other than a natural person (including but not limited to any business or other entity), to state the entity's full name, place and date of incorporation or formation, principal place of business or activity, the identity of the natural persons within that

entity having knowledge of the matter with respect to which that entity is named, and the entity's past and/or present relationship to You;

c) as applied to a document (whether or not any claim of privilege is made in respect thereof), to describe the document and to state the type of document, the date of creation of the document, the date of communication of the document, the names and identities of the individuals who drafted, authored, or signed the document or to whom a copy thereof was addressed or sent, a summary of the subject matter of the document, the number of pages of the document, the present whereabouts of the document, including without limitation all originals and copies, and the name and address of the present or last-known custodian of the document;

d) as applied to a thing (including without limitation any products manufactured, developed, or sold by Plaintiffs), to describe the thing and to state the date that the thing was first introduced for sale, the date of the thing's first sale, all versions, parts, or revision numbers or codes, all product names, and all team names or project titles used in connection with the design, development, testing, or engineering of that product;

e) as applied to a process, to describe the process and to state the date that the process was first used, the date the products or goods made by the process were first sold, all numbers or codes used to refer to the process, including but not limited to process revision numbers or codes, all process names, and all team names or project titles used in connection with the design, development, testing, or engineering of that process; or

f) as applied to a communication, to describe the communication and to state the type of communication, the date and the parties to such communication, and if such communication has been recorded in documentary form, to identify all documents recording such communication.

Z.    "**Information**" shall mean information in any form, including but not limited to documentary, electronic, graphical, or tabular, and communicated by any means, including but not limited to orally, in writing, or via electronic communication.

AA.    "**Describe**" when used in relation to an act, event, instance, occasion, transaction, conversation, or communication, shall mean (1) to summarize the content, subject matter, and purpose; (2) to state the date and place thereof; (3) to identify the individual participants; (4) to summarize separately for each individual participant what was said or done; and (5) to identify each document or communication used or prepared in connection therewith or making any reference thereto.

BB.    "**Date**" shall mean the exact date, if known, or the closest approximation to the exact date as can be specified, including without limitation, the year, month, week in a month, or part of a month.

CC.    "**Relate to**," "**Related to**," "**Relating to**," or "**Concerning**" shall have their ordinary meanings, including without limitation in whole or in part constituting, containing, embodying, reflecting, describing, involving, supporting, contradicting, evidencing, analyzing, identifying, mentioning, stating, referring directly or indirectly to, dealing with, or in any way pertaining to.

DD.    As used herein, the singular form of a term shall be interpreted to include the plural and vice versa.

EE.    As used herein, the masculine form of a term shall be interpreted to include the feminine and vice versa.

FF.    Except where the context does not permit, the term "**including**" shall be without limitation.

GG.     Except where the context does not permit, the terms "**and**" and "**or**" shall be both conjunctive and disjunctive.

HH.     Except where the context does not permit, the terms "**each**" and "**any**" shall mean any and all.

## INSTRUCTIONS

The following Instructions apply to the Deposition Topics below and should be considered part of each such Deposition Topic.

1.     Each Deposition Topic shall be construed independently, and no Deposition Topic shall be construed as limiting the scope of any other Deposition Topic.

2.     The witness or witnesses You designate to testify about Deposition Topics identified herein must be prepared to testify to all information known or reasonably available to You regardless of where the information is maintained, in what form the information is maintained, or whether the information is maintained by You or by Your predecessors, subsidiaries, parents, and affiliates.

## DEPOSITION TOPICS

### TOPIC NO. 1:

The structure, design, technical requirements, development, specifications, implementation, and operation of the Vizgen Accused Instrumentalities, including documentation thereof and the persons who were directly involved in the foregoing activities, and including the function, operation, configuration, and workflow of the following aspects of the Vizgen Accused Instrumentalities:

(a)     Assignment of barcodes to different genes of interest;

(b)     Labelling of target RNA species with encoding probes;

(c)     Design and structure of encoding probes used in the MERSCOPE Platform including the design and structure of any targeting sequence and readout sequence of the encoding probes;

(d)      Hybridization of the encoding probes in the MERSCOPE Platform;

(e)      Design and structure of readout probes used in the MERSCOPE Platform;

(f)      Detection of fluorescent signals in the MERSCOPE Platform;

(g)      Hybridization of readout probes to encoding probes in the MERSCOPE Platform;

(h)      Inactivating and/or removing bound readout probes between successive rounds of hybridization by photobleaching or otherwise;

(i)      The construction of codewords from the observed fluorescent signals in the MERSCOPE Platform;

(j)      The matching of codewords with valid codewords in a codebook;

(k)      Decoding of codewords used in the MERSCOPE Platform;

(l)      The ability of the MERSCOPE platform to detect and correct errors.

**TOPIC NO. 2:**

Vizgen's customers' use of the Vizgen Accused Instrumentalities, including any use described or not described (not accused) in Plaintiffs' November 23, 2022 Infringement Contentions or any update thereto.

**TOPIC NO. 3:**

For each Vizgen Accused Instrumentality, including any prototypes or research and development projects that led to the Vizgen Accused Instrumentalities, the decision to begin development and/or launch the Vizgen Accused Instrumentality, including any analysis of the total research and development costs, time commitment, steps, and/or investments incurred by Vizgen in connection with this decision and any analysis concerning whether those costs, time, steps, and/or investments were justified.

**TOPIC NO. 4:**

Similarities or differences between the Vizgen Accused Instrumentalities and 10x's Xenium products in functionality, design, features, and operation.

**TOPIC NO. 5:**

The relevant advantages and disadvantages of the Vizgen Accused Instrumentalities over the Xenium Platform, the CosMx Platform, other *In Situ* Analysis products, Spatial Analysis products, other competing products, and what was known in the prior art.

**TOPIC NO. 6:**

The identification and contents of any instructions, manuals, guides, product bulletins, product specifications, posters, flyers, order forms, whitepapers, case studies, presentations, webinars, support, repairs, advertisements, or other activities or documents provided or made available to any third parties, including actual or potential customers, relating to the design, function, features, operation, and workflow of the Vizgen Accused Instrumentalities.

**TOPIC NO. 7:**

The process and strategy employed by Vizgen for marketing, pricing, negotiating, and selling the Vizgen Accused Instrumentalities, including the policies, practices, or methods used as well as the circumstances and factors considered when negotiating the sale of spatial analysis products.

**TOPIC NO. 8:**

Your projections and/or forecasts for the marketing or sale of the Vizgen Accused Instrumentalities or any other current or future *In Situ* Analysis and/or Spatial Analysis products, including *In Situ* Analysis and/or Spatial Analysis products You may produce as a result of any expansion, investment, acquisition, growth, or diversification, including projected sales and profits.

**TOPIC NO. 9:**

Any business plan for or relating to the Vizgen Accused Instrumentalities, including licensing plans, strategic plans, operating plans, marketing plans, financial plans, production plans, sales plans, capital or investment plans, and all related forecasts.

**TOPIC NO. 10:**

Vizgen's contracts, offers, sales, attempts to sell, or proposals, including rejections thereof, for actual or potential purchases of each Vizgen Accused Instrumentality or other *In Situ* Analysis and/or Spatial Analysis product.

**TOPIC NO. 11:**

All sales and uses of the Vizgen Accused Instrumentalities on a U.S.- and worldwide-basis, including:

(a)     total unit sales, gross and net revenues, gross profits, of each of instruments, assays, and services (on a quarterly basis);

(b)     the identity of each customer and the instruments, assays, and services provided to each customer;

(c)     the location of each sale and use, including whether the sale involved importation to or exportation from the United States;

      (d)      average unit selling price and marginal profits; and

      (e)      rebates, discounts, subsidies, commissions.

**TOPIC NO. 12:**

Since the first public announcement of the Vizgen Accused Instrumentalities, all actual and projected sales of consumables reflecting actual and projected pull-through sales for the Vizgen Accused Instrumentalities.

**TOPIC NO. 13:**

The cost (including cost of goods sold and operating costs) of designing, developing, manufacturing, marketing including sales commissions, implementing, and maintaining the Vizgen Accused Instrumentalities, including documents sufficient to show these costs on a quarterly basis.

**TOPIC NO. 14:**

The creation and content of any financial documents produced by Vizgen, including the creation and maintenance of any underlying records, documents, or data supporting those summary documents.

**TOPIC NO. 15:**

The 10x Asserted Patents or any Related Patent, and all information received or generated by Vizgen relating to the 10x Asserted Patents, any Related Patent, and/or the applications and patents from which they issued or claimed priority, including Vizgen's first awareness, understanding of the technology described therein and the meaning of the terms and phrases used in the specification and claims, or any investigation, opinion or report relating thereto.

**TOPIC NO. 16:**

Steps taken to conceive, design, or develop a modification of or alternative to the Vizgen Accused Instrumentalities, including communications about taking such steps.

**TOPIC NO. 17:**

Formal or informal freedom-to-operate analyses conducted by or on behalf of Vizgen relating to the Vizgen Accused Instrumentalities, *in situ* analysis products, or other spatial analysis products.

**TOPIC NO. 18:**

Any sale or attempted sale of Vizgen Accused Instrumentalities in which Vizgen's customer (including potential customers) indicated interest in purchasing a product from 10x or which Vizgen otherwise believed the customer was interested in purchasing a product from 10x, including:

    (a)      the identity of the customer, the product or service purchased by the customer, the 10x product Vizgen understood or believed the customer contemplated buying;

    (b)      Vizgen's statements to customer describing, comparing, or referencing the Vizgen Accused Instrumentalities or a 10x product; and

    (c)      Vizgen's knowledge or beliefs about the bases of the customer's decision to buy.

**TOPIC NO. 19:**

Vizgen's manufacturing and marketing capacity for the production and commercialization of the Vizgen Accused Instrumentalities, and any other product as to which Vizgen claims any lost profits as a result of 10x's alleged infringement, on a quarterly basis from 2021 to present.

**TOPIC NO. 20:**

Research, design, development, implementation, and testing by You of any product and/or technology for *in situ* analysis and/or spatial analysis, including each of Vizgen's decisions to begin development of any such product.

**TOPIC NO. 21:**

Prior art to the 10x Asserted Patents, including but not limited to:

    (a)      the facts and circumstances surrounding Vizgen's first awareness of prior art identified in Vizgen's invalidity contentions; and

    (b)      any Vizgen knowledge or understanding of the technology described therein.

**TOPIC NO. 22:**

Measures and analyses of Vizgen's market share over time in Vizgen's Alleged SST Market and any other market in which the Vizgen Accused Instrumentalities are marketed and sold, including:

    (a)      the nature of each market and any measure of market share;

    (b)      the identity of each market participant, its products, and its relative share;

    (c)      the nature of competition between Vizgen and each market participant;

    (d)      the presence, absence, and nature of any first-mover advantage; and

    (e)      any effects on Vizgen from changes in market share.

**TOPIC NO. 23:**

Vizgen's goals and projections for the market for *in situ* analysis products, including:

(a)    documents and things reflecting Vizgen's goals and projections for MERSCOPE

(b)    steps taken by Vizgen to compete with 10x; and

(c)    documents and things reflecting Vizgen's goals and projections for competing with 10x.

**TOPIC NO. 24:**

Competition in any market in which the Vizgen Accused Instrumentalities are marketed and sold, including:

(a)    competition for publications, including engagement with and by Key Opinion Leaders (KOLs) and academic researchers;

(b)    the identity of all providers and their products and services that compete with the Vizgen Accused Instrumentalities;

(c)    the nature of any competition between Vizgen and any competitor, including any future products;

(d)    technical and commercial comparisons between the Vizgen Accused Instrumentalities and the competing products and services; and

(e)    any analysis of such market(s), including market research and Vizgen's knowledge thereof, the market shares of Vizgen, NanoString, 10x and other participants, any Vizgen competitive analyses and monitoring of such competition, all market participants and their products, industry growth projections, and demand.

**TOPIC NO. 25:**

Customer acceptance of or demand for the Vizgen Accused Instrumentalities or other products in Vizgen's Alleged SST Market and any other market in which the Vizgen Accused Instrumentalities are marketed and sold, including:

(a)    any related study, survey, analysis, or research reflecting such customer acceptance or demand;

(b)    information reflecting the features or functionality that drive demand; and

(c)    all external feedback regarding any of the Vizgen Accused Instrumentalities, including regarding the performance, reliability, precision, or accuracy of the Vizgen Accused Instrumentalities.

**TOPIC NO. 26:**

The portion of Vizgen's profits, if any, attributable to the Vizgen Asserted Patent and the portion of profits attributable to other Vizgen patents not asserted in this action.

**TOPIC NO. 27:**

Any valuation of the Vizgen Asserted Patent or any Vizgen Related Patents, including any analysis or investigation regarding the potential value of those patents and/or any diligence undertaken for licensing, tax, accounting, litigation, or any other purpose.

**TOPIC NO. 28:**

The incremental sales, revenue, costs, expenses, or profit attributable to the use of the technology claimed in the Vizgen Asserted Patent in any product, system, or method.

**TOPIC NO. 29:**

Customer complaints, criticisms, or feedback relating to any of the Vizgen Accused Instrumentalities.

**TOPIC NO. 30:**

All agreements, including assignments, license agreements, and settlement agreements, relating to any ownership, ownership interest, financial interest, control or rights to or under the Vizgen Asserted Patent, and further including offers or discussions for a license, settlement agreements, covenants not to sue, or any other agreement relating to the Vizgen Asserted Patent, including identification for each, of the persons involved, including all licensees, the patents and claims thereof thought to be infringed (if any), the allegedly infringing product (if any), the details of any related communications or negotiations, the details of action taken, the details of any licensing rates or payments discussed, the substance of any such agreement entered into, and the results thereof.

**TOPIC NO. 31:**

The existence, identification, and description of any patent or technology licensing policies, procedures, or practices followed by Vizgen.

**TOPIC NO. 32:**

Licenses, whether executed or potential, to which Vizgen is a licensor or licensee and Vizgen's in-licensing and out-licensing efforts for patented technology relating to spatial analysis and/or *in situ* analysis, including:

(a)    identification of each license or potential license, including its date of execution, parties and their commercial relationship, terms, and any amendments;

(b)    the negotiation history of each executed or potential license, including whether the license related to settlement of a legal proceeding;

(c)    identification of products that actually practice any of the licensed patents or that a party asserted practices any licensed patents;

    (d)      royalties paid and received;

    (e)      assessments of the effective royalty rates or methodologies used to estimate the value or the appropriate royalty to be applied.

## TOPIC NO. 33:

The marketability of, market demand for, or consumer acceptance for any feature(s), functionality(ies), and/or attribute(s) of the Xenium Platform and the MERSCOPE Platform, including any research or study regarding whether the technology in any of the 10x Asserted Patents or the Vizgen Asserted Patent drives or drove consumer demand for any product, system, or method.

## TOPIC NO. 34:

*In situ* analysis and/or spatial analysis tools and/or technology that were known in the art prior to the filing dates of the 10x Asserted Patents.

## TOPIC NO. 35:

Each of Vizgen's decisions to begin development of MERSCOPE and/or any other product related to *in situ* analysis.

## TOPIC NO. 36:

Any investigation, opinion, report, or observation as to the patentability, validity, enforceability, inventorship, scope, or infringement of any claims of the Vizgen Asserted Patent or any Vizgen Related Patents, including communications, demand letters, and notice letters

## TOPIC NO. 37:

The development of the alleged invention of each Asserted Claim of the Vizgen Asserted Patent, including the identification, selection, or determination of the proper named inventors for the Vizgen Asserted Patent.

## TOPIC NO. 38:

The employment and/or consulting relationship for the named inventors of the Vizgen Asserted Patent, including facts and circumstances related to resumes or curricula vitae, employment agreements, consulting agreements, confidentiality agreements, invention or patent assignments or agreements, and severance or separation agreements.

## TOPIC NO. 39:

The first written description, offer for sale, sale, public disclosure, public use, or disclosure to another of the alleged invention of the Vizgen Asserted Patent, including the identity of the parties to each such event, the date on which each such event occurred, and any documents demonstrating the existence of such event.

**TOPIC NO. 40:**

Your analysis or testing of any Xenium Platform product or component thereof, including any reverse engineering.

**TOPIC NO. 41:**

Vizgen's first awareness of the Xenium Platform, including at least the dates of Vizgen's first awareness, the individuals involved, and how Vizgen became aware of the Xenium Platform.

**TOPIC NO. 42:**

Vizgen's knowledge of 10x's alleged infringement of one or more claims of the Vizgen Asserted Patent, including (a) the date on which You first became aware of the alleged infringement and the circumstances surrounding that awareness; (b) Your suspicion or alleged knowledge that 10x uses, manufactures, sells, offers for sale, or imports into the United States any device or product that allegedly practices any alleged invention of any claim of the Vizgen Asserted Patent or any Related Patents, or has done so in the past; (c) any investigation conducted by Vizgen and any conclusions that it reached with regard to such alleged infringement; (d) the decision to sue or not sue, including any board of directors' meetings or other leadership or management meetings related to 10x, the Vizgen Asserted Patent, the 10x Asserted Patents or any Related Patents, this Action, or any other actual, threatened, or contemplated litigation against 10x.

**TOPIC NO. 43:**

The decision to seek patent protection for the subject matter of any claim of the Vizgen Asserted Patent.

**TOPIC NO. 44:**

The preparation and prosecution of the applications that led to the Vizgen Asserted Patent or any Vizgen Related Patents.

**TOPIC NO. 45:**

Any and all efforts, attempts, and/or offers (formal or informal) made by, to, or between Vizgen to sell, purchase, license, or otherwise transfer ownership of any rights in the Vizgen Asserted Patent, including any sale, acquisition, security interest, lien against, security agreements, or transfer of any rights relating to the Vizgen Asserted Patent or any Vizgen Related Patent.

**TOPIC NO. 46:**

The relationship between Vizgen and Harvard, including any licenses, agreements, or negotiations for potential agreement(s), whether in writing or oral, any payments or other value received, and any communications between Vizgen and Harvard relating to the Vizgen Asserted Patent.

**TOPIC NO. 47:**

Vizgen's knowledge of facts and circumstances relating to any secondary consideration of non-obviousness or obviousness (including near-simultaneous invention) relating to the Vizgen Asserted Patent, including:

    (a)    any alleged long-felt need for the technology claimed in the Vizgen Asserted Patent;

    (b)    any alleged problem solved by the technology claimed in the Vizgen Asserted Patent;

    (c)    any alleged skepticism expressed in the industry related to the technology claimed in the Vizgen Asserted Patent;

    (d)    any alleged commercial success of the technology claimed in the Vizgen Asserted Patent;

    (e)    any alleged praise from others in the field for the technology claimed in the Vizgen Asserted Patent;

    (f)    any alleged copying of the technology claimed in the Vizgen Asserted Patent;

    (g)    any alleged surprising or unexpected results achieved by the technology claimed in the Vizgen Asserted Patent; and

    (h)    any near-simultaneous invention by others.

**TOPIC NO. 48:**

Any efforts by others to solve the problems to which the inventions of the Vizgen Asserted Patent were directed, including whether those efforts were successful.

**TOPIC NO.49:**

Any alleged harm Vizgen has suffered or expects to suffer as a result of any 10x or Harvard action, including any Vizgen belief about actual or potential hardships to Vizgen if making, using, selling, offering for sale, or providing support for the Vizgen Accused Instrumentalities is enjoined.

**TOPIC NO. 50:**

Vizgen's knowledge, understanding and belief as to whether the public interest would be disserved if making, using, selling, offering for sale, or providing support for the Vizgen Accused Instrumentalities is enjoined.

**TOPIC NO. 51:**

Any alleged harm, including irreparable harm, Vizgen believes it will suffer as a result of 10x's alleged infringement of the Vizgen Asserted Patent; whether monetary damages would

adequately compensate it for its alleged injuries resulting from 10x's alleged infringement; and whether the public interest would be served by an injunction against 10x's allegedly infringing activities.

**TOPIC NO. 52:**

Any alternatives to the Vizgen Asserted Patent for performing *in situ* analysis.

**TOPIC NO. 53:**

Any alternatives to the 10x Asserted Patents for performing *in situ* analysis.

**TOPIC NO. 54:**

Vizgen's statements relating to 10x, Harvard, any of the 10x Asserted Patents, Dr. George Church, or litigation between Vizgen and 10x, including any announcement, press releases, and public statements.

**TOPIC NO. 55:**

Communications between Vizgen and anyone outside Vizgen relating to this Action, including with NanoString, customers of NanoString's CosMx Platform or other spatial analysis and/in *in situ* analysis products, government agencies concerning this Action, or potential or actual investors and customers.

**TOPIC NO. 56:**

Any formal analyses, memoranda, or presentations (prepared by You or a third party) concerning: (a) customer demand, (b) market shares, (c) costs, or (d) comparisons of products that You contend compete with the Vizgen Accused Instrumentalities or any other current and future Spatial Analysis products.

**TOPIC NO. 57:**

Any assessment, analysis, or projection by You regarding the potential effect, if any, of this Action on the competition for the Vizgen Accused Instrumentalities or any other *in situ* analysis and/or Spatial Analysis products.

**TOPIC NO. 58:**

Your first knowledge of the facts underlying the allegations in the Counterclaims, and any investigation You conducted concerning (i) the allegations in the Counterclaims, (ii) possible claims against 10x concerning the allegations in the Counterclaims, or (iii) possible claims against 10x related to those or similar allegations.

**TOPIC NO. 59:**

Your reliance, if any, on any language in Harvard's NIH grant application including NIH Grant No. P50HG005550 Proposal when designing, developing and/or commercializing the Accused Vizgen Instrumentalities or any *in situ* analysis and/or spatial analysis products.

**TOPIC NO. 60:**

Your alleged belief that Harvard provided indications and/or assurances to You about Your freedom to commercialize the Vizgen Accused Instrumentalities and facts and circumstances relating thereto.

**TOPIC NO. 61:**

Any harm Vizgen alleges it has suffered due to the actions of 10x and/or Harvard, including any alleged infringing acts, any act, omission, event, or statement You contend caused antitrust injury to Vizgen, and any alleged lost sales of Vizgen's products due to the actions of 10x and/or Harvard.

**TOPIC NO. 62:**

Any impact that the actions of 10x and/or Harvard have had on Vizgen's sales, profits, or pricing of its products and services, whether in the United States or abroad.

**TOPIC NO. 63:**

10x's acquisition of ReadCoor, including Your first awareness of the acquisition and any analysis Vizgen performed relating to that Acquisition.

**TOPIC NO. 64:**

10x's acquisition of Cartana, including Your first awareness of the acquisition and any analysis Vizgen performed relating to that Acquisition.

**TOPIC NO. 65:**

Any harm Vizgen believes it has suffered or will suffer as a result of alleged patent infringement, antitrust violations or any other alleged harm by 10x.

**TOPIC NO. 66:**

Vizgen's knowledge and belief as to whether its infringement of any 10x Asserted Patent is not willful, and as to whether any 10x's alleged infringement of the Vizgen Asserted Patent is or has been willful.

**TOPIC NO. 67:**

The September 9, 2016, license between Harvard and ReadCoor, including facts and circumstances relating to Vizgen's first awareness of the license and any analysis Vizgen performed relating to that license and/or any intellectual property subject to the license.

**TOPIC NO. 68:**

NIH Grant No. P50HG005550 Proposal, including Vizgen's first awareness of the grant generally, and Vizgen's awareness of the Grant's Management and Organization section (pages 117-118), the Data and Materials Dissemination Plan (pages 130-132), and the Resource Sharing Plan (page 133) sections of the Grant and any alleged reliance by Vizgen on any statements made in the Grant.

**TOPIC NO. 69:**

NIH's Office of Policy for Extramural Policy Administration (OPERA) investigation into NanoString's and Vizgen's allegations that Harvard waived the right to exclusively license patents that arose from NIH Grant No. P50HG005550 Proposal, including facts and circumstances of any meetings or communications between NIH and Vizgen.

**TOPIC NO. 70:**

Any customer outreach from Vizgen regarding the pending patent disputes in the U.S. and/or Europe.

**TOPIC NO. 71:**

The corporate structure and business operations of Vizgen, including each of its predecessors, successors, subsidiaries, divisions, parents, or affiliates, and any joint venture or other legal entities that it wholly or partially owns or owned, either directly or indirectly.

**TOPIC NO. 72:**

The identity, location, authenticity, and business record status of documents and other tangible things constituting evidence relating to the categories set forth in the Topics above.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Karen Jacobs*

Karen Jacobs (#2881)
Cameron P. Clark (#6647)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
cclark@morrisnichols.com

OF COUNSEL:

Matthew Powers
Paul Ehrlich
Stefani Smith
Robert Gerrity
Li Shen
TENSEGRITY LAW GROUP LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA  94065
(650) 802-6000

Ronald J. Pabis
Samantha Jameson
Kiley White
Joanna R. Schacter
TENSEGRITY LAW GROUP LLP
1676 International Drive, Suite 910
McLean, VA  22102
(650) 802-6000

Marguerite M. Sullivan
Molly M. Barron
Jesse Aaron Vella
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C.  20004
(202) 637-2200

February 6, 2024

*Attorneys for 10x Genomics, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 6, 2024, upon the following in the manner indicated:

James L. Higgins, Esquire                                   *VIA ELECTRONIC MAIL*
Pilar G. Kraman, Esquire
Jennifer P. Siew, Esquire
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Vizgen, Inc.*

David Bilsker, Esquire                                      *VIA ELECTRONIC MAIL*
Adam B. Wolfson, Esquire
Sam Stake, Esquire
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
*Attorneys for Vizgen, Inc.*

Kevin P.B. Johnson, Esquire                                 *VIA ELECTRONIC MAIL*
Victoria F. Maroulis, Esquire
Andrew Bramhall, Esquire
Brian C. Cannon, Esquire
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, CA  94065
*Attorneys for Vizgen, Inc.*

Angus Chen, Ph.D.                                           *VIA ELECTRONIC MAIL*
Catherine T. Mattes, Esquire
David LeRay, Esquire
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY  10010
*Attorneys for Vizgen, Inc.*

Patrick D. Curran, Esquire                                *VIA ELECTRONIC MAIL*
Eric D. Wolkoff, Esquire
Kathleen Marini, Esquire
QUINN EMANUEL URQUHART & SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA  02199
*Attorneys for Vizgen, Inc.*

Michael J. Songer, Esquire                                *VIA ELECTRONIC MAIL*
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC  20005-3807
*Attorneys for Vizgen, Inc.*

Henry Y. Huang, Esquire                                   *VIA ELECTRONIC MAIL*
WHITE & CASE LLP
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA  94306-2109
*Attorneys for Vizgen, Inc.*

Joseph B. Cicero, Esquire                                 *VIA ELECTRONIC MAIL*
CHIPMAN BROWN CICERO & COLE, LLP
Hercules Plaza
1313 North Market Street, Suite 5400
Wilmington, DE  19801
*Attorneys for Vizgen, Inc.*

Kenneth L. Dorsney, Esquire                               *VIA ELECTRONIC MAIL*
Cortlan S. Hitch, Esquire
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
*Attorneys for President and Fellows of
Harvard College*

Geoffrey M. Raux, Esquire                                 *VIA ELECTRONIC MAIL*
Ruben J. Rodrigues, Esquire
Michael J. Tuteur, Esquire
Lea Gulotta James, Esquire
John W. Custer, Esquire
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2500
Boston, MA  02199
*Attorneys for President and Fellows of
Harvard College*

Sarah E. Rieger, Esquire                                    *VIA ELECTRONIC MAIL*
Kate E. Gehl, Esquire
Ian T. Hampton, Esquire
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI  53202
*Attorneys for President and Fellows of*
*Harvard College*

Jarren N. Ginsburg, Esquire                                 *VIA ELECTRONIC MAIL*
Alan D. Rutenberg, Esquire
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, DC  20007
*Attorneys for President and Fellows of*
*Harvard College*



/s/ *Karen Jacobs*
_____
Karen Jacobs (#2881)