**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| 10x GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>　　　　　Plaintiffs,<br><br>　　　　　　　　v.<br><br>VIZGEN, INC.,<br><br>　　　　　Defendant. | C.A. No. 22-595-MFK<br><br><br>REDACTED - PUBLIC VERSION<br>(Filed May 6, 2024)<br><br>████████████ |
| VIZGEN, INC.,<br><br>　　　　　Counterclaim-Plaintiff,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>　　　　　Counterclaim-Plaintiff as to certain claims,<br><br>　　　　　　　　v.<br><br>10x GENOMICS, INC.,<br><br>　　　　　Counterclaim-Defendant as to certain claims,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>　　　　　Counterclaim-Defendant as to certain claims. |  |

**LETTER TO THE HONORABLE MATTHEW F. KENNELLY FROM
PILAR G. KRAMAN REGARDING REQUEST FOR ADDITIONAL DEPOSITION
HOURS DUE TO DEPOSITION MISCONDUCT TO BE HEARD AT APRIL 26, 2024
HEARING**


Dated: April 22, 2024

Dear Judge Kennelly:

Pursuant to the Court's Oral Order of April 19, 2024, Vizgen submits this letter brief (1) to request the Court increase Vizgen's total fact deposition hours from 85 to 100 and (2) to instruct Harvard that its witnesses must be prepared to testify truthfully and cooperatively.

The conduct of senior Harvard witnesses at deposition has been to "run out the clock" and frustrate Vizgen's ability to obtain foundational, factual information. Harvard's senior patent licensing officer recited repetitive "I don't know[s]" for hours in response to basic questions. In addition, Harvard failed to prepare its Rule 30(b)(6) witnesses, leading to wasted hours of testimony. The preclusive effect at trial of Harvard's actions is a question for another day. But the immediate, practical problem is that Vizgen requires additional hours of fact testimony in order defend itself from Harvard and 10x's lawsuit, and to obtain reasonable discovery on its antitrust, license, and unfair competition counterclaims. Harvard and 10x oppose this modest request and have told Vizgen that Harvard's egregious deposition conduct is proper.

### Background

As this Court knows, the Harvard patents invented by George Church arose from NIH government funding. After Harvard and 10x filed this lawsuit, Vizgen discovered through a FOIA request that Harvard and Dr. Church had promised the NIH in the grant application that Harvard would grant "open and non-exclusive licenses" to patented technology that arose from the government funding. D.I. 138, Counterclaims ¶¶ 21-32. The NIH made that promise a condition of the grant. *Id.* ¶¶ 30-32. Harvard violated that promise, however, by setting aside the Church patents to license exclusively to Church's own startup company ReadCoor in 2016. Harvard's Office of Technology Development ("OTD") was responsible for licensing. The head of OTD then and now was ***Isaac Kohlberg***—and he signed the ReadCoor license at issue. *Id.* ¶ 75.

In 2019, Isaac Kohlberg signed another patent license agreement—this time with Vizgen in connection with a different patent portfolio. *Id.*



D.I. 253, Memo. ISO Prelim. Injunction at 5-7. Harvard, including Kohlberg and Jordan Grant (head of Technology Transactions) explicitly recognized that ████████████████████████████████████████ ███████████ *Id.* But Kohlberg signed the amendment anyway, thus ensuring financial payout—at Vizgen's expense.

Following Kohlberg's and Grant's signoff on ReadCoor's license amendment, 10x acquired ReadCoor for over $400 million. Kohlberg wrote on October 7, 2020: "████████████████████ ████████████████████████████████████████████" *Id.* 6-7; D.I. 254-4, Ex. D. ████████████████████████████. And Kohlberg executed the stockholder documents for Harvard.

### Harvard's Deposition Conduct

***1. Isaac Kohlberg And Jordan Grant Frustrated Discovery.*** Isaac Kohlberg is a central figure in this case. Despite signing ***all*** the critical legal documents for Harvard—including the ReadCoor

amendment that brought ReadCoor's rights dramatically into conflict with Vizgen—and being head of OTD at all relevant times, Isaac Kohlberg engaged in the deposition tactic of robotically reciting "I don't remember" to basic foundational questions:

> Q. How often does [George Church] contact your office?
> **A. *I don't know.***
> Q. Do you email with him at all?
> **A.  *I don't remember.***
> Q. Do you talk on the phone with him?
> **A. *I don't remember.***
> Q. When was the last time you talked on the phone with George Church?
> A.  *I don't remember.*
> Q. Did you talk to George Church in preparation for this deposition?
> **A. *No, I did not.***
> Q. Have you spoken to George Church about this lawsuit?
> **A. *I don't remember.***
> Q. You don't remember whether you've spoken to George Church about this lawsuit? That's your testimony, sir?
> **A. *I don't remember.***
> Q. When was the last time you spoke with George Church?
> **A. *I don't remember.***
> Q. You don't remember when was the last time you spoke to him on the phone?
> **A. *I don't remember.***
> Q. Is that your truthful testimony, sir?
> **A. *Yes.***
> MR. TUTEUR: Objection.
> MR. CANNON: [W]hen was the last time you emailed with George Church?
> **A. *I don't remember.***
> Q. You have no memory whatsoever of the last time you emailed with him?
> **A. *I don't remember.***
> Q. Do you have any memory whatsoever of the last time you spoke with George Church on the phone?
> **A. *I don't remember.***
> Q. Have you had any video calls with George Church?
> **A. *I don't remember*.**
> Q. Have you ever had a video call with George Church ever.
> **A. *I don't remember*.**

<u>Ex. A</u>, I. Kohlberg Tr. 76:13-78:8.  The video of the deposition underscores the contempt that Mr. Kohlberg exhibited for the process.

This is not the case of a witness trying and failing to remember facts.  Mr. Kohlberg methodically evaded Vizgen's counsel's questions by repeating "I don't remember" throughout the entire deposition.  Further examples include:

> Q. What is your current compensation package from Harvard.
> MR. TUTEUR: Objection.

2

**A.** *I don't remember.*
Q. You don't remember your current salary from Harvard?
**A.** *I do not remember my salary, right, at Harvard University.*
Q. Do you remember how much you got paid at Harvard in 2023, last year?
**A.** *I do not.*
[...]
Q. Do you know when ReadCoor was founded?
**A.** *I don't remember.*
Q. Do you know who are the founders of ReadCoor?
**A.** *I don't remember.*
Q. Was George Church one of the founders of ReadCoor?
**A.** *I don't remember.*
Q. Do you know when the Office of Technology Development, OTD, at Harvard decided that the George Church patents would be exclusively licensed to ReadCoor?
MR. TUTEUR: Objection to the form. Foundation.
**A.** *I don't remember.*

Ex. A, I. Kohlberg Tr. 54:13-24; 82:14-83:4.

Mr. Kohlberg spent approximately **4.5 hours** of Vizgen's deposition time responding "I don't remember" **140 times** in response to the vast majority of questions.  Vizgen submits additional excerpts at Exhibit A, I. Kohlberg Tr. 16:4-17:5 & 17:20-23 (how many license agreements he signed in 2024); 83:19-25 & 84:13-20 (circumstances of the ReadCoor license); 102:23-103:18 (interactions with Ting Wu, a Harvard inventor with whom Mr. Kohlberg works).

Mr. Kohlberg is a senior and experienced officer of Harvard responsible for patent licensing.  He claimed to have no memory whatsoever in response to nearly every question asked.  His conduct was the effective equivalent of a blanket refusal to testify.

**Jordan Grant** is another example.  He is Harvard's Director of Technology Transactions whom Harvard designated on eighteen Rule 30(b)(6) topics related to licensing.  Grant deliberately wasted deposition time by providing lengthy, non-responsive speeches reciting Harvard's litigation position.  For instance, Vizgen asked the following foundational question:

> Q. Mr. Grant, do you see in your e-mail to yourself on Monday, April 25, 2022, you used the phrase "███████████████████████"?

In response, Harvard's Mr. Grant embarked on several lengthy speeches.  Ex. B, J. Grant Tr. 308:23-313:2 (450-word, non-responsive speech).  *Id.* 307:5-308:20; 324:19-332:15 (providing long, filibustering responses without answering the question asked over course of approximately *twelve minutes*); 337:6-342:10 (similar stalling and filibustering); 231:1-232:11 (repeatedly answering as to "Harvard OTD," rather than Harvard generally, as asked); 143:3-145:16 (additional deliberately long responses to simple questions).

3

Mr. Grant also took an unrealistic amount of time purporting to review short emails he himself authored and to respond to simple questions regarding those emails. Ex. B, J. Grant Tr. 344:2-347:21 (Vizgen's counsel withdrawing the question after Mr. Grant deliberately took an inordinate amount of time—***ten minutes***—to review an email and then filibuster at length with a non-responsive answer); 349:15-352:15 (similar long, non-responsive filibustering).

Vizgen put the witness and counsel on notice multiple times as these tactics continued throughout the deposition. But Mr. Grant's time-wasting tactics became more extreme as his deposition continued. Ex. B, J. Grant Tr. 146:9-19 (Vizgen's Counsel: "Mr. Grant, I'm sure you know that we have time limits in this case. So I'm going to put counsel on notice that if I keep getting long speeches that are not responsive, I'm going to seek additional time for the deposition outside of the 85 hours."); 307:23-308:12; 310:18-21; 312:17-313:2; 341:11-12; 344:22-345:1; 353:12-354:4. Counsel for Harvard refused to address these issues or even discuss them with its own witness despite being requested to do so by Vizgen's counsel. *Id.* at 310:18-24. Vizgen used approximately **9.5 hours** trying, but failing, to elicit responsive testimony from Mr. Grant.

***2. Harvard Did Not Prepare Its Rule 30(b)(6) Witnesses***. In addition, Harvard's Rule 30(b)(6) designees have consistently been unprepared to testify. As this Court knows, Vizgen contends that Harvard deliberately concealed the NIH grant by posting only a truncated version on its website (without the licensing promises). Harvard's John Aach was Harvard's Rule 30(b)(6) witness on the storage of and access to the NIH grant application within Harvard including hard copies. Below is the testimony from Mr. Aach offered on this topic showing lack of knowledge and preparation:

> Q. As the -- as the corporate representative on Topic 6, what did you do to get up to speed or learn the facts in order to testify on this topic?
> **A. *Well, I didn't look at that.***
> Q. What do you mean "didn't look at that"? What does "that" mean?
> **A. *I don't know. I'm not even certain I had a complete copy with all the forms. I may have. I don't know. More germane, I don't know where those copies would have gone.***
> Q. Well, what did you do to prepare to be the representative on Topic 6 today?
> **A. *I'm unaware of any special preparations I did to be the representative on Topic 6 today.***
> Q. Exhibit -- and when you – we're looking at Exhibit 7, which is the full grant application. Can you tell me where hard copies of this document were stored at Harvard after it was submitted to the NIH?
> **A. *I'm afraid I can't. I don't know where the hard copies would be stored.***
> Q. Can you tell me where electronic copies of Exhibit 7 were stored at Harvard after it was submitted to the NIH?
> **A. *I'm afraid I can't answer that either. I don't know.***

Ex. C, J. Aach Tr. 117:13-118:17.

The chart attached as Exhibit D contains other example testimony showing Harvard's Rule 30(b)(6) witnesses' lack of preparation. Vizgen has had to use its limited deposition hours to try

to **educate and refresh** Harvard's own 30(b)(6) witnesses by walking through various documents on topics these witnesses were supposed to—but were not—prepared on. Again the preclusive effect of the Rule 30(b)(6) testimony is for later in the case, but at a minimum Vizgen ought to receive additional hours for the work it had to do with unprepared witnesses. *Black Horse v. Dow Corp.*, 228 F.3d 275, 304 (3d Cir. 2000) (holding that producing an unprepared Rule 30(b)(6) witness is "tantamount to a failure to appear" that is sanctionable under Rule 37(d)).

In addition, although the deposition conduct concerns Harvard witnesses, 10x and Harvard joined forces at the deposition to make disruptive duplicative objections **in tandem**, further slowing down the depositions. Ex. A, I. Kohlberg Tr. 192:4-8 (MR. TUTEUR: Objection. MR. GERRITY: Objection to form. Calls for speculation. Incomplete hypothetical. Lacks foundation. MR. TUTEUR: I'll go with all of those.); 193:6-9 & 191:18-20 (same).

**3. Vizgen's Request Is Reasonable.**  Vizgen has already suffered prejudice by having to account for wasted time in deposition by cutting back time on other witnesses and withdrawing depositions altogether for others. And as a start-up company, Vizgen does not have the resources of Harvard or the publicly-traded 10x. And as this Court knows, this case is important—both to Vizgen and the public and relevant market that Vizgen alleges 10x and Harvard have conspired to monopolize.

The Court imposed the 85-hour limit on September 19, 2022 (D.I. 45 ¶ 8(e)(i)) **before** the first Rule 12 order on Vizgen's counterclaims against Harvard and 10x (D.I. 114, 2/2/23); **before** Vizgen filed its amended claims (D.I. 138, 4/17/23); and **before** this Court ruled on Harvard's and 10x's Rule 12 challenge to those claims (D.I. 193, 7/10/2023). The 85-hour time limit was tight given the new claims, but Vizgen would have made it work. If senior Harvard witnesses had complied with their obligations to answer directly and truthfully, Vizgen would not be here today.

Harvard's senior witnesses should know better. Harvard's OTD depends upon the judicial system to enforce patents and licenses—these are not self-enforcing property rights. Yet when Vizgen— a party sued by Harvard—asked Messrs. Kohlberg and Grant questions under oath, they did everything possible to prevent Vizgen from learning basic facts and wasted time.

Significant depositions remain in this case, including George Church and the remainder of Harvard's Rule 30(b)(6) topics. Vizgen requests a modest 15-hour addition to its hours limit and an instruction that Harvard witnesses comply with their obligations to this Court.

Respectfully submitted,

*/s/ Pilar G. Kraman*

Pilar G. Kraman (No. 5199)

Cc:    All counsel of record (by CM/ECF and email)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 22, 2024, a copy of the foregoing

document was served on the counsel listed below in the manner indicated:

**BY EMAIL**

Kenneth L. Dorsney
Cortlan S. Hitch
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
kdorsney@morrisjames.com
chitch@morrisjames.com

Geoffrey M. Raux
Ruben J. Rodrigues
Michael J. Tuteur
Lea Gulotta James
John W. Custer
Lucas I. Silva
Amani S. Kmeid
Foley & Lardner LLP
111 Huntington Avenue
Suite 2500
Boston, MA 02199

Sarah E. Rieger
Kate E. Gehl
Ian T. Hampton
Sydney K. Hecimovich
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202

Jarren N. Ginsburg
Alan D. Rutenberg
Foley & Lardner LLP
Washington Harbour
3000 K Street NW, Suite 600
Washington, DC 20007

Jared J. Braithwaite
Foley & Lardner LLP
95 S. State Street, Suite 2500
Salt Lake City, UT 84111

Karen Jacobs
Cameron P. Clark
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
kjacobs@morrisnichols.com
cclark@morrisnichols.com

Samantha Jameson
Kiley White
Ron Pabis
Joanna R. Schacter
Azra M. Hadzimehmedovic
Aaron M. Nathan
Tensegrity Law Group LLP
1676 International Drive, Suite 910
McLean, VA 22102

Matthew Powers
Paul Ehrlich
Stefani Smith
Robert Gerrity
Li Shen
William P. Nelson
Tensegrity Law Group LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065

10x_Vizgen_Service@tensegritylawgroup.com

Marguerite M. Sullivan
Molly M. Barron
Jesse Aaron Vella
Christopher John Brown
Brian Barrows Goodell
Sahdia Khan
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000

BOST-F-10Xv.Vizgen@foley.com

*Attorneys for President and Fellows of Harvard College*

Washington, D.C. 20004
marguerite.sullivan@lw.com
molly.barron@lw.com
jesse.vella@lw.com
chris.brown@lw.com
brian.goodell@lw.com
sahdia.khan@lw.com

Kelly Fayne
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
kelly.fayne@lw.com

*Attorneys for 10X Genomics, Inc*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman*
James L. Higgins (No. 5021)
Pilar G. Kraman (No. 5199)
Jennifer P. Siew (No. 7114)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
jhiggins@ycst.com
pkraman@ycst.com
jsiew@ycst.com

*Attorneys for Vizgen, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| 10x GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>      Plaintiffs,<br><br>      v.<br><br>VIZGEN, INC.,<br><br>Defendant.<br><br><br>VIZGEN, INC.,<br><br>      Counterclaim-Plaintiff,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>      Counterclaim-Plaintiff as to certain claims,<br><br>      v.<br><br>10x GENOMICS, INC.,<br><br>      Counterclaim-Defendant as to certain claims,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>      Counterclaim-Defendant as to certain claims. | C.A. No. 22-595-MFK |

**[PROPOSED] ORDER**

On this _____ day of _____, 2024, upon consideration of Defendant and Counterclaim-Plaintiff Vizgen, Inc.'s ("Vizgen") motion to increase its 85-hour fact deposition cap to 100 hours;

**IT IS HEREBY ORDERED** that:

Vizgen shall be permitted a total of 100 hours of taking fact testimony by deposition. Plaintiff and Counterclaim-Defendant Harvard is instructed to ensure its witnesses do not improperly frustrate, delay, or impede Vizgen's examinations during their depositions.

_____
The Honorable Matthew F. Kennelly
United States District Judge

# <u>Exhibit A</u>

## *Isaac Kohlberg Deposition Transcript Excerpts*

Page 1

1

2               IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF DELAWARE
3    - - - - - - - - - - - - - - - - - - -x
                                          :
4    10X GENOMICS, INC. and PRESIDENT      :
     AND FELLOWS OF HARVARD COLLEGE,       : C.A. No.
5                                          : 22-595-MFK
                        Plaintiffs,        :
6                                          :
7            v.                            :
                                          :
     VIZGEN, INC.,                         :
8                                          :
                        Defendant.        :
9    - - - - - - - - - - - - - - - - - - -x
                                          :
10   VIZGEN, INC.,                         :
                                          :
11                 Counterclaim-Plaintiff, :
                                          :
12           and                          :
                                          :
13   PRESIDENT AND FELLOWS OF HARVARD      :
     COLLEGE,                              :
14                                         :
                   Counterclaim-Plaintiff :
15                 as to certain claims,   :
                                          :
16           v.                           :
                                          :
17   10X GENOMICS, INC.,                   :
18                 Counterclaim-Defendant  :
                   as to certain claims,   :
19                                         :
     and                                   :
20                                         :
     PRESIDENT AND FELLOWS OF HARVARD      :
21   COLLEGE,                              :
                                          :
22                 Counterclaim-Defendant  :
                   as to certain claims.   :
23   - - - - - - - - - - - - - - - - - - -x
24           *** CONFIDENTIAL - ATTORNEYS' EYES ONLY ***
                   DEPOSITION OF ISAAC KOHLBERG
25                      MARCH 21, 2024

Page 16

```
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    of your career at Harvard University?
 3         A    No, I don't.
 4         Q    Do you -- do you have a sense of how many
 5    patent license agreements you signed, say, last
 6    year?
 7         A    No, I don't.
 8         Q    Do you have any sense of how many patent
 9    license agreements you signed this year, 2024?
10              We're in -- almost through the third month
11    of 2024.
12              MR. TUTEUR:  Objection to the form.
13              You can answer.
14              THE WITNESS:  Thank you.
15         A    No, I don't.
16    BY MR. CANNON:
17    ███    █████████████████████████████
     █  ████████████████████████████████
     █    ████    ██████████
     █    █    ████████████████████████████
     █    █    ██████████████
     █    █    ██████████████
     █    █    ████████████████
     █    █    ████████████████████████████████
     █   █████████████████████████████████
```

```
                                             Page 17
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2         █       ████████████████████████████████████
      █  ███████████████████████████████
      █  █    █████████████████████████████
      █  █  ████████████████
 6         Q    If you wanted to find out how many patent
 7    license agreements you personally signed this year,
 8    how would you do that?
 9         A    I would check with the head of my
10    transaction team.
11         Q    And who is that?
12         A    The head of my transaction team, the
13    director of transactions at Harvard OTD is Jordan
14    Grant.
15         Q    When you signed patent license agreements
16    this year, did you review them before you signed
17    them?
18         A    I have reviewed -- yes, I review certain
19    aspects of them.
20         Q    Is there a reason you can't remember,
21    sitting here today, under oath, how many patent
22    license agreements you signed in 2024?
23         A    I don't know.
24         Q    Do you have any medical condition that
25    might prevent you from remembering how many patent
```

```
                                              Page 54
1     I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2     permanent position in 2005 at Harvard, what was your
3     compensation package?
4              MR. TUTEUR:  Objection; relevance.
5          A    I don't remember.
6     BY MR. CANNON:
7          Q    Was your compensation package tied in any
8     way to the generation of royalties for Harvard?
9          A    No.
10         Q    Did your -- has your compensation changed
11    over the years at Harvard?
12         A    Yes.
13         Q    What is your current compensation package
14    from Harvard?
15             MR. TUTEUR:  Objection.
16         A    I don't remember.
17    BY MR. CANNON:
18         Q    You don't remember your current salary from
19    Harvard?
20         A    I do not remember my salary, right, at
21    Harvard University.
22         Q    Do you remember how much you got paid at
23    Harvard in 2023, last year?
24         A    I do not.
25    ████        ██████████████████████████████████████████
```

Page 55

1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    

3         MR. TUTEUR:  Objection to the form.

4

7    BY MR. CANNON:

8

21         MR. GERRITY:  Objection to form.

22

23    BY MR. CANNON:

24

 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    ▆    ▆
▆  ▆▆▆▆▆▆▆▆▆
▆    ▆    ▆▆▆▆▆▆▆▆▆▆
▆    ▆    ▆▆▆▆▆▆▆
 6         Q    What was your base salary last year from
 7    Harvard?
 8         A    I don't remember.
 9         Q    I have to say, sir, I'm somewhat surprised
10    you cannot remember your salary from Harvard.
11              What's the best information you can give me
12    about what your current salary is from Harvard,
13    either monthly or annually?  What's -- what's the
14    best information you have that you can give me?
15              MR. TUTEUR:  Objection to the form.
16              THE WITNESS:  Should I answer?
17              MR. TUTEUR:  Yes.
18         A    The best information I can give you, as it
19    relates to my annual salary, is ▆▆▆▆▆▆▆▆▆
▆  ▆▆▆▆▆▆▆
▆  ▆▆▆▆▆▆
▆    ▆    ▆▆▆▆▆▆▆▆▆
▆  ▆▆▆▆▆▆▆▆
▆    ▆▆▆▆▆  ▆▆▆▆▆▆
▆    ▆    ▆▆▆▆▆▆▆▆▆▆▆

```
                                          Page 76
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2    merged into OTD; is that correct?
 3        A    Correct.
 4        Q    Do you -- would you agree that George
 5    Church has been in constant contact with your
 6    office, OTD?
 7              MR. GERRITY:   Objection to form.
 8          Foundation.
 9              MR. TUTEUR:   Objection.
10        A    George Church has been in contact with the
11    office, yes.
12    BY MR. CANNON:
13        Q    How often does he contact your office?
14        A    I don't know.
15        Q    Do you email with him at all?
16        A    I don't remember.
17        Q    Do you talk on the phone with him?
18        A    I don't remember.
19        Q    When was the last time you talked on the
20    phone with George Church?
21        A    I don't remember.
22        Q    Did you talk to George Church in
23    preparation for this deposition?
24        A    No, I did not.
25        Q    Have you spoken to George Church about this
```

```
                                              Page 77
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2   lawsuit?
 3        A    I don't remember.
 4        Q    You don't remember whether you've spoken to
 5   George Church about this lawsuit?
 6             That's your testimony, sir?
 7        A    I don't remember.
 8        Q    When was the last time you spoke to George
 9   Church?
10        A    I don't remember.
11        Q    You don't remember when was the last time
12   you spoke to him on the phone?
13        A    I don't remember.
14        Q    Is that your truthful testimony, sir?
15        A    Yes.
16             MR. TUTEUR:  Objection.
17   BY MR. CANNON:
18        Q    When was -- when was the last time you
19   emailed with George Church?
20        A    I don't remember.
21        Q    You have no memory whatsoever of the last
22   time you emailed with him?
23        A    I don't remember.
24        Q    Do you have any memory whatsoever of the
25   last time you spoke with George Church on the phone?
```

```
                                            Page 78
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2         A    I don't remember.
 3         Q    Have you had any video calls with George
 4    Church?
 5         A    I don't remember.
 6         Q    Have you ever had a video call with George
 7    Church ever?
 8         A    I don't remember.
 9         Q    It's your -- it's your testimony under oath
10    that you have no memory whether you ever had a video
11    call with George Church; is that correct?
12         A    Correct.
13         Q    You would agree, wouldn't you, sir, that
14    commitments -- that -- let me use a different word.
15              You would agree, wouldn't you, sir, that
16    statements made in a grant application to the United
17    States government are to be followed?
18              MR. TUTEUR:  Objection to the form.
19         A    I don't know.
20    BY MR. CANNON:
21         Q    And you would agree, if a principal
22    investigator on a grant application says that they
23    were going to engage in open and non-exclusive
24    licensing, they ought to do that, shouldn't they?
25              MR. TUTEUR:  Objection to the form.
```

```
                                         Page 82
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2   George Church ended up getting licensed to a company
 3   called ReadCoor?
 4           MR. TUTEUR:  Objection to the form.
 5      A    Can you repeat the question, please?
 6   BY MR. CANNON:
 7      Q    Are you aware that one of the issues in
 8   this case is -- relates to certain patents, where
 9   George Church is an inventor, being licensed to a
10   company called ReadCoor?
11           MR. TUTEUR:  Objection to the form.
12      A    Yes, I do.
13   BY MR. CANNON:
14      Q    Do you know when ReadCoor was founded?
15      A    I don't remember.
16      Q    Do you know -- who are the founders of
17   ReadCoor?
18      A    I don't remember.
19      Q    Was George Church one of the founders of
20   ReadCoor?
21      A    I don't remember.
22      Q    Do you know when the Office of Technology
23   Development, OTD, at Harvard decided that the George
24   Church patents would be exclusively licensed to
25   ReadCoor?
```

```
                                              Page 83
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2            MR. TUTEUR:  Objection to the form.
 3        Foundation.
 4        A    I don't remember.
 5   BY MR. CANNON:
 6        Q    Do you remember -- do you remember having
 7   to make that decision at some point, about whether
 8   the George Church patents should be exclusively
 9   licensed to ReadCoor or non-exclusively licensed to
10   ReadCoor?
11            MR. TUTEUR:  Objection to the form.
12            Brian, George Church, as you've already
13        said, has lots of patents.
14            Do you want to be more specific?
15            MR. CANNON:  Well, I mean, I think my
16        question speaks for itself, but, sure, we'll
17        get it more specific.
18   BY MR. CANNON:
19        Q    You know there's George Church patents in
20   here called the FISSEQ patents.
21            Have you heard of that, sir?
22        A    I don't remember.
23        Q    You've never heard of the George Church
24   patents called the FISSEQ patents?
25        A    I don't remember.
```

                                                      Page 84

 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2        Q     But you do know that -- I'll just call

 3    them -- certain George Church patents were licensed

 4    to a company called ReadCoor.

 5              You have that knowledge, correct?

 6        A     Yes, I do.

 7        Q     And I asked you earlier about the decision

 8    to make that license exclusive or non-exclusive, and

 9    you would have made that decision, correct?

10        A     I probably -- I would have endorsed the

11    decision made by the director of the development

12    that had been working on this technology.

13        Q     And do you actually remember endorsing that

14    decision?

15        A     No, I do not remember.

16        Q     Do you remember any of the circumstances

17    leading up to your decision or OTD's decision to

18    make that license exclusive?

19              MR. TUTEUR:  Objection to the form.

20        A     No, I do not remember.

21              MR. CANNON:  Angela, if we could put into

22         the -- into the share exhibit -- I believe it's

23         tab 39A, please.

24              MS. NELSON:  Just one second.

25              MR. TUTEUR:  Exhibit 115?

```
                                            Page 102

 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2   BY MR. CANNON:
 3       Q    Did you prepare these meeting minutes, or
 4   did the person referred to as Jess prepare these
 5   meeting minutes?
 6       A    I don't remember.
 7   ███  ████████████████████████████████████████
     ████████████████████████████████████████████
     ████████████████████████
     ███  ███  ████████████████████
11       Q    All right.  If you could scroll down in the
12   agreement, and there is a reference to someone
13   called Ting Wu.
14            Do you see that, about halfway down the
15   page?
16       A    Yes, I do.
17       Q    Who is Ting Wu?
18       A    She was a PI, a principal investigator, at
19   Harvard Medical School.
20       Q    What was her connection to ReadCoor, if
21   any?
22       A    I don't know.
23       Q    Have you ever met in person with Ting Wu?
24       A    I don't remember.
25       Q    Have you ever emailed with Ting Wu?
```

```
                                        Page 103
```

 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY

 2        A    I don't remember.

 3        Q    Have you ever had a telephone call with

 4    Ting Wu?

 5        A    I don't remember.

 6        Q    Ever had a video call with Ting Wu, ever?

 7        A    I don't remember.

 8        Q    Do you understand Ting Wu may be married to

 9    George Church?  Is that correct?

10             MR. TUTEUR:  Objection to the form.

11        A    I don't know.

12    BY MR. CANNON:

13        Q    What is Ting Wu's connection to George

14    Church, if any?

15        A    I don't know.

16        Q    Has Ting Wu provided patents to Harvard OTD

17    for potential licensing?

18        A    I don't remember.

19             (Pause in proceedings.)

20             MR. CANNON:  Is everything okay for the

21        witness?

22             THE WITNESS:  Yes, yes?

23             MR. TUTEUR:  He needed some sweetener for

24        the coffee.

25             MR. CANNON:  Okay.

Page 121

1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY

2    BY MR. CANNON:

3

16              MR. CANNON:  Angela, if you could put into

17       the share exhibit tab 12, please.

18              MS. NELSON:  Sure.  Just one second.

19              Okay.

20                       (HARV0190142 was marked as

21                       Exhibit 118 for identification,

22                       as of this date.)

23              MR. TUTEUR:  This is Exhibit 118?

24              MS. NELSON:  Yes.

25              MR. CANNON:  It should be, yeah.  Thank

```
                                        Page 125
 1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2        Q     And do you -- sorry.  Go ahead.
 3        A     -- entered into --
 4        Q     Did you review this license agreement
 5    before you signed it?
 6        A     I don't remember.
 7        Q     Did you discuss the specific terms of this
 8    license agreement with anybody before you signed it?
 9        A     I don't remember.
10        Q     But you take responsibility for this
11    license agreement, correct?
12        A     I signed this agreement.
13        Q     So, does that mean you take responsibility
14    for it?
15        A     I don't know what "responsibility" means.
16        Q     I mean, you are the head of Harvard OTD,
17    correct?
18        A     Yes.
19        Q     And you signed this license agreement?
20        A     Yes.
21        Q     And one of your responsibilities as the
22    head of Harvard OTD is to execute license
23    agreements, correct?
24        A     It is my authority to sign and execute
25    license agreements.
```

```
                                          Page 191
 1     I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2     it failed to disclose the NIH grant as part of any
 3     due diligence in connection with the ReadCoor
 4     acquisition?
 5              MR. GERRITY:  Objection to form.
 6              MR. TUTEUR:  Objection.
 7         A    No, I'm not.
 8     BY MR. CANNON:
 9         Q    You mentioned -- you mentioned earlier
10     today that 10x and Harvard obtaining a permanent
11     injunction against Vizgen would be an undesirable
12     outcome; is that correct?
13         A    Yes.
14         Q    And is that because the effect of an
15     injunction would be to take away medical research
16     tools that are being sold by the Harvard start-up
17     Vizgen?
18              MR. GERRITY:  Objection to form.
19              MR. TUTEUR:  Objection.
20              MR. GERRITY:  Speculation.
21         A    The concern is that the effect would impact
22     on the ability of Vizgen to develop products and
23     services that may benefit humankind.
24     BY MR. CANNON:
25         Q    And if Harvard and 10x is successful in
```

Page 192

```
1    I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
2    this lawsuit, then Vizgen won't be able to do that,
3    will they?
4            MR. TUTEUR:  Objection.
5            MR. GERRITY:  Objection to form.  Calls for
6        speculation.  Incomplete hypothetical.  Lacks
7        foundation.
8            MR. TUTEUR:  I'll go with all of those.
9    A    If 10x -- and Harvard joins 10x, as it's
10   required to do, succeeds in the lawsuit and an
11   injunction -- a permanent injunction will be issued,
12   and if -- it would definitely impact Vizgen's
13   ability to do that.
14   BY MR. CANNON:
15   Q    And would you agree that would -- that
16   would impact the ability of a researcher, a
17   researcher at Harvard or a researcher at the
18   University of Delaware or anywhere to purchase a
19   product from Vizgen?  They couldn't do that if
20   Harvard and 10x is successful, correct?
21           MR. GERRITY:  Same objection.
22           MR. TUTEUR:  Objection.
23   A    I don't know.
24   BY MR. CANNON:
25   Q    I mean, you do know, don't you?  If there
```

```
                                                   Page 193

 1      I. Kohlberg - CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2      is a permanent injunction, as a result of this
 3      lawsuit, against Vizgen, researchers at Harvard and
 4      other universities will not be able to purchase
 5      products from Vizgen?
 6               MR. GERRITY:  Objection.
 7               MR. TUTEUR:  Same objection.
 8               MR. GERRITY:  Foundation.  Speculation.
 9               MR. TUTEUR:  Asked and answered.
10      A    I'm not a patent -- I am not a patent
11      attorney, and I do not -- I don't know what would be
12      the consequences of such an injunction with respect
13      to certain IP assets --
14      BY MR. CANNON:
15      Q    Well, you've signed --
16      A    -- Vizgen.
17      Q    You've signed a lot of patent agreements,
18      sir, haven't you?
19      A    Yes, I did.
20      Q    And you understand that an exclusive
21      license gives a right to exclusivity, correct?
22               MR. TUTEUR:  Objection.
23      A    That is correct.
24      BY MR. CANNON:
25      Q    And through this lawsuit, Harvard and 10x
```

# <u>Exhibit B</u>

## *Jordan Grant Deposition Transcript Excerpts*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF DELAWARE
3     * * * * * * * * * * * * * * * * * * * * * * * * * * *
4     10X GENOMICS, INC., and PRESIDENT
      AND FELLOWS OF HARVARD COLLEGE,
5
                      Plaintiffs,
6
      vs.                        CA NO. 22-595-MFK
7
      VIZGEN, INC.,
8
                      Defendant.
9     _____
10    VIZGEN, INC.,
                      Counterclaim Plaintiff,
11    vs.
12    10X GENOMICS, INC., and PRESIDENT AND
      FELLOWS OF HARVARD COLLEGE,
13                    Counterclaim Defendants.
      * * * * * * * * * * * * * * * * * * * * * * * * * * *
14
15        *CONFIDENTIAL - ATTORNEYS' EYES ONLY*
16            VIDEOTAPED DEPOSITION OF:
17                 JORDAN B. GRANT
18                 (Taken Remotely)
19              FOLEY & LARDNER LLP
20             111 Huntington Avenue
21             Boston, Massachusetts
22          April 9, 2024      10:09 a.m.
23
24        Darlene M. Coppola, RPR, RMR, CRR

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3     *****************************************
 4     10X GENOMICS, INC., and PRESIDENT
       AND FELLOWS OF HARVARD COLLEGE,
 5
                     Plaintiffs,
 6
       vs.                    CA NO. 22-595-MFK
 7
       VIZGEN, INC.,
 8
                     Defendant.
 9     _____
10     VIZGEN, INC.,
                     Counterclaim Plaintiff,
11     vs.
12     10X GENOMICS, INC., and PRESIDENT AND
       FELLOWS OF HARVARD COLLEGE,
13                   Counterclaim Defendants.
       *****************************************
14
15        *CONFIDENTIAL - ATTORNEYS' EYES ONLY*
16            VIDEOTAPED DEPOSITION OF:
17               JORDAN B. GRANT
18               (Taken Remotely)
19             FOLEY & LARDNER LLP
20           Boston, Massachusetts
21        April 10, 2024      10:05 a.m.
22                  Volume II
23
24        Darlene M. Coppola, RPR, RMR, CRR
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 143

1    when we had received that inquiry from Jones

2    Day.

3         Q.   And at Harvard, it's OTD that decides

4    whether to exclusively or nonexclusively

5    license patents; is that correct?

6         A.   So the licensing practices with

7    respect to whether an exclusive or

8    nonexclusive license is granted for any

9    particular patent is something that a lot of

10   people have input on at OTD.

11             OTD looks at the -- looks at the

12   technology that's covered by the patent and

13   considers all the various ways that that

14   patent might give rise to a product that would

15   be useful for the public.

16             And we -- in some circumstances, an

17   exclusive license to a single start-up is the

18   most likely way to ensure or hope that a

19   product is commercialized and developed for

20   the public good.  In other circumstances, a

21   nonexclusive licensing regime would be an

22   effective way to have that technology

23   commercialized and used broadly for the public

24   good.

Page 144

```
 1              That's -- OTD's mission always is to
 2         ensure that the technology covered by the
 3         patents that we file is commercialized for the
 4         benefit of the public.
 5              Q.   With respect to ReadCoor in
 6         particular, it was OTD's decision to
 7         exclusively license patents under the NIH
 8         grant to ReadCoor, correct?
 9                        MR. RODRIGUES:  Objection.
10              A.   So I think that was the same question
11         you asked me, and I tried to answer it.
12         BY MR. BRAMHALL:
13              Q.   Hold on for a second.  I'm asking you
14         specifically with respect to ReadCoor.
15              With respect to ReadCoor, it was OTD's
16         decision to choose to exclusively
17         grant -- excuse me.  Let me say it again.
18         Withdrawn.
19              With respect to ReadCoor, it was OTD's
20         decision to exclusively license patents to
21         ReadCoor that arose under the NIH grant we've
22         been talking about, right?
23                        MR. RODRIGUES:  Objection.
24              A.   So OTD is the entity within Harvard
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 145

```
 1        that develops the licensing regime for

 2        different technology portfolios.  And in this

 3        regard, with respect to the patents that were

 4        eventually licensed to ReadCoor, it was

 5        determined that an exclusive license to

 6        ReadCoor would be the most likely avenue for

 7        successful commercialization of the inventions

 8        that were covered by those patents.

 9   BY MR. BRAMHALL:

10        Q.   It was determined by OTD, correct?

11        A.   So there were a number of people at

12   OTD who would have been involved in those

13   conversations and discussions around what OTD,

14   as an entity, believed was the -- the most

15   likely way to successfully commercialize the

16   technology for the public good.

17        Q.   And in making that determination in

18   2016, OTD did not take into account any

19   language in the grant application or the terms

20   and conditions of that award, right?

21                   MR. RODRIGUES:  Objection.

22        A.   So the terms and conditions of the

23   award and the language in the grant

24   application in no way -- in no way provided
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1       any sort of waiver by OTD of its rights and
2       frankly obligations under Bayh-Dole to license
3       the patents in a way that would benefit the
4       public good.  So --
5                       MR. BRAMHALL:  I'm going to
6       object and move to strike.  It's not
7       responsive.
8       BY MR. BRAMHALL:
9           Q.   And, Mr. Grant, I'm sure you know that
10      we have time limits in this case.  So I'm
11      going to put counsel on notice that if I keep
12      getting long speeches that are not responsive,
13      I'm going to seek additional time for the
14      deposition outside of the 85 hours, which
15      frankly we've already raised issues with --
16      with you all.
17                  So I'm going to ask the question
18      again.  I'm going to ask you, Mr. Grant.
19      Please listen to my questions.
20                      MR. RODRIGUES:  Before --
21      before --
22
23                  (Parties speaking simultaneously.)
24

Page 231

1      Q.   Mr. Grant, did Harvard do any

2   analysis, investigation, testing, or

3   examination to determine whether Vizgen was

4   infringing any 10x/Harvard asserted patent

5   prior to the filing of this lawsuit?

6                  MR. RODRIGUES:   I caution you

7   not to reveal the substance of any privileged

8   communications, but if you can answer that yes

9   or no, you may.

10      A.   Can you just repeat the question,

11   please, Mr. Bramhall.  There was a lot packed

12   in there.

13                  MR. BRAMHALL:  Maybe -- could

14   the court reporter just read it back.  Is that

15   possible?

16

17            *(Question read.)

18

19                  MR. BRAMHALL:  Thank you.

20      A.    OTD did not undertake any

21   investigation or other analysis regarding any

22   Vizgen product relating to this suit prior to

23   the lawsuit being filed by 10x.

24   BY MR. BRAMHALL:

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 232

1        Q.    I appreciate your responding as to

2     OTD, but I'm asking as to Harvard more

3     generally.

4                    MR. RODRIGUES:   Objection.

5           Same instruction.

6        A.    To my knowledge, no one at OTD

7     conducted any analysis or determination or

8     any -- did any other work relating to any

9     Vizgen product that might have been claimed by

10    10x to be infringing any patents that 10x had

11    control over license to.

12    BY MR. BRAMHALL:

13       Q.    And would your answer be the same as

14    to Harvard more generally, which is what

15    you're designated to testify about today?

16       A.    I'm not sure I can speak to the

17    breadth of Harvard on this topic.  I can't

18    imagine anyone else at Harvard would have been

19    involved, but Harvard is a very large place,

20    and I may not be aware of all communications

21    relating to this matter.

22       Q.    You're not aware, as Harvard's

23    corporate witness, of any investigation,

24    testing, examination, or analysis of Vizgen

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 307

```
 1              (Exhibit 232 marked for

 2         identification.)

 3

 4         BY MR. BRAMHALL:

 5              Q.   Mr. Grant, can you look at

 6         Exhibit 232, which is HARV0139855, and again,

 7         I'll draw your attention to the e-mail that is

 8         sent from you to you on April 25, 2020 that is

 9         at the bottom of the first page.

10              Do you see that?

11              A.   I'm looking at Exhibit 232.

12              Q.   Yes.  At the bottom of the page, that

13         first page, there's an e-mail from you to you.

14              Do you see that?

15              A.   Dated April 25, 2022?

16              Q.   Yes.

17              A.   Yes.

18              Q.   And there you referred to ████████

19         ████████████████████████████

20              Do you see that?

21              In the first --

22              A.   In the context of this --

23              Q.   I'm not asking about the context, sir.

24         And let me just pause for a moment and note
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 308

1          that the amount of time you're taking to

2          answer my questions and look at documents is

3          beyond belief.  I can't help but be concerned

4          that there's a deliberate strategy to take up

5          time.  I don't want to get bogged down in it,

6          and I haven't been raising objections as we've

7          been going along, but it's the same issue that

8          we had yesterday.

9                     And so I would just ask you, in the

10         time that we have remaining, can you please

11         just answer the question I'm asking, which is

12         not about the context.

13                          MR. RODRIGUES:  Objection to the

14         examining attorney not allowing the witness to

15         answer the question.  The questioning attorney

16         has had plenty of time to ask all the

17         questions that he's wanted.

18                     And if you want to ask the question

19         again, I'm sure the witness will try to answer

20         it.

21                          MR. BRAMHALL:  Yes.

22         BY MR. BRAMHALL:

23              Q.   Mr. Grant, do you see in your e-mail

24         to yourself on Monday, April 25, 2022, you

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 309



1    used the phrase

?

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 310



```
18              MR. BRAMHALL:  Counsel for
19     Harvard, do you want to take a break and talk
20     to your witness about answering questions
21     directly and not wasting time?
22              MR. RODRIGUES:  I think he
23     provided an answer to the question.  I don't
24     think a break is necessary.
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 311

1          THE WITNESS:  Yeah.  And again,

2     I'm using -- I think you could --

3               MR. RODRIGUES:  I think we would

4     all appreciate it if you would stop using

5     intimidating tactics and just ask your

6     questions.  And if you want a more narrow

7     answer, then ask more narrow questions.

8               MR. BRAMHALL:  It's hard for me

9     to --

10

11          (Parties speaking simultaneously.)

12

13      A.   I can see --

14     BY MR. BRAMHALL:

15      Q.   Okay.  Go ahead.

16     ██    ███████████████████████████

██  ██████████████████████████████████

██  █████████████████    ████████████████

██  ██████████████████████████████

██  ███████████████████████████████████

██  ██████████████████████████████

██  ████████████████████████    ███████████

██  █████████████████████████████████

██  ███████████████████████████████████

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 312



16    BY MR. BRAMHALL:

17         Q.   Well, all I was asking was something

18    very, very simple, and I think the tactics are

19    clear for all to see.

20              And I object to the way you're

21    answering the questions, and I don't believe

22    you're being fully truthful or intending to

23    answer the questions that I'm asking, and it's

24    a waste of time, and it's obviously a

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 313

1      litigation tactic.  So I'll put that one

2      aside.

3            Let me ask you --

4      A.   I think --

5

6            (Parties speaking simultaneously.)

7

8      A.   -- I don't remember --

9                 MR. RODRIGUES:  There's no

10     question pending.  You don't have to say

11     anything.

12     BY MR. BRAMHALL:

13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 324

1           Again, your question presumes that

2      there's something in the notice of award or

3      the terms of the grant application that would

4      have any impact on the way Harvard and OTD

5      licensed the patents that were supported by

6      that award.

7           Again, there's nothing in the grant

8      application or in the notice of award from the

9      NIH that suggested that Harvard's rights under

10     Bayh-Dole with respect to those subject

11     inventions were being restricted in any way.

12           So OTD would have gone along --

13     undertaken its normal due diligence process,

14     knowing and understanding that those patents

15     were subject to Bayh-Dole, and we would have

16     complied with all of our obligations to the

17     federal government under Bayh-Dole.

18     BY MR. BRAMHALL:

19     Q.   Let me ask you this, the terms and

20     conditions of the NIH grant award that's at

21     issue in this case, those also create

22     obligations for Harvard, correct?

23                 MR. RODRIGUES:  Objection.

24                 MR. PABIS:  Objection.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 325

1          A.     The notice of award that we

2     received -- that ORA received from the NIH in

3     approving George Church's grant application

4     had certain terms and conditions.  Those terms

5     and conditions were conditions for the funding

6     of that award.  This is true.

7                 There are terms and conditions that

8     the NIH told ORA and, through ORA, George

9     Church, that they needed to meet in order to

10    continue to receive funding under that award.

11    And there's nothing in the record to suggest

12    that those terms and conditions were not fully

13    complied with.

14                In fact, we talked yesterday at length

15    about the request that we got from the NIH to

16    explain how we had complied with the terms of

17    that notice of award, and we had discussions

18    with the NIH.  We confirmed for the NIH that

19    we had complied with all the terms of that

20    award, that our licensing practices complied

21    with the terms of the notice of award.

22                And then we provided a written letter

23    detailing what OTD's and Harvard's practice

24    was with respect to the patents that were

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 326

1          supported by the funding under that award.  We

2          provided that letter to the NIH, and the NIH

3          responded to that letter.

4               Q.   Sir, I haven't asked you -- I haven't

5          asked you at all about the letter.  Okay.  Can

6          you just listen to my questions.

7                    Sir, yes or no?  Harvard is obligated

8          and was obligated to comply with the terms and

9          conditions of the NIH award that's at issue in

10         this case?

11                    MR. RODRIGUES:  Objection.

12    BY MR. BRAMHALL:

13               Q.   Yes or no, please.

14               A.   Yeah, I think I answered that question

15         at the top of my prior answer, which is that

16         there -- the notice of award had terms and

17         conditions that the NIH said needed to be

18         complied with in order for the funding to be

19         received by Harvard.  Those terms and

20         conditions were complied with.

21    BY MR. BRAMHALL:

22               Q.   Let me ask you this, is it Harvard's

23         position that none of the terms and conditions

24         of that NIH grant award that's at issue in

Page 327

```
 1        this case create any obligations for Harvard

 2        with respect to patent licensing?

 3                    MR. RODRIGUES:   Objection.

 4        A.    In the notice of award that the NIH

 5        provided, they cited certain pages which

 6        contain certain clauses in the grant

 7        application.   The provisions that are cited in

 8        the notice of award that are particular pages

 9        in the grant application describe ORA's and

10        Harvard Medical School's and George Church's

11        lab in particular, their strategies for

12        disseminating information, providing data,

13        making software available, making materials

14        available.

15             The description in the grant

16        application is quite detailed about what

17        George Church intended to do with respect to

18        all of that.   There is language that also

19        describes in broad terms how George hoped that

20        the technology that would result from this

21        grant application would be commercialized.

22             And there's language in there that

23        describes his intentions that any patents and

24        other intellectual property -- I think the
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 328

1    term in the award is "innovations" -- would be

2    used for the public benefit.

3              There is nothing in that -- in those

4    pages that are cited by the NIH that in any

5    way restricts Harvard's ability to -- and

6    Harvard's rights under Bayh-Dole to grant

7    licenses, both nonexclusive and exclusive, to

8    commercial parties in order to have those

9    inventions that come out of that award

10   developed further into products for the public

11   good.

12   BY MR. BRAMHALL:

13        Q.   That understanding you just stated

14   where Harvard is not restricted in any way

15   with respect to nonexclusively or exclusively

16   licensing patents under the NIH grant to

17   commercial parties, that's the understanding

18   that Harvard and OTD have operated under and

19   continue to operate under with respect to

20   patent licensing, correct?

21                  MR. RODRIGUES:  Objection.

22        A.   Mr. Bramhall, that was a very long

23   question with many parts.  If you don't mind,

24   I would ask you to restate it.  And if you

Page 329

1     could, I would ask you to give me again the

2     exhibit number for the patent application and

3     for the notice of award so I can look at that

4     language and give you my answer to your

5     question.

6     BY MR. BRAMHALL:

7          Q.   I mean, I think your position has been

8     really clear.  From Harvard's position, the

9     grant application and the notice of award do

10    not impose any obligations on Harvard beyond

11    the -- let me back up.

12          I don't have time frankly because of

13    the way the deposition was conducted to go

14    back on these documents.  I'm just trying to

15    get you to tell me that with respect -- if you

16    want to look at the grant application, it's

17    Exhibit 7.

18          And I'll just ask you specifically

19    about the data and the material dissemination

20    plan, which is pages 130 and 131.  I just want

21    you to confirm for me that from Harvard's

22    perspective, none of -- nothing in that plan

23    creates any obligations on Harvard with

24    respect to exclusively or nonexclusively

Page 330

1        licensing patents; is that right?

2                    MR. RODRIGUES:   Objection.

3        A.    I'm sorry.   I had to redownload that

4        very long document.

5        BY MR. BRAMHALL:

6        Q.    Sure.   So it's Exhibit 7.   It's pages

7        130 and 131 of the document.   It's the data

8        and materials dissemination plan, which, as

9        you mentioned, we talked about at length

10       yesterday.

11               And I just want to confirm that from

12       Harvard's understanding, nothing in this data

13       and materials dissemination plan imposed any

14       obligations on Harvard -- Harvard or OTD with

15       respect to patent licensing.

16       A.    So the notice of award says that these

17       pages, I believe, are listed in the notice of

18       award as being -- I think the notice of award

19       essentially says that Harvard will comply with

20       or follow the plans that it has on these pages

21       in order to continue to receive the funding.

22               And the language on these pages in the

23       section for "Data and Materials Dissemination

24       Plan" on pages 130 and 131 talk in very broad

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 331

```
1          strokes about what the Church lab intends to
2          do to disseminate the software, the protocols,
3          the data, and how the Church lab would work
4          with the Office of Technology Licensing, now
5          OTD, and its licensing activities.
6               And it says that the "CTCHGV" -- which
7          is the acronym for this particular project --
8          "would pursue open and nonexclusive licensing
9          agreements that encourage innovations to be
10         made widely available to researchers and
11         commercial entities."
12              So there's nothing in there that
13         suggests that Harvard is waiving its rights to
14         grant an exclusive license.  Harvard OTD
15         undertakes its licensing with an aim to ensure
16         that the inventions that come out of federal
17         awards are developed and commercialized in a
18         way that those inventions have an impact for
19         the benefit of the public.  And there's
20         nothing in here to --
21         Q.   Yes.  So the sentence you just read,
22         it says "open and nonexclusive licensing
23         agreements."  That is -- certainly includes
24         patents, right, sir?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 332

1              MR. RODRIGUES:  Objection.

2        A.    Well, I don't know what George Church

3    was thinking about when -- or ORA was

4    considering when they reviewed this language.

5    And I think it came from his grant manager,

6    but it says that "Open and" nonexclusively --

7    "nonexclusive license agreements that

8    encourage innovations to be made widely

9    available would be pursued."  It certainly

10   doesn't preclude also that the exclusive

11   licensing of inventions in a manner that will

12   make those inventions also widely available or

13   commercialized in a way that would make the

14   benefits of those inventions -- the

15   innovations themselves widely available.

16   BY MR. BRAMHALL:

17        Q.    My question is more narrow.  The "open

18   and nonexclusive licensing agreements," that

19   phrase, that includes patent licenses, and

20   certainly does not exclude them, correct?

21              MR. PABIS:  Objection.

22              MR. RODRIGUES:  Objection.

23        A.    Again, I don't know what George

24   Church's intent was and what the subject

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 337

1                    to 2:30 p.m.)

2

3                         THE VIDEOGRAPHER:  We are back

4         on the record.  The time is 2:30.

5         BY MR. BRAMHALL:

6              Q.   Mr. Grant, I understand we're coming

7         to the end of day here.  I wanted to ask you

8         about some testimony you gave yesterday.  You

9         testified that OTD doesn't review grant

10        applications or grant notices of award as a

11        matter of course; is that fair?

12                        MR. PABIS:  I think the witness

13        is muted.

14                        MR. BRAMHALL:  Yes.  We have a

15        mute issue.

16             A.   I'm sorry.  We just unmuted it.

17                  So grant applications themselves are

18        put together by grant managers and reviewed

19        and worked on by the Office of Research

20        Administration.  OTD has no role in reviewing

21        those before they are submitted.  If a notice

22        of award is received, that notice of award is

23        received by ORA.  The notice of award may have

24        terms and conditions related to it that the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 338

1       NIH would put in that notice of award.

2               The role of OTD is to receive reports

3       of innovation, and we talked about yesterday

4       was that reports of innovation or reports of

5       inventions received by the inventors often

6       include references to the award grant number.

7       And we would know that that -- that that

8       invention would have been supported by that

9       federal award, which would trigger processes

10      at OTD to report that invention to the federal

11      government.

12              It's conceivable that an NIH notice of

13      award could have some language in it that

14      would put Harvard on notice that the NIH was

15      somehow restricting Harvard's rights under

16      Bayh-Dole, which are only inventions -- filed

17      patents on those inventions and license those

18      inventions in any manner that would be most

19      appropriate to have those inventions

20      commercialized.

21              The only -- the only way that the NIH

22      can do that, in my understanding, is to

23      essentially go through this very specialized

24      filing procedure, which I don't know in detail

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 339

1    but involves other departments of the federal

2    government.  And if the NIH were to ever want

3    to restrict Harvard's rights it would

4    otherwise have under Bayh-Dole, the NIH would

5    have to go through that exercise, and Harvard

6    would receive notice of that, and OTD would

7    certainly be aware of that.

8         ORA would certainly notify us if that

9    were the case in the same way that ORA

10   notified us when the NIH reached out to them

11   with questions about our licensing practices

12   with respect to the inventions that are the

13   subject of this grant.

14        So none of that happened.  To my

15   knowledge, this never happened at Harvard.  If

16   it ever did, OTD would certainly be aware of

17   it, and it would need to adjust our licensing

18   practices with respect to the particular

19   inventions that were coming out of the

20   particular grant award, the subject of which

21   the NIH decided to try to restrict Harvard's

22   rights under Bayh-Dole.

23   BY MR. BRAMHALL:

24        Q.   Harvard did not adjust its licensing

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 340

1      practices with respect to any of the

2      particular inventions coming out of the

3      grant -- the NIH grant that's at issue in this

4      case, correct?

5          A.   So you used the word "adjust" there.

6      Harvard OTD conducts its licensing practices

7      with respect to inventions that are reported

8      to us based on what those inventions are.

9              Assuming we are filing patents on

10     those inventions, we would determine the

11     best -- the most appropriate and most likely

12     way to license those inventions that would

13     lead to, you know, you could call successful

14     commercialization of those inventions with a

15     goal being to make that -- make an impact and

16     benefit the public, and that can happen in

17     many ways.

18             And there are -- there are various

19     ways that we structure our licensing,

20     depending on the nature of the invention

21     itself.  It could be -- it could require very

22     little investment to get to a product, and we

23     would potentially license it nonexclusively to

24     many parties.  If an invention required -- was

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    very early and seemed to require significant

2    investment to get that innovation that the

3    invention -- that invention might cover, then

4    we would potentially license that under an

5    exclusive licensing framework so that the

6    start-up company would be able to receive

7    sufficient funding from investors to be able

8    to develop that technology to the point that a

9    product would be available that the public

10   could buy and use.

11                   MR. BRAMHALL:  Objection.  Move

12   to strike.  Nonresponsive.  Time wasting.

13   BY MR. BRAMHALL:

14       Q.   Sir, I asked you a very specific

15   question.  I didn't ask you about

16   generalities.  You used the word "adjust" in

17   your prior answer.  And I was asking the

18   following:  Did Harvard adjust its licensing

19   practices with respect to any of the

20   particular inventions that were coming out of

21   the NIH grant award in this case?  Yes or no?

22                   MR. RODRIGUES:  Objection.

23       A.   Our licensing practices with respect

24   to the patents that cover the inventions

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 342

1    coming out of this grant award were no

2    different than our general licensing

3    practices.

4    BY MR. BRAMHALL:

5        Q.    So there was no adjustment?

6        A.    There -- we look at each invention,

7    and we do our best to put in place a licensing

8    regime that will lead to commercialization and

9    lead to development of products that are

10   beneficial to the public.

11       Q.    Let's take a look at Exhibit 234, if

12   we could.  This is a new exhibit, HARV0010164.

13   It's an e-mail from 2017, an e-mail chain, I

14   should say, that involves you.

15           Let me know when you've got that one

16   up.  It should be in the Exhibit Share.

17

18           (Exhibit No. 234 marked for

19   identification.)

20

21   BY MR. BRAMHALL:

22   ██    ████████████████████████████

██      ██████████████████████████████████

██      ████████████████████████████████

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 344

1      I recall correctly.

2      ███   ███████████████████████   ███

       ███████████████████████████████████

       ███████████████████████████████████

       █████████████████████████████

6                    MR. RODRIGUES:  Objection.

7          A.   (Witness reviews document.)

8      BY MR. BRAMHALL:

9          Q.   I'm happy to give you more time, but

10     if you need more time, maybe we should go off

11     the record.

12                   MR. RODRIGUES:  Mr. Bramhall,

13     I'll let the witness review it.  I'm sure you

14     have follow-ups.

15                   MR. BRAMHALL:  Yes.  The issue

16     is we are on a running clock, as you know, but

17     I guess I'll adjust that.

18                   MR. RODRIGUES:  Well, you -- you

19     wanted to show him this document.  You chose

20     to spend time during the deposition this way.

21     That's the way we'll spend it.

22                   MR. BRAMHALL:  It's one thing to

23     spend time reviewing.  It's another to waste

24     time deliberately in order to run out the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 345

1    clock.

2              MR. RODRIGUES:   There is no

3    indication that the review is improper here.

4    It is a a ten-page document.   The witness

5    already suggested he hasn't seen this before.

6    This isn't one of the documents that's been

7    used at his prior deposition.   It doesn't seem

8    within the scope of the 30(b)(6) prep.   He's

9    entitled to review it.

10

11              (Brief pause.)

12

13

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 346

1

10          THE STENOGRAPHER:  Just a

11     minute.  The witness froze up.

12

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 347

1  ████████    ████████████████

2                    THE STENOGRAPHER:  I'm sorry.

3       Excuse me.

4              Gayle, is it only me?

5                    THE VIDEOGRAPHER:  We're

6       starting to get some feedback from, I think,

7       the other microphone.  If you could, put your

8       microphone a little bit further from you,

9       Mr. Grant.

10

11                    (Brief pause.)

12

13                    THE WITNESS:  So I've got a new

14      speaker, a new microphone now.  Can you hear

15      me better now?

16      BY MR. BRAMHALL:

17          Q.   Honestly, I'm going to withdraw the

18      question because you're just wasting time.

19      You're giving me a lengthy answer to something

20      I didn't ask.  That's not what we're here to

21      do.  Do you understand, Mr. Grant --

22          A.   I'm sorry --

23

24                    (Parties speaking simultaneously.)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 349

1           Do you understand that?

2       A.    I understand the rules of procedure

3    for this deposition, yes.

4       Q.    And you're here to answer the

5    questions that I ask you under oath subject to

6    the penalty of perjury.  Are you aware of

7    that?

8       A.    Yes.

9       Q.    And you -- have you been listening to

10    my questions and answering the questions that

11    I'm asking you?

12       A.    I wouldn't mind if you repeated the

13    question that you asked in connection with

14    this ten-page e-mail.

15    ████  ██████████████████████████████

████  ████████  ██████████████████████

████  ████████████████████████████████

████  ████████████████████

████  ██████████████████  ██████████  ███

████  ██████████████████████████████████

████  ████████████████

████  ██  ██████████████████████████

████  ██████████████████████████████

████  ██████████████████████████████

CONFIDENTIAL - ATTORNEYS' EYES ONLY



Page 350

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 351



1

24                              MR. BRAMHALL:  I'm going --

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 352

13    BY MR. BRAMHALL:

14         Q.   Are you finished?

15         A.   Yes.

16              MR. BRAMHALL:  Okay.  So I have

17    more documents to ask about, but I agree we

18    should just -- we should end this at this

19    point.  I will ask one or two more follow-ups.

20    BY MR. BRAMHALL:

21         Q.   Mr. Grant, ORA does not handle

22    intellectual property at Harvard, right?

23         A.   That's too general of a statement to

24    be accurate.  ORA is responsible for

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 353

1          negotiate- -- not negotiating -- they do

2          negotiate some awards.  Federal awards are not

3          negotiated, as you may know.  But they handle

4          those awards.

5                    OTD is responsible for the management

6          of patentable inventions on behalf of Harvard

7          University.  ORA is not responsible for the

8          prosecution and the licensing of patentable

9          inventions that come out of Harvard's labs.

10         OTD is responsible.  That is the main job of

11         OTD as it is.

12                   MR. BRAMHALL:  Yes, I think

13         let's stop there.  Again, I have more -- I've

14         raised a number of objections about time

15         wasting.  In fact, I think it got worse after

16         I raised my concerns about it.

17                   We also have issues on the Vizgen side

18         with the witness's preparation on the

19         corporate topics, but I'm not going to belabor

20         any of these points at this point.

21                   I'm sure you'll have a response.  Feel

22         free to go ahead, Counsel.  But otherwise, we

23         can -- we can stop here subject to -- subject

24         to us raising issues with this deposition and

Page 354

```
 1       others.  It's really a continuation of a

 2       pattern that we've seen in the past with the

 3       time issues and the preparation issues

 4       frankly.

 5                   MR. RODRIGUES:  And, sure, I

 6       obviously disagree with the statement and the

 7       characterization.  The witness is well

 8       prepared.  He's also generally knowledgeable

 9       in all the subject matter given.  Of course,

10       his work at Harvard.

11                   The witness was made available for

12       seven hours yesterday.  Counsel chose to use

13       five and a half hours of that time.  We made

14       the witness available for three hours.  I

15       think we're well past that, closer to three

16       and a half, if not more than that.  The court

17       reporter will be able to figure out the actual

18       time.  And we obviously disagree with the

19       characterizations of the witness's testimony.

20                   I have a quick follow-up question,

21       and, Mr. Bramhall, obviously, I will let you

22       ask any follow-up to my follow-ups within this

23       as long as it's within the scope of my

24       follow-up.
```

# __Exhibit C__

## *John Aach Deposition Transcript Excerpts*

HIGHLY COFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF DELAWARE
3   * * * * * * * * * * * * * * * * * * * * * * * * * *
4   10X GENOMICS, INC., and PRESIDENT
    AND FELLOWS OF HARVARD COLLEGE,
5
                       Plaintiffs,
6
    vs.                        CA NO. 22-595-MFK
7
    VIZGEN, INC.,
8
                       Defendant.
9   _____
10  VIZGEN, INC.,
11                  Counterclaim Plaintiff,
12  vs.
13  10X GENOMICS, INC., and PRESIDENT AND
    FELLOWS OF HARVARD COLLEGE,
14
                       Counterclaim Defendants.
15
    * * * * * * * * * * * * * * * * * * * * * * * * * *
16
17  *HIGHLY COFIDENTIAL - ATTORNEYS' EYES ONLY*
18          VIDEOTAPED DEPOSITION OF:
19               JOHN AACH, PH.D.
20            Boston, Massachusetts
21         March 22, 2024     10:06 a.m.
22
23
24      Darlene M. Coppola, RPR, RMR, CRR

HIGHLY COFIDENTIAL - ATTORNEYS' EYES ONLY

Page 117

1      on the same page.

2            A.    Okay.

3            Q.    And if you ever need to look back at

4      an exhibit, just let me know.

5                  But if you go to the folder, you

6      should see Exhibit 7, NIH grant.

7            A.    All right.  This is the full

8      submission with all the forms and all the

9      sections.

10           Q.    Yes.  So -- so the -- my question is

11     where was this document stored at Harvard?

12           A.    I don't know.  I don't know.

13           Q.    As the -- as the corporate

14     representative on Topic 6, what did you do to

15     get up to speed or learn the facts in order to

16     testify on this topic?

17           A.    Well, I didn't look at that.

18           Q.    What do you mean "didn't look at

19     that"?  What does "that" mean?

20           A.    I don't know.  I'm not even certain I

21     had a complete copy with all the forms.  I may

22     have.  I don't know.  More germane, I don't

23     know where those copies would have gone.

24           Q.    Well, what did you do to prepare to be

HIGHLY COFIDENTIAL - ATTORNEYS' EYES ONLY

Page 118

```
 1        the representative on Topic 6 today?
 2             A.   I'm unaware of any special
 3        preparations I did to be the representative on
 4        Topic 6 today.
 5             Q.   Exhibit -- and when you -- we're
 6        looking at Exhibit 7, which is the full grant
 7        application.
 8                  Can you tell me where hard copies of
 9        this document were stored at Harvard after it
10        was submitted to the NIH?
11             A.   I'm afraid I can't.  I don't know
12        where the hard copies would be stored.
13             Q.   Can you tell me where electronic
14        copies of Exhibit 7 were stored at Harvard
15        after it was submitted to the NIH?
16             A.   I'm afraid I can't answer that either.
17        I don't know.
18             Q.   Do you know -- you agree that -- did
19        you have copies of the final grant application
20        that was submitted to the NIH, you personally?
21             A.   I -- I may have been passed one.  I
22        don't recall specifically whether I did.
23             Q.   Did the Church Lab, in general, have
24        copies of the grant application submitted to
```

# **Exhibit D**
## *Rule 30(b)(6) Exemplar Testimony*

| Deponent | Rule 30(b)(6) Topic(s) | Exemplar Testimony[1] |
|---|---|---|
| **John Aach (Harvard)** | **Topic 6:** Identification of where copies of the application that led to NIH Grant No. P50HG005550, whether electronic or hard copy, were stored at Harvard and who had access thereto. | Q. As the -- as the corporate representative on Topic 6, what did you do to get up to speed or learn the facts in order to testify on this topic?<br>A. ***Well, I didn't look at that.***<br>Q. What do you mean "didn't look at that"? What does "that" mean?<br>A. ***I don't know. I'm not even certain I had a complete copy with all the forms. I may have. I don't know. More germane, I don't know where those copies would have gone.***<br>Q. Well, what did you do to prepare to be the representative on Topic 6 today?<br>A. ***I'm unaware of any special preparations I did to be the representative on Topic 6 today.***<br>Q. Exhibit -- and when you – we're looking at Exhibit 7, which is the full grant application. Can you tell me where hard copies of this document were stored at Harvard after it was submitted to the NIH?<br>A. ***I'm afraid I can't. I don't know where the hard copies would be stored.***<br>Q. Can you tell me where electronic copies of Exhibit 7 were stored at Harvard after it was submitted to the NIH?<br>A. ***I'm afraid I can't answer that either. I don't know.*** |
| **Sam Liss (Harvard)** | **Topic 24:** All facts and circumstances surrounding Harvard's licensing of patents to Vizgen and all amendments to that license. | |

---

[1]   For ease of review, this chart quotes the portions of deposition testimony at issue. Vizgen can provide the underlying transcript pages to the Court upon request.

| | |
|---|---|
| **Grant Zimmermann (Harvard)** | **Topic 15:** Harvard's licensing of the 10x Asserted Patents to ReadCoor and/or 10x and all potential or actual amendments to that license.  |
| | **Topic 21:** All facts and circumstances surrounding the definitions of "Field A," "Field B," "Field C," and "Field D" in Harvard's license agreement with ReadCoor/l0x, including all facts and circumstances surrounding any amendments to those definitions, and Harvard's understanding of the meaning of such definitions. |
| | **Topic 22:** The October 23, 2018 amendment to the ReadCoor-Harvard license, including the reasons for the amendment and the negotiations and discussions regarding the same. |
| | **Topic 23:** The September 25, 2020 amendment to the ReadCoor-Harvard license, including the reasons for the amendment and the negotiations and discussions regarding the same. |

| **Jordan Grant (Harvard)**[2] | **Topic 14**: Harvard's practices and procedures (including due diligence) used by Harvard between 2015 through the present to determine whether cases and/or patents are funded by any grants and/or subject to any encumbrances prior to and after licensing such cases and/or patents.<br><br>**Topic 15**: Harvard's licensing of the 10x Asserted Patents to ReadCoor and/or 10x and all potential or actual amendments to that license.<br><br>**Topic 16**: Harvard's due diligence relating to Harvard's license agreement with ReadCoor/10x and any and all amendments thereto, including Harvard's efforts to determine whether the related cases and/or patents were funded by any grants and/or subject to any encumbrances. | Q. Did OTD or Harvard do anything differently than its standard practices when licensing patents under the NIH grant that's at issue in this case?<br>MR. RODRIGUES: Objection.<br>A. I don't recall. ***I was not involved in the processes that resulted in the due diligence form that is Exhibit 233. I can't speak personally as to what processes were done.***<br>Q. Well, you're Harvard's corporate witness. Is that Harvard's answer?<br>A. ***So there would have been a number of processes that would have been conducted, and I have no personal knowledge of the actual processes***. What I'm looking at is the due diligence form that's provided in this exhibit.<br>Q. I'm asking did OTD, in licensing patents under the NIH grant that's at issue in this case, do anything different than its standard practices?<br>A. ***So I'm not sure what you mean by "standard practices."*** We have certain procedures we go through with respect to conducting due diligence, which is borne out in this form. Each DBD handles that slightly differently, but they have to complete this form, and different people within OTD help them complete all of the tasks that they need to do to complete this form. ***And I can't speak to how Jess Duda completed those tasks.***<br>[…]<br>Q. So the ReadCoor license that is now [ ] owned by 10x, that covers more than just the five asserted patents in this litigation that have been asserted against Vizgen, right?<br>MR. RODRIGUES: Objection.<br>A. ***I don't know the number of patents offhand that are still subject to the ReadCoor license or which ones have been asserted, to be honest with you.*** |

---

[2]  Jordan Grant was Harvard's Rule 30(b)(6) witness on several additional topics intentionally omitted for space, for a total of 18 topics.