# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br> Plaintiffs, <br><br> v. <br><br> VIZGEN, INC., <br><br> Defendant | C.A. NO. 22-595-MFK <br><br> ▮▮▮▮▮▮▮▮▮▮▮▮ |
| VIZGEN, INC., <br><br> Counterclaim-Plaintiff, <br><br> v. <br><br> 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE, <br><br> Counterclaim-Defendants | |

## OPENING BRIEF IN SUPPORT OF PRESIDENT AND FELLOWS OF HARVARD COLLEGE'S MOTION FOR SUMMARY JUDGMENT AS TO AMENDED COUNTERCLAIMS NOS. I, V, XVII, XIX, XX, AND XXI, AND SIXTH, EIGHTH, AND NINTH AFFIRMATIVE DEFENSES

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

OF COUNSEL:

Michael J. Tuteur (*pro hac vice*)
Geoffrey M. Raux (*pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 502-3284
mtuteur@foley.com
graux@foley.com
rrodrigues@foley.com

*Attorneys for Counterclaim-Defendant*
*President and Fellows of Harvard College*

## TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT ............................................................................................. 1

II.     FACTUAL BACKGROUND ............................................................................ 1

III.    LEGAL STANDARD ...................................................................................... 4

IV.     ARGUMENT .................................................................................................. 5

        A.      Summary Judgment Should Be Granted For All Counterclaims and Defenses Based on the Bad Faith Licensing Theory ............................ 5

                1.      ████████████████████████ ............................................ 6

                2.      Harvard Did Not Understand or Control Vizgen's Commercialization ................................................................. 7

                3.      Harvard's Patent Prosecution Was Not Improper ..................... 8

                4.      Harvard Had No Duty to Warn Vizgen of Potential Infringement .......... 10

                5.      Vizgen Was Fully Aware of the Risk It Might Infringe .......................... 11

        B.      Summary Judgment Should Be Granted For All Counterclaims and Defenses Based on the Grant Fraud Theory .......................................... 12

                1.      The Grant Application and Award Did Not Create a Contract ................ 13

                2.      The Grant Did Not Repudiate Harvard's Bayh-Dole Obligations ........... 14

                3.      The Grant Application and Award Do Not Bar All Exclusive Licenses ................................................................................. 16

        C.      Summary Judgment Should Be Granted for the Reasons Argued by 10x ............ 16

V.      RELIEF REQUESTED ................................................................................. 17

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Armstrong v. White Winston Select Asset Funds, LLC*,
648 F.Supp.3d 230 (D. Mass. 2022) ........................................................... 9

*Blue Hills Off. Park LLC v. J.P. Morgan Chase Bank*,
477 F.Supp.2d 366 (D. Mass. 2007) ......................................................... 10

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007) ................................................................. 7, 8

*C.R. Bard, Inc. v. Atrium Med. Corp.*,
No. cv-21-00284, 2021 WL 4774948 (D. Ariz. Oct. 13, 2021) .............................. 10

*Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of City of Boston*,
38 F Supp.2d 46 (D. Mass. 1999) ............................................................ 11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................... 5

*L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*,
121 F. Supp. 2d 147 (D. Mass. 2000) ....................................................... 12

*Mathewson Corp. v. Allied Marine Indus.*, Inc.,
827 F.2d 850 (1st Cir. 1987) ............................................................... 13

*Moore v. La-Z Boy*,
639 F.Supp.2d 136 (D. Mass. 2009) ......................................................... 15

*O'Hara v. Diageo-Guinness, USA, Inc.* 306 F.Supp.3d 441, 454 (D. Mass. 2018), *on reconsideration* 370 F.Supp.3d 204 (D. Mass. 2019), 370 F.Supp.3d 204 (D. Mass. 2019) ... 11

*Rogers v. Comcast Corp.*,
55 F.Supp.3d 711 (E.D. Pa. 2014) .......................................................... 11

*Thryoff v. Nationwide Mut. Ins. Co.*,
460 F.3d 400 (2d Cir. 2006) ................................................................. 9

*Uno Rest., Inc. v. Boston Kenmore Realty Corp.*,
441 Mass. 376 (2004) ........................................................................ 9

*Zurich Am. Ins. Co. v. Watts Regul. Co.*,
796 F. Supp. 2d 240 (D. Mass. 2011) ....................................................... 12

**Statutes**

35 U.S.C. § 200 ............................................................................................................. 2, 16

35 U.S.C. § 203 ................................................................................................................. 16

35 U.S.C. §§ 202(a)(2), 202(b) ........................................................................................ 16

35 U.S.C. §§ 204,  203(a), and 207-209 ......................................................................... 2, 3

42 U.S.C. § 241 ................................................................................................................. 14

M.G.L. c. 93A .............................................................................................................. 5, 12

M.G.L. c. 93A, § 3 ........................................................................................................... 11

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................... 5

**Regulations**

37 C.F.R. § 401.14 ........................................................................................................... 16

37 C.F.R. § 401.3(e) ......................................................................................................... 16

## I.    NATURE AND STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT

Vizgen is a sophisticated party backed by sophisticated investors that knowingly entered a licensing arrangement with Harvard for a limited number of patents. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Now, upon facing a lawsuit alleging infringement of patents exclusively licensed to 10x, Vizgen has manufactured affirmative defenses and counterclaims to excuse its unlawful conduct. Vizgen's defenses and counterclaims depend on two theories of liability: (i) that Harvard acted unfairly and in bad faith toward Vizgen in connection with the parties' License Agreement (the "Bad Faith Licensing Theory"); and (ii) that Harvard deceived the government due to statements made in a 15-year old grant application (the "Grant Fraud Theory"). After discovery, Vizgen has uncovered no evidence supporting the factual and legal predicates to its theories of liability. Summary judgment should be granted.

## II.    FACTUAL BACKGROUND

Harvard is a nonprofit research university at the forefront of scientific discovery with more than 4,800 faculty, researchers, and other academics who regularly make inventions. D.I. 87 at 3. Harvard secures patents on many of these inventions and licenses them to companies that can commercialize them for the public good. SUF ¶¶ 1, 3.  That process is facilitated by the Office of Technology Development ("OTD"), which works with principal investigators to identify discoveries and then, with the help of outside counsel, applies for patent protection. SUF ¶ 2. Any license can be restricted to a specific technical "field" of use, or it can allow for use in all technical fields. SUF ¶ 4. In addition, the license can provide both non-exclusive and exclusive rights, depending on what would best incentivize commercialization. SUF ¶¶ 3, 5.

For research at Harvard that is federally-funded, the Bayh-Dole Act applies. Under the Bayh-Dole framework, recipients of federal research funds must disclose inventions that arise from federal funded research, obtain patent protection for them, and license those rights to companies to commercialize products for the public's benefit. 35 U.S.C. § 200 *et seq.* Recourse to exclusive licenses is expected under Bayh-Dole, and is specifically mentioned throughout the Act (*see, e.g.,* 35 U.S.C. §§ 204,  203(a), and 207-209).

The Asserted Patents in this case arose from NIH Grant No.1P50HG005550, awarded in September of 2010. The application for that Grant was submitted in May 2009.  SUF ¶ 10, Rodrigues Ex. 12. Within its 153 pages, the Grant Application contains discrete and limited statements about the "open sharing" of "software, protocols and data" and makes reference to "open" and "non-exclusive" licensing agreements. SUF ¶ 10. None of these statements applies expressly to patents, nor is there any evidence that they were intended to be contractual commitments on behalf of Harvard. *Id.* Instead, they reflect ████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████ SUF ¶ 13. As. Dr. Church testified, ███████████████████████████████████████████████████████████████████████ ████████████████████████████ *Id.*

Dr. Church and his team went on to conduct ground-breaking research that resulted in numerous  patented  inventions. ██████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ SUF ¶ 15; Rodrigues Ex. 35.

In September 2019, Harvard entered into a different License Agreement with Vizgen for unrelated patents. SUF ¶ 21,  Rodrigues Ex. 17. ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ SUF ¶

23; Ex. 17 at 11.4; 11.17.

██████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████.

3

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ SUF ¶ 40.

After acquiring ReadCoor, ███████████████████████████████████████ There is no evidence that Harvard relied on any confidential information from Vizgen as part of its prosecution. Moreover, neither this prosecution nor ████████████████████████████ ████████ created anything new that ***Harvard did not already have***. In other words, Harvard's prosecution did not cause this lawsuit. It resulted because Vizgen chose to commercialize a product that infringed patents for which it had no license. Vizgen's attempt to pass the buck to Harvard should be rejected, and summary judgment should be entered in Harvard's favor.

## III.    <u>LEGAL STANDARD</u>

Summary judgment is proper where the record evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).

4

IV.    <u>**ARGUMENT**</u>

A.    <u>**Summary Judgment Should Be Granted for All Counterclaims and Defenses Based on the Bad Faith Licensing Theory**</u>

The Bad Faith Licensing Theory is the basis for Vizgen's counterclaims for breach of the implied covenant, violation of M.G.L. c. 93A, and violation of California's unfair competition law (Counts I, V, & XX), and one of the two alternative grounds on which Vizgen bases its antitrust claims against Harvard (Counts XVII and XIX). It also supplies one of the two grounds for Vizgen's Sixth, Eighth, and Ninth Affirmative Defenses.

As pleaded, the theory is that, during negotiations over the license, "Vizgen repeatedly informed Harvard that it was seeking the intellectual property necessary for freedom to operate when implementing Vizgen's planned scope of operations[.]" D.I. 440 at ¶ 72. Allegedly, "Harvard assured Vizgen that the particular set of intellectual property it proposed for Vizgen to license…encompassed all that Vizgen needed from Harvard from an intellectual property standpoint to commence and develop its operations." *Id.* ¶ 73. "Harvard [purportedly]…informed Vizgen, both orally and in the License Agreement itself, ██████████████████████ ██████" *Id.* ¶ 172. The parties then entered the License Agreement, which Vizgen contends has "the express purpose…for Vizgen to obtain the requisite intellectual property to commence its commercial operations to market the MERSCOPE/MERFISH technology—commercial operations that were disclosed in detail to Harvard." *Id.* ¶ 169. "Unbeknownst to Vizgen..., Harvard was [allegedly] working with 10x to obtain patent claims within the Harvard patent portfolio purporting to cover Vizgen's commercial activities, using a series of new and amended patent applications…" *Id.* ¶ 174. During this time, Harvard "never indicated that Vizgen's commercial activities infringed on any of Harvard's other intellectual property…" *Id.* ¶ 173. After purportedly requiring Vizgen to commercialize in the manner that it did, Harvard, ████

5

████████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* ¶ 223.

At the pleadings stage, this Court determined that the majority of the counterclaims and defenses based on the Bad Faith Licensing Theory were adequately alleged. D.I. 114. However, at this stage, naked allegations do not suffice. Because Vizgen lacks record evidence to support the factual and legal predicates to the Bad Faith Licensing Theory, Harvard is entitled to summary judgment. Indeed, if any of these predicates is removed, the Theory falls apart.

**1.** ██████████████████████████████████.

At the heart of the Bad Faith Licensing Theory is the contention that ███████████ ██████████████████████████. The Court already rejected Vizgen's contention that freedom to operate was promised in the License Agreement itself. D.I. 114 at 9-13. In fact, the Court specifically noted that the "plain language of section 2.7 conflicts with Vizgen's contention that Harvard represented elsewhere in the contract that Vizgen could use its licensed patents to commercialize products without liability for infringement of other Harvard patents not included in the license." *Id.* at 12.

Vizgen's breach of warranty claim was dismissed due to the unambiguous language in the License Agreement. *Id.* at 11-13. However, the implied covenant and 93A claims survived insofar as Vizgen alleged conduct over and above the purported promise of freedom to operate, including alleged oral representations made by Harvard. *See id.* at 7-9, 17-25. Following discovery, no evidence supporting any oral promise of freedom to operate has been adduced. To the contrary, the record is replete with testimony that ██████████████████████████████ ███████████████████████████. SUF ¶¶ 31-34.

The most Vizgen can point to is vague, self-serving testimony from a Vizgen witness that ████████████████████████████████████ SUF ¶ 35. A sophisticated party like Vizgen

cannot, however, reasonably rely on generic assurances of this kind, even if they were made (which they were not). The unreasonableness of Vizgen's purported reliance is augmented by the fact that ████████████████████████████████████████ *Id.* ██████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████ There is ***no record evidence*** that can overcome the clear and direct statements made by Harvard in the License Agreement. Accordingly, the factual predicate that █████████████████████████████ must be rejected.[1]

### 2.    *Harvard Did Not Understand or Control Vizgen's Commercialization*

A second predicate to the Bad Faith Licensing Theory is that Harvard understood Vizgen's commercialization efforts at such a level that it could have identified Vizgen's future infringement. The allegations supporting this contention are sparse, tied to ████████████████ ███████████████████████████████████████████████ D.I. 440 at ¶¶ 81-90; 170-71. ███████████████████████████████████ ██████████████████████████████ SUF ¶ 25, Ex. 17 at Sch. II. ███████████████████████████ SUF ¶ 26; Rodrigues Ex. 26. Nothing in the record shows that ████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[1] Harvard's alleged assurance of freedom to operate is also the primary basis for the "open" portion of Vizgen's "open early, closed late" scheme. Relying on *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-08 (3d Cir. 2007), Vizgen has argued that Harvard engaged in "bait-and-switch conduct" that violates antitrust laws. D.I. 176 at 18. The factual record, however, shows that *Broadcom* does not apply. In *Broadcom* and other "FRAND" cases, there was reasonable reliance on the part of the plaintiff. Indeed, a plaintiff must take the "bait" to be harmed by the "switch." Here, the evidence does not show that Vizgen reasonably relied on any assurances of freedom to operate. The same is true with respect to the purported "promises" made by Harvard to the NIH in 2009. The evidence shows that Vizgen first became aware of those "promises" during this litigation—long ***after*** it became "locked-in" to its commercialization path. D.I. 440 at ¶¶ 125-126. Without reasonable reliance, Vizgen cannot establish the "open" portion of its claims.



SUF ¶ 27.

SUF ¶ 43.

This absence of evidence also undercuts Vizgen's contention that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. D.I. 440 at ¶ 179. While true that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF ¶ 27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF ¶ 21; Ex. 17 at § 8.3. The obligations to commercialize were included to protect Harvard and comply with Bayh-Dole, preventing a situation where patent rights might get "stuck" with Vizgen if it proved unable to commercialize. SUF ¶ 5. **Nothing in the record** support Vizgen's contention that Harvard required it to infringe.

### 3. _Harvard's Patent Prosecution Was Not Improper_

A third predicate of the Bad Faith Licensing Theory is that Harvard wrongfully pursued an "aggressive patenting strategy" whereby patent rights licensed to 10x would cover Vizgen's product. The "wrongfulness" of Harvard's patent prosecution is the key issue here, yet, notably, Vizgen has asserted no claim or defense of inequitable conduct. Regardless, it was not wrongful, unfair, or in bad faith for Harvard to follow a lawful process to maximize the protection afforded by patents it owned that were **not licensed** to Vizgen. Massachusetts law does not impose total allegiance between contracting parties such that Harvard was required to act in Vizgen's best interests in all respects, including with respect to rights that were not part of the parties' contract. _See Uno Rest., Inc. v. Boston Kenmore Realty Corp._, 441 Mass. 376, 388 (2004) ("The purpose of the implied covenant of good faith and fair dealing is not to supply contractual terms that the

parties are free to negotiate."); *see also Thryoff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006) ("[T]he implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.") (internal citations and quotations omitted). What matters—at least for purpose of the implied covenant—are Harvard's performance of the contractual obligations it owes to Vizgen and the reasonableness of Vizgen's expectations with respect to that performance. *See Armstrong v. White Winston Select Asset Funds, LLC*, 648 F.Supp.3d 230, 261 (D. Mass. 2022) ("The essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance obligations…").

The prosecution of patents not part of the License Agreement does not qualify as Harvard's discretionary performance of its contractual obligations to Vizgen. In addition, the notion that a sophisticated party like Vizgen could have reasonably expected that, by entering the License Agreement, Harvard was affirmatively tying its own hands with respect to **patents not licensed to Vizgen** lacks any record support. *See Blue Hills Off. Park LLC v. J.P. Morgan Chase Bank*, 477 F.Supp.2d 366, 377 (D. Mass. 2007) ("[W]here sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they chose"…"[i]t is no appropriate part of judicial business to rewrite contracts freely entered into between sophisticated business entities."). The License Agreement makes clear that ███████████████████████████████████████ and Harvard stated unambiguously ████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████ *See also C.R. Bard, Inc. v. Atrium Med. Corp.*, No. cv-21-00284, 2021 WL 4774948 at *6 (D. Ariz. Oct. 13, 2021) (rejecting implied covenant claim based on action taken with respect

to patents not included in license agreement; "The parties could have added other patents to this provision, but did not. The covenant is not to be applied as an equitable remedy for rebalancing economic interests—particularly where, as here, the parties are sophisticated business persons or entities.") (internal quotations omitted).

Finally, and as a matter of statute, Harvard cannot be liable under Chapter 93A insofar as the relevant statutory scheme "affirmatively permits" the conduct alleged to be unfair. *See* M.G.L. c. 93A, § 3. Patent prosecution is a normal activity, performed under the auspices of the U.S. Patent and Technology Office ("USPTO"), within the strictures of Title 37 of the Code of Federal Regulations, and subject to rules and requirements set forth in the Manual of Patent Examining Procedure. It is the USPTO—not the patent owner—that approves the issuance of patents and specific claims thereunder. Harvard's prosecution efforts—even if they were aimed at "cover[ing] Vizgen's commercial activities" (they were not)—were not just permitted by the statutory scheme; they were ultimately approved by the USPTO.[2] For these reasons, the predicate that Harvard's prosecution of these patents was somehow wrongful must be rejected.

### 4.    *Harvard Had No Duty to Warn Vizgen of Potential Infringement*

A fourth predicate to the Bad Faith Licensing Theory is that Harvard acted wrongfully by failing to warn Vizgen that it was infringing Harvard's other patents. As this Court previously held: "Vizgen's allegation regarding Harvard failing to disclose the possibility of infringement simply does not give rise to liability…Vizgen cites no authority to support its contention that Harvard, which was simply a contracting counterparty, had a duty enforceable in tort to affirmatively warn Vizgen in this regard." D.I. 114 at 15. While this holding was only dispositive

---

[2] *See, e.g., O'Hara v. Diageo-Guinness, USA, Inc.* 306 F.Supp.3d. 441, 454 (D. Mass. 2018), *on reconsideration* 370 F.Supp.3d 204 (D. Mass. 2019) (because regulatory body reviewed and approved bottle labels in question defendant was exempted from liability under 93A, § 3); *Cablevision of Boston, Inc. v. Pub. Improvement Comm'n of City of Boston*, 38 F Supp.2d 46, 60-61 (D. Mass. 1999) (municipal agency's approval of defendant's conversion of telecommunications conduits precluded liability under 93A, § 3); *Rogers v. Comcast Corp.*, 55 F.Supp.3d 711, 721 (E.D. Pa. 2014) (finding claim "futile" under 93A, § 3 because alleged misconduct was approved by FTC).

of Vizgen's negligent misrepresentation claim, it is relevant to Vizgen's implied covenant and c. 93A claims. Indeed, as stated above, there is no evidence that ███████████████████████ ███████████████████████████████████████████. With no actual knowledge of infringement, and no duty to disclose, it is impossible to conclude that by failing to warn Vizgen of infringement Harvard acted unfairly toward Vizgen or with the level of "rascality" required for M.G.L. c. 93A. *See, e.g., Zurich Am. Ins. Co. v. Watts Regul. Co.,* 796 F. Supp. 2d 240, 244 (D. Mass. 2011) ("In the context of disputes among businesses, where both parties are sophisticated commercial players, the objectionable conduct must attain a level of rascality that would raise an eyebrow to the rough and tumble of the world of commerce."); *see also L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F. Supp. 2d 147, 154 (D. Mass. 2000) ("The Massachusetts courts have made clear that a seller's failure to disclose a potential problem, rather than an actual, known problem, does not amount to a violation of Chapter 93A."). In the end, Vizgen was responsible for making itself aware of public patent filings and policing its own conduct with respect to infringement. Harvard did not take on this duty simply by entering into the License Agreement, and it is unreasonable for anyone—certainly a sophisticated party like Vizgen—to assume otherwise.

### 5.    *Vizgen Was Fully Aware of the Risk It Might Infringe*

Overall, the Bad Faith Licensing Theory should be rejected because it is contrary to the parties' reasonable expectations. Vizgen is a sophisticated party backed by sophisticated investors. In the parties' License Agreement, Harvard ███████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ SUF ¶ 21; Ex. 17 at § 8.3. These disclaimers placed the onus squarely on Vizgen to perform whatever due diligence it needed to protect itself against downstream claims of infringement. ████████████████████████████████████



SUF ¶ 28.

SUF ¶ 29. Vizgen had every ability to review those publicly available patents and evaluate whether they might pose risks for its future commercialization of a MERFISH product. Vizgen's after-the-fact claim that it "believed" it was getting access to Harvard patents that were not included in ███████████████████ ████████████ the License Agreement is simply not credible, and insufficient to survive Rule 56. Indeed, the evidence contradicts it, insofar as it shows that ████████████████████ ████████████████████████████████████████████. SUF ¶¶ 31-32.

Vizgen performed whatever amount of diligence it deemed necessary with respect to infringement. The fact that it should have done more does not now bless its counterclaims. As a sophisticated actor in the market, Vizgen should be held responsible for its own actions and the risks it chose to take. Vizgen knowingly accepted the risks, and it cannot now blame Harvard once those risks have been realized. *See Mathewson Corp. v. Allied Marine Indus.*, Inc., 827 F.2d 850, 856 (1st Cir. 1987) ("When the transaction is commercial, the principals practiced and represented by counsel, and the contract itself reasonably clear, it is far wiser for a court to honor the parties' words than to imply other and further promises out of thin air.").

**B.    Summary Judgment Should Be Granted for All Counterclaims and Defenses Based on the Grant Fraud Theory**

Vizgen's second theory of liability is the Grant Fraud Theory. It is the basis for the entirety of the c. 93A claim in Count XXI, and supplies the other of the two alternative grounds

on which Vizgen's antitrust counterclaims against Harvard in Counts XVII and XIX are based, for Vizgen's Sixth, Eighth, and Ninth Affirmative Defenses, and, potentially, for Count XX.[3]

As alleged by Vizgen, as part of a Grant Application submitted in 2009, "Dr. Church and Harvard [allegedly] made false statements to induce NIH to fund Dr. Church's research." D.I. 440 at ¶ 407. These statements included that "innovations developed…would be 'available to the larger research community,'" "that technology developed under the Grant would be available to interested parties, including commercial entities, through 'open and non-exclusive licensing agreements,' and that 'the Church lab will work with Harvard…to obtain open and non-exclusive licenses that will encourage commercialization of these innovations.'" *Id.* ¶ 408-409. Vizgen characterizes these statements as "express promises" by Harvard and alleges that "NIH accepted Harvard and Dr. Church's offer and promises by issuing the Grant expressly conditioned on these promises" and by placing "material reliance on them" in funding the research. *Id.* ¶ 416, 428. Harvard purportedly breached these contractual promises by entering into an exclusive license agreement with 10x for the Asserted Patents and then refusing to grant a license to those same Patents to Vizgen. *Id.* ¶ 418, 432.

### 1.    *The Grant Application and Award Did Not Create a Contract*

The Grant Fraud Theory presumes that the Grant Application and Award constitute a negotiated contract. Harvard and 10x previously argued that the Grant was issued pursuant to 42 U.S.C. § 241 (which distinguishes between contracts and "grants-in-aid"), and that the NIH also distinguishes between grants and contracts, stating expressly that a grant is ***not*** a "legally binding agreement". D.I. 156 at 7-8. The Court rejected that argument under a Rule 12 standard, noting that the NIH was authorized to enter contacts; hence, there was a factual question whether, in this

---

[3] Vizgen's antitrust claims allege other factual grounds, but they do not involve any conduct of Harvard. Count XX limits itself to conduct on or after Oct. 5, 2020.  That would seem to preclude the Grant Fraud Theory, but, ultimately, Count XX is unclear.

case, the NIH and Harvard had a "meeting of the minds" and intended to create enforceable rights. *See* D.I. 193 at 8 ("To the extent 10x is arguing that, even though the NIH was authorized to enter into a contract, the NIH did not actually intend its grant to Harvard to be enforceable as a contract, that is a factual issue that cannot be determined on a motion to dismiss.")]. With respect to that "factual question," Vizgen has the burden to prove the existence of an enforceable contract. *See, e.g., Moore v. La-Z Boy,* 639 F.Supp.2d 136, 140 (D. Mass. 2009). It has uncovered **zero evidence** in support of its position. In fact, the only relevant record evidence— including ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████ SUF ¶¶ 16-18; Rodrigues Exs. 33, 35, 37. Because Vizgen has unearthed no evidence that the NIH or Harvard intended the Grant Application and Award to be a contract, this predicate to the Grant Fraud Theory fails.

### 2. *The Grant Did Not Repudiate Harvard's Bayh-Dole Obligations*

The existence of a contract with legally binding obligations is only one piece of the Grant Fraud Theory. Even if the Grant were considered a contract, Vizgen's theory holds only if it also contractually limits Harvard's rights to license patents exclusively. Harvard previously argued that the statements in the Grant Application identified by Vizgen could not plausibly be construed to restrict Harvard's ability in this way. D.I. 156 at 12-13. Consistent with established NIH-policies, Harvard argued that these "generic aspirational statements" about open sharing and free disclosure pertained to **data and materials** ("research tools"), not patents. *Id.* Applying Rule 12, this Court rejected that argument, holding that if the Grant Application and Award constitute a binding contract, the statements identified by Vizgen could plausibly be construed as restricting exclusive patent licensing. D.I. 193 at 10.

14

Now on summary judgment, Vizgen must show **evidence** to support its interpretation.  It has none. To the contrary, the unequivocal testimony of all Harvard witnesses, including Dr. Church, rejects any intent to restrict exclusive licensing of patents.  SUF ¶ 13. Vizgen has proffered no contrary evidence from the NIH, and the NIH's and Harvard's course of conduct following the Grant Award is fully preclusive of Vizgen's aggressive interpretation.

Patent ownership and licensing (including exclusive licensing) is central to the Bayh-Dole framework, serving as the catalyst for private companies to invest in "subject inventions" and pursue commercialization that will inure to the public good. *See* 35 U.S.C. § 200. Under federal law, restrictions can be placed on patent rights, including on the ability to exclusively license. However, to place such restrictions, the NIH must make an explicit determination of "exceptional circumstances" (a "DEC"), and must file the DEC with the Commerce Department within thirty days of the award, along with a supporting explanation of why the DEC's terms will better achieve the goals of Bayh-Dole. *See* 35 U.S.C. §§ 202(a)(2), 202(b); 37 C.F.R. § 401.3(e). A copy of the DEC, statement of facts, and analysis must also be provided to the funding recipient, as well as a notice of the recipient's statutory right to appeal. *See id.* If a restriction on a funding recipient is not being followed, the NIH has "march-in rights" it can exercise to compel compliance, so that, here, if the NIH had restricted Harvard's ability to exclusively license patents, it could have "marched in" after the exclusive license granted to 10x was disclosed and forced Harvard to grant additional licenses to qualified applicants. *See* 35 U.S.C. § 203; 37 C.F.R. § 401.14. Federal agencies have used DECs in the past where they have sought to limit a funding recipient's rights under Bayh-Dole, including to impose limitations on licenses.

In this case, the NIH filed no DEC. SUF ¶ 18; Ex. 35. █████████████████
████████████████████████████████████████████████████████████████████████████████



█████ SUF ¶ 18. If the Grant Application contained a binding restriction on exclusive licensing, there would certainly be evidence that the NIH acted consistently with that intent. Because there is none, Vizgen's interpretation should be rejected. *See* Ex. 20, Eisenberg at ¶¶ 57-96, 133-137.

### 3. *The Grant Application and Award Do Not Bar All Exclusive Licenses*

Finally, supposing that the Grant Application and Award was indeed a contract that required Harvard "to try" to "pursue" non-exclusive patent licenses, Harvard complied. The evidence shows that ███████████████████████████████████████████████████ ████████████████████████████████████████ SUF ¶ 15; Rodrigues Ex. 13. On Rule 12, Harvard argued this point. D.I. 156 at 13, n.11; D.I. 180 at 6-7. The Court recognized the import of the contention, noting that it was "an asserted fact contrary to Vizgen's allegations in the counterclaim…." D.I. 193 at 10. Now on Rule 56, however, where Harvard's factual contention is ***undisputed***, it forecloses the Grant Fraud Theory on its own. Indeed, if Harvard was only required to pursue ***some*** level of non-exclusive licensing, then, indisputably, it complied with its obligations. Accordingly, the Grant Fraud Theory must be rejected and summary judgment should enter in Harvard's favor.

### C. Summary Judgment Should Be Granted for the Reasons Argued by 10x

In addition, summary judgment should be granted in Harvard's favor for the reasons set forth in 10x's Motion for Summary Judgment, which is incorporated herein by reference.

## V.    **<u>RELIEF REQUESTED</u>**

For these reasons, Harvard respectfully requests that this Court enter summary judgment in its favor as to Amended Counterclaims Nos. I, V, XVII, XIX, XX, and XXI, and the Sixth, Eighth, and Ninth Affirmative Defenses.

Dated: November 5, 2024

*Of Counsel*:

Michael J. Tuteur (*pro hac vice*)
Ruben J. Rodrigues (*pro hac vice*)
Geoffrey M. Raux (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 502-3284
mtuteur@foley.com
rrodrigues@foley.com
graux@foley.com

Sarah E. Rieger (*pro hac vice*)
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 271-2400
srieger@foley.com

Jarren N. Ginsburg (*pro hac vice*)
FOLEY & LARDNER LLP
3000 K Street, N.W.
Washington, DC 20007
(202) 672-5300
jginsburg@foley.com

Respectfully submitted,

  */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff and Counterclaim-Defendant President and Fellows of Harvard College*

17