**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>Plaintiffs,<br><br>v.<br><br>VIZGEN, INC.,<br><br>Defendant. | C.A. No. 22-cv-595-MFK<br><br>**REDACTED PUBLIC VERSION** |

## <u>PLAINTIFF 10X GENOMICS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

LEGAL STANDARD.................................................................................................1

ARGUMENT ..............................................................................................................2

I.    VIZGEN CANNOT PROVE THE CONSCIOUS COMMITMENT AND
      SPECIFIC INTENT REQUIRED TO MAINTAIN ITS CONSPIRACY TO
      MONOPOLIZE CLAIM.....................................................................................2

      A.    Vizgen Cannot Prove a Conscious Commitment to Achieve an Unlawful
            Objective (Element 1)................................................................................2
            1.    There Is No Evidence of a Conscious Commitment To Engage In
                  The Alleged "Open Early, Closed Late Scheme" ........................3
            2.    This Litigation Is Not Evidence Of A Conspiracy......................6
      B.    There Is No Evidence that Harvard or 10x Had a Specific Intent to
            Monopolize the Alleged SST Market (Element 3) ...................................7

II.   VIZGEN CANNOT PROVE ANY ELEMENT OF ITS ATTEMPTED
      MONOPOLIZATION CLAIM..........................................................................11

      A.    Vizgen Cannot Prove That 10x's Conduct Was Anticompetitive
            (Element 1)..............................................................................................11
            1.    10x's Acquisition and Prosecution of Patent Rights Is Not
                  Anticompetitive Conduct ..........................................................11
            2.    This Lawsuit Is Protected Activity Under *Noerr-Pennington* ..................12
            3.    Vizgen Cannot Establish Predatory Pricing...............................14
            4.    Vizgen Cannot Establish Anticompetitive Bundling.................18
      B.    Vizgen Cannot Prove Specific Intent to Monopolize (Element 2) .......................21
      C.    Vizgen Cannot Prove a Dangerous Probability of Achieving Monopoly
            Power (Element 3) ..................................................................................21

III.  VIZGEN CANNOT SHOW ANTITRUST INJURY, WHICH IS SEPARATELY
      FATAL TO ITS SHERMAN ACT CLAIMS ..................................................22

IV.   VIZGEN'S TORTIOUS INTERFERENCE CLAIM FAILS.............................25

V.    VIZGEN'S MASSACHUSETTS CLAIMS FAIL FOR THE SAME REASONS
      AS ITS SHERMAN ACT CLAIMS.................................................................27

VI.   VIZGEN'S CALIFORNIA CLAIMS ALSO FAIL FOR THE SAME REASONS
      AS ITS SHERMAN ACT CLAIMS.................................................................28

CONCLUSION..........................................................................................................29

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
263 F.3d 239 (3d Cir. 2001)........................................................................................24

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)..........................................................................................6

*Advo, Inc. v. Phila. Newspapers, Inc.*,
51 F.3d 1191 (3d Cir. 1995)............................................................................... *passim*

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946).......................................................................................................2

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).......................................................................................................1

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
204 Cal. App. 4th 1 (2012) .........................................................................................28

*Aspinall v. Philip Morris Cos., Inc.*,
813 N.E.2d 476 (Mass. 2004) .....................................................................................27

*AT&T v. IMR Cap. Corp.*,
888 F. Supp. 221 (D. Mass. 1995) ..............................................................................28

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)...............................................................................................24, 25

*BanxCorp v. Bankrate, Inc.*,
2019 WL 2098842 (D.N.J. Mar. 21, 2019),
*aff'd*, 847 F. App'x 116 (3d Cir. 2021)........................................................................16

*Barr Lab'ys, Inc. v. Abbott Lab'ys*,
978 F.2d 98 (3d Cir. 1992).............................................................................21, 22, 25

*Belton v. Comcast Cable Holdings, LLC*,
151 Cal. App. 4th 1224 (2007) ...................................................................................28

*Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*,
483 F. Supp. 3d 38 (D. Mass. 2020) ...........................................................................22

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...........................................................................................15, 17, 18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)....................................................................................23

*Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*,
   601 F.2d 48 (2d Cir. 1979)..........................................................................16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)......................................................................................2

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)................................................................................28

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999).........................................................................28

*Chip-Mender, Inc. v. Sherwin-Williams Co.*,
   2006 WL 13058 (N.D. Cal. Jan. 3, 2006)....................................................22

*Cutting Edge Homes, Inc. v. Mayer*,
   229 N.E.3d 613 (Mass. App. Ct. 2024) .......................................................26

*Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*,
   833 F.2d 606 (6th Cir. 1987) .......................................................................16

*Dufficy Enters., Inc. v. Berarducci*,
   2020 WL 12309011 (Mass. Super. Ct. June 7, 2020)...................................25

*Eisai, Inc. v. Sanofi Aventis U.S., LLC*,
   821 F.3d 394 (3d Cir. 2016)..................................................................18, 19, 20, 25

*ERBE Elektromedizin GmbH v. Canady Tech. LLC*,
   629 F.3d 1278 (Fed. Cir. 2010)....................................................................14

*Florcsk v. Unstoppable Domains Inc.*,
   2024 WL 492384 (D. Del. Feb. 8, 2024) ......................................................14

*FTC v. Endo Pharms. Inc.*,
   82 F.4th 1196 (D.C. Cir. 2023).....................................................................11

*G.S. Enters., Inc. v. Falmouth Marine, Inc.*,
   571 N.E.2d 1363 (Mass. 1991) ....................................................................25

*Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*,
   421 F. Supp. 274 (N.D. Cal. 1976) ..............................................................10

*Gordon v. Lewistown Hosp.*,
   423 F.3d 184 (3d Cir. 2005).....................................................................2, 10

*Great Escape, Inc. v. Union City Body Co., Inc.*,
    791 F.2d 532 (7th Cir. 1986) ...................................................................................10, 21

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015).............................................................................................6

*Houser v. Fox Theatres Mgmt. Corp.*,
    845 F.2d 1225 (3d Cir. 1988)...........................................................................................5

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l Inc.*,
    602 F.3d 237 (3d Cir. 2010).............................................................................2, 7, 8, 11

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
    90 F.3d 737 (3d Cir. 1996).............................................................................................21

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999).............................................................................................1

*In re Lipitor Antitrust Litig.*,
    855 F.3d 126 (3d Cir. 2017), *as amended* (Apr. 19, 2017)...........................................6

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017).............................................................................2, 6, 7, 23

*Indivior Inc. v. Alvogen Pine Brook LLC*,
    681 F. Supp. 3d 275 (D.N.J. 2023) ..................................................................................7

*Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*,
    146 F.3d 691 (9th Cir. 1998) ...................................................................................15, 16

*Ledgewood Co., Inc. v. Bialek*,
    789 N.E.2d 606 (Mass. App. Ct. 2003) .........................................................................26

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003).....................................................................................18, 20

*Mathews v. Lancaster Gen. Hosp.*,
    87 F.3d 624 (3d Cir. 1996).............................................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................ *passim*

*Microsoft Corp. v. i4i Ltd.*,
    564 U.S. 91 (2011)..........................................................................................................14

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)......................................................................................................1, 3

*Nobelpharma AB v. Implant Innovations, Inc.*,
  141 F.3d 1059 (Fed. Cir. 1998)......................................................................12

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
  886 F.3d 332 (3d Cir. 2018)...............................................................5, 8, 21

*PMP Assocs. v. Globe Newspaper Co.*,
  321 N.E.2d 915 (Mass. 1975) ......................................................................27

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993).....................................................................................6, 7

*Psy-ed Corp v. Klein.*,
  947 N.E.2d 520 (Mass. 2011) ......................................................................25

*SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981)......................................5, 10

*Simon & Simon, PC v. Align Tech., Inc.*,
  No. CV 19-506, 2020 WL 1975139 (D. Del. Apr. 24, 2020) .........................18

*Skyhook Wireless, Inc. v. Google Inc.*,
  30 Mass. L. Rptr. 417 (Mass. Super. Ct. 2012),
  *aff'd*, 19 N.E.3d 440 (Mass App. Ct. 2014) ...............................................26

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)..........................................................................10, 11, 21

*Stitt Spark Plug Co. v. Champion Spark Plug Co.*,
  840 F.2d 1253 (5th Cir. 1988) ................................................................15, 16

*Suzuki of W. Mass., Inc. v. Outdoor Sports Expo, Inc.*,
  126 F. Supp. 2d 40 (D. Mass. 2001) ............................................................28

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*,
  2008 WL 1925304 (D.N.J. Apr. 30, 2008) ....................................................17

*Syufy Enters. v. Am. Multicinema, Inc.*,
  793 F.2d 990 (9th Cir. 1986) ..........................................................................4

*Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*,
  989 F.2d 132 (3d Cir. 1993).........................................................................13

*Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*,
  134 F.3d 1458 (11th Cir. 1998) ......................................................................5

*Teva Pharms. USA, Inc. v. Abbott Lab'ys*,
  580 F. Supp. 2d 345 (D. Del. 2008)..............................................................12

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*,
   902 F.3d 1 (1st Cir. 2018) ............................................................................14

*United States v. Empire Gas Corp.*,
   537 F.2d 296 (8th Cir. 1976) .......................................................................22

*United Truck Leasing Corp. v. Geltman*,
   551 N.E.2d 20 (Mass. 1990) ........................................................................26

*Walsh v. TelTech Sys., Inc.*,
   821 F.3d 155 (1st Cir. 2016) .......................................................................27

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) ........................................................................18

## STATUTES

California Cartwright Act ...........................................................................1, 28

California Unfair Competition Law .............................................................1, 28

M.G.L. Chapter 93A ..............................................................................1, 27, 28

M.G.L. Chapter 93A
   § 2 .........................................................................................................27
   § 11 .......................................................................................................27

Sherman Act ...................................................................................... *passim*

## RULES

Fed. R. Civ. P. 9(b) ....................................................................................6

Fed. R. Civ. P. 56(a) ...................................................................................1

## INTRODUCTION

Attempting to distract the Court from Vizgen's own unlawful infringement, Vizgen asserts five counterclaims sounding in antitrust against 10x and Harvard (conspiracy to monopolize, California Cartwright Act, California Unfair Competition Law, and two counts under Mass. Gen. Laws ch. 93A) and two counterclaims against 10x individually (attempted monopolization and tortious interference). All of these claims are based on the same alleged facts, and all depend on Vizgen proving that 10x and Harvard joined together in an unlawful scheme to secure an illegal monopoly for 10x. Vizgen cites no direct evidence of this alleged scheme, thus requiring the fact-finder to infer a conspiracy from entirely circumstantial evidence. But "antitrust law limits the range of permissible inferences from ambiguous evidence." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 124 (3d Cir. 1999) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Because "mistaken inferences . . . chill the very conduct the antitrust laws are designed to protect," "conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Matsushita*, 475 U.S. at 594, 597 n.21 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)). The fact-finder cannot find a conspiracy, or *any* unlawful conduct, from the evidence presented here, and thus the Court should grant summary judgment in 10x's favor on all of the antitrust counterclaims.

## LEGAL STANDARD

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The moving party is entitled to summary judgment if the nonmoving party "fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When relying on circumstantial evidence to prove conspiracy, the nonmovant "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondent." *Matsushita*, 475 U.S. at 588.

## **ARGUMENT**

## I.    VIZGEN CANNOT PROVE THE CONSCIOUS COMMITMENT AND SPECIFIC INTENT REQUIRED TO MAINTAIN ITS CONSPIRACY TO MONOPOLIZE CLAIM

A conspiracy to monopolize requires proof of: (1) an agreement to monopolize between two actors; (2) an overt act; (3) specific intent to monopolize; and (4) antitrust injury. *See Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l Inc.*, 602 F.3d 237, 253 (3d Cir. 2010). Vizgen cannot satisfy at least the first, third, and fourth elements.[1]

### A.    Vizgen Cannot Prove a Conscious Commitment to Achieve an Unlawful Objective (Element 1)

The agreement element of an antitrust conspiracy requires a claimant to prove "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946); *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 208 (3d Cir. 2005). "Bare allegations" of conspiracy "cannot defeat summary judgment." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 154 (3d Cir. 2017). A claimant must either present direct evidence, which proves the alleged conspiracy on its face (and does not exist here), or indirect evidence from which the Court can reasonably infer "a conscious commitment to a common scheme designed to achieve an unlawful objective."

---

[1] Because antitrust injury is a requirement of both Sherman Act claims, 10x addresses that point separately below. *See infra* at § III.

*Monsanto Co.*, 465 U.S. at 768. Attempting to prove a conspiracy through the latter, Vizgen points to its so-called "Open Early, Closed Late" scheme whereby Harvard allegedly made promises in an NIH grant application and ████████████████████████████████████████ ███████████████████████, and then conspired with 10x to close access to certain Church Patents via an exclusive license and subsequent amendments; the CIP patent application, which Vizgen claims were improperly drafted to cover Vizgen's technology; and this litigation, which Vizgen claims is a sham. D.I. 440 ¶ 373. The Court cannot infer an illegal conspiracy from this.

### 1. There Is No Evidence of a Conscious Commitment To Engage In The Alleged "Open Early, Closed Late Scheme"

There is no (direct or indirect) evidence to support Vizgen's "Open Early, Closed Late" conspiracy theory. The first part of Vizgen's theory is that Harvard "opened" the patented technology through promises allegedly made to the NIH in 2009, and separate promises Harvard allegedly made to Vizgen in connection with the Vizgen License. D.I. 440 ¶¶ 23-27, 72-74. Putting aside whether either event, in fact, "opened" the Church Patents to Vizgen (neither did), to prove a conspiracy under Section 2, Vizgen must prove that 10x (previously ReadCoor) and Harvard had a conscious commitment to "open" the technology and induce Vizgen to develop its product to practice that patented technology. Vizgen cannot make that showing. It is undisputed that 10x (and ReadCoor) neither participated in, nor had any knowledge of, the alleged "promises" in the NIH grant application ("grant application") or the Vizgen License.

ReadCoor was created years after the NIH funding was awarded, and ██████████████ ██████████████████████████████████████████.[2] Statement of Undisputed Material Facts

---

[2] Though Dr. Church helped found ReadCoor, once the company was formed, he had no role other than as a scientific advisor to the board. Ex. 13 at 197:25-198:5, 204:10-16; *see also* Ex. 14 at 42:8 ("").

("SUF") ¶¶ 2, 4; *see also* Ex. 9 at 145:21-146:14, 149:12-19, 153:19-154:2; Ex. 21 at 291:11-292:15; Ex. 14 at 232:6-239:9, 242:3-243:17. Far from knowing the content of the grant application, 10x ████████████████████████████████████████████████

███████████████. SUF ¶ 2. It could not have consciously committed to any scheme that relied on

that language. Similarly, ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████. *See* SUF ¶ 11; ████████████████████

████████████████████████████████████. Indeed when ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. Ex. 61 at -621. Thus, Vizgen cannot prove

that 10x had a conscious commitment to a common scheme with Harvard to lure Vizgen into

developing its product to infringe the Church Patents. *See Syufy Enters. v. Am. Multicinema, Inc.*,

793 F.2d 990, 1000-01 (9th Cir. 1986) (finding insufficient evidence of conspiracy to monopolize

where one party to the alleged conspiracy lacked knowledge of the other's actions).

The second step of the "Open Early, Closed Late" theory also fails. There is no evidence

that 10x and Harvard had a conscious commitment to illegally "close" Vizgen's access to the

Church Patents. Vizgen claims that the 2018 and 2020 Amendments to the ReadCoor License and

the 2020 CIP application constitute evidence that Plaintiffs conspired. But the Court cannot infer

a conspiracy from any of these events.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████, undermining any inference of

conspiracy. *See Matsushita*, 475 U.S. at 588 (holding plaintiff "must show that the inference of a conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents"). Moreover, at the time, not a single company had commercialized a product that performed SST analysis, so the alleged SST market did not exist. *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1206 (2d Cir. 1981) (finding "the threat of potential antitrust liability" does not "attach upon the acquisition of a patent at a time prior to the existence of the relevant market").

Vizgen's reliance on the 2020 Amendment fares no better. ReadCoor requested the 2020 Amendment from Harvard so that ███████████. *See* SUF ¶¶ 6, 9. Harvard negotiated and ultimately agreed to a version of the requested amendment ████████████████████████ ██████████████████████████ ████████████████ ██ SUF ¶ 6. For its part, ███████████████████████████ ████████████████████████████████ █████████████. SUF ¶ 8; Ex. 19 at 10 ███████████████ ███████████████████████████████████. That is not an antitrust conspiracy. *See, e.g.*, *Houser v. Fox Theatres Mgmt. Corp.*, 845 F.2d 1225, 1232-33 (3d Cir. 1988) (affirming summary judgment on conspiracy claim based on insufficient evidence that licenses constituted conspiracies in restraint of trade). Rather, each of Harvard, 10x, and ReadCoor had legitimate business justifications for their conduct, and their actions were consistent with these justifications. The inferences required to transform Plaintiffs' independent actions into a conspiracy would be completely unreasonable. *See Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*,

---

[3] Ex. 20 at -238-41; Ex. 25 at -276; Ex. 26 at -614-17; Ex. 27 at-793-94; Ex. 28 at -802; Ex. 29 at -415-16.

886 F.3d 332, 339 (3d Cir. 2018) ("Liability hinges on whether valid business reasons, as part of the ordinary competitive process, can explain the defendant's actions."); *Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1466 (11th Cir. 1998) ("A defendant can escape § 2 liability if the defendant's actions can be explained by legitimate business justifications."); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999) (affirming summary judgment for a newspaper owner because his conduct was consistent with his interest in assisting the newspaper in its effort to enter the market).

Finally, the 2020 CIP patent application does not constitute evidence of an unlawful scheme between Harvard and 10x. Patent prosecution is immune from antitrust liability under *Noerr-Pennington* absent fraud on the PTO. *See In re Lipitor Antitrust Litig.*, 855 F.3d 126, 145 (3d Cir. 2017), *as amended* (Apr. 19, 2017). Vizgen does not claim inequitable conduct or any other fraud, nor could it. *See* Fed. R. Civ. Proc. 9(b); SUF ¶ 14.

## 2.    This Litigation Is Not Evidence Of A Conspiracy

Vizgen also attempts to establish an unlawful agreement by labeling this litigation a "sham," but this also does not create a genuine factual dispute as to the existence of a conscious commitment to an unlawful scheme sufficient to allow Vizgen's conspiracy claim to get to a jury. The fact that 10x, the exclusive licensee of the Church Patents, and Harvard, the patent owner, are both plaintiffs does not establish a conscious commitment between them to achieve an unlawful objective. Under *Noerr-Pennington*, "those who petition the government for redress are generally immune from antitrust liability." *In re Wellbutrin XL*, 868 F.3d at 147-48 (citing *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993)). A party seeking to overcome this protection must prove that the litigation is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 148; *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015) (the "exacting" test "properly

places a heavy thumb on the scale in favor of the [antitrust] defendant"). Moreover, the lawsuit must have been objectively baseless *at the time it was filed*. *In re Wellbutrin XL*, 868 F.3d at 148-49 (affirming summary judgment on sham litigation claim because the decision to sue was reasonable despite that the parties later learned additional facts); *Indivior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 298 (D.N.J. 2023) ("The relevant inquiry is most pertinently whether a lawsuit is objectively baseless at the time it is initiated."). "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail." *In re Wellbutrin XL*, 868 F.3d at 148 (citing *PRE*, 508 U.S. at 60-61).

Vizgen asserts that no reasonable person would believe that 10x and Harvard could succeed in this case due to the grant application and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.*, D.I. 440 ¶¶ 6, 372, 384. Neither renders Plaintiffs' claims objectively baseless, as discussed below, (*see infra* at § II(A)(2)). But even if it did, to prove a conspiracy to monopolize based on the litigation, Vizgen would have to show that both Plaintiffs knew when they filed the complaint that it was a sham. *See In re Wellbutrin XL*, 868 F.3d at 148. Vizgen cannot make that showing. It is undisputed that 10x was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶¶ 2, 11, and a reasonable litigant in 10x's position at the time of the Complaint would have had no reason to conclude that Vizgen had a legal right to the Church Patents. Thus, 10x could not have had a conscious commitment to engage in a common scheme with Harvard to file sham litigation.

## B. There Is No Evidence that Harvard or 10x Had a Specific Intent to Monopolize the Alleged SST Market (Element 3)

The third element of a conspiracy to monopolize claim requires evidence that all parties to the alleged conspiracy had a specific intent to monopolize the relevant market. *Howard Hess*, 602

F.3d at 257-58. The intent required "goes beyond the mere intent to do the act," rather co-conspirators "must have intended to achieve an illegal monopoly." *Id.* at 257 (citations and internal quotations marks omitted). Moreover, specific intent to engage in unlawful activity cannot be inferred from conduct for which there is an equally plausible legitimate business justification. *See id.* at 258 (finding "only plausible inference" from each distributor's agreement to manufacturer's pricing policies was the intent to "retain and/or increase its own business," not "further [manufacturer's] monopolistic ambitions"); *Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995) (finding no specific intent to monopolize when "conduct is consistent with other, equally plausible explanations" because "targeting" of competition's "largest customers [is] exactly what we would expect from a legitimate competitor"); *Phila. Taxi Ass'n*, 886 F.3d at 341 (finding no specific intent to monopolize because alleged conduct could "reasonably be viewed as 'predominantly motivated by legitimate business aims'" (citation omitted)).

Vizgen has to show that 10x and Harvard shared the specific intent to monopolize the SST market. Its conduct allegations and the undisputed facts do not line up. Vizgen's theory is that Harvard "opened" access to the patented technology through the grant application, but then "closed" access to the alleged SST market specifically when 10x and Harvard filed suit against Vizgen. But the patented technology did not exist at the time of the grant application in 2009, and 10x and Harvard could not have known the relevance to some future product market. The alleged SST market did not come into existence until over a decade later. There is no evidence to connect the grant application statements in 2009 to a future intent by 10x or Harvard to monopolize the alleged SST market.

Additionally, Vizgen has no evidence that the NIH has any role in setting industry standards, and it certainly did not do so with the Church Patents. The undisputed evidence shows

that Vizgen was not even aware of any alleged "promises" made to NIH until *after it had already commercialized its product.* SUF ¶¶ 2, 11-12. For an "Open Early, Closed Late" scheme to be a "scheme" to monopolize, not only would Vizgen have had to rely on the purported openness—impossible since Vizgen did not know about it—but Harvard and 10x would have needed some expectation that Vizgen would rely on those alleged representations of openness in order to entice Vizgen into incorporating the patented technology into its product. There is no evidence of any such expectation or intent for Vizgen to rely on the grant application and therefore no evidence that Harvard or 10x had a specific intent to monopolize some future market that would emerge from the patented technology that would emerge from the grant funding.

Setting aside the disconnect in Vizgen's theory of "opening" a patented technology in 2009 and "closing" a product market more than a decade later, Vizgen also cannot prove that either 10x or Harvard later had a specific intent to monopolize the alleged SST market as all of the challenged conduct furthered, and was entirely consistent with, legitimate business purposes. ReadCoor requested amendments to the ReadCoor License in 2018 and ████████████ in 2020, Harvard filed a CIP application in 2020, and Plaintiffs filed this lawsuit. D.I. 440 ¶¶ 89, 173-74. With respect to the 2018 Amendment, the evidence reflects that ReadCoor requested it to ██████ ████████████████████████████████████████████████████████████████████████ ██████████████████. *See* SUF ¶ 5. There is no evidence that ReadCoor requested the 2018 Amendment, or Harvard granted it, with the specific intent to prevent Dr. Zhuang from developing her technology (nor was that the result), or to monopolize a future SST market. *See id..* Indeed, at the time of the 2018 Amendment, the alleged SST market did not exist, Vizgen did not exist (much less have a license from Harvard), and Vizgen was four years from commercializing MERFISH. *See id.*; Ex. 9 at 262:2-12 ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████.

     For the 2020 Amendment and 2020 CIP, the evidence shows that ██████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████. *See* SUF ¶¶ 6, 9. Seeking legitimate patent rights—including legally acquired ██████

██ and prosecution of new patent claims—does not constitute specific intent to illegally

monopolize but rather to obtain a legal monopoly. *See SCM Corp.*, 645 F.2d at 1206 (when a patent

"in the first instance has been lawfully acquired," even prior to the commercialization of the

patented art, its owner does not violate the antitrust laws by exercising its patent rights and

"achieving commercial success"); Ex. 53 at 146:17-24 ██████████████████████

██████. Thus, as with the 2018 Amendment, there is no evidence that 10x, ReadCoor, or

Harvard had a specific intent to monopolize the alleged SST market in connection with the 2020

Amendment or the 2020 CIP.

     Even if Vizgen could prove that 10x intended the 2020 Amendment to cover potential

competitors, that still would not establish specific intent to monopolize. The "mere intention to

exclude competition [and to expand one's own business] is not sufficient to show a specific intent

to monopolize." *Gen. Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*, 421 F. Supp.

274, 286 (N.D. Cal. 1976). "All lawful competition aims to defeat and drive out competitors."

*Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541 (7th Cir. 1986) (granting

summary judgment on conspiracy claim based on lack of evidence of specific intent to monopolize,

despite ample evidence of intent to drive out competitor). A claimant attempting to prove specific

intent must show "more than an intent to compete vigorously," which Vizgen cannot do. *Spectrum*

*Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993); *see also Gordon*, 423 F.3d at 214-15 (requiring proof of more than defendant's intent to "prevail over" competitors); *Advo*, 51 F.3d at 1199 (declining to find specific intent based on the defendant's "aggressive-sounding language," because the antitrust statutes do not condemn "colorful, vigorous hyperbole" and "[i]solated and unrelated snippets of such language 'provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition'" (citation omitted)).[4]

## II.     VIZGEN CANNOT PROVE ANY ELEMENT OF ITS ATTEMPTED MONOPOLIZATION CLAIM

To succeed on its attempted monopolization claim, Vizgen must prove that 10x (1) engaged in predatory or anticompetitive conduct, (2) with a specific intent to monopolize, and (3) has a dangerous probability of achieving monopoly power in the alleged SST market. *Spectrum Sports*, 506 U.S. at 456. Vizgen cannot establish any of these elements.

### A.     Vizgen Cannot Prove That 10x's Conduct Was Anticompetitive (Element 1)

Vizgen's attempted monopolization claim is based on the same "Open Early, Closed Late" and sham litigation theories as its conspiracy claim, together with allegations of predatory pricing and bundling. D.I. 440 ¶¶ 384-85, 387. None of this alleged conduct constitutes anticompetitive conduct sufficient to establish a Section 2 violation.

#### 1.     10x's Acquisition and Prosecution of Patent Rights Is Not Anticompetitive Conduct

As explained above, the activity underlying Vizgen's "Open Early, Closed Late" theory does not give rise to antitrust liability. First, both the 2018 Amendment and the 2020 Amendment were lawful transfers of Harvard's patent rights to ReadCoor (and subsequently 10x), for which

---

[4] The standard for establishing specific intent is the same for both Sherman Act claims. *Howard Hess*, 602 F.3d at 257.

Plaintiffs each had legitimate business justifications. *See FTC v. Endo Pharms. Inc.*, 82 F.4th 1196, 1204-05 (D.C. Cir. 2023) (describing "long-standing principle that a single patentee may set conditions in granting a single licensee the right to use its valid patents"). That is true whether the 2020 Amendment ████████████████████████████████████. Second, the CIP constitutes petitioning activity and is therefore immune from antitrust liability under *Noerr* absent proof of knowing and willful fraud on the PTO, which does not exist. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-69 (Fed. Cir. 1998); *Teva Pharms. USA, Inc. v. Abbott Lab'ys,* 580 F. Supp. 2d 345, 362 (D. Del. 2008).

### 2.    This Lawsuit Is Protected Activity Under *Noerr-Pennington*

10x's assertion of its patent rights through litigation is also protected activity under *Noerr*, and therefore cannot support Vizgen's attempted monopolization claim. To proceed on this theory, Vizgen would have to prove that the litigation is a sham, which it cannot do.

*First*, the grant application did not constitute a binding "promise" by Harvard that it would never grant exclusive licenses to any patents that arose from research funded by the grant. The NIH recently reviewed Harvard's compliance with the grant, found no issues, and closed the matter. *See* SUF ¶ 3; Ex. 8 at -177 (letter from NIH stating "[b]ased on [NIH's] review of the submitted material, NIH does not have any further questions at this time regarding Harvard's licensing or reporting of usage of intellectual property developed under the award in question"). The NIH's conclusion is unsurprising as neither the grant application nor the grant itself contains language that prohibits Harvard from exclusively licensing patents arising from the funded research. Vizgen selectively points to a few paragraphs in the "Software, protocol, and data sharing" section to try to allege a binding obligation for non-software technologies that emerged from the research. Ex. 62 at -686. The "Data and Materials Dissemination Plan" subsection explains that programs, "generally available as documented source code" without the right to

redistribute, and data, subject to NIH policies on distribution of data related to human subjects, will be made available on Dr. Church's website. *Id.* The "Commercialization" subsection contains an aspirational statement that the Church Lab would "pursue open and non-exclusive licensing agreements" for the software, protocols, and data "described above." *Id*. at -687. None of this applies to non-software or data sharing inventions and certainly does not relate to the technology described in the Church Patents.[5] The grant application on its face does not limit Harvard's licensing rights for all patents that arose from the grant, and there are no terms suggesting that whatever obligations did exist would last in perpetuity, beyond the grant's termination in 2016— three years before Vizgen existed.

The parties' intentions and conduct confirm this interpretation. *See Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 137-38 (3d Cir. 1993) (parties' course of conduct demonstrated there was no genuine issue of fact as to the meaning of terms in the contract). ███████████████████████████████████████████████████████████████████████████. *See* Ex. 13 at 335:25-336:13; Ex. 8 at -177; Ex. 63 at 58:6-60:23; Ex. 64 at 85:4-24, 87:3-16. Rather, they ████████████ ████████████████████████████████████████████████████████. Ex.13 at 600:9-601:19. Dr. Church also made related publications available online. Ex. 6 at -757. Harvard anticipated that it would decide whether to grant exclusive or non-exclusive licenses based on the specific circumstances, and ██████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

---

[5] Vizgen also points to the "Resource Sharing Plan" but this "briefly summarize[s]" the Data and Materials Dissemination Plan, which covers software and data, not patent rights. Ex. 62 at -689.

███████████████████████████████████████████. Finally, even Vizgen's damages expert recognizes that "it is uncertain" that Vizgen will win this case and testified that Vizgen's long-range plan accounts for the risk of losing, implying that Vizgen itself knows that Plaintiffs' interpretation of the NIH is not objectively unreasonable. Ex. 53 at 56:25-57:3, 59:12-15. Thus, the NIH grant does not render this litigation a sham.

*Second*, as to the merits, Vizgen's non-infringement and invalidity defenses do not render Plaintiffs' infringement claims objectively baseless. These run-of-the-mill patent defenses do not meet the high bar needed to establish sham litigation. *See, e.g.*, *ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1292 (Fed. Cir. 2010); *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, 902 F.3d 1, 14 (1st Cir. 2018); *Florcsk v. Unstoppable Domains Inc.*, 2024 WL 492384, at *2-3 (D. Del. Feb. 8, 2024). At claim construction, Vizgen disputed only four claim terms across the Church Patents, and the Court rejected Vizgen's interpretation of each. D.I. 247, at 6, 21, 34, 43. This affirms "the existence of probable cause" and precludes a finding of sham as even incorrect claim constructions do not make a suit objectively baseless. *See ERBE*, 629 F.3d at 1292. Additionally, patents are presumed valid and can only be successfully challenged with clear and convincing evidence. *United Food*, 902 F.3d at 14 (citing *Microsoft Corp. v. i4i Ltd.*, 564 U.S. 91, 95 (2011)). Plaintiffs' patent claims have never been litigated, let alone found to be invalid. And Vizgen did not file any *Inter Partes* Reviews to challenge their validity.

### 3.    Vizgen Cannot Establish Predatory Pricing

"[C]utting prices in order to increase business often is the very essence of competition." *Matsushita*, 475 U.S. at 594; *Advo*, 51 F.3d at 1196 (*Matsushita* "in effect created a legal presumption . . . that predatory pricing is unlikely to threaten competition"); *see* Ex. 53 at 18:23-25 (admitting that low prices are a feature of competition). Thus, to establish predatory pricing, a

claimant must prove that "the prices complained of are below an appropriate measure of a rival's costs," and that the rival has a "dangerous probability of recouping its investment in below-cost prices." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222, 224 (1993). Vizgen cannot prove either.

  ***First***, ███████████████████████████████████████████████████████████████ ████████████████. *See* SUF ¶ 15; Ex. 15 ¶ 116, fig.1. To use an *in situ* instrument, a customer must also purchase proprietary consumables that are unique to that instrument. For that reason, both 10x and Vizgen consider ██████████████████████████████████████████████. *See, e.g.*, SUF ¶ 15; Ex. 55 at 52:8-18 ███████████████████████████████████████ ███████████████████████████████████; Ex. 56 at 232:2-235:18 (admitting that Vizgen takes future consumable sales by a purchaser of an instrument into consideration when pricing its instruments).[6] In these circumstances, "the expected return" for the seller rationally includes the initial purchase and sales of consumables that "will follow." *Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253, 1255 (5th Cir. 1988) (finding no predatory pricing when company sold spark plugs to equipment manufacturer "at prices well below the price of [identical] replacement plugs" and allegedly recouped losses on the replacement plug sales). Further, customers know they need to purchase consumables to use the instrument, so "the rational buyer of [equipment] must calculate the cost of [consumables] when he makes his initial purchase." *Kentmaster Mfg. Co. v. Jarvis Prods. Corp.*, 146 F.3d 691, 694 (9th Cir. 1998) (finding no predatory pricing when defendant was alleged to use sales of spare parts, which were unique to

---

[6] Ex. 57 at 65:21-66:18 (Vizgen "balance[s] in between the cost of the instrument and the consumables"), 66:24-67:4 (Vizgen is "willing to price the instrument itself at a [lower] price" on the expectation of making more on consumables); Ex. 58 at -751 ("[t]he discounts maker [sic] more sense if they're using consumables"); *see also* Ex. 48 at 77:15-19 (agreeing Vizgen revenue forecasting takes into account consumables in addition to instrument revenue).

the brand and "required continuously" over the life of the equipment, to recoup low prices on equipment). Thus, the "rationally-calculated price," and relevant price for predatory pricing analysis, is the combined price. *Id.* at 694; *Stitt Spark Plug*, 840 F.2d at 1256 ("any meaningful comparison of price and cost must encompass" both original and replacement purchases).

Despite these undisputed facts, Vizgen's expert Dr. Kearl did not ██████████████ ██████████████████████████.[7] Ex. 53 at 76:21-24, 92:18-93:1, 149:24-150:3. Plaintiffs' expert Dr. Israel, however, analyzed 10x's transaction data and concluded that ██████████ ██████████████████████████████.[8] Ex. 15 ¶ 116, fig.1. 10x's data show ████████████████████████████ ██████████████████████████████. *See* SUF ¶ 15. Thus, Vizgen cannot prove that 10x's prices are predatory. Indeed, 10x's (and Vizgen's) discounts on instruments are economically the same as common "buy one, get one" or "free with purchase" promotions, which courts have repeatedly held are not predatory. *See, e.g., Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 613-14 (6th Cir. 1987) (offering first listing free with expectation that customer would buy additional listings was not predatory; plaintiff "would have to show that the Defendants' overall charges for advertising space in their yellow pages are priced below cost"); *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir. 1979) (newspaper adding Sunday edition and charging the existing weekly price was not predatory); *BanxCorp v. Bankrate, Inc.*, 2019 WL 2098842, at *8 (D.N.J. Mar. 21, 2019) ("to demonstrate that promotional pricing—such as a 'free first listing'—is predatory,

---

[7] Dr. Kearl *did* ████████████████████████████████. Ex. 53 at 51:22-52:1 ██████████████████████████████.

[8] Dr. Kearl does not dispute ██████████████████████████████████ ██████████████████. Ex. 53 at 92:12-17. ████████████████████ ██████████████████. *Id.* 149:24-150:3.

Plaintiff must demonstrate that Defendant's overall prices were below cost"), *aff'd*, 847 F. App'x 116 (3d Cir. 2021); *Syncsort Inc. v. Innovative Routines Int'l, Inc.*, 2008 WL 1925304, at *16 (D.N.J. Apr. 30, 2008) (evaluating predatory pricing claim based on "buy one, get one free" deal and finding "whether a product was sold at a below-cost price must be based on the entire transaction, not just a piece of the larger deal").

**Second**, Vizgen cannot show a likelihood of recoupment. For a predatory pricing claim to stand, a firm must be able to achieve monopoly power *and* maintain it "for long enough both to recoup the predator's losses and to harvest some additional gain." *Matsushita*, 475 U.S. at 589. This is a high bar that Vizgen cannot meet. Vizgen must demonstrate that 10x's prices are capable of "driving [Vizgen] from the market," and after accomplishing that alleged objective 10x would be able to increase prices "above a competitive level that would be sufficient to compensate for the amounts expended on the predation." *Brooke Grp.*, 509 U.S. at 225. "[C]oncrete evidence" is required for a "reasonable inference" of recoupment. *Id.* at 233, 234. Vizgen has no such evidence. Dr. Kearl did not analyze whether or the degree to which prices would increase as a result of 10x's alleged predatory pricing—the fundamental input into determining whether 10x would ultimately recoup the benefit of selling at a purportedly predatory price. Ex. 53 at 131:22-25; 137:10-23. Dr. Kearl did not even attempt to analyze whether 10x's discounts have had any impact on Vizgen, nor did he consider the extent to which they have prevented or will prevent NanoString (now owned by Bruker, SUF ¶ 18) from competing, or impact new entrants. *Id.* at 112:12-22. In fact, two companies have announced single-cell spatial platforms that will compete with Xenium, MERSCOPE, and NanoString's CosMx, SUF ¶ 17, and other biotechnology companies have the resources and know-how to enter the space—███████████████████████████████ ███████████████ and would be incentivized to do so if 10x charged supracompetitive prices. *See*

Ex. 65 at -439; Ex. 15 ¶ 166. Where, as here, market conditions "would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed." *Brooke Grp.*, 509 U.S. at 225-26.

### 4.    Vizgen Cannot Establish Anticompetitive Bundling

Unlawful bundling requires a claimant to prove the conditioning of discounts on purchases of different products for the purpose of using market power in one market to exclude competition in another. *LePage's Inc. v. 3M*, 324 F.3d 141, 155-57 (3d Cir. 2003). The rebate on "purchases across multiple different product lines" must be so significant as to render the choice between products "meaningless" to consumers. *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 403-04, 405 (3d Cir. 2016).[9] And the claimant must prove that it "cannot make a comparable offer." *LePage's*, 324 F.3d at 155. Again, Vizgen cannot satisfy any of these requirements.



Importantly, ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* SUF ¶ 16. Thus, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. *Id.* Additionally, when 10x did sell more than one product together, a comparison of those transaction prices to average prices for standalone instruments shows that the discounts were ▮▮▮▮▮▮▮▮▮▮▮▮▮.[10] *See id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮. *See* Ex. 53 at 112:12-22. *Cf. LePage's*, 324 F.3d at 154 (finding evidence that "substantial" discounts covering a significant portion of sales supported a finding of foreclosure).

To the extent that Vizgen lost sales to Xenium, its own records show it lost more often for

---

[9] *LePage's* is to be interpreted narrowly. *Simon & Simon, PC v. Align Tech., Inc.*, No. CV 19-506, 2020 WL 1975139, at *8 (D. Del. Apr. 24, 2020) (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 274 n.11 (3d Cir. 2012) ("For several reasons, we interpret *LePage's* narrowly.")).

[10] In many cases, the customer actually ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ex. 15 ¶ 146 & tbl.12.

procompetitive reasons, unrelated to 10x's alleged bundling. *See* Ex. 53 at 162:23-163:25, 165:8-15. MERSCOPE win-loss data show numerous losses based on performance, data, and reputation. *See* SUF ¶ 13; Ex. 49 at 1-2 (10x has "[b]etter FFPE performance"; 10x "data has less background noise"; "10x has got a way better reputation"). "Competition has not been thwarted." *Eisai*, 821 F.3d at 403, 404. And where 10x won sales due to discounts, the evidence shows that 10x offered discounts ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████—all of which are decidedly procompetitive. Ex. 38 at 120:13-121:8; *see id.* at 126:14-127:13 ████████████████████████████; Ex. 34 at 102:19-104:7 ██████████

██████████████████████████████████████████████████████████;

Ex. 41 at -829 ████████████████████████████████████████████

████; Ex. 66 at -587 ████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████; Ex. 40 at -677 ████████████████████

████████████████████████; Ex. 42 at -965 ████████████████████

████████████████████; Ex. 67 at -126 ██████████████████████████

██████████████████████████████████████████████████████████

████████████; SUF ¶ 10. Vizgen cannot prove substantial foreclosure caused by 10x's discounting, and it has not even tried. *See* Ex. 53 at 108:8-109:7 (admitting that he used the Ninth Circuit's discount attribution test, not the Third Circuit's foreclosure standard to assess Vizgen's bundling claim).

There is no evidence that 10x forced a customer to buy another instrument to receive a

discount, refused to sell to a customer who would not buy an additional instrument, or offered discounts only to Xenium purchasers who purchased another instrument. *Id.* at 100:19-101:22, 116:13-118:1, 124:11-19. Thus, there is no consequence to customers who choose not to accept 10x's discount offers, and Vizgen cannot prove foreclosure for this reason as well. *See Eisai*, 821 F.3d at 405-07 (finding that bundled rebate scheme was not unlawful where "customers did not risk penalties or supply shortages for terminating" participation in the rewards program or violating its terms); *Advo*, 51 F.3d at 1203 (distinguishing from unlawful rebate scheme because no evidence of threats to deny service to customers that did not purchase other product or "extraordinary discounts" to customers who did). ███████████████████████████████

████████████████████████████████████████████████████████████

███. In any event, 10x's internal sales strategy does not create a factual dispute as to whether there was *actual* foreclosure in the alleged SST market; Vizgen would need evidence of such foreclosure, which it does not have.

Finally, Vizgen cannot show that it cannot make a "comparable offer," as the Third Circuit requires. *See LePage's*, 324 F.3d at 155. Since before Xenium launched, Vizgen has marketed its MERSCOPE instrument as a substitute for Visium and Chromium, and customers compare MERSCOPE to Visium. *See* Ex. 44 at -758; Ex. 45 at -541; Ex. 68 at -369; Ex. 46 at -652-53; Ex. 47 at -201-202. Vizgen also partners with ScaleBio, which offers a single-cell RNA sequencing platform, like 10x's Chromium, to provide a "cost-effective solution to combine single-cell and spatial technologies." Ex. 69 at -760-61.[11] Dr. Kearl certainly did not conclude that Vizgen is unable to offer comparable bundles because he did not even consider the question. Ex. 53 at 126:17-20, 271:7-273:10.

---

[11] *See also* Ex. 70 at -756; Ex. 71 at 1.

### B.    Vizgen Cannot Prove Specific Intent to Monopolize (Element 2)

Vizgen cannot prove specific intent to maintain its attempted monopolization claim for the same reasons it cannot prove the specific intent required to prove conspiracy. *See supra* at § 1(B); *see also Great Escape*, 791 F.2d at 541 ("[s]pecific intent to monopolize is an element of both offenses"). In addition, 10x's pricing practices are explained by equally plausible legitimate business justifications, which Vizgen's own expert acknowledges. Ex. 53 at 88:15-19 (admitting that the discounting of instruments to encourage their adoption would be a rational business decision). *See Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 339 (3d Cir. 2018). The evidence overwhelmingly shows that 10x's overriding goal was to compete on price and quality, which is the essence of lawful competition. *See Advo*, 51 F.3d at 1194, 1199 ("targeting" competitor's customers with discounts was conduct "expect[ed[ from a legitimate competitor").

### C.    Vizgen Cannot Prove a Dangerous Probability of Achieving Monopoly Power (Element 3)

To maintain its attempted monopolization claim, Vizgen also must prove that 10x has a dangerous probability of successfully monopolizing the alleged SST market. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 750 (3d Cir. 1996) ("a higher degree and proximity to actual monopolization must be demonstrated before an award of treble damages can be seriously pursued"). Dangerous probability cannot be inferred from the alleged conduct alone but rather requires "inquiry into the relevant . . . market and the defendant's economic power in that market." *Spectrum Sports*, 506 U.S. at 459. Among other things, the analysis considers probable industry development and barriers to entry. *Barr Lab'ys, Inc. v. Abbott Lab'ys*, 978 F.2d 98, 111-12 (3d Cir. 1992). Thus, for the same reasons Vizgen cannot prove likely recoupment to maintain its predatory pricing claim, it cannot prove a dangerous probability of monopolization. *See* SUF ¶ 17; *supra* at § 2(A)(3).

Vizgen's expert agrees that spatialomics is a nascent field that is "constantly evolving." Ex. 53 at 154:17-155:13. The tools and technologies to facilitate research are developing rapidly, with significant new entrants. *Id*. 191:22-192:8 (agreeing three companies have "announced that they're entering"), 96:8-14 (identifying "list of potential entrants"); Ex. 60 ¶¶ 14, 48-49, 76-77; SUF ¶ 17. Vizgen and its expert ignore these facts in asserting that 10x will be the only player in the alleged SST market if it succeeds on its infringement claims. D.I. 440 ¶¶ 136, 388. But a jury could not reasonably conclude from the evidence that there is a dangerous probability that 10x will secure monopoly power such that it can "maintain supracompetitive prices for an extended time." *Matsushita*, 475 U.S. at 591 n.15; *see also Barr Lab'ys*, 978 F.2d at 114 (affirming grant of summary judgment based on new entry); *see also United States v. Empire Gas Corp.*, 537 F.2d 296, 305 (8th Cir. 1976) (finding no dangerous probability of success when there was insufficient proof that defendant's actions caused competitors to decide not to enter or to leave the business). Moreover, a successful outcome for 10x and Harvard in this litigation would not support Vizgen's attempted monopolization claim because the acquisition of monopoly power through successful patent litigation does not constitute a dangerous probability of success for Section 2 purposes. *See, e.g.*, *Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 483 F. Supp. 3d 38, 65 (D. Mass. 2020) (possibility of attaining market power through successful patent infringement litigation was not a dangerous probability of success); *Chip-Mender, Inc. v. Sherwin-Williams Co.*, 2006 WL 13058, at *4-5 (N.D. Cal. Jan. 3, 2006) (allegations of a dangerous probability of success insufficient where market power would allegedly be achieved if and only if the patent suit is successful).

## III.  VIZGEN CANNOT SHOW ANTITRUST INJURY, WHICH IS SEPARATELY FATAL TO ITS SHERMAN ACT CLAIMS

Vizgen's Sherman Act claims fail for the additional and independent reason that Vizgen cannot prove antitrust injury. To prevail on either Section 2 claim, Vizgen must establish antitrust

injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [antitrust] defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Because the antitrust laws were intended to protect competition, *not competitors*, a claimant must prove both harm to oneself caused by anticompetitive conduct and that the "challenged conduct affected the prices, quantity or quality of goods or services." *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996). Vizgen's alleged injuries fail on both points: Vizgen cannot prove that it was injured by any conduct prohibited by the antitrust laws, nor can it prove harm to competition.

Vizgen's antitrust claims are based on: conduct related to Vizgen's alleged "Open Early, Closed Late" theory and 10x's alleged pricing practices. As to the former, Vizgen cannot dispute that it did not rely on the grant application because Vizgen ████████████████████████████ ███████████████████████. *See* SUF ¶ 2; Ex. 72 at 68:12-23, 70:4-14. Thus, even if the grant application "opened" the Church Patents to Vizgen (it did not, *see supra* at § 1(A)(1)), that "opening" could not have been a source of any injury to Vizgen. *See* Ex. 53 at 46:22-47:2, 49:20-50:1 █████████████████████████████████████████ ████████████████████████████. As to the subsequent alleged promises by Harvard, Vizgen's alleged harm was, in fact, due to Vizgen's own failure to investigate whether any patents might impact MERSCOPE before it invested resources to develop it. *See In re Wellbutrin XL*, 868 F.3d at 166 (affirming "no antitrust standing exists when a plaintiff's grievance is caused by [patent] regulatory scheme rather than by the defendant's actions"). The Vizgen License provides ██████████████████████████████████████████████████ ████████████████████████████████ Ex. 43 at -955. It also makes clear ████████████████████████████████████████████████

███████████████████████████████████████████. *Id.* at -507.

Finally, absent evidence that the steps Plaintiffs allegedly took to "close" the technology were, in fact, unlawful, which does not exist (*see supra* at § 1(A)(1)), any injuries allegedly caused by this litigation are not antitrust injuries as a matter of law. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct."); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir. 2001) ("if its conduct constitutes valid petitioning, the petitioner is immune from antitrust liability whether or not the injuries are caused by the act of petitioning or are caused by government action which results from the petitioning").

Nor can Vizgen prove the requisite harm to competition caused by its alleged "Open Early, Closed Late" theory. Vizgen's expert Dr. Kearl opines that the alleged scheme has caused and will cause harm to competition, but those opinions are based on only his say-so. For example, Dr. Kearl admits that to assess harm to competition, one should consider whether prices have increased, quality has decreased, and customers have fewer options. Ex. 53 at 17:18-18:1, 20:11-20. Yet he did not determine whether any of that has, in fact, happened or will happen in the future. *Id.* 130:3-23, 131:16-25, 132:21-133:12, 134:12-15. Nor did he account for NanoString's role in the alleged SST market, ████████████████████████, or the impact of recently announced entrants, Singular and Element. *Id.* 30:23-24 ("I don't know anything about NanoString except it has a product in the market."), 195:20-196:22, 198:5-14, 199:13-21, 232:18-25.

Finally, Vizgen cannot prove antitrust injury caused by 10x's alleged pricing practices. It has not even tried. Because Dr. Kearl believes that "it's the scheme in its entirety that creates the harm," *id.* at 25:16-17, he has not attempted to show that 10x's pricing practices have harmed Vizgen or competition. *Id.* at 25:18-26:7, 27:16-20 (admitting that he has not analyzed either harm

24

to Vizgen or harm to competition from bundling or predatory pricing); *id.* at 111:17-19 ███████

████████████████████████████████████████████████████. And, indeed, low prices benefit

consumers. *Atl. Richfield*, 495 U.S. at 340 ("Low prices benefit consumers regardless of how those

prices are set, and so long as they are above predatory levels, they do not threaten competition.

Hence, they cannot give rise to antitrust injury."); *Barr Lab'ys*, 978 F.2d at 109 ("Conduct that

harms competitors may benefit consumers — a result the antitrust laws were not intended to

penalize."). To prove harm to competition from discounting, Vizgen would have to prove

foreclosure (in the case of bundling) and recoupment (in the case of predatory pricing). *See Eisai*,

821 F.3d at 403-04 ("One competitor's inability to compete does not automatically mean

competition has been foreclosed."); *Advo*, 51 F.3d at 1200 ("Predatory pricing schemes that fail at

the recoupment stage may injure specific competitors . . . but do not injure competition."). Vizgen

cannot prove either. *See supra* at §§ 2(A)(3), (4). Thus, Vizgen cannot prove antitrust injury, as

required to maintain antitrust claims based on bundling or predatory pricing.

## IV.    VIZGEN'S TORTIOUS INTERFERENCE CLAIM FAILS

To prevail on tortious interference, a claimant must prove, among other things, that the

respondent knowingly induced a breach of a third-party contract and that the interference was both

intentional and improper in motive or means. *Psy-ed Corp v. Klein.*, 947 N.E.2d 520, 536 (Mass.

2011) (citing *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 571 N.E.2d 1363 (Mass. 1991)). Vizgen

cannot establish either.

At a minimum, knowing inducement requires awareness of the alleged contract. *See, e.g.*,

*Dufficy Enters., Inc. v. Berarducci*, 2020 WL 12309011, at *36 (Mass. Super. Ct. June 7, 2020)

("The defendants could not have *knowingly* induced [a party] to terminate, or *intentionally*

interfered with, an agreement about which they had no knowledge at the time the agreement was

terminated."). Here, Vizgen cannot prove that ████████████████████████████████

of the Vizgen License or any of Harvard's communications with Vizgen relating to it. *See* SUF ¶ 11. Thus, even if Vizgen could prove that Harvard's conduct in connection with the Vizgen License somehow amounted to ████████, as Vizgen alleges, 10x could not have knowingly induced Harvard to breach those promises without knowledge of them. *Ledgewood Co., Inc. v. Bialek*, 789 N.E.2d 606 (table) (Mass. App. Ct. 2003) (affirming summary judgment on the ground that there was no evidence in the record that the defendant knew of a contract extension).

To establish improper means, "[i]t is not enough to show that the defendant intentionally advised a party to breach or forego a contract"; the actions must be "'innately wrongful [and] predatory in character,' deceitful, or involving 'threats, misrepresentation, or defamation.'" *Cutting Edge Homes, Inc. v. Mayer*, 229 N.E.3d 613, 617 (Mass. App. Ct. 2024) (citations omitted); *see also United Truck Leasing Corp. v. Geltman*, 551 N.E.2d 20, 23 (Mass. 1990) (requiring acts "wrongful by some measure beyond the fact of interference itself"). To prove an improper motive, a claimant must show "an intent specifically to harm the plaintiff, unrelated to any legitimate business purpose." *Cutting Edge Homes*, 229 N.E.3d at 619; *see also United Truck*, 551 N.E.2d at 24 (affirming motion for directed verdict when defendant's "apparent motives were to benefit his customers and himself financially"); *Skyhook Wireless, Inc. v. Google Inc.*, 30 Mass. L. Rptr. 417 (Mass. Super. Ct. 2012) (granting summary judgment when the defendant acted in its legitimate corporate interest), *aff'd*, 19 N.E.3d 440 (Mass App. Ct. 2014). Vizgen cannot prove either. The Vizgen License was executed in 2019, so only conduct after that date could have even arguably interfered with it. Yet the events that Vizgen challenges—the 2020 Amendment; the 2020 CIP application; and this litigation—each had a legitimate business purpose separate and apart from anything relating to Vizgen. D.I. 440 ¶¶ 206-08; *see* SUF ¶¶ 5-9, 14. Thus, Vizgen cannot prove either the improper means or motive required to maintain its tortious interference claim.

## V.    VIZGEN'S MASSACHUSETTS CLAIMS FAIL FOR THE SAME REASONS AS ITS SHERMAN ACT CLAIMS

Vizgen reframes its Sherman Act claims as violations of Mass. Gen. Laws ch. 93A §§ 2 and 11, but these claims fail for the same reasons as the federal antitrust claims. To satisfy the first element of a Chapter 93A claim, a plaintiff must prove an unfair or deceptive act or practice in the conduct of trade or commerce. *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016). An act is "unfair" if it comes "within at least the penumbra of some common-law, statutory, or other established concept of unfairness"; "is immoral, unethical, oppressive, or unscrupulous"; and "causes substantial injury to consumers." *Id.* (quoting *PMP Assocs. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917 (Mass. 1975)). An act is "deceptive" "if it possesses a tendency to deceive" and "if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." *Id.* (quoting *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 486-87 (Mass. 2004)). Vizgen cannot prove either. Vizgen asserts two claims against 10x under Chapter 93A— "ongoing prosecution" and "misrepresentations." D.I. 440 ¶¶ 224-28, 416, 418. Both are based on the same conduct as Vizgen's Sherman Act claims. Specifically, Vizgen claims that 10x engaged in unfair and deceptive conduct by filing this litigation, tortiously interfering with Harvard's alleged promises to Vizgen, and "closing" Vizgen's access to the Church Patents. Its misrepresentation claim is based on the alleged "Open Early, Closed Late" theory.

For the same reasons that merit summary judgment in 10x's favor on Vizgen's antitrust and tortious interference claims, the Court should dispose of these claims as well. *See generally supra* §§ 1(A), 2(A). *See* M.G.L. ch. 93A § 11 ("the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act," which is to be construed in harmony with judicial interpretations of federal antitrust statutes (M.G.L. ch. 93 §§ 1, 4, 5)); *see also Suzuki of W. Mass., Inc. v. Outdoor*

27

*Sports Expo, Inc.*, 126 F. Supp. 2d 40 (D. Mass. 2001) (dismissing Chapter 93A claims upon dismissal of state and federal antitrust claims where plaintiffs asserted no independent evidence of unfair or deceptive trade practices); *AT&T v. IMR Cap. Corp.*, 888 F. Supp. 221 (D. Mass. 1995) (dismissing Chapter 93A claim based on the same factual allegations as the infirm Sherman Act claims); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) ("[W]e have been presented with no persuasive reason why these state tort claims, based on the same petitioning activity as the federal claims, would not be barred by the *Noerr-Pennington* doctrine.").

## VI.   VIZGEN'S CALIFORNIA CLAIMS ALSO FAIL FOR THE SAME REASONS AS ITS SHERMAN ACT CLAIMS

Vizgen's California claims also rely on the same conduct as its Sherman Act claims. *See* D.I. 440 ¶¶ 394-98 (citing the alleged "Open Early, Closed Late" scheme, sham litigation, bundling and predatory pricing); *id*. ¶¶ 401-03 (incorporating by reference earlier paragraphs and merely characterizing them as "unfair competition"). Thus, these claims fall together. For the same reasons that Vizgen cannot prove a conscious commitment to engage in a common scheme to monopolize (*see supra* at §1(A)), it cannot prove the combination "that seeks to achieve an anticompetitive end" that the Cartwright Act requires. *See Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 8 (2012). Similarly, Vizgen's failure to prove anticompetitive conduct is fatal to its Unfair Competition Law claim. That claim requires proof of "unfair" practices, defined as those that threaten an incipient violation of antitrust law, have a comparable effect as violating an antitrust law, or significantly threaten or harm competition. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 169 (1999) ("company must act with the purpose, i.e., the desire, of injuring competitors or destroying competition"); *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1233 (2007); *supra* at § 2(A).

## CONCLUSION

For the above reasons, 10x respectfully requests that the Court grant summary judgment in its favor on Vizgen's Counterclaims 4, 5, and 17-21.

Respectfully submitted,

*Of Counsel*:
TENSEGRITY LAW GROUP LLP
Matthew D. Powers
Paul Ehrlich
William P. Nelson
Stefani Smith
Robert Gerrity
Li Shen
555 Twin Dolphin Drive
Suite 650
Redwood Shores, CA 94065
Tel: (650) 802-6000

Azra M. Hadzimehmedovic
Aaron M. Nathan
Samantha Jameson
Ronald J. Pabis
Kiley White
Joanna R. Schacter
1676 International Drive, Suite 910
McLean, VA 22102-3848
Tel: (650) 802-6000
10x_Vizgen_Service@tensegritylawgroup.com

Latham & Watkins LLP
Marguerite M. Sullivan
Molly M. Barron
Christopher John Brown
Brian Barrows Goodell
Sahdia Khan
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
(202) 637-2200
marguerite.sullivan@lw.com

/s/ *Jason J. Rawnsley*
Frederick L. Cottrell, III (#2555)
Jason J. Rawnsley (#5379)
Alexandra M. Ewing (#6407)
Gabriela Z. Monasterio (#7240)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
rawnsley@rlf.com
ewing@rlf.com
monasterio@rlf.com

*Attorneys for 10x Genomics*

29

molly.barron@lw.com
chris.brown@lw.com
brian.goodell@lw.com
sahdia.khan@lw.com

Kelly Fayne
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
kelly.fayne@lw.com

Dated: November 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2024, copies of the foregoing were caused to be served upon the following in the manner indicated:

| | |
|---|---|
| James L. Higgins (No. 5021)<br>Pilar G. Kraman (No. 5199)<br>Jennifer P. Siew (No. 7114)<br>YOUNG, CONAWAY, STARGATT & TAYLOR LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>(302) 571-6600<br>YCST_vizgen@ycst.com<br><br>David Bilsker<br>Adam B. Wolfson<br>Sam Stake<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>50 California Street, 22nd Floor<br>San Francisco, California 94111<br>(415) 875-6600<br><br>Kevin P.B. Johnson<br>Victoria F. Maroulis<br>Andrew Bramhall<br>Brian C. Cannon<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>555 Twin Dolphin Dr., 5th Floor<br>Redwood Shores, California 94065<br>(650) 801-5000<br><br>Angus Chen, Ph.D.<br>Catherine T. Mattes<br>David D. LeRay<br>Andrew Tigchelaar<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000<br><br>Patrick D. Curran<br>Eric D. Wolkoff<br>Kathleen Marini<br>Angela Nelson | **Via E-mail**<br>YCST_vizgen@ycst.com<br>vizgen@quinnemanuel.com<br>wcvizgen-10xservice@whitecase.com<br>cicero@chipmanbrown.com |

| | |
|---|---|
| QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>111 Huntington Avenue, Suite 520<br>Boston, MA 02199<br>(617) 712-7100<br><br>vizgen@quinnemanuel.com<br><br>Michael J. Songer<br>WHITE & CASE LLP<br>701 Thirteenth Street, NW<br>Washington, DC 20005<br>(202) 626-3647<br>wcvizgen-10xservice@whitecase.com<br><br>Henry Y. Huang<br>Tiffany T. Huynh<br>WHITE & CASE LLP<br>3000 El Camino Real<br>Palo Alto, CA 94306<br>(650) 213-0383<br>wcvizgen-10xservice@whitecase.com<br><br>Alexandra J. Cho<br>Samantha J. Kokonis<br>WHITE & CASE LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br>(212) 819-8200<br>wcvizgen-10xservice@whitecase.com<br><br>Joseph B. Cicero<br>CHIPMAN BROWN CICERO & COLE, LLP<br>Hercules Plaza<br>1313 North Market Street, Suite 5400<br>Wilmington, DE 19801<br>(302) 295-0191<br>cicero@chipmanbrown.com<br><br><br>***Attorneys for Defendant Vizgen, Inc.*** | |
| Kenneth L. Dorsney (#3726)<br>Cortlan S. Hitch (#6720)<br>**MORRIS JAMES LLP**<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE 19801 | **Via E-mail**<br>kdorsney@morrisjames.com<br>chitch@morrisjames.com<br>BOST-F-10Xv.Vizgen@foley.com |

(302) 888-6800
Kdorsney@morrisjames.com
Chitch@morrisjames.com

Geoffrey M. Raux, Esq.
Ruben J. Rodrigues, Esq.
Michael J. Tuteur, Esq.
Lea Gulotta James, Esq.
John W. Custer, Esq.
Lucas I. Silva, Esq.
Amani S. Kmeid, Esq.
**FOLEY & LARDNER LLP**
111 Huntington Avenue, Suite 2500
Boston, MA 02199
(617) 502-3284
(617) 502-3228

Sarah E. Rieger, Esq.
Kate E. Gehl, Esq.
Ian T. Hampton, Esq.
**FOLEY & LARDNER LLP**
777 East Wisconsin Avenue
Milwaukee, WI 53202
(414) 271-2400

Jarren N. Ginsburg, Esq.
Alan D. Rutenberg, Esq.
**FOLEY & LARDNER LLP**
Washington Harbour
3000 K Street NW, Suite 600
Washington, DC 20007
(202) 295-4071

Jared J. Braithwaite, Esq.
**FOLEY & LARDNER LLP**
95 S. State Street, Suite 2500
Salt Lake City, Utah 84111
(801) 401-8920

BOST-F-10Xv.Vizgen@foley.com

***Attorneys for President and Fellows of Harvard College***

*/s/ Alexandra M. Ewing*
Alexandra M. Ewing (#6407)