# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| 10X GENOMICS, INC. and PRESIDENT AND FELLOWS OF HARVARD COLLEGE<br><br>Plaintiffs,<br><br>v.<br><br>VIZGEN, INC.,<br><br>Defendant.<br><br>VIZGEN, INC.,<br><br>Counterclaim-Plaintiff,<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>Counterclaim-Plaintiff, as to certain Claims,<br><br>v.<br><br>10X GENOMICS, INC.,<br><br>Counterclaim-Defendant, as to certain Claims<br><br>and<br><br>PRESIDENT AND FELLOWS OF HARVARD COLLEGE,<br><br>Counterclaim-Defendant, as to certain Claims. | C.A. No. 22-595 (MFK)<br><br>**CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY PURSUANT TO STIPULATED PROTECTIVE ORDER** |

**EXPERT REPORT OF MICHAEL L. METZKER, Ph.D. REGARDING THE INVALIDITY OF U.S. PATENT NOS. 11,021,737, 11,293,051, 11,293,052 and 11,549,136**

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

with the use of a decoding scheme consisting of many consecutive hybridization steps"[325] and in the context of rolling circle amplification of padlock probes "the multiplexing ability of the detection assay can be increased by applying serial and combinatorial labeling of the RCPs.[71] This approach involves multiple rounds of hybridization and stripping of detection oligonucleotides to extract information about the identity of molecules present in the original sample."[326] It would have been obvious to one of ordinary skill in the art to utilize the teachings of the Larsson Dissertation and/or Goransson (2009) to identify an analyte such as an RNA molecule by detecting signals in a temporally-sequential manner from detection reagent(s) bound to such analyte. For example, the Larsson Dissertation provides examples of using rolling circle amplification for RNA molecules.[327]

210. In addition, a POSA would consider the transfer of the Goransson (2009) detection methods to an *in situ* environment as the next logical and common sense step after the successful application of an *in vitro* multiplex method for the detection of ASMs. "For a person skilled in the art starting from [Goransson (2009)], it would be routine to want to apply in vitro results to an in situ or in vivo context. This also applies to ASMs."[328] This is further evidenced by Stougaard (2007), which describes a method for detecting non-polyadenylated RNA molecules using Turtle Probes, which was initially carried out in vitro in a controllable

---

[325] *See* Grundberg, *Genotyping and mutation detection in situ: Development and application of single-molecule techniques*, DIGITAL COMPREHENSIVE SUMMARIES OF UPPSALA DISSERTATIONS FROM THE FACULTY OF MEDICINE 656 (2011) ("Grundberg Dissertation") at 46 (citing Göransson (2009)).

[326] *See* Larsson Dissertation at 22. I note that reference 71 is Göransson (2009).

[327] *Id*. at 35 (Figure 4) (showing RNA directly targeted by padlock probes and RNA that is targeted by turtle probes) (an "RNA molecule").

[328] *See* Order of the Court of Appeal of the Unified Patent Court issued on 26/02/2024 in the proceedings for provisional measures concerning EP 4 108 782, 16-17 (EP4108782B1 is the European counterpart the TOSS Patents).

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

environment and, after successful implementation, was also tested *in situ* with positive results.[329] That same logic applies equally when starting with the Larsson Dissertation. For a POSA, it would have been routine and obvious to want to apply *in situ* results (generation of *in situ* amplicons with tag sequences) to a decoding scheme demonstrated *in vitro* (on a microarray) for multiplexed *in situ* identification of nucleic acid analytes. For a POSA, demonstrating a decoding scheme *in vitro* first that requires multiple rounds of hybridization would be essential before applying *in situ*. Goransson (2009) provides that teaching. Both references provide the requisite teaching and motivation for a POSITA to use the decoding scheme of Goransson (2009) with the *in situ* methods of the Larsson Dissertation; Goransson (2009) states, "[o]ur approach is generic and can be applied for multiplex quantification of ASMs created from any assay that results in circular DNA molecules" and the Larsson Dissertation states, "mRNA expression is associated with substantial cell-to-cell variation and our presented method ***permits simultaneous visualization of multiple transcripts directly in complex tissue samples***," wherein both references teach the use of padlock probes for incorporation of tag sequences into a target nucleic acid analyte.[330]

211.   Taken as a whole, the Nilsson laboratory described multiplex decoding schemes in 2009,[331] including those disclosed and claimed in the TOSS Patents, and further exemplified one such method (sequencing barcode padlock sequences to identify mRNA *in situ*).[332]. Moreover, the Nilsson laboratory developed *in situ* single molecule detection with specific teachings to use the decoding schemes for *in situ* multiplex analysis. To the extent the Nilsson laboratory did not

---

[329] *Id.* at 32; Stougaard et al., *In situ detection of non-polyadenylated RNA molecules using Turtle Probes and target primed rolling circle PRINS*, BMC BIOTECHNOLOGY, 7:69 (2007) ("Stougaard (2007)").

[330] *See* Goransson (2009), 2; Larsson Dissertation, Abstract.

[331] *See* Göransson Dissertation; *see also* Göransson (2009).

[332] *See* Ke et al. (2013).

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

make all embodiments of the TOSS Patent claims, a clear rationale was provided in these references, along with a reasonable expectation of success.

        **a.**        **The Larsson Dissertation and/or Göransson (2009) discloses every element of Claim 1 of the '737 Patent**

212.    Asserted Claims 18 and 21 of the '737 Patent ultimately depend from unasserted independent Claim 1 of the '737 Patent. For brevity, I first provide exemplary disclosures in the Larsson Dissertation and Göransson (2009) for every element of Claim 1 here before addressing the asserted dependent claims.

213.    Claim 1 of the '737 Patent recites three generic steps: (a) "contacting a cell or tissue sample comprising said analyte with a detection reagent"; (b) "detecting a temporal order of signal signatures in said cell or tissue sample"; and (c) "using said temporal order of signal signatures to identify said analyte in said cell or tissue sample." Each of those steps is expressly disclosed by the Larsson Dissertation.

        **i.**        ***"a method for identifying an analyte, comprising"***

214.    The Larsson Dissertation discloses a method for identifying an analyte in a cell or tissue sample. Specifically, the Larsson Dissertation discloses and teaches *in situ* single molecule detection of DNA or RNA, in combination with cellular protein detection.

        **ii.**        ***"(a) contacting a cell or tissue sample comprising said analyte with a detection reagent, wherein said detection reagent comprises (i) a probe that binds to said analyte and (ii) a nucleic acid label comprising one or more pre-determined subsequences"***

215.    The Larsson Dissertation discloses contacting a cell or tissue sample comprising said analyte with a detection reagent, wherein said detection reagent comprises (i) a probe that binds to said analyte and (ii) a nucleic acid label comprising one or more pre-determined subsequences. Specifically, the Larsson Dissertation teaches padlock probes, which have two

118

described in the Göransson Dissertation. Given that, the references clearly do not use "incompatible techniques that each worked for its respective purpose."[361]

251. It would have been obvious to apply the decoding schemes as taught by the Göransson Dissertation for detection and identification of DNA or mRNA to the *in situ* methods and reagents taught by the Larsson Papers. A person of ordinary skill in the art would have been motivated, with a reasonable expectation of success, to use the decoding scheme of the Göransson Dissertation *in situ* as suggested in the Larsson Papers because the Göransson Dissertation explicitly states that the same padlock probe technology for RCA has been used *in situ* in Larson (2004).[362] The Göransson Dissertation also states that the method "is generic in that the target can be any biomolecule which has been encoded into a DNA circle via a molecular probing reaction" and that the approach "can be applied for multiplex quantification of ASMs created from any assay that results in circular DNA molecules."[363]

252. Moreover, the same rationales provided for the combination of the Larsson Dissertation (incorporating Larsson (2004))) and Göransson 2009, applies equally to the combination of the Göransson Dissertation (incorporating the Göransson 2009 paper) and the Larsson Papers. The state of the art at the time of filing, provided motivation to the skilled artisan by both identifying the problem (multiplexing) and suggesting a solution (decoding algorithms). As detailed *supra*, that motivation includes: a) the ISH and IHC techniques were well established in 2011 (and as detailed in Section IV); b) the field was moving in the direction of single mRNA molecule detection *in situ* providing motivation for multiplexing (and building on RNASeq and array based technologies doing the same without the context of the cell

---

[361] *Id.*

[362] *See* Göransson Dissertation at 13.

[363] *Id.* at Paper III, Abstract, 2.

134

architecture) along with a general consensus in the art that there was a need and a desire for imaging techniques to expand the number of targets identified in one cell[364]; and c) importantly all the reagents needed were readily available and in routine use for ISH and IHC.

253. The comparison of the Figures from each of the references illustrates the reagents needed to practice the decoding scheme (and the overlap in teaching).



| Göransson Dissertation, Paper III, Fig. 1A. | Larsson (2004), Fig. 1 | Larsson (2010), Fig. 1(a) |

### a. The Göransson Dissertation, Larsson (2004) and/or Larsson (2010) teaches every element of Claim 1 of the '737 Patent

254. Asserted Claims 18, 21, and 23 of the '737 Patent ultimately depend from unasserted independent Claim 1 of the '737 Patent. For brevity, I first provide exemplary disclosures in the Göransson Dissertation and the Larsson Papers for every element of Claim 1 of the '737 Patent here.

255. Claim 1 of the '737 Patent recites three generic steps: (a) "contacting a cell or tissue sample comprising said analyte with a detection reagent"; (b) "detecting a temporal order of signal signatures in said cell or tissue sample"; and (c) "using said temporal order of signal

---
[364] *See* Levsky (2002).

the identification of mRNA transcripts *in situ* using a bipartite FISH probe and a decoding scheme for multiplexing.

301. Gunderson (2004) discloses and teaches general decoding schemes (*e.g.*, algorithms) using a sequence sequentially hybridized with a fluorophore label probe to identify a nucleic acid analyte. Gunderson (2004) explains that the disclosed decoding scheme can be applied in many other assays, including *in situ*:

> Finally, the decoding algorithm is general and can, in principle, ***be applied to any spatially fixed collection of objects or molecules that are associated with specific DNA sequences***. In genomics, the classification and characterization of large collections of sequences is often a key step in the analysis of complex biological systems. For example, a library of DNA clones is traditionally searched for a single gene of interest by hybridization to a labeled DNA probe (Sambrook 1989). ***The approach described here would allow a search for 1000s of genes at a time, while distinguishing closely related members of gene families and perhaps alternative splice forms.*** Similarly, electrophoretic separations of complex mixtures of nucleic acids are often probed to characterize a gene or its mRNA (Southern 1975; Alwine et al. 1979; Liang and Pardee 1992); this can also be parallelized. ***Finally, fluorescence in situ hybridization (FISH), a powerful class of methods with many applications, could be applied to 1000s of genes simultaneously. To illustrate, FISH with combinatorially labeled oligonucleotide probes has been used to measure transcription from 10 genes in a single cell (Levsky et al. 2002). The decoding strategy we describe could potentially allow transcription to be measured for all genes in a single cell***.[439]

302. In this disclosure, Gunderson (2004) specifically identifies the fluorescence *in situ* hybridization (FISH) protocols of Levsky (2002). Levsky (2002) discloses and teaches single molecule detection of RNA *in situ*, using a combinatorial labeling methodology.

303. Gunderson (2004) discloses and teaches a method of performing TOSS (temporal order of signal signatures) for decoding a random array of DNA libraries comprising an oligonucleotide with two portions (1) a probe that is able to bind to an analyte (oligonucleotide sequences "that capture assay products") and (2) one more pre-determined sequences

---

[439] *See* Gunderson (2004) at 874-75.

(oligonucleotide sequences that serve as a "decodable address sequence[]").[440] Gunderson (2004) explains that its algorithm "requires only a few labels and several sequential hybridizations to identify thousands of different DNA sequences with great accuracy" and "can be applied to any spatially fixed collection of objects or molecules that are associated with specific DNA sequences."[441] While illustrating, and specifically exemplifying, the decoding algorithm in a simplified version with one pre-determined subsequence (re-probed multiple times to provide a temporal order of signal signatures) and in an array format, Gunderson (2004) having demonstrated the feasibility of the algorithm in an *in vitro* setting discloses and teaches the method for use *in situ* (*i.e.*, in a cell or tissue sample).

304.    I understand that 10x has asserted that a POSA "would not have been motivated to modify Gunderson (2004) in light of Levsky (2002) because the references use incompatible techniques that each worked for their respective purposes."[442] In particular, 10x has asserted that Gunderson's "sequential detection" process is fundamentally different from Levsky (2002)'s "spectral barcodes" because the former involves multiple hybridization steps while the latter "eliminates any hybridization steps."[443] I disagree. As I describe *supra*, Gunderson (2004)'s express reference to Levsky (2002) discredits this assertion. Similarly, Levsky (2002) recognizes the relationship between microarray technology and *in situ* analysis, noting how "microarray and *in situ* assays yield complementary information." [444] It further states that "[a] metaphor for the difference between these technologies is that transcription site profiling measures the transcriptional 'thermostat' and microarrays view the 'ambient temperature' of the

---

[440] *Id*. at 875 (describing methods for preparing "oligonucleotide-linked beads and bead pools").

[441] *Id.* at Abstract.

[442] *See* Final Rebuttal Contentions at 29-31.

[443] *Id.* at 31-32.

[444] *See* Levsky (2002) at 839.

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

the '737 Patent, which further recites "*wherein (b) comprises coupling an additional detection reagent to said analyte at said location, wherein said additional detection reagent comprises (i) an additional probe that binds to said analyte and (ii) an additional one or more pre-determined subsequences; and wherein said temporal order of signal signatures comprises signal signatures associated with sequences of said one or more pre-determined subsequences and said additional one or more pre-determined subsequences*.".

347. Levsky (2002) teach the use of "three to five 50-mer DNA probes" for each transcript, which each have a unique sequence. In applying the decoding scheme of Gunderson (2004) to the *in situ* methods of Levsky (2002), one of ordinary skill in the art would have immediately envisaged that these additional probes would each have one or more of the decode sequences taught by Gunderson for decoding each transcript ("analyte").

    4.    '737 Patent: Gunderson (2004) in view of Sood '043 and/or Levsky (2002)

348. As explained *supra* in Section VI.A.3, Gunderson (2004) discloses and teaches a method of performing TOSS (temporal order of signal signatures) for decoding a random array of DNA libraries comprising an oligonucleotide with two portions (1) a probe that is able to bind to an analyte (oligonucleotide sequences "that capture assay products") and (2) one more pre-determined sequences (oligonucleotide sequences that serve as a "decodable address sequence[]").[480] Gunderson (2004) explains that its algorithm "requires only a few labels and several sequential hybridizations to identify thousands of different DNA sequences with great accuracy" and "can be applied to any spatially fixed collection of objects or molecules that are associated with specific DNA sequences."[481] While illustrating, and specifically exemplifying,

---

[480] *See* Gunderson (2004) at 875 (describing methods for preparing "oligonucleotide-linked beads and bead pools").
[481] *Id.* at Abstract.

the decoding algorithm in a simplified version with one pre-determined subsequence (re-probed multiple times to provide a temporal order of signal signatures) and in an array format, Gunderson (2004) having demonstrated the feasibility of the algorithm in an *in vitro* setting discloses and teaches the method for use *in situ* (*i.e.*, in a cell or tissue sample). Further, based on Gunderson (2004)'s express reference to Levsky (2002) and the knowledge in the art at the time, a POSA would have at once envisaged using Gunderson (2004)'s detection methods *in situ*.

349. At a minimum, a POSA would have been motivated, with a reasonable expectation of success, to use the decoding scheme in Gunderson (2004) *in situ* based on Gunderson (2004)'s own teachings.[482] Further, a POSA looking to use Gunderson (2004)'s decoding scheme *in situ* would have referred to Sood '043 because Sood '043 also focuses on multiplex detection of analytes using a temporal detection strategy. Further, the detection reagents taught in both Gunderson (2004) and Sood '043 are nearly identical (both containing a target binding section and a nucleic acid "zip code").

350. For example, a person of ordinary skill in the art could increase the number of mRNA molecules detected *in situ* in Sood '043 (*e.g.*, Example 6) by using Gunderson (2004)'s decoding scheme and detection reagents. In Example 6 of Sood '043, two mRNA molecules are detected. By using Gunderson (2004)'s detection reagents (or by modifying Sood '043's detection reagents accordingly) one could greatly increase the number of mRNA molecules to be detected in a cell or tissue sample.[483] Sood '043 supplements the teaching and disclosure of

---

[482] *Id*. at 875 ("The decoding strategy we describe could potentially allow transcription to be measured for all genes in a single cell.").

[483] *Id.* at 874 ("This bottleneck can be overcome by using multiple decoding sequences on each bead type such that if pairs of sequences are used, up to $10^6$ (1000 x 1000) unique combinatoric sequences can be formed from just 2000 primary decoder sequences"); *see also* Sood '043 [0079] (teaching "a nanoparticle comprising a large number of independently detectable moieties (*e.g.*, nucleic acid sequences), and generating a signal from each of the independently detectable moieties").

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

566. In my opinion, for similar reasons as discussed in Section VI.B.3, the Asserted Claims of the '051 Patent are invalid as obvious over Gunderson (2004) in view of Sood '043 and/or Levsky (2002). Gunderson (2004), Sood '043 and/or Levsky (2002) disclose, teach or suggest all claim limitations of the '051 Asserted Claims as set forth *infra*.

567. For the reasons discussed in section **Error! Reference source not found.**, I believe a POSA would have been motivated to combine the Gunderson (2004) with Sood '043 and/or Levsky (2002).

568. Gunderson (2004) discloses and teaches a method of performing TOSS (temporal order of signal signatures) for decoding a random array of DNA libraries comprising an oligonucleotide with two portions (1) a probe that is able to bind to an analyte (oligonucleotide sequences "that capture assay products") and (2) one more pre-determined sequences (oligonucleotide sequences that serve as a "decodable address sequence[]").[689] Gunderson (2004) explains that its algorithm "requires only a few labels and several sequential hybridizations to identify thousands of different DNA sequences with great accuracy" and "can be applied to any spatially fixed collection of objects or molecules that are associated with specific DNA sequences."[690] While illustrating, and specifically exemplifying, the decoding algorithm in a simplified version with one pre-determined subsequence (re-probed multiple times to provide a temporal order of signal signatures) and in an array format, Gunderson (2004) having demonstrated the feasibility of the algorithm in an *in vitro* setting discloses and teaches the method for use *in situ* (*i.e.*, in a cell or tissue sample). Further, based on Gunderson (2004)'s express reference to Levsky (2002) and the knowledge in the art at the time, a POSA would have at once envisaged using Gunderson (2004)'s detection methods *in situ*.

---

[689] *Id.* at 875 (describing methods for preparing "oligonucleotide-linked beads and bead pools").

[690] *Id.* at Abstract.

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

reagent," I understand that the Court agreed with 10x's argument that requiring "'each probe [to have] a corresponding analyte, in a one-to-one relationship"—is erroneous."[937]

908.    Applying the above constructions to the claims, it is my opinion that the Asserted Claims have a broad scope and encompass methods to identify *any analyte* in a cell or tissue sample using *a detection reagent that binds to said analyte* and has *at least one pre-determined subsequence* to be detected in *a temporally-sequential manner*.[938]  Notably, the claims lack any limits on the type of analyte (*e.g.*, oligonucleotides), probe (*e.g.*, complementary oligonucleotides), nucleic acid label, or detection method.  The Asserted Claims of the '051 Patent, which only require that the detection reagent bind to the analyte, are even broader.

909.    Although certain dependent claims recite narrowing elements (*e.g.*, claims 2 and 3 of the '051 Patent further recite that the analytes are "cellular nucleic acid molecules"), none of the Asserted Claims provide sufficient limits commensurate to the teaching in the specification. I reserve the right to revise or supplement my opinion in response to any further claim construction.

        **2.**    **Nature of the Invention**

910.    As the specification describes, the Asserted Claims of the TOSS Patents relate to "the development of a multiplexed biological assay and readout, in which a multitude of detection reagents comprising one or more probes and/or probe types are applied to a sample, allowing the detection reagents to bind target molecules or analytes, which can then be optically identified in a temporally-sequential manner."[939]  In particular, the TOSS Patents relate to methods of analyzing the identity and spatial location of analytes *in situ*.  Although certain *in situ*

---

[937] *See* Claim Construction Order (D.I. 327) at 16.

[938] The Asserted Claims of the '051 Patent, which only require that the detection reagent bind to the analyte, are even broader.

[939] *See, e.g.*, '737 Patent at 3:59-65.

analytical techniques had been developed around the time of the invention of the TOSS Patents, these methods had only been demonstrated for certain nucleic acid applications, not *any* type of analyte as encompassed by the Asserted Claims.

911. I understand that 10x has asserted that "certain relevant techniques (including, *e.g.*, techniques for working with nucleic acids, amplification, hybridization, fluorescent *in situ* hybridization or "FISH", etc.) were individually well known in the art, and the specification includes references to commercially available instruments and products to carry out these techniques."[940] Although I agree that the prior art taught each of the steps of the claimed methods as applied to transcripts (*see* Section VI), these techniques had not been demonstrated to be applicable to all analytes, *e.g.*, "antigens, receptors, proteins, peptides, nucleic acids, sugars, lipid, carbohydrates, glycans, glycoproteins, oligonucleotides, cells, viruses," as encompassed by the Asserted Claims. Likewise, no instruments or products for performing such a technique were commercially available at the time.

### 3. State of the Prior Art

912. I understand that 10x has generically asserted that the "the specifications of the 737, 051, 052, and 136 Patents contain descriptions, guidance, protocols, and working examples to enable one skilled in the art with relevant knowledge and training in the field to practice the full scope of the invention."[941] I disagree because the specification lacks, among other things, any working example of the claimed invention performed *in situ* to detect nucleic acids, let alone "antigens, receptors, proteins, peptides, nucleic acids, sugars, lipid, carbohydrates, glycans, glycoproteins, oligonucleotides, cells, viruses." As another example, the claimed "detection reagent"—the primary reagent required to practice the Asserted Claims—was not commercially

---

[940] *See* Final Rebuttal Contentions at 71-72.

[941] *Id.* at 72.

available for all the analytes falling within the scope of the claim at the time of filing, and thus, a POSA would need to make these detection reagents *de novo*. However, the specification of the TOSS Patents does not teach how to create the claimed detection reagents for use in identifying analytes in a cell or tissue sample.

913. Further, to the extent it is determined that a POSA would not have had a reasonable expectation of success in combining the prior art described in Section VI, this would further support a less-sophisticated state of the art. For example, I understand that 10x contends that a POSA "as of 2010-2012 would not have had a reasonable expectation for the combinations [of *in situ* techniques and array-based techniques] to work, including because of the challenges described *supra* of utilizing a sequential detection method on analytes that are not immobilized." Although I disagree that a POSA would not have combined the art with a reasonable expectation of success, especially with respect to nucleic acid analytes, transferring such prior art techniques to *in situ* contexts for any analyte or any cell or tissue sample would have not been straightforward due to the wide variation of biochemical and biophysical properties.

### 4. Relative Skill of Those in the Art

914. As I explain *supra*, a POSA would have had at least a graduate degree, such as a Ph.D., in a relevant discipline such as molecular biology, molecular genetics, engineering, bioinformatics or related fields and several years of postgraduate training or practical laboratory experience in that discipline. Although a POSA would have had knowledge of certain prior art techniques relevant to the claimed methods of the TOSS Patents, they could not merely combine such techniques to detect any analyte in a cell or tissue sample. Further, even if a POSA would have been able to practice the Asserted Claims to detect nucleic acids from the disclosure in the

universal reagent or approach that would be applicable for all detection methods, and thus, a POSA would need to perform further experimentation to arrive at the appropriate conditions.

### B. The Asserted Claims of the TOSS Patents are Invalid Under 35 U.S.C. § 112 for Lacking Written Description

929. In my opinion, the Asserted Claims of the TOSS Patents are invalid for lack of written description because the specification fails to describe or support a method of analytes in a cell or tissue sample using detection reagents that are detected in a temporally sequential manner. I understand from counsel that the specification must reasonably convey to a POSA that the inventor had possession of the claimed invention as of the filing date to satisfy the written description requirement. I further understand that a description that merely renders the claimed invention obvious does not satisfy this requirement.

930. For the reasons described *infra*, in my opinion a POSA would not have recognized that the named inventors of the TOSS Patents were in possession of a method of identifying an analyte in a cell or tissue sample as of the filing date. Further, the following claim limitations detailed *infra* are not supported in the specification.

#### 1. "Identif[ying] … In A Cell or Tissue Sample"/ "Using Said Temporal Order of Signal Signatures to Identify [An] Analyte . . . in said Cell or Tissue Sample"

931. The Asserted Claims of the TOSS Patents all require identifying analytes in cells or tissue samples. For example, independent claims (including asserted claims and those from which asserted claims depend) recite as follows:

- "using said temporal order of signal signatures to identify said analyte in said cell or tissue sample" ('737 Patent, Claim 1(c))

- "using said temporal order of signal signatures to identify said location of said analyte in said cell or tissue sample" ('737 Patent, Claim 24(d))

450

- "using said temporal order of signal signatures to identify an analyte of said plurality of analytes at said location in said cell or tissue sample" ('051 Patent, Claim 1(f))

- "using said temporal order of signal signatures corresponding to said location to identify a nucleic acid molecule of said plurality of nucleic acid molecules at said location in said cell or tissue sample" ('051 Patent, Claim 26(e))

- "using said temporal order of signal signatures to identify said analyte at said location of said biological sample" ('052 Patent, Claim 1(c))

- "using said temporal order of signal signatures generated at said location to identify said target nucleic acid at said location of said cell or tissue sample" ('052 Patent, Claim 26(e))

- "using at least said first signal signature and said second signal signature to identify said analyte [in a cell or tissue sample (1(a))]" ('136 Patent, Claim 1(g))

- "using said temporal order of signal signatures to identify said RNA molecule [in said cell or tissue sample (24(a))])." ('136 Patent, Claim 24(c))

The specification, however, fails to demonstrate the inventors were in possession of the claimed invention using a temporal order of signal signatures to identify analytes *in said cell or tissue sample*.

932.    There are no other disclosures, including by way of examples or figures, in the specification for practicing the entire claimed methods *in situ*. As I explain *supra*, the specification describes a single experiment using biotinylated anti-*C albicans* antibody conjugated with different "SeqTag" labels to identify an extracellular analyte of a yeast cell, *i.e.*, not in a cell and not in a tissue sample (*see* '737 Patent, Example 1). Likewise, the exemplary readout shown in Figure 10 relates to a "displacement-hybridization experiment according to an

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

embodiment of the method described herein" performed on a streptavidin-coated microarray that is "exposed to a sequence of fluorescently labeled detection probes and displacement oligonucleotides, as per displacement-hybridization readout."  This description is insufficient to show possession of *in situ* implementation, especially in view of the specification distinguishing the claimed inventions from prior art methods performed on solid supports, like arrays, that "cannot be used and detected directly on a sample (*e.g.*, on a tissue sample) or *in situ*."

933.    I understand that 10x has asserted that "the specification of the 737, 051, 052, and 136 Patents, including all incorporated disclosures and originally filed provisional applications, contain adequate disclosure such that one skilled in the art would recognize from reading the specification, including all incorporated disclosures and originally filed provisional applications, that the inventors actually invented and possessed the claimed inventions as they relate to "identifying an analyte in a cell or tissue sample using the detection reagent" and associated terms as of December 2011."  I have reviewed the portions of the specification of the TOSS Patents and provisional applications cited by 10x but they recite generic concepts relating to prior art techniques.  For example, paragraph 28 of the '285 Provisional states:

> The detection molecules and methods described herein can be used in any biological assays for detection, identification and/or quantification of target molecules or analytes in a sample. In particular embodiments, the detection molecule can be present in a soluble phase for various biological assays. By way of example only, in some embodiments, the detection molecule can be adapted for use in immunofluorescence. For example, the detection molecule adapted for use in immunofluorescence can be used to identify microbes or pathogens. In alternative embodiments, the detection molecule can be adapted for use in immunohistochemistry. For example, the detection molecule adapted for use in immunohistochemistry can be used to study tissue biopsies or cultured cells. In some embodiments, the detection molecule and the method described herein can be applied to

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

fixed cells and/or living cells. In other embodiments, the detection molecule can be adapted for use in fluorescence *in situ* hybridization.[949]

While prior art techniques relating to *in situ* applications such as FISH may render obvious the claimed methods, there is no disclosure in the specification of the invention with all the claimed elements.

934. The lack of disclosure of the claimed method *in situ* is further supported by the testimony of the named inventors of the TOSS Patents. For example, when asked during his deposition to identify any disclosure of *in situ* experiments in the asserted patents, Dr. Church was unable to do so even after using the search function.[950] Dr. Church further testified that he was unsure of the timing of when the named inventors performed a successful *in situ* experiment but that the "range would be between 2010 reported invention and the 2013 or '14 submission to [S]cience."[951] However, when probed further, Dr. Church stated that he did not recall "anything prior to the provisional patent" or the non-provisional application filed thereafter showing a successful *in situ* experiment"[952]

### 2. "Detection Reagent"

935. The specification of the TOSS Patents teaches that each "detection reagent" for an analyte comprises the full complement of predetermined subsequences used to identify the probe/analyte (an "identifier" of the probe/analyte). This disclosure does not provide written description for a "detection reagent" comprising a nucleic acid label that contains fewer than the number of predetermined subsequences necessary to identify the probe associated with the label or the target of the probe.

---

[949] *See* '285 Provisional at para 38.

[950] *See* Church Dep. Tr. at 385:13-388:21.

[951] *Id.* at 389:12-22.

[952] *Id.* at 389:23-391:12, 392:22-393:14.

**OUTSIDE ATTORNEYS' EYES ONLY INFORMATION**

Dated: August 14, 2024

Michael L. Metzker, Ph.D.